No. 23-1666

# United State Court of Appeals
# for the Third Circuit

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,

*Debtors.*

---

D & V CLAIMANTS,

*Appellants,*

-V.-

BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,

*Appellees.*

---

ON APPEAL FROM THE U.S. DISTRICT COURT FOR THE DISTRICT OF
DELAWARE NO. 22-CV-01237 (THE HON. RICHARD G. ANDREWS)

## APPELLEES' OMNIBUS RESPONSE TO D&V AND LUJAN CLAIMANTS' MOTIONS FOR STAY PENDING APPEAL

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
Tori L. Remington (No. 901)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200

WHITE & CASE LLP
Jessica C. Lauria
Glenn Kurtz
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200

Michael C. Andolina
Matthew E. Linder
Laura E. Baccash
Blair M. Warner
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400

*Counsel for Debtors-Appellees, Boy Scouts of America and Delaware BSA, LLC*

# **INTRODUCTION**

The D&V and Lujan Claimants' (the "Appellants") emergency motions fail to establish grounds for a stay pending appeal (collectively, the "Stay Motions").[1] Appellees Boy Scouts of America and Delaware BSA LLC (together, the "BSA") and numerous other parties negotiated a plan that "ensure[s] the survival of an American institution, not only so that it may continue carrying out its charitable mission, but as a means to arguably more important ends: providing long-awaited compensation to abuse Survivors."  Ex. D (the "Affirmation Opinion") at 6-7. Following a "lengthy, contentious, and emotionally charged proceeding," the Bankruptcy Court confirmed the Plan supported by every estate fiduciary and the overwhelming majority of abuse survivors in a 269-page opinion and confirmation order.  *Id.* at 6.  Upon entry of the Affirmation Opinion and denial of the pending Stay Motions, including any temporary stay request, all conditions precedent to the Effective Date of the Plan[2] can now be satisfied, and no further delay is warranted.

---

[1]  Appellees have filed concurrently herewith, a response to the Certain Insurers' motions for stay pending appeal. For this Court's convenience, Appellees note that these responses are identical with the exception of sections I.A and I.B, which cover the unlikelihood of success on the merits and lack of irreparable harm, specific to each Appellant.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) For Boy Scouts of America and Delaware BSA, LLC* [Ex. A] (the "Plan"), the Affirmation Opinion, or the Stay Motions, as applicable.

The motions for temporary stay have no merit because the act of filing the motions prevents the Plan from going effective until the motions are resolved.  Ex. F ¶ 3.  A stay would jeopardize the ability of the BSA, a 100-year old Congressionally-chartered organization to continue its mission and compensate survivors of childhood sexual abuse.

Insurers and two claimant groups comprised of less than 0.2% of survivors seek to stay implementation of the Plan.  Appellants raise the same issues that two courts have already determined are meritless in lengthy, detailed opinions applying established law to largely uncontroverted facts.  Appellants cannot make a "strong showing" that their appeals have any chance of success, much less that they are likely to succeed.  Moreover, the alleged harm to Appellants is not irreparable, but illusory.  The balancing of equities also favors the BSA, as does the public interest.

## **BACKGROUND**

BSA's contested confirmation hearing lasted twenty-two trial days.  Ex. D at 19.  Twenty-six witnesses, eleven of whom were qualified as experts, testified and were subject to cross-examination.  *Id*.  The confirmation hearing transcripts total more than 5,000 pages.

On July 29, 2022, the Bankruptcy Court issued an opinion with respect to confirmation of the Plan ("Confirmation Opinion").  Ex. C.  On September 8, 2022, the Bankruptcy Court entered the order confirming the Plan (the "Confirmation

Order"). Ex. B. The Plan provides an equitable, streamlined, and certain process to compensate abuse survivors and allows the BSA to continue its vital charitable mission. Ex. D at 15. On September 22, 2022, Appellants appealed the Confirmation Order to the District Court. On February 9 and 10, 2023, after extensive briefing, the District Court heard approximately five hours of oral argument. Ex. D at 22. On March 28, 2023, the District Court issued the Affirmation Opinion and order affirming the Confirmation Order. Ex. E.

On April 11, 2023, the District Court denied Appellants' motions for stay based on their failure to meet the first two stay factors alone. Ex. F.

## **ARGUMENT**

A stay pending appeal is an "extraordinary remedy." *El v. Marino*, 722 F. App'x 262, 267 (3d Cir. 2018). "[T]he moving party bears the burden of showing that the circumstances justify the imposition of the stay." *In re. W.R. Grace & Co.*, 475 B.R. 34, 205 (D. Del. 2012). There are four factors courts consider: (1) whether the applicant has made a strong showing of likelihood of success on the merits; (2) whether the applicant will suffer irreparable injury absent a stay; (3) whether issuance of the stay will substantially harm other parties; and (4) whether a stay is in the public interest. *In re Revel AC, Inc.*, 802 F.3d 558, 565 (3d Cir. 2015).

The first two factors are the "most critical," and although "both are necessary" for imposition of a stay, "the former is arguably the more important piece of the stay

analysis." *Revel,* 802 F.3d at 568 (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

Appellants fail to satisfy any of the four factors required for a stay pending appeal.

## I.    Appellants Are Not Entitled To A Stay

### A.    Appellants Cannot Demonstrate Success On The Merits

In the Third Circuit, "a sufficient degree of success for a strong showing exists

if there is a 'reasonable chance, or probability, of winning.'" *Revel*, 802 F.3d at 568–

69 (quoting *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir.

2011) (en banc)). "It is not enough that the chance of success on the merits be 'better

than negligible.'" *Nken*, 556 U.S. at 434. Appellants must show that they have a

"*significantly* better than negligible" chance of success. *In re S.S. Body Armor I.,*

*Inc.*, 927 F.3d at 773 (quoting *Revel*, 802 F.3d at 571). Moreover, "where, as here,

'two courts, not one, have concluded that the [Appellants] are unlikely to succeed in

winning a reversal' the threshold showing of likelihood of success on the merits is

raised 'one notch higher.'" *In re Finova Grp. Inc.*, No. 07-480, 2008 U.S. Dist.

LEXIS 71555, at *2 (D. Del. Sept. 22, 2008) (quoting *In re Forty-Eight Insulations*,

115 F.3d 1294, 1301 (7th Cir. 1997)).

Appellants' arguments do not come close to the "strong showing" required.

Ex. F ¶¶ 14–23. Both courts below issued thorough, well-reasoned opinions

rejecting Appellants' arguments based on the law and the extensive, largely

undisputed evidentiary record. Appellants advance the same failed arguments, citing

the same distinguishable or otherwise inapplicable legal authority. *Compare* Ex. C *with* Ex. D. Appellants cannot meet their burden of a "strong showing" of likelihood of success by "rehash[ing]" arguments that were twice rejected. *See W.R. Grace,* 475 B.R. at 206.

Likewise, Appellants' arguments fail because both courts' opinions comport with Third Circuit law authorizing non-consensual third-party releases in appropriate circumstances. *See, e.g.*, Ex. D at 58; Ex. C at 128. Appellants' reliance upon an out-of-circuit opinion (*i.e.*, *Purdue*) that conflicts with Third Circuit law is unpersuasive. *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000).[3] The law of this Circuit is settled. Yet, Appellants argue they are likely to prevail on their appeals related to the releases because of a lack of (i) jurisdiction, (ii) statutory authority outside of section 524(g), and (iii) an ability to meet Third Circuit standards to authorize non-consensual releases. *See* D&V ¶¶ 14–16; Lujan ¶¶ 6–9.

The District Court found "no error in the Bankruptcy Court's exercise of 'related to' jurisdiction," which was "based on identity of interest, shared insurance, contractual indemnity, and residual property interests, each of which is supported by

---

[3]    The *Purdue* opinion, currently pending before the Second Circuit, departed from well-established Second and Third Circuit precedent. *See In re Johns-Manville Corp.*, 843 F.2d 636, 640, 649 (2d Cir. 1988); *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141–42 (2d Cir. 2005). Among other things, the *Purdue* court disregarded the applicability of sections 1123(b)(6) and 105(a) to authorize third-party releases. *See United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990).

careful findings." Ex. D at 57.[4] Any one of these reasons is independently sufficient to provide jurisdiction.  *See* Ex. C at 122.

Initially, contrary to D&V Claimants' argument that the Plan releases independent claims against non-debtors, both courts found that "claims against Local Councils and Chartered Organizations are not wholly separate," under, among other theories of liability, negligence and respondeat superior.  Ex. D at 45–50.  Indeed, evidence demonstrated that such claims stem from the Scouting system that the BSA designed, which was implemented through Local Councils and Chartered Organizations in accordance with the BSA's Rules and Regulations.  *Id.*  As the District Court stated, evidence of Abuse Claims asserting independent liability for non-debtors "is absent from the record."  *Id.* at 49.

Specifically, Lujan Claimants ignore that the BSA is the "real party defendant" and the interconnected nature of the delivery of Scouting within the tripartite structure.  These are the same claims, and there is a complete identity of interest. Ex. D at 48 ("BSA was the 'real party defendant' in defending Abuse Claims."); *see also id.* at 50 ("There can therefore be no concern that there is only an 'incidental' relationship connecting the Channeling Injunction and Releases to BSA.").

---

[4]  Although not necessary because both courts found there is related to jurisdiction, the Bankruptcy Court also found that it had "arising in" jurisdiction.  Ex. C at 119.

The District Court found that the uncontroverted record on appeal supports shared insurance among the releasees and contains "ample evidence of complex and competing claims against BSA's insurance which supports subject matter jurisdiction over claims against the Releasees." *Id.* at 53. Moreover, both courts found there is automatic indemnification of all Abuse Claims. Ex. D at 54-55. Additionally, despite Lujan Claimants' misunderstanding, the BSA's unrefuted residual interest in Local Council property also supports "related to" jurisdiction. *Id.* at 56.

Next, the District Court found that Appellants "are wrong" to assert that there is no statutory authority to support non-debtor releases because "[t]he Third Circuit, courts within the Third Circuit, and other courts have repeatedly recognized the statutory authority of bankruptcy courts to issue nonconsensual third-party releases under appropriate circumstances." *Id.* at 58 (citations omitted). In addition, both courts held that the Channeling Injunction and Releases are not prohibited under sections 524(e) and 524(g) of the Bankruptcy Code, courts in the Third Circuit, in appropriate circumstances, rely on their "inherent equitable power consistent with §§ 105(a), 1123(a)(5), and 1123(b)(6) of the Bankruptcy Code" to grant nonconsensual third-party releases. *Id.* at 59–62. Moreover, based on Third Circuit precedent from *Millennium*, the District Court agreed that the Bankruptcy Court had constitutional authority to confirm the Plan. Ex. D at 58-59 (citing *Continental*, 203

F.3d at 215-15 and *In re Millennium Lab Holdings, II, LLC*, 945 F.3d 126, 135 (3d Cir. 2019)).

In addition to pointing out that Appellants "misconstrue[d] the legal standard articulated in *Continental*," the District Court concluded they "failed to demonstrate clear error in any of the Bankruptcy Court's factual findings supporting the necessity and fairness of the Channeling Injunction and Releases." Ex. D at 63, 72. Critically, while the released parties include thousands of Chartered Organizations, contrary to Appellants' assertions, the Releases are narrowly-tailored to address *only* claims related to Abuse in Scouting. *Id.* at 50. Chartered Organizations, such as the Roman Catholic Entities, will *not* be released for Abuse unrelated to Scouting. *Id.* at 114 ("Of course, the Archbishop will have to defend non-Abuse Claims (*i.e.*, abuse claims unrelated to Scouting) but those claims are not covered by the BSA Insurance Policies."). Moreover, both courts found that the parties being released under the Plan were appropriately disclosed and identified. *Id.* at 71–72 ("The [BSA restructuring] website [which contains the list of potential Protected Parties] is repeatedly referenced throughout the solicitation packages served on all holders of Direct Abuse Claims."). Finally, the Bankruptcy Court's findings that each party receiving a release made a substantial contribution in the form of money, property, and/or assignment of insurance rights without which, the Plan and settlements

therein would not have been possible, is uncontroverted. Ex. C at 140–48.[5] In particular, both courts found that the aggregate Local Council contribution was substantial. *See* Ex. D at 69–70; Ex. C at 141–45.

The District Court found that the Confirmation Opinion "includes countless specific findings of fact that support each aspect of the necessity and fairness" under *Continental* and Appellants' "argument is contrary to the record." Ex. D at 71. Indeed, the third-party releases are necessary and essential and without the releases, the BSA's reorganization fails. *Id.* at 63–68. As part of its fairness analysis, the Bankruptcy Court relied upon the uncontroverted testimony of Ms. Gutzler, the BSA's insurance expert, to make its determinations regarding the amount of committed contingent, allocated and unallocated insurance funding contributed to the Settlement Trust. *See* Ex. C at 68–70. Moreover, the District Court affirmed the Bankruptcy Court's determination that the Releases were fair "[b]ecause D&V and Lujan Claimants will receive under the Plan all the compensation to which they would be entitled in the tort system" and this is "adequate consideration," including with respect to claims against third-parties that are released. Ex. D at 69.

---

[5] Lujan Claimants' arguments that the Plan does not provide non-monetary relief against non-debtors related to sexual abuse prevention are meritless because the Youth Protection Program incorporated into the Plan, which provides for robust youth-safety measures, will be applicable to all of Scouting, including Local Councils and Chartered Organizations. Ex. A at Ex. L (Youth Protection Program).

Appellants continue to allege that the Bankruptcy Court's finding that the Direct Abuse Claims will likely be paid in full and the determination of the credibility of Dr. Bates's testimony was somehow clearly erroneous. The District Court, however, found that these arguments "fail," as the "Bankruptcy Court's reliance upon Dr. Bates's uncontroverted and well-reasoned expert opinion, as opposed to unsubstantiated statements by non-experts, is not clearly erroneous." Ex. D at 26–33. Because the claims will be paid in full, Appellants' arguments as to how the Settlement Trust will operate are without merit.

D&V Claimants rely on their attorney's declaration, which purports to characterize the record (in many cases, incorrectly), and makes legal arguments upon which D&V Claimants rely as factual support. Additionally, to the extent that Ms. Dumas attempts to introduce new evidence as to the merits, Ms. Dumas's declaration is improper and should be disregarded by this Court. *See, e.g.*, *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 U.S. Dist. LEXIS 113494, at *21 (S.D.N.Y. Aug. 15, 2014) *aff'd*, 619 F. App'x 34 (2d Cir. 2015) ("[D]eclarations of counsel are generally properly used only to describe the documents attached to them as exhibits for the Court's consideration, [] not to advance factual averments or legal arguments."); *Davis v. Novastar Mortg., Inc.*, 408 F. Supp. 2d 811, 816 (W.D. Mo. 2005).

In addition to being legally improper, Ms. Dumas's declaration misstates the facts and is contrary to both courts' clear findings. In one egregious example, Ms.

10

Dumas argues, incorrectly, that Dr. Bates testified that, in order to reach the estimated aggregate value of $2.4 to $3.6 billion, most single-victim abuse claims would be assigned significantly reduced values. Dumas Decl. ¶ 8. Lujan Claimants make a similar argument. Lujan ¶ 9. However, Appellants do not address that the District Court rejected these contentions, finding that "these arguments are not supported by the record." Ex. D at 30. Moreover, Appellants try to convince this Court that the TDP base matrix values can only be adjusted upwards, and not downward in the manner described in Dr. Bates's testimony. D&V ¶ 21; Lujan ¶ 9. This is incorrect. As the District Court found, the TDP allows for claims to be scaled down from the base matrix values. Ex. D at 133. The Bankruptcy Court likewise found that the TDP base matrix values were "simply a starting place" and could be adjusted downwards. Ex. C at 221–22. The TDP specifically provide that the "scaling factors can increase or decrease" the claim amount and specify that the Settlement Trustee may assign a mitigating Scaling Factor in the range of 0 to 1.0 "to eliminate or decrease the Proposed Allowed Claim Amount." Ex. A. at Ex. A, (TDP) Art. VIII B and D.

Lujan Claimants separately argue that the McCarran Ferguson Act reverse preempts the Bankruptcy Code provisions that support the Channeling Injunction. Lujan ¶ 10. They assert that a Guam statute, which provides them with direct action rights, governs the "business of insurance" as that term is used in the McCarran

11

Ferguson Act, permitting the statute to reverse preempt the Bankruptcy Code. *See id*. Both Courts rejected this, finding that the Guam statute only provides a procedural right to bring claims against insurers, but "is not for the protection of policyholders." Ex. D at 90. Both courts concluded that the Guam statute does not regulate the business of insurance as that term is used in the McCarran-Ferguson Act. Ex. D at 86–96. Lujan Claimants cite to decisions construing direct action statutes under Louisiana, Georgia, and New York law. Lujan ¶ 10. But the District Court thoroughly distinguished each decision for several reasons, including failure to address the "business of insurance" requirement or the McCarran Ferguson Act at all. Ex. D at 92–95.

Lujan Claimants further argue that Bankruptcy Court lacked jurisdiction to authorize the sale of insurance policies free and clear over Lujan Claimants' interests and over the Archbishop of Agaña's interests in BSA insurance policies and non-debtors' separate insurance policies in which the BSA lacks any interest. Lujan ¶ 11. But the District Court agreed with the Bankruptcy Court that the Insurance Settlements do "not disadvantage the Lujan Claimants more than other creditors," notwithstanding whatever direct action rights they may have. Ex. D at 83. And the District Court found that Lujan Claimants lack standing "to raise the rights of the Archbishop," which settled with the BSA and stipulated to resolve its objection to the Plan because under applicable Ninth Circuit law, a creditor has no independent

standing to appeal an adverse decision regarding an alleged violation of the automatic stay. *Id.* at 84–85. Additionally, the Archbishop's plan has been confirmed and is effective, rendering the arguments regarding an alleged violation of the automatic stay moot. *Id.* at 85. Further, the District Court found that the Insurance Settlements satisfy the *Martin* standard. *Id.* at 84–86. Other insurance-related arguments are equally without merit.

Because Appellants have failed to satisfy this essential factor, the Court need not consider Appellants' arguments as to the remaining three factors. *Revel,* 802 F.3d at 571 (if movant fails on "either" of the first two factors, "the stay should be denied without further analysis"); *see also In re MD Helicopters, Inc.,* 641 B.R. 96, 109 (D. Del. 2022).

### B.    Appellants Will Not Suffer Irreparable Harm

"To establish irreparable harm, a stay movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent." *Revel,* 802 F.3d at 571; *W.R. Grace,* 475 B.R. at 206. Where movants have little to no chance of success on the merits, they must make an even more substantial showing of irreparable injury. *See Revel,* 802 F.3d at 570.

Appellants claim irreparable harm from the risk of mootness. An inability to prejudice the BSA and survivors by staying the Plan based on meritless arguments does not constitute any harm, much less irreparable harm. It is well-established that

13

"[t]he mere possibility that [Appellants'] objections may become moot after the confirmation order becomes effective by itself is insufficient to demonstrate irreparable injury for purposes of the stay." *In re Exide Holding, Inc.*, No. 20-1402 (D. Del. 2020) [D.I. 32] Oct. 22, 2020 Hr'g Tr. at 78:8-12; *W.R. Grace*, 475 B.R. at 206; *In re Color Spot Holdings, Inc.*, No. 18-1246, 2018 WL 3996938, at *3 (D. Del. Aug. 21, 2018); *In re Nuverra Env't'l Sols., Inc.,* 2017 WL 3326453, at *4 (D. Del. Aug. 3, 2017). Indeed, if mootness alone were sufficient to show irreparable injury, "a stay would be issued in every case of this nature pending appeal." *W.R. Grace,* 475 B.R. at 207. Additionally, because the harm must not be remote or speculative, Appellants' characterization of this alleged harm as not "doctrinally correct" or applicable is speculative at best. Lujan ¶ 13.

Appellants' reliance on *L.A. Dodgers* is misplaced. In *In re L.A. Dodgers*, the "central reality" of the irreparable harm analysis focused on appellant's potential loss of a "unique and extremely valuable asset." 465 B.R. 18, 35–36 (D. Del. 2011). No such unique asset is implicated here.

Appellants assert they will suffer irreparable harm because their claims against non-debtors will be released under the Plan. Lujan ¶ 19; D&V ¶ 2. These arguments fail because they are premised on the erroneous notion, unsupported by evidence, that they will receive more compensation for their claims outside of the Plan. To the contrary, the Bankruptcy Court made a finding of fact, supported by

14

the only record evidence on the matter, and affirmed by the District Court, that survivor claims will likely be paid in full for all claims released under the Plan.[6]  Ex. D at 32, 34, 69.  Because the first two factors are not met, no further analysis is required.  Ex. F ¶ 29.

### C.    The BSA And Other Stakeholders Will Be Irreparably Harmed By A Stay

Appellants' unsubstantiated arguments that issuing a stay will not cause material harm to Appellees and other parties are wrong.  As proven by the Whittman Declaration, a stay will have a substantial, detrimental effect on the BSA, survivors and other creditors and stakeholders.  *See* Whittman Decl. ¶¶ 8–10, 20.

Any delay costs the BSA, survivors, and other creditors significant cash losses, but most importantly, if stayed pending appeal, the BSA may exhaust its cash and be forced to liquidate before the Plan could be consummated.  *See* Whittman Decl. ¶¶ 11–12.  The imposition of any stay will (i) substantially harm the BSA's operations, including, the ability to recruit new members and secure donations, and jeopardize the BSA's ability to continue as a national organization and (ii) cost tens of thousands of survivors and other stakeholders, many of whom are elderly, billions

---

[6]    Lujan Claimants' assertion that the PSZJ contribution to the Settlement Trust will be misspent has no basis in fact because all contributions to the Settlement Trust will be used in accordance with the Plan and Settlement Trust Agreement.  *See* Lujan ¶ 21.  Additionally, the appointment of the Settlement Trustee was not the subject of any objection.

of dollars. *See generally id*. Following years of decline, the BSA was finally able to stabilize membership numbers in 2022 after the Bankruptcy Court confirmed the Plan, but granting the Stay Motions may reverse the positive momentum that the BSA has since gained. *Id.* ¶ 19.

Further, if the BSA is forced to liquidate, the Insurance Settlement Agreements would terminate, and it may prove impossible for survivors to collect the $1.65 billion those agreements contemplate. *See* Ex. C at 140; Whittman Decl. ¶ 18. Making matters worse, Century is contributing $800 million, and is in run-off and absent the Century and Chubb Companies Insurance Settlement, collecting from Century may be difficult. *See* Ex. C at 79; Ex. D at 82. Additionally, the Hartford Insurance Settlement Agreement provides that if the Plan does not become effective, Hartford may seek administrative expenses of $23.61 million. *See* Ex. A at Ex. I-1, § VI.N.3.a.iii (Hartford Insurance Settlement Agreement). This too will diminish survivor recoveries.

And if such delay caused a liquidity crisis and the BSA were forced to liquidate, the difference between the funds available under the Plan and liquidation value for abuse survivors, without considering harm to the BSA and other creditors, would range from $2.2 billion to $6.9 billion or higher. *Id.*

16

Granting a stay would delay the distribution of billions of dollars to survivors.[7] Whittman Decl. ¶ 19. The survivors are an aged group in need of money. Ex. C at 166–67. Courts recognize that a delay in distributions is a tangible and substantial harm. *See, e.g.*, *In re ANC Rental Corp.*, No. 01-11220, 2002 WL 1058196, at *3 (D. Del. May 22, 2002) (parties would be substantially harmed by a one year delay in implementing plan); *see also W.R. Grace*, 475 B.R. at 208 (denying stay due to the "detrimental effects for both Grace and its thousands of creditors, who at this point are more than entitled to take steps forward towards emergence from bankruptcy and obtaining payment of their long-awaited claims"). Moreover, many survivors are elderly and any delay could mean no closure or recovery in their lifetimes. *See* Survivor-Related Decls; Whittman Decl. ¶¶ 15, 17.

### D.    The Public Interest Favors Denial Of The Stay

The public interest in allowing the Plan to go effective for the benefit of the BSA's creditors, including over 82,000 survivors, weighs heavily in favor of denying the stay. In considering a stay of a confirmation order, courts must "consider the good of the case as a whole," because the "public interest cannot tolerate any scenario under which private agendas can thwart the maximization of

---

[7]  Appellants argue that, regardless of a stay, survivors may not receive payments for some time. Lujan ¶ 25; Certain Insurers at 22. This argument makes no sense. A delay in the Effective Date will cause a commensurate or greater delay in the liquidation of claims and payments to survivors.

value for all." *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 284 (Bankr. S.D.N.Y. 2007).

Moreover, the "timely resolution of the bankruptcy estate is...in the public interest," while "[a]ctions that needlessly delay a fair settlement agreement deprive claimants of their proceeds while preventing the debtor from completing its reorganization." *In re W.R. Grace & Co.*, 412 B.R. 657, 666 (D. Del. 2009). "In the bankruptcy context, there is a general public policy weighing in favor of affording finality to bankruptcy judgements." *In re Nine Point Energy Holdings, Inc.*, No. 21-972 (RGA), 2021 WL 3410242, at *7 (D. Del. Aug. 4, 2021) (quoting *W.R. Grace*, 475 B.R. at 208).

The Bankruptcy Court found that "many survivors have been waiting for thirty, forty, or even fifty years to tell their stories and receive a meaningful recovery." *See* Ex. C at 158. Confirmation testimony and the hundreds of survivors' letters to the Courts illustrate the need to begin distributions as soon as possible. *See, e.g.*, Bankr. D.I. 5635, 10275 (survivors' letters).

A stay would serve only to "thwart the will of such an overwhelming majority [of voting creditors] to accommodate the desires of such a small minority, who are simply dissatisfied with the Settlement under the Plan." *Adelphia*, 368 B.R. at 284. This delay is precisely the type of harm that this factor was designed to avoid.

Likewise, a stay threatens the BSA's ability to continue to "serve[] over one million boys and girls across the country, providing them with opportunities to learn self-sufficiency and leadership skills that can contribute to the betterment of society." Ex. C at Introduction. The loss of the non-profit Scouting mission would be unjust to American society at large. *See In re Gen. Motors*, 409 B.R. 24, 33 (Bankr. S.D.N.Y. 2009) ("[W]ith the death of [the debtor] on the line, the damage to the public interest would be irreparable...the public interest does not favor a stay; it compels the denial of one...this is a monumental factor."). Thus, the public interest weighs against a stay.

## II.    If A Stay Is Granted, Appellants Must Post A Substantial Bond

A bond "secure[s] the prevailing party against any loss that might be sustained as a result of an ineffectual appeal." *In re Tribune Co.,* 477 B.R. 465, 478 (Bankr. D. Del. 2012) (quoting *In re Adelphia,* 361 B.R. 337, 350 (S.D.N.Y. 2007)). To obtain such a stay, it is a "standard requirement" that an appellant post bond "at or near the full amount of the potential harm to the non-moving parties. *Adelphia,* 361 B.R at 350-52; *see also In re Purdue Pharma*, No. 21-08271 (Bankr. S.D.N.Y. Nov. 9, 2021) D.I. 4158 at 276:20-22 ("[P]osting of a bond to protect the appellees from the adverse effects of a stay is the norm rather than the exception."); Fed. R. Bankr. P. 8025(b)(4).

Appellants, including the dozens of extraordinarily well-capitalized insurance companies trying to evade their obligations, boldly assert there is no need for a bond with no attempt to demonstrate "why the court should deviate from the ordinary full security requirement." *In re ASHINC Corp.*, No. 21-994 (CFC), 2021 WL 3288078, at *2 (D. Del. Aug. 2, 2021); *W.R. Grace*, 475 B.R. at 209; *see also Adelphia*, 361 B.R. at 350 (finding that "the party seeking a stay without bond *has the burden of providing specific reasons* why the court should depart from the standard requirement of granting a stay only after posting of a supersedeas bond") (emphasis added). Appellants rely solely on *L.A. Dodgers*, but *neglect to inform the Court that the parties had contractually agreed to waive* the bond requirement and the court determined that it "hold[s] the parties to the contractual agreement not to require [appellant], in the circumstances of this appeal, to post a bond." *L.A. Dodgers*, 465 B.R. at 38.

Appellants also ignore that waiver of the bond requirement occurs "only in extraordinary circumstances, and only where alternative means of securing [Appellees'] interest are available." *Bank of Nova Scotia v. Pemberton*, 964 F. Supp. 189, 192 (D.V.I. 1997); *see also Tribune*, 477 B.R. at 478 (addressing requirement to post bond "absent exceptional circumstances"). Appellants' waiver request is deficient and further weighs against imposition of the stay. *See W.R. Grace*, 475 B.R. at 209 ("[T]he Court declines to do Appellant's work for it. Therefore, the

Court will merely consider this as another factor weighing against the imposition of a stay.").

Arguing that no bond should be required because there is no money judgment against Appellants is a non-sequitur.  D&V ¶ 30; Lujan ¶ 31.  A bond is required to secure the risk that the BSA and the 82,000 survivors will have sustained losses in the billions of dollars based on the delay alone, not just money judgments.  A bond is needed here to secure the risk of this complicated Plan never being consummated. *See Tribune*, 477 B.R. at 478–79; *Adelphia,* 361 B.R. at 350–52.

Given the irreparable harm to Appellees if a stay is granted, including the risk of liquidation, the bond required should be $6.9 billion.  Whittman Decl. ¶¶ 10, 20. In reality, the actual cost of the stay is unquantifiable—the loss of a century-old, non-profit American institution, which "unlike the typical chapter 11 debtor," provides responsible citizenship, character development, and self-reliance training to millions of boys and girls in partnership with community organizations across the nation, is priceless.  *See* Ex. D at 6-8.  The "importance and magnitude" of the BSA's mission—to prepare young people to make ethical and moral choices over their lifetimes—has been recognized by Congress and cannot be overstated.  *Id.* at 8-9.

For the reasons explained in the Whittman Declaration, if this Court granted the Stay Motions, the BSA, survivors and other stakeholders "will incur substantial

harm and a condition to any such stay, must be the requirement for a bond."
Whittman Decl. ¶ 20.

## **CONCLUSION**

Appellees respectfully request that the Court deny the Stay Motions and not impose a stay of *any* length. If a stay were to be issued, a bond should be set in an amount commensurate with the harm as set forth above.

Dated:  April 11, 2023
     Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Derek C. Abbott*

Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
Tori L. Remington (No. 6901)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:    dabbott@morrisnichols.com
          aremming@morrisnichols.com
          ptopper@morrisnichols.com
          tremington@morrisnichols.com

– and –

WHITE & CASE LLP
Jessica C. Lauria (admitted *pro hac vice*)
Glenn Kurtz (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:    jessica.lauria@whitecase.com
          gkurtz@whitecase.com

– and –

WHITE & CASE LLP
Michael C. Andolina
Matthew E. Linder
Laura E. Baccash
Blair M. Warner
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email:    mandolina@whitecase.com
          mlinder@whitecase.com
          laura.baccash@whitecase.com
          blair.warner@whitecase.com

*Attorneys for the Debtors-Appellees and Debtors in Possession, Boy Scouts of America and Delaware BSA LLC*

**DLA PIPER, LLP (US)**

*/s/ R. Craig Martin*

R. Craig Martin (No. 5032)
1201 North Market Street Suite 2100
Wilmington, Delaware 19801-1147
Telephone: (302) 468-5655
craig.martin@dlapiper.com

– and –

**WACHTELL, LIPTON, ROSEN & KATZ**

Richard G. Mason
 Douglas K. Mayer
Mitchell S. Levy
51 West 52nd Street
New York, New York 10019 Telephone: (212) 403-1000
RGMason@wlrk.com
DKMayer@wlrk.com
MSLevy@wlrk.com

*Attorneys for Appellee Ad Hoc Committee of Local Councils of the Boy Scouts of America*

**MONZACK MERSKY AND BROWDER, PA**

*/s/ Rachel B. Mersky*
Rachel B. Mersky (No. 2049)
1201 North Orange Street, Suite 400
Wilmington, Delaware 19801
Telephone:  (302) 656-8162
Facsimile:   (302) 656-2769
Email: RMersky@Monlaw.com

*– and –*

**BROWN RUDNICK LLP**
David J. Molton, Esq.
Eric Goodman, Esq.
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: DMolton@BrownRudnick.com

*– and –*

Sunni P. Beville, Esq.
Tristan G. Axelrod, Esq.
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Email: SBeville@BrownRudnick.com
        TAxelrod@BrownRudnick.com


*Counsel to the Coalition of Abused Scouts for Justice*

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ James E. O'Neill*
Richard M. Pachulski (CA Bar No. 90073)
Alan J. Kornfeld (CA Bar No. 130063)
Debra I. Grassgreen (CA Bar No. 169978)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tele/Fax: (302) 652-4100 / (302) 652-4400
Email:        rpachulski@pszjlaw.com
              akornfeld@pszjlaw.com
              dgrassgreen@pszjlaw.com
              joneill@pszjlaw.com

*Counsel for the Official Tort Claimants' Committee*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Robert S. Brady*
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Jared W. Kochenash (No. 6557)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimilie: (302) 571-1253
Email:        rbrady@ycst.com
              eharron@ycst.com
              jkochenash@ycst.com

*Counsel to the Future Claimants' Representative*

**KTBS LAW LLP**

*/s/ David M. Klauder*
David M. Klauder, Esq. (No. 5769)
BIELLI & KLAUDER, LLC
1204 N. King Street
Wilmington, Delaware 19801
Tel/Fax: (302) 803-4600 / (302) 397-2557
dklauder@bk-legal.com

-and-

Thomas E. Patterson
Daniel J. Bussel
Robert J. Pfister
Sasha M. Gurvitz
1801 Century Park East, Twenty-Sixth Floor
Los Angeles, CA 90067
Telephone: (310) 407-4000
Email: tpatterson@ktbslaw.com
        dbussel@ktbslaw.com
        rpfister@ktbslaw.com
        sgurvitz@ktbslaw.com

*Counsel to each of The Zalkin Law Firm, P.C.
and Pfau Cochran Vertetis Amala PLLC*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this response complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(a).  This response contains 5,197 words, excluding the portions of the response exempted by Federal Rule of Appellate Procedure 32(f).  I further certify that this response complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule Appellate Procedure 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: April 11, 2023          */s/ Tori L. Remington*　　　　　
　　　　　　　　　　　　　　　Tori L. Remington