**Nos. 23-1664, 23-1665, 23-1666, 23-1667, 23-1668, 23-1669, 23-1670, 23-1671, 23-1672, 23-1673, 23-1674, 23-1675, 23-1676, 23-1677, 23-1678, 23-1780 (Consolidated)**

# United States Court of Appeals
# For the Third Circuit

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,

*Reorganized Debtors.*

NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH PA, *ET AL.*;
DUMAS & VAUGHN CLAIMANTS; LUJAN CLAIMANTS,

*Appellants,*

v.

BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,

*Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE (LEAD CASE NO. 22-CV-01237 (RGA))

**APPELLEE BSA'S CONSOLIDATED ANSWERING BRIEF**

(*Counsel Listed on Inside Cover*)

WHITE & CASE LLP
Jessica C. Lauria
Glenn M. Kurtz
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
jessica.lauria@whitecase.com
gkurtz@whitecase.com

WHITE & CASE LLP
Michael C. Andolina
Matthew E. Linder
Laura E. Baccash
Blair M. Warner
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
mandolina@whitecase.com
mlinder@whitecase.com
laura.baccash@whitecase.com
blair.warner@whitecase.com

WHITE & CASE LLP
Ronald K. Gorsich
Doah Kim
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone:  (213) 620-7700
rgorsich@whitecase.com
doah.kim@whitecase.com

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
Derek C. Abbott (Del. No. 3376)
Andrew R. Remming (Del. No. 5120)
Sophie Rogers Churchill (Del. No. 6905)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
dabbott@morrisnichols.com
aremming@morrisnichols.com
srchurchill@morrisnichols.com

*Counsel for Reorganized Debtors-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Local Rule 26.1.1 of the Third Circuit Local Appellate Rules, Boy Scouts of America and Delaware BSA, LLC ("Appellees" or "BSA"), make the following disclosures:

Boy Scouts of America is a non-profit corporation founded in 1910 and chartered by an act of Congress on June 15, 1916. Boy Scouts of America has no parent corporation and has issued no stock. No publicly held corporation holds any interest in Boy Scouts of America.

Delaware BSA, LLC is a wholly owned subsidiary of Boy Scouts of America. Delaware BSA, LLC has issued no stock, and no publicly held corporation holds any interest in Delaware BSA, LLC.

The members of the official committee of unsecured creditors were: (1) Pension Benefit Guaranty Corporation, (2) Girl Scouts of the United States of America, (3) Roger A. Ohmstede, (4) Pearson Education, Inc., and (5) Lion Brothers Company, Inc. The Creditors' Committee was disbanded as of the Effective Date and is not a party to these appeals.

The members of the official committee of tort claimants were: (1) Robb Lawson, (2) Robert Grier, (3) Morgan Wade Paul, (4) Christopher Desmond Haywood, (5) Douglas Kennedy, (6) Jorge Tobon, (7) Jorge Vega, (8) John

Humphrey, and (9) Richard Halvorson.  The Tort Claimants' Committee was disbanded as of the Effective Date and is not a party to these appeals.

The trustee of the BSA Settlement Trust is the Hon. Barbara J. Houser (ret.). Neither the trust nor the trustee is a party to these appeals.

The claims administrators of the BSA Settlement Trust are Hon. Michael Reagan and Randi Ilyse Roth.  The claims administrators are not parties to these appeals.

Other active participants in BSA's bankruptcy proceedings include: (1) the Ad Hoc Committee of Local Councils, consisting of eight nonprofit corporations, (2) the Settling Insurance Companies,[1] (3) James L. Patton, Jr., as Future Claimants' Representative, (4) Coalition of Abuse Scouts for Justice, an ad hoc group of abuse survivors, and (5) Pfau Cochran Vertetis Amala PLLC and The Zalkin Law Firm, P.C.  ((3) through (5), collectively, "Survivor Appellees").

---

[1]    Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company, Century Indemnity Company, Federal Insurance Company, Westchester Fire Insurance Company, Clarendon National Insurance Company, River Thames Insurance Company Ltd., Zurich American Insurance Company, American Guarantee and Liability Insurance Company, American Zurich Insurance Company, and Steadfast Insurance Company.

# CROSS REFERENCE INDEX

Pursuant to Third Circuit Local Appellate Rule 28.2, BSA responds to the

individual and joint issues raised on appeal by Appellants as set forth below:

| **Issue Presented** | **Appellant Br.** (Page Nos.) | **BSA Br.** (Page Nos.) |
| --- | --- | --- |
| Channeling Injunction and Releases: The Bankruptcy Court Had Jurisdiction | Lujan Claimants (7–28) D&V Claimants (15–33) | 36–53 |
| Channeling Injunction and Releases: The Bankruptcy Court Had Statutory Authority | Lujan Claimants (28–29) D&V Claimants (33–48) | 53–63 |
| Channeling Injunction and Releases: The Bankruptcy Court Had Constitutional Authority | D&V Claimants (49–53) | 63–65 |
| The Channeling Injunction and Releases are Supported by the Record | Lujan Claimants (29–41) D&V Claimants (53–68) | 65–94 |
| Insurance Settlements Were Properly Approved | Lujan Claimants (41–68) | 94–107 |
| The Plan Satisfies the Best-Interests Test | Lujan Claimants (70–74) | 107–13 |
| Lujan Claimants Were Properly Classified | Lujan Claimants (74–75) | 113–15 |
| The Plan Provides for Equal Treatment of Abuse Claimants | Lujan Claimants (75–77) | 115–18 |
| The Plan Does Not Violate the AOA Automatic Stay | Lujan Claimants (68–70) | 118–21 |
| Future Abuse Claimants are Treated Fairly and Equitably | D&V Claimants (68–69) | 121–23 |
| Plan Modifications Were Proper | Lujan Claimants (77–82) | 123–28 |
| Insurers' Contractual Rights are Not Impaired | Certain Insurers (29–52) | 128–43 |
| The Plan Was Proposed in Good Faith | Certain Insurers (52–65) | 143–83 |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................1
JURISDICTIONAL STATEMENT ........................................................7
STATEMENT OF RELATED CASES ..................................................8
STANDARD OF REVIEW ....................................................................8
STATEMENT OF THE CASE ...............................................................9
    A.   Background on BSA ...............................................................9
    B.   Prepetition Abuse Claim Litigation.................................12
    C.   Overview of Insurance and Coverage Litigation .............14
        1.   Insurance Policies ...................................................14
        2.   Prepetition Insurance Coverage Litigation .............15
    D.   Chapter 11 Cases .................................................................16
        1.   Claims Filed in the Chapter 11 Cases.....................16
        2.   Mediation and the Plan ...........................................16
        3.   The Plan....................................................................17
        4.   Confirmation Hearing, Opinion and Confirmation Order........24
        5.   Affirmation Order and Plan Effective Date............25
        6.   Post-Effective Date Events .....................................25
SUMMARY OF THE ARGUMENT .....................................................27
ARGUMENT.........................................................................................32
I.     The District Court Standard of Review Was Appropriate.............................32
II.    The Bankruptcy Court Had Subject Matter Jurisdiction to Approve the Channeling Injunction and Releases ..........................................36
    A.   "Arising In" and "Arising Under" Jurisdiction.................37
    B.   "Related To" Jurisdiction...................................................39
        1.   Interconnectedness..................................................41
        2.   Shared Insurance.....................................................45
        3.   Contractual Indemnification....................................47
        4.   BSA's Residual Interest in Local Council Property................50
III.   Statutory Authority .............................................................53
IV.   Constitutional Authority .....................................................63
V.    The Channeling Injunction and Releases Are Appropriate and Supported

by Unrebutted Evidence ................................................................65

    A.    The Channeling Injunction and Releases Are Necessary to BSA's Reorganization .................................................................66

    B.    The Channeling Injunction and Releases Are Fair ..........................71

    C.    D&V Claimants' Arguments Based on *LTL Management* Are Meritless ...............................................................................76

    D.    The *Master Mortgage* Factors Are Satisfied ..................77

        1.    Identity Of Interest ...................................................78

        2.    Contribution Of Substantial Assets to the Reorganization .......79

        3.    A Substantial Majority of Impacted Creditors Support the Plan......................................................................83

        4.    The Plan Provides for the Payment in Full of the Abuse Claims.....................................................................84

        5.    The Injunction Is Essential to Reorganization .......91

    E.    *Purdue* Does Not Alter This Court's Analysis .................93

VI.    Lujan Claimants' Challenge of the Insurance Settlements Lacks Merit.......94

    A.    The Insurance Settlements were Properly Approved and the Settlement Amounts Appropriate under the *Martin* Standard...........95

    B.    Abuse Insurance Policies and Local Council Insurance Policies Are Property of the Estate ................................................97

        1.    The Proceeds of BSA Insurance Policies Are Property of BSA's Estate...........................................................97

        2.    Local Council Insurance Policies Are Property of BSA's Estate and Therefore Properly Sold Back to the Applicable Settling Insurance Companies ................................100

    C.    The Plan Adequately Protects and Compensates Lujan Claimants for Their Alleged Interest in the Abuse Insurance Policies That Are the Subject of the Insurance Settlements ..................................102

    D.    McCarran-Ferguson Act Does Not Reverse Preempt the Bankruptcy Code ...........................................................106

VII.    The Plan Satisfies the Best-Interests Test under Section 1129(a)(7)..........107

VIII.    The Plan Properly Classifies the Claims of the Lujan Claimants under Section 1122(a) .............................................................................113

IX.    The Plan Provides for Equal Treatment of Holders of Class 8 Abuse Claims under Section 1123(a)(4) .......................................................115

X.    Lujan Claimants Lack Standing to Assert That the Plan Violates AOA's Automatic Stay, and Such Arguments Are Moot.......................................118

XI.    The Plan Treats Holders of Future Abuse Claims Fairly and Equitably ....121

XII.   The Post-Solicitation Plan Modifications Were Proper ............................123

       A.    The RCAHC Resolution ...................................................124

       B.    The Fraud Prevention Audit Program .............................................127

XIII.  The Confirmation Order and Plan Do Not Impair Insurers' Contractual
       Rights ...................................................................................128

       A.    There Is No Requirement That Plans of Reorganization Be
             Insurance Neutral; Insurance Neutrality Is a Standing Concept.......128

       B.    The Plan Is "Insurance Neutral" By Preserving Insurers' Rights
             and Defenses...................................................................131

             1.    The Lower Courts Correctly Found the Plan and the
                   Confirmation Order Preserve Insurers' Policy Rights and
                   Defenses ...................................................................132

             2.    BSA Repeatedly Confirmed That the Plan and Confirmation
                   Order Preserve Insurers' Policy Rights and Defenses ...........135

             3.    The Plan Does Not Have to Specify Insurers' Rights, Nor
                   Could It Do So Because There Are Disputes About Such
                   Rights ...................................................................136

             4.    Insurers' Challenges to the Plan Language Are Meritless .....138

       C.    Insurers Ask This Court to Impose New Plan Language Not to
             Preserve Rights and Defenses, But to Provide Them With an
             Advantage in Future Hypothetical Litigation ...................................142

XIV.   The Bankruptcy Court Did Not Err in Its Findings  That BSA Proposed
       the Plan in Good Faith, and the District Court Did Not Err in Affirming
       Those Findings ...................................................................143

       A.    Insurers' Argument Disregards the Standards for Finding That a
             Debtor Proposed a Plan in Good Faith ...........................................144

       B.    The Bankruptcy Courts' Factual Findings of Good Faith Are
             Supported by Overwhelming and Largely Uncontroverted
             Evidence, and Insurers Have Not Appealed Them ...........................147

       C.    The Bankruptcy Court's Finding That BSA Proposed the Plan in
             Good Faith, and the District Court's Affirmance, Are Correct
             Under any Standard of Review ...................................................155

       D.    Insurers' Argument That the Bankruptcy Court Failed to Consider
             the Interests of Insurers Is Incorrect and Would Not Show That the
             Lower Courts Erred in Finding That Plan Was Proposed in Good
             Faith...................................................................157

1.      The Cases That Insurers Rely On Instead Of the Established
        Law for Evaluating Good Faith Are Inapposite.....................157

2.      The Plan and the Confirmation Order Do Not Abrogate
        Insurers' Rights and Defenses.............................................160

3.      Insurers' Argument Also Fails Because the Bankruptcy
        Court Made Factual Findings That BSA Properly
        Considered Insurers' Interests, and Those Findings Have
        Not Been Appealed.............................................................160

4.      Insurers' Novel Argument About Moral Hazard Does Not
        State a Ground for Appeal, and Is Factually Incorrect...........167

CONCLUSION .............................................................................183

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ace Pallet Corp. v. Conrail*,
  764 F. App'x 197 (3d Cir. 2019)....................................................175

*Aloha Council v. Ins. Co. of N. Am.*,
  No. DC-18-11896 (Dist. Ct. Tex., Dallas Cnty., July 21, 2023) ......................26

*Am. Ref-Fuel Co. of Hempstead v Resource Recycling, Inc.*,
  281 A.D.2d 573 (2d Dept 2001)....................................................138

*Archer v. Warner*,
  538 U.S. 314 (2003)....................................................54

*Atkinson v. Kettler*,
  372 S.W.2d 704 (Tex. Civ. App. 1963)....................................................52

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)....................................................157

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)....................................................173

*Capital Ins. & Surety Co. Inc. v. Kelly*,
  361 F.2d 567 (9th Cir. 1966)....................................................103

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994)....................................................173

*Century Indem. Co. v. Boy Scouts of Am.*,
  Case No. 20-00774 (D. Del. Mar. 29, 2021) ....................................................16

*Century Indem. Co. v. Boy Scouts of Am.*,
  Case No. 21-1792 (3d Cir. Jan. 3, 2022) ....................................................16

*CoreStates Bank, N.A. v. United Chem. Techs.*,
  202 B.R. 33 (E.D. Pa. 1996) ....................................................145

*Czyzewski v. Jevic Hold. Corp.*,
  137 S. Ct. 973 (2017)....................................................60

*Dep't. of Hous. & Urb. Dev. v. Rucker*,
    535 U.S. 125 (2002)........................................................55

*Erie v. Tompkins*,
    304 U.S. 64 (1938)..........................................................64

*Exec. Benefits Ins. Agency v. Arkison*,
    573 U.S. 25 (2014)......................................................35, 36

*Freeman v. Pittsburgh Glass Works, LLC*,
    709 F.3d 240 (3d Cir. 2013)...............................48, 49, 51

*Gillman v. Cont'l Airlines (In re Cont'l Airlines)*,
    203 F.3d 203 (3d Cir. 2000)................................57, 65, 77

*Heikkila v. Sphere Drake Ins. Underwriting Mgmt., Ltd.*,
    No. CIV. 96-00047, 1997 WL 995625 (D. Guam Aug. 29, 1997)................103

*Highmark, Inc. v. UPMC Health Plan, Inc.*,
    276 F.3d 160 (3d Cir. 2001).......................................1, 94

*Hobbs v. Bd. of Educ. of N. Baptist Conv.*,
    126 Neb. 416 (Neb. 1934).............................................80

*Hormel v. Helvering*,
    312 U.S. 552 (1941).................................................48, 51

*In re A.H. Robins Co.*,
    88 B.R. 742 (E.D. Va. 1988).................................44, 58, 59

*In re Airadigm Commc'ns, Inc.*,
    519 F.3d 640 (7th Cir. 2008).........................................58

*In re Am. Capital Equip., LLC*,
    688 F.3d 145 (3d Cir. 2012).......................... 144, 155, 158

*In re AOV Indus., Inc.*,
    792 F.2d 1140 (D.C. Cir. 1986) ........................... 114, 116

*In re Archbishop of Agaña*,
    Case No. 19-00010 (Bankr. D. Guam) .......................... 118, 119, 120

*In re Armstrong World Indus., Inc.*,
   348 B.R. 136 (Bankr. D. Del. 2006) .................................................. 113

*In re Barrett*,
   833 F. App'x 668 (9th Cir. 2020) ...................................................... 120

*In re Bestway Prods., Inc.*,
   151 B.R. 530 (Bankr. E.D. Cal. 1993) ................................................ 57

*In re CBI Holding Co.*,
   529 F.3d 432 (2d Cir. 2008) ........................................................... 100

*In re Celotex Corp.*,
   204 B.R. 586 (Bankr. M.D. Fla. 1996) ............................... 39, 55, 145

*In re Century Glove, Inc.*,
   No. 90-400 (SLR), 1993 WL 239489 (D. Del. Feb. 10, 1993) ....................... 124

*In re Charles St. African Methodist Episcopal Church of Bos.*,
   499 B.R. 66 (Bankr. D. Mass. 2013) .................................................. 38

*In re Chemtura Corp.*,
   439 B.R. 561 (Bankr. S.D.N.Y. 2010) ................................................ 149

*In re Combustion Eng.*,
   391 F.3d 190 (3d Cir. 2004) .................................................. *passim*

*In re Conseco*,
   301 B.R. 525 (Bankr. N.D. Ill. 2003) ...................................... 109, 110

*In re Cont'l Airlines*,
   203 F.3d 214 (3d Cir. 2000) .................................................. *passim*

*In re Ditech Holding Corp.*,
   606 B.R. 544 (Bankr. S.D.N.Y. 2019) ............................................... 111

*In re Dow Corning Corp.*,
   198 B.R. 214 (Bankr. E.D. Mich. 1996) ............................................. 104

*In re Emerge Energy Servs. LP*,
   No. 19-11563 (KBO), 2019 WL 7634308
   (Bankr. D. Del. Dec. 5, 2019) ....................................................... 149

*In re Emons Indus. Inc.*,
   220 B.R. 182 (Bankr. S.D.N.Y. 1998)............................................121

*In re Essar Steel Minn., LLC*,
   47 F.4th 193 (3d Cir. 2022).......................................................37, 38

*In re Exide Holdings, Inc.*,
   No. 20-11157 (CSS), 2021 WL 3145612
   (D. Del. July 26, 2021).......................................................65, 145, 149

*In re Exide Techs.*,
   607 F.3d 957 (3d Cir. 2010) ..............................................................8

*In re Falch*,
   450 B.R. 88 (Bankr. E.D. Pa. 2011) ...............................................146

*In re Fed.-Mogul*,
   300 F.3d 368 (2002)..........................................................................48

*In re Fed.-Mogul*,
   684 F.3d 355 (3d Cir. 2011)......................................... 158, 168, 172

*In re Fed.-Mogul Glob. Inc.*,
   No. 01-10578 (JFK), 2007 WL 4180545
   (Bankr. D. Del. Nov. 16, 2007)......................................................124

*In re Fruehauf Trailer Corp.*,
   444 F.3d 203 (3d Cir. 2006)............................................ 8, 143, 146

*In re Genco Shipping & Trading Ltd.*,
   513 B.R. 233 (Bankr. S.D.N.Y. 2014)............................................149

*In re Glob. Indus. Techs.*,
   645 F.3d 201 (3d Cir. 2011).....................................................*passim*

*In re HomeBanc Mortg. Corp.*,
   945 F.3d 801 (3d Cir. 2019).....................................................*passim*

*In re Kaplan*,
   104 F.3d 589 (3d Cir. 1997)..............................................................57

*In re Linear Elec. Co.*,
   852 F.3d 313 (3d Cir. 2017)...........................................................118

*In re Lower Bucks Hosp.*,
488 B.R. 303 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139
(3d Cir. 2014) ...................................................................47

*In re LTL Management*,
58 F.4th 738 (3d Cir. 2023).....................................76, 154

*In re LTL Mgmt. LLC*,
64 F.4th 84 (3d Cir. 2023).................................6, 76, 155

*In re Maremont Corp.*,
601 B.R. 1 (Bankr. D. Del. 2019).........................152, 178

*In re Master Mortgage*,
168 B.R. 930 (Bankr. W.D. Mo. 1994) .........................77, 78, 79, 92

*In re Millennium Lab Holdings II, LLC*,
945 F.3d 126 (3d Cir. 2019)......................................*passim*

*In re Mosdos Chofetz Chaim Inc.*,
Nos. 22-33, 22-36, 2023 U.S. App. LEXIS 179
(2d Cir. Jan. 5, 2023) .........................................................35

*In re New Century TRS Holdings, Inc.*,
505 B.R. 431 (Bankr. D. Del. 2014).................................36

*In re Nutraquest, Inc.*,
434 F.3d 639 (3d Cir. 2006)...............................94, 97, 98

*In re Peabody Energy Corp.*,
933 F.3d 918 (8th Cir. 2019).........................................149

*In re Pecan Groves of Ariz.*,
951 F.2d 242 (9th Cir. 1991).........................................119

*In re Piece Goods Shops Co., L.P.*,
188 B.R. 778 (Bankr. M.D.N.C. 1995) .........................114

*In re Plant Insulation Co.*,
544 F. App'x 669 (9th Cir. 2013)..................................155

*In re Purdue Pharma L.P.*,
69 F.4th 45 (2d Cir. 2023)..........................................*passim*

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000) ..................................................... 61, 127, 144, 145

*In re Quigley Co.*,
    676 F.3d 45 (2d Cir. 2012) .................................................................. 46, 111

*In re Quigley Co., Inc.*,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010) .......................................... 110, 111, 116

*In re Roman Cath. Archbishop of Portland in Oregon*,
    345 B.R. 686 (Bankr. D. Or. 2006) ................................................................ 52

*In re Roman Catholic Archbishop of Portland*,
    No. 04-37154 (EP), 2007 Bankr. LEXIS 1180
    (Bankr. D. Or. Apr. 13, 2007) ...................................................................... 150

*In re RTI Holding Co., LLC*,
    No. 20-12456 (JTD), 2021 WL 4994414
    (Bankr. D. Del. Oct. 27, 2021) ..................................................................... 149

*In re Seaside Eng'g & Surveying*,
    780 F.3d 1070 (11th Cir. 2015) ...................................................................... 58

*In re SGL Carbon*,
    200 F.3d 154 (3d Cir. 1999) ......................................................................... 158

*In re Signal Int'l, Inc.*,
    No. 15-11498 (MFW) (Bankr. D. Del. Nov. 24, 2015) .................................... 58

*In re Spansion, Inc.*,
    426 B.R. 114 (Bankr. D. Del. 2010) ............................................................ 145

*In re Stolrow's, Inc.*,
    84 B.R. 167 (9th Cir. B.A.P. 1988) ............................................................. 144

*In re Thgh Liquidating LLC*,
    No. 19-2215 (RGA), 2020 WL 5409002 (D. Del. Sept. 9, 2020) .................. 157

*In re Thorpe Insulation Co.*,
    677 F.3d 869 (9th Cir. 2012) ........................................................................ 161

*In re TK Holdings Inc.*,
    No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) ...................................... 83

*In re Tonopah Solar Energy, LLC*,
  No. 11844 (KBO), 2022 WL 982558 (D. Del. Mar. 31, 2022) .......................145

*In re USA Gymnastics*,
  No. 18-09108 (RLM) (Bankr. S.D. Ind. Dec. 16, 2021) ..................................121

*In re W.R. Grace & Co.*,
  13 F.4th 279 (3d Cir. 2021).............................................................................41

*In re W.R. Grace & Co.*,
  446 B.R. 96 (Bankr. D. Del. 2011), *aff'd*, 729 F.3d 311
  (3d Cir. 2013) ...................................................................................................178

*In re W.R. Grace & Co.*,
  591 F.3d 164 (3d Cir. 2009)...................................................................*passim*

*In re W.R. Grace & Co.*,
  900 F.3d 126 (3d Cir. 2018)....................................................................42, 44

*In re W.R. Grace*,
  475 B.R. 34 83 (D. Del. 2012) *aff'd*, 729 F.3d 332
  (3d Cir. 2013) .......................................................................................*passim*

*In re Walker*,
  628 B.R. 9 (Bankr. E.D. Pa. 2021) .................................................................146

*In re Wash. Mut., Inc.*,
  442 B.R. 314 (Bankr. D. Del. 2011).................................................................116

*In re Wash. Mut., Inc.*,
  461 B.R. 200 (Bankr. D. Del. 2011), *vacated on other grounds*,
  No. 08-12229 (MFW), 2012 WL 1563880
  (Bankr. D. Del. Feb. 24, 2012).......................................................................110

*In re The Weinstein Co. Holdings, LLC*,
  No. 18-10601 (MFW) (Bankr. D. Del. Jan. 26, 2021) ....................................83

*In re Wool Growers Cent. Storage Co.*,
  371 B.R. 768 (Bankr. N.D. Tex. 2007) ...........................................................86

*J.P. Morgan Sec. Inc. v Vigilant Ins. Co.*,
  151 AD3d 632 (1st Dept 2017) ......................................................................137

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
  987 F.2d 154 (3d Cir. 1993) ............................................................ 113

*Kahn v. Rockhill*,
  28 A.2d 34 (N.J. Ch. 1942) ............................................................... 52

*Langenkamp v. Culp*,
  498 U.S. 42 (1990) ............................................................................ 63

*Law v. Siegel*,
  571 U.S. 415 (2014) .......................................................................... 60

*MacArthur Co. v. Johns-Manville Corp.*,
  837 F.2d 89 (2d Cir. 1988) ........................................................ 46, 58

*Mastro v. Rigby*,
  764 F.3d 1090 (9th Cir. 2014) ......................................................... 35

*McCartney v. Integra Nat'l Bank North*,
  106 F.3d 506 (3d Cir. 1997) ............................................................ 41

*Mfg. Res. Int'l, Inc. v. Civiq Smartscapes, LLC*,
  No. 17-269 (RGA), 2019 WL 4198194 (D. Del. Sept. 4, 2019) ..................... 175

*Myers v. Martin* (*In re Martin*),
  91 F.3d 389 (3d Cir. 1996) ..................................................... 79, 95, 96

*Nat'l Sur. Corp. v. Houser*,
  No. 17-CH-14975 (Cook Cty. Cir. Ct. July 20, 2023) ......................... 26

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  259 F.3d 154 (3d. Cir. 2001) ......................................................... 173

*Pacor Inc. v. Higgins*,
  743 F.2d 984 (3d Cir. 1984) ...................................................... 39, 50

*Passaic Valley Sewerage Com'rs v. St. Paul Fire & Marine Ins. Co.*,
  206 N.J. 596, 21 A.3d 1151 (2011) ............................................... 138

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'Ship*,
  507 U.S. 380 (1993) .......................................................................... 55

*Rauso v. Martinez*,
    Nos. 20-2927 and 21-1503, 2022 WL 4965388
    (3d Cir. Oct. 4, 2022) ....................................................................120

*Republic of Iraq v. Beaty*,
    556 U.S. 848 (2009) ........................................................................54

*Reyes v. United States*,
    No. 08-00005, 2010 WL 5207583 (D. Guam Dec. 15, 2010) ................ 102, 103

*Sherwin-Williams Co. v. Cty. of Del.*,
    968 F.3d 264 (3d Cir. 2020) ............................................................138

*SN Liquid., Inc. v. Icon Int'l, Inc. (In re SN Liquid., Inc.)*,
    388 B.R. 579 (Bankr. D. Del. 2008) ..................................................46

*Stoe v. Flaherty*,
    436 F.3d 209 (3d Cir. 2006) ..............................................................37

*Townsend v. Benavente*,
    339 F.2d 421 (9th Cir. 1964) ...........................................................103

*United States v. Energy Res. Co.*,
    495 U.S. 545 (1990) ........................................................................56

*United States* v. *Pepperman*,
    976 F.2d 123 (3d Cir. 1992) .........................................................56, 57

*Wellness Int'l Network, Ltd. v. Sharif*,
    575 U.S. 665 (2015) ........................................................................33

*William K. Harrington, United States Trustee, Regions 2 v. Purdue
    Pharma L.P., et al.*, S. Ct. Case No. 23A87 (2023) ...........................93

*Wyatt v. Gov't of the V.I.*,
    385 F.3d 801 (3d Cir. 2004) ...........................................................139

## Statutes and Other Authorities

11 U.S.C. § 105(a) .........................................................*passim*

11 U.S.C. § 362(c)(2) ....................................................120

11 U.S.C. § 363 ................................................97, 101, 106

11 U.S.C. § 523(a) ................................................................................54

11 U.S.C. § 523(a)(2) .......................................................................54, 93

11 U.S.C. § 523(a)(4) ............................................................................93

11 U.S.C. § 523(a)(6) ............................................................................93

11 U.S.C. § 541 .....................................................................................45

11 U.S.C. § 541(a)(7) ...................................................................100, 101

11 U.S.C. § 1122 ...............................................................29, 112, 114

11 U.S.C. § 1122(a) ..................................................... 112, 113, 115, 116

11 U.S.C. § 1112(b) ......................................................................154, 158

11 U.S.C. § 1123(a)(4)................................................................*passim*

11 U.S.C. § 1123(a)(5)..................................................................4, 53, 60

11 U.S.C. § 1123(b)(6) ................................................................*passim*

11 U.S.C. § 1126(c) ...............................................................................73

11 U.S.C. § 1127(a) .............................................................................124

11 U.S.C. § 1129(a) ..................................................... 6, 144, 154, 155

11 U.S.C. § 1129(a)(1)............................................................................55

11 U.S.C. §1129(a)(7)....................................................................*passim*

11 U.S.C. § 1129(b)(1) ...........................................................................72

140 Cong. Rec. 27,692 (Oct. 4, 1994)....................................................62

18 U.S.C. § 152 ...................................................................................177

18 U.S.C. § 157 ...................................................................................177

18 U.S.C. § 2571...................................................................................177

2 COLLIER ON BANKRUPTCY ¶ 105.01 (16th ed. 2023)............................53

28 U.S.C. § 157(a) ..................................................................8

28 U.S.C. § 157 (b) .................................................................8

28 U.S.C. § 157(c)(2)............................................................33

28 U.S.C. § 158(a)(1).........................................................8, 34

28 U.S.C. § 158(d)(2) .............................................................8

28 U.S.C. § 1291 ....................................................................8

28 U.S.C. § 1334 ....................................................................8

28 U.S.C. § 1334(e) ..............................................................50

Bankruptcy Reform Act, Pub. L. 103-394 § 111(b) (1994) ...................62

Fed. R. Bankr. P. 12(b)(1)....................................................141

Fed. R. Bankr. P. 3019(a).....................................................124

Fed. R. Bankr. P. 9019...................................................95, 101

H.R. Rep No. 64-130 (1916) ...............................................9, 11

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 414 (1977)...............72, 73

*Hiding in Plain View: A Neglected Supreme Court Decision Resolves
    the Debate Over Non-Debtor Releases in Chapter 11
    Reorganizations*, 23 EMORY BANKR. DEV. J. 13, 115 (2006)...........57

McCarran-Ferguson Act, 15 U.S.C. § 1012(b) ....................................106

# PRELIMINARY STATEMENT

BSA's Plan is the largest settlement of sexual abuse claims in U.S. history. The Plan became effective six months ago, on April 19, 2023, after the district court issued a 155-page opinion affirming the Confirmation Order.[2]  The Plan has since been substantially consummated.  The Settlement Trust—which under the Plan assumed sole responsibility for paying abuse claims—has been funded with more than $1 billion of cash and other assets.  Another $1.46 billion, a majority of which is being held in escrow, will be released to the Settlement Trust upon the resolution of these appeals.  The Settlement Trust has also been vested with insurance rights that the bankruptcy court estimated to be worth at least $4 billion (and which could be worth even more).  The Settlement Trustee, Hon. Barbara J. Houser (Ret.), has hired dedicated staff and numerous professionals and has begun reviewing abuse

---

[2]  All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) For Boy Scouts of America and Delaware BSA, LLC* (A858–1354) (the "Plan"), or the *Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* (A788–1354) (the "Confirmation Order"), as applicable.

"A__" refers to the Joint Appendix filed at D.I. 62.  "Bankr. D.I.__" refers to documents filed in the main bankruptcy case, *In re Boy Scouts of Am.*, Case No. 20-10343 (Bankr. D. Del.).  "Dist. D.I. ___" refers to documents filed in the consolidated appeal, *In re Boy Scouts of Am.*, Case No. 22-1237 (D. Del.).  "D.I. ___" refers to documents filed in this consolidated appeal, Case No. 23-1664.

1

claims and making bi-weekly distributions to abuse survivors. BSA has refinanced all of its secured debt and incurred significant associated costs and expenses. BSA has also paid $5.8 million to approximately 820 non-abuse creditors under the Plan. BSA has emerged from bankruptcy stronger than before, having received post-bankruptcy commitments for more than $48 million in committed charitable donations from 50 different donors and maintained membership in line with projections.[3]

Critically, both lower courts determined that the Plan pays abuse survivors *in full* and that the Plan preserves all of the rights, obligations, and defenses of Non-Setting Insurance Companies under their policies issued to BSA and other protected parties. Notwithstanding these determinations, survivor appellants—which comprise only 140 (0.2%) of the 82,200 individuals who filed proofs of claim against BSA—seek to enhance their recoveries above payment in full at the expense of all other survivors. Insurer-appellants (the "Insurers") seek to avoid, by any means necessary, their payment obligations under insurance policies covering Scouting-related abuse claims.

Appellants' arguments are without merit and should be rejected. D&V and Lujan Claimants (together, "Claimants") principally challenge the Channeling

---

[3] Concurrently herewith BSA has filed a motion to dismiss these appeals as moot.

Injunction and Releases, arguing that the bankruptcy court lacked subject matter jurisdiction and statutory and constitutional authority to approve such relief. To the contrary, the Channeling Injunction and Releases are appropriate and essential in these extraordinary cases.

First, the bankruptcy court properly exercised jurisdiction to confirm the Plan and approve the settlement of Scouting-related Abuse Claims in the Plan. The Scouting-related Abuse Claims are channeled to the Settlement Trust and processed by the Settlement Trustee, in accordance with the heavily negotiated TDP. Ultimately, such claims are resolved consensually or, if the claimant so elects, by a court of competent jurisdiction. Confirmation of the Plan containing this claims process clearly fell within the bankruptcy court's core "arising in" and "arising under" jurisdiction. The bankruptcy court also had "related to" jurisdiction based on unrebutted facts, including the clear identity of interest among BSA and the Releasees; shared insurance, which, if depleted, would reduce the value of BSA's estate property; contractual indemnification obligations among BSA and the Releasees, which, if triggered, would increase the quantum of claims against BSA; and BSA's residual interest in all Local Council property, the value of which would deteriorate as a result of further abuse litigation.

Second, the bankruptcy court had statutory and constitutional authority to approve the Channeling Injunction and Releases. As the "cornerstone of the Plan,"

3

the Channeling Injunction and Releases are "integral to the restructuring of the debtor-creditor relationship," the standard established by this Court in *Millennium*.[4] And the granting of Channeling Injunction and Releases is within the bankruptcy court's statutory authority, in appropriate circumstances, to promote successful reorganizations consistent with sections 105(a), 1123(a)(5), and 1123(b)(6) of the Bankruptcy Code.

Third, as evidenced by "countless specific findings of facts," the Channeling Injunction and Releases are fair and necessary to BSA's reorganization under *In re Cont'l Airlines*, 203 F.3d 214 (3d Cir. 2000). The uncontroverted evidence establishes that the Channeling Injunction and Releases were necessary to unlock the value of BSA's insurance assets through the Insurance Settlement Agreements and to obtain financial contributions from Local Councils, Chartered Organizations, Settling Insurance Companies and other Releasees. Absent the interrelated resolutions, BSA would be faced with mounting litigation that would jeopardize or eliminate (a) any recovery for survivors and (b) BSA's ability to successfully reorganize. In addition, the Channeling Injunction and Releases are fair because holders of Direct Abuse Claims will be paid in full under the Plan. Claimants fail to demonstrate any reversible error.

---

[4] *In re Millennium Lab Holdings II, LLC,* 945 F.3d 126, 135–36 (3d Cir. 2019).

Insurers have consistently changed their arguments as they struggle to find a challenge to a Plan that was developed over years of mediation and that garnered the overwhelming support of all stakeholders, including many other insurers, other than Insurers and two attorneys representing 0.2% of the survivor class.  In the bankruptcy court, Insurers alleged that BSA colluded with survivors, "turning over the pen" on the TDP to inflate awards.  Insurers had no support for their false allegations. Indeed, Insurers received contemporaneous documentation demonstrating that their allegations were false, yet they continued to make them.  Following trial, the bankruptcy court made factual findings that BSA did not collude with survivors and acted in good faith in proposing the Plan, which findings were based on a very significant and largely uncontested volume of evidence.  The bankruptcy court also found that Insurers failed to submit evidence to support their allegations, after being provided broad discovery, including mediation materials to which they had been given access, over the objections of the mediating parties, based on their allegations that the alleged collusion took place in mediation.

Given the deference to findings of fact, the wealth of evidence supporting the findings, and the dearth of evidence supporting any contrary findings, on appeal to the district court, Insurers did not challenge them.  Instead, Insurers argued that the bankruptcy court committed legal error by (a) failing to consider "the totality of circumstances" in finding good faith, and (b) that the standard for the bankruptcy

court's finding that BSA proposed the Plan in good faith was subject to *de novo* review because the ultimate conclusion of good faith is an issue of law, citing *In re LTL Mgmt. LLC*, 64 F.4th 84 (3d Cir. 2023), a case that did not address section 1129(a), the statute at issue.  The district court correctly rejected the first argument, which was supported by nothing, because the court plainly considered the totality of circumstances.  The court also rejected the second argument, holding that it was not clear that *LTL* applies to section 1129(a), but, in any event, under a *de novo* review, there was "no error in the Bankruptcy Court's determination based on its detailed analysis of objections and ample support in the record."  A196.  Indeed, Insurers did not actually challenge the finding that BSA proposed the Plan in good faith based on the court's factual findings, the standard articulated in *LTL*, 64 F.4th at 10, but simply repeated their unsupported factual contentions that had been rejected.  As the district court found, Insurers actually sought "different underlying factual findings to support a different conclusion."  A165.

On this appeal, Insurers again change theories, abandoning their arguments that the bankruptcy court failed to consider the "totality of circumstances" and erred in not finding bad faith based on their unsupported and rejected factual assertions. Indeed, Insurers relegate their bad faith argument to the back of their brief and assert that BSA did not consider Insurers' interests.  But the bankruptcy court made factual findings to the contrary and those findings have not been appealed.  Otherwise,

Insurers now lead with their incorrect back-up argument that the Confirmation Order and Plan did not assign their policy obligations and abrogated their coverage defenses. To the contrary, the Confirmation Order and Plan, and the decisions of the bankruptcy court and the district court, are each clear that the Policy obligations and defenses are fully preserved through explicit language that "nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, *the terms* of any Insurance Policy issued by a Non-Settling Insurance Company or *rights or obligations* under such Insurance Policy" and a volume of similar protective language. Insurers are left to argue that the bankruptcy court and the district court erred in *agreeing* that Insurers' rights and defenses have not been abrogated, so that they can ask this Court to modify the Plan to include language that was never agreed to by the parties, disclosed, voted on, adjudicated, or confirmed. The additional language they seek to impose, in fact, does not clarify that Insurers' rights and defenses have been preserved, but rather provides Insurers with new rights and defenses in hypothetical future litigation with respect to matters that were not adjudicated and over which the bankruptcy court did not have jurisdiction. An appeal of the order confirming the Plan is not the right forum for resolving any such hypothetical future dispute.

## JURISDICTIONAL STATEMENT

The bankruptcy court had subject matter jurisdiction to enter a final order

confirming the Plan and the Confirmation Order under 28 U.S.C. §§ 157(a) and (b) and 1334.  The district court had appellate jurisdiction to review the Confirmation Order under 28 U.S.C. § 158(a)(1).  This Court has appellate jurisdiction under 28 U.S.C. §§ 158(d)(2) and 1291.

## STATEMENT OF RELATED CASES

By Clerk's Order, the following appeals have been procedural consolidated: Nos. 23-1664, 23-1665, 23-1666, 23-1667, 23-1668, 23-1669, 23-1670, 23-1671, 23-1672, 23-1673, 23-1674, 23-1675, 23-1676, 23-1677, 23-1678, & 23-1780. Other appeals before this Court arising out of the same bankruptcy case include Nos. 21-1792 and 21-2035.

## STANDARD OF REVIEW

This Court exercises "plenary review of an order from a district court sitting as an appellate court in review of a bankruptcy court." *In re Exide Techs.*, 607 F.3d 957, 961–62 (3d Cir. 2010).  This Court reviews both courts' legal conclusions *de novo* and sets aside a bankruptcy court's factual finding only if clearly erroneous. *Id*. at 962.  A bankruptcy court's factual findings "may only be overturned if they are 'completely devoid of a credible evidentiary basis or bear[] no rational relationship to the supporting data.'"  *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210 (3d Cir. 2006) (internal citation omitted).  Mixed questions of law and fact are reviewed under a mixed standard, affording a clearly erroneous standard to factual

findings but exercising plenary review of the bankruptcy court's interpretation and application of those facts to legal precepts. *In re HomeBanc Mortg. Corp.*, 945 F.3d 801, 810–11 (3d Cir. 2019).

## STATEMENT OF THE CASE

### A. Background on BSA

BSA was chartered by an act of Congress as a non-profit corporation under title 36 of the United States Code and signed into law by President Wilson on June 15, 1916. 36 U.S.C. §§ 30901-08; A49; A514. BSA's charitable mission is to prepare young people for life by instilling in them values including trustworthiness, kindness, friendliness, and helpfulness. A49–50; H.R. Rep No. 64-130, at 245 (1916) (recognizing the "importance and magnitude" of BSA's work and that BSA "tends to conserve the moral, intellectual, and physical life of the coming generation").

Scouting operates through a network of organizations that share a common charitable mission. A50; A515–16. BSA develops and disseminates the structure and content of the Scouting program, owns and licenses intellectual property, and establishes merit badge requirements and membership qualifications. A50; A516–17. BSA also purchases general liability insurance shared among BSA, Local Councils and Chartered Organizations (since the 1970s) and provides shared technical support, accounting, human resources, and other corporate services to

Local Councils.  A50; A525; A517.

Most Scouts never interact with the national BSA organization directly.  A50.
Instead, the tens of thousands of Scouting units nationwide—*e.g.*, "troops," "packs,"
and "dens"—are organized locally, through Chartered Organizations including
religious institutions, schools, and civic associations.  A50.  These Scouting units
and their Chartered Organizations are, in turn, supported by Local Councils.  A50.
The bankruptcy court found that it takes:

> all three levels of organization to deliver Scouting—national, which
> sets policy and provides administrative services, Local Councils, which
> charter Organizations, recruit Scouts and volunteer leaders and enforce
> BSA rules and regulations, and Chartered Organizations, which provide
> facilities and use Scouting to further one of their goals of youth
> character development, career skill development, community service,
> patriotism, military and veteran recognition or faith-based youth
> ministry.

A646 (finding identity of interest).

Approximately 250 Local Councils span the United States, covering areas of
varying size, population, and demographics.  A50.  Each Local Council is a non-
profit organization incorporated under state law.  Local Councils are chartered by
BSA annually to facilitate the delivery of the Scouting program.  A50–51.  Local
Councils are led by paid professional adult leaders with assistance from volunteers,
and each Local Council has its own board of directors and senior management.  A51.
Pursuant to BSA's bylaws, BSA may revoke or refuse to renew a Local Council
charter at any time in its sole discretion and in the best interest of Scouting.  *Id.*  In

such circumstances, Local Council articles of incorporation provide that the council will dissolve and its property shall become vested in the national organization after being used to satisfy the Local Council's debts. *Id.*

BSA relies on Local Councils for services essential to Scouting, including funding of local programs and initiatives, recruitment and training of Scouts and volunteer leaders, opportunities for rank advancement, local enforcement of BSA's policies, rules, and regulations, and registration of members and leaders. *Id.* Local Councils also own and operate hundreds of camps and other properties that host outdoor activities, educational programs, and leadership training for youth involved in BSA's Scouting programs. *Id.*

Through Local Councils, BSA maintains relationships with local donors and Chartered Organizations, which sponsor more than 44,000 Scouting units throughout the country. A51. Chartered Organizations, which include religious institutions, schools and civil associations, partner with Local Councils to organize and sponsor Scouting units that deliver BSA's Scouting program. A50–51. These relationships are vital to the success of Scouting, drive membership, and provide essential funding. *Id.* Without a Local Council operating in a particular region through its partnership with Chartered Organizations, BSA would lose access to the resources necessary to operate Scouting units in such region. *Id.*

BSA also receives services and support from various Related Non-Debtor

Entities.  A51–52.  There is "no record that any of the Non-Related Debtor Entities is involved in anything other than Scouting."  A52; A648.

### B.    Prepetition Abuse Claim Litigation

BSA's bankruptcy proceedings were precipitated by claims of historical sexual abuse in Scouting programs.  A52; A520–523, A533–34.  Before the Petition Date, BSA was a defendant in numerous abuse-related lawsuits (and the subject of numerous unfiled claims) asserted by abuse survivors, many of which also named Local Councils, Chartered Organizations, and certain Related Non-Debtor Entities as co-defendants.  A52; A532.  The abuse allegations in these cases varied in severity, with plaintiffs generally seeking economic and non-economic damages, punitive damages, and non-monetary relief.  A52; A523.  Of the Abuse Claims filed in BSA's bankruptcy that have ascertainable dates, more than 80% alleged abuse that occurred before 1988.  A20571 (Disclosure Statement at 73 n.73).

Due to increasing changes in state statutes of limitations, the number of abuse claims against BSA sharply increased during the years immediately preceding the Chapter 11 Cases.  A52–53; A533.  Since 2002, approximately seventeen states have enacted legislation allowing victims of sexual abuse to assert claims that previously would have been time barred.  A52–53; A533.  This trend accelerated in 2019, when more than a dozen states enacted such legislation.  A52–53; A533.

Beginning in 2016, BSA, assisted by Ogletree Deakins Nash, Smoak &

Stewart, P.C. ("Ogletree"), BSA's national coordinating counsel for abuse litigation, worked to resolve Abuse Claims by implementing a coordinated and uniform approach for handling such claims.  A53; A532.  With certain exceptions,[5] BSA administered, defended, and settled Abuse Claims on behalf of Local Councils, Related Non-Debtor Entities, and Chartered Organizations.  A53; A532–33.

BSA, with Ogletree's assistance, resolved approximately 250 prepetition Abuse Claims, spending approximately $150 million in settlement and legal costs between 2017 and 2019.  A53; A532–33.  With potential claims still mounting in 2018 and 2019, BSA, with assistance of legal and financial advisors, began to explore strategic options for a global out-of-court resolution of Abuse Claims.  A53. In late 2019, BSA participated in a mediation with counsel to certain abuse survivors and certain insurers, which proved unsuccessful.  A53; A533.  Ultimately, given the volume of Abuse Claims being asserted, BSA recognized that case-by-case litigation was untenable and threatened its ability to equitably compensate survivors of sexual abuse and the future of Scouting, and that a global resolution outside of bankruptcy was not possible.  A533.

---

[5]  *See* A1811–13 (Confirmation Hr'g Tr. at 189:13–21, 191:11–192:6) (describing exceptions with respect to the Archbishop of Agaña, Guam, TCJC)); A6445 ¶ 4.

### C.    Overview of Insurance and Coverage Litigation

### 1.    Insurance Policies

BSA's insurance program has evolved over the last eighty years, with variations in insurance carriers, covered entities, policy limits, and deductibles.  A54.  Nearly all years have some available coverage for Abuse Claims, either subject to a per-occurrence limit, an aggregate limit, or both.  *Id*.

BSA began procuring insurance for Abuse Claims from at least 1935 and continued to do so through the date of its chapter 11 petition.  Prior to 1969, BSA only procured primary insurance policies, but after 1969, BSA began to purchase primary and excess insurance policies.  *Id*.  Because of the number of insurance policies in the BSA's insurance-program, in the post-1982 period alone, there is approximately $3.6 billion of coverage potentially available (after accounting for exhaustion of coverage).  *Id*.  It is worth noting that certain of the older policies during this period are missing or disputed.  *Id*.

In addition to procuring significant insurance coverage for itself, the BSA also began to insure Local Councils and Chartered Organizations.  Specifically, before 1971, Local Councils were not insureds under BSA's insurance program; instead, they purchased independent insurance policies.  A55.  For a brief period in the 1970s, BSA offered each Local Council the opportunity to pay to be added as an additional insured on BSA's insurance policies.  *Id*.  Many elected this option; others continued

to independently purchase coverage. *Id.* Starting in 1975, all Local Councils became insureds under BSA's insurance program. *Id.*

Beginning in 1976, BSA also amended its policies to provide coverage for Chartered Organizations, albeit with some variation in coverage. A55. Some (but not all) Chartered Organizations are also listed as additional insureds on their Local Council's independent insurance policies. *Id.*

### 2. Prepetition Insurance Coverage Litigation

Before the Petition Date, BSA was engaged in extensive insurance coverage litigation relating to Abuse Claims in cases styled (a) *Nat'l Surety Corp. v. Boy Scouts of Am., et al.*, Case No. 2017-CH-14975, pending in the Circuit Court of Cook County, Illinois, Chancery Division (the "Illinois Action") (b) *Boy Scouts of Am., et al. v. Ins. Co. of North Am. et al.*, Case No. DC-18-11896, pending in the 192nd Judicial District Court of Dallas County, Texas (the "Century Texas Action"); and (c) *Boy Scouts of Am., et al. v. Hartford Accident and Indem. Co., et al.*, Case No. DC-18-07313, pending in the 95th Judicial District Court of Dallas County, Texas. A529-531. Hartford also filed an adversary proceeding in the Chapter 11 Cases against BSA and others involving similar coverage issues. A531. The coverage litigation generally involved the availability, extent, and/or allocation of insurance coverage for various Abuse Claims. A529-A531.

15

**D.    Chapter 11 Cases**

On February 18, 2020 (the "<u>Petition Date</u>"), BSA filed for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

### 1.    Claims Filed in the Chapter 11 Cases

On May 26, 2020, the bankruptcy court entered an order establishing November 16, 2020 as the deadline for holders to file claims, including Abuse Claims, against BSA (the "<u>Bar Date Order</u>").[6]  A534.  The Bar Date Order also approved procedures for providing notice to known and unknown survivors of Scouting-related abuse and procedures for the confidential submission of Abuse Claims.  A535.  As of the bar date, 82,209 unique and timely Direct Abuse Claims, 14,000 largely (if not entirely) contingent and unliquidated Indirect Abuse Claims (approximately 13,700 of which were asserted by Local Councils and Chartered Organizations), and 950 non-abuse claims (*e.g.*, trade claims, employee claims, secured creditor claims) were filed in the Chapter 11 Cases.  A536.

### 2.    Mediation and the Plan

Since the Petition Date, BSA sought a global resolution that would achieve its

---

[6]    Prior to their settlement with BSA, Century and Chubb Companies appealed the Bar Date Order.  This Court stayed the appeal pending the Confirmation Order becoming final and non-appealable.  *See Century Indem. Co. v. Boy Scouts of Am.*, Case No. 20-00774 (D. Del. Mar. 29, 2021) [D.I. 1, 25, 27]; *see also Century Indem. Co. v. Boy Scouts of Am.*, Case No. 21-1792 (3d Cir. Jan. 3, 2022) [D.I. 35].

dual objectives of (a) providing an equitable and efficient process to compensate abuse survivors and (b) ensuring that BSA can continue its vital charitable mission. A7024–25. To that end, on June 9, 2020, the bankruptcy court appointed mediators in the Chapter 11 Cases to assist BSA and other stakeholders in resolving disputed issues. A537.

For nearly two years, BSA engaged in near-continuous mediation with every major constituency in the Chapter 11 Cases, including Insurers. A56; A537. The mediation ultimately led to overwhelming support for the Plan from each key constituency.

The voting results on the Plan evidence overwhelming creditor support for the Plan, with each class having accepted the Plan. A56–57. 85.72% of Direct Abuse Claimants and 82.41% of Indirect Abuse Claimants voted to accept the Plan. A57.

### 3. The Plan

BSA's Plan is supported by every estate fiduciary and organized creditor group (A47):

a.   the Tort Claimants' Committee, the Future Claimants' Representative, the Coalition (an ad hoc committee representing more than 70,000 abuse survivors), and the Pfau/Zalkin claimants (certain survivors represented by the law firms of Pfau Cochran Vertetis Amala PLLC and Zalkin Law Firm, P.C.);

b.   the Settling Insurance Companies, including BSA's two primary insurers, Hartford and Century and Chubb Companies, and

17

Zurich and Clarendon;

c.   BSA's prepetition secured lender, JPM, which agreed to restructure BSA's $262 million of funded debt;

d.   the official committee of general unsecured creditors;

e.   the Ad Hoc Committee of Local Councils, consisting of eight Local Councils, acting as the unofficial voice for all Local Councils in the Chapter 11 Cases; and

f.   Chartered Organizations, including the United Methodist Entities and Roman Catholic Entities.

The Plan consists of the following key elements:

**Settlement Trust**.  The Plan establishes a Settlement Trust that is funded with more than $2.46 billion of cash and other property plus insurance rights assigned to the Settlement Trust by BSA, Local Councils and Chartered Organizations—estimated by the bankruptcy court to have a value of at least $4.0 billion—as well as certain contributed causes of action.  A582–84.  The Settlement Trust also has the exclusive authority to pursue recoveries from non-settling parties, including insurance companies, for the benefit of survivors.  A582–84.

**Channeling Injunction and Releases**.  The Channeling Injunction and Releases are fair and necessary to ensure the equitable administration and compensation of Scouting-related Abuse Claims.  Scouting-related Abuse Claims are receiving payment *in full* under the Plan.  A142; A682.

The global resolution of Scouting-related Abuse Claims under the Plan is

predicated on interdependent settlements and related channeling injunction and third-party releases (the "<u>Channeling Injunction and Releases</u>").  A46–47.  The settlements untangle the web of overlapping liabilities, insurance rights, and obligations of BSA and Related Non-Debtor Entities, Local Councils, Chartered Organizations, Settling Insurance Companies, and all of their respective representatives (collectively, "<u>Releasees</u>").  A46.

In exchange for Releasees' substantial contributions to the Settlement Trust under the Plan and the payment in full of Scouting-related Abuse Claims, the Plan "channels" to the Settlement Trust all Scouting-related Abuse Claims against Releasees and provides for coextensive releases of the channeled Abuse Claims. Specifically, with respect to Chartered Organizations, the Plan provides for three different forms of releases: (1) for Contributing Chartered Organizations, the Plan channels to the Settlement Trust and releases all Scouting-related Abuse Claims regardless of when such claims arose; (2) for Participating Chartered Organizations, the Plan channels to the Settlement Trust and releases (a) all Scouting-related Abuse Claims involving abuse alleged to have occurred on or after January 1, 1976 and (b) Scouting-related Abuse Claims involving abuse alleged to have occurred prior to January 1, 1976, to the extent such claim is covered under an insurance policy issued by a Settling Insurance Company; and (3) for Opt-Out Chartered Organizations, the Plan channels to the Settlement Trust and releases Scouting-related Abuse Claims

involving abuse alleged to have occurred at any time prior to the Petition Date to the extent such claim is covered under an insurance policy issued by a Settling Insurance Company. A60. This unique structure was critical to securing the cash and other valuable third-party contributions to the Settlement Trust under the Plan and unlocking BSA's and Local Councils' insurance coverage for the benefit of the abuse survivors.

Importantly, by definition, only Abuse Claims that are related to Scouting are released and channeled under the Plan. A91; A155; A627–28; A867; A907–08 (Plan definitions). No claims for Abuse unrelated to Scouting are being released, including to the extent a claim has "mixed" characteristics involving Scouting- and non-Scouting related abuse. A91; A895 (Plan definition of Mixed Claim). For such Mixed Claims, ***only*** the portion of the Abuse related to Scouting is released. A91. In addition, ***no*** perpetrators of abuse are being released under the Plan. A893; A903.

**<u>Trust Distribution Procedures</u>**. Scouting-related Abuse Claims are processed, liquidated, and paid by the Settlement Trustee in accordance with the Settlement Trust Agreement and Trust Distribution Procedures (the "<u>TDP</u>"). The TDP create four processes by which Direct Abuse Claims are liquidated and an Allowed Claim Amount (or, a Final Determination) is determined: (a) the Expedited Distribution election, (b) evaluation under the Claims Matrix, (c) the Tort System Alternative, and (d) the Independent Review. A1016–43. To satisfy the General

Criteria under the TDP and become an Allowed Abuse Claim, the Abuse Claimant must provide, among other things, evidence that a Protected Party "may be negligent or may otherwise bear legal responsibility." A1020 (TDP Art. VII.C.2(c). The evidence must be "credible" and demonstrate "by a preponderance of the evidence" that the Abuse Claim is "legally valid" and "entitled to a recovery." A1019–20.[7]

The TDP were the subject of extensive negotiations and mediation involving BSA and stakeholders representing abuse survivors. A47; A687–88. The lower courts found that the TDP are consistent with BSA's prepetition practices, and that the Base Matrix Values and Scaling Factors emulate the tort system. A746–47; A172–73. Moreover, the lower courts found that the Plan does not require or bind Insurers to pay future awards. A700–01; A175–76.

**BSA Contribution to the Settlement Trust**. On the Effective Date, BSA contributed to the Settlement Trust the following: (a) a note in the principal amount

---

[7]    In their Statement of Facts, Certain Insurers incorrectly assert that "[a]ll claimants who satisfy the General Criteria receive some amount of compensation." C.I. Br. at 22. To the contrary, there are various ways a claimant who satisfies the General Criteria may receive an Allowed Amount of $0, including if (a) the Settlement Trustee applies a mitigating factor of zero for any applicable mitigating factor (*see* A1027, A1029 (TDP Arts. VIII.D, VIII.F)), (b) the Settlement Trustee discovers that such claim is fraudulent (*see* A1021 (TDP Art. VII.C.3)), (c) the claimant elects the Independent Review Option and receives a settlement recommendation of $0 (*see* A1039 (TDP Art. XIII.D)), and (d) the claimant elects the Tort System Alternative and the claim is denied or dismissed (*see* A1036 (TDP Art. XII.G)).

of $80 million payable by BSA over ten years; (b) all of BSA's rights to insurance for Abuse Claims; (c) BSA's Artwork, valued at approximately $59 million; (d) BSA's interests in oil and gas properties valued at $7.6 million; (e) BSA's claims for reimbursement, indemnity, contribution, breach of conduct or other causes of action arising from any payments BSA made on account of Abuse Claims on or before the Effective Date; and (f) the assignment of any Perpetrator Indemnification Claims held by BSA.  A57–58.

**Local Council Contribution**.   On the Effective Date, Local Councils contributed to the Settlement Trust the following: (a) $519 million, consisting of cash and proceeds of real property sales; (b) a promissory note payable from pension fund overages in the principal amount of $100 million; (c) insurance rights under the BSA Insurance Policies; and (d) the Local Council's own insurance policies, to the extent permitted under state law and/or through the savings clause in the Plan.  A58; Bankr. D.I. 11124.

**Settling Insurance Companies**.   The Settling Insurance Companies— Hartford, Century and Chubb Companies, Zurich Insurers and Zurich Affiliated Insurers, and Clarendon—have bought back their policies in exchange for a $1.656 billion contribution to the Settlement Trust pursuant to the Insurance Settlement Agreements.  A58.

**Chartered Organizations**.

a. **Contributing Chartered Organizations** currently include only the United Methodist Entities. United Methodist Entities are providing, among other things, a $30 million contribution to the Settlement Trust and certain non-monetary commitments to support Scouting. In exchange, Contributing Chartered Organizations receive Protected Party status and the full and complete benefit of the Channeling Injunction and Releases. A59.

b. **Participating Chartered Organizations** is the default form of treatment for Chartered Organizations under the Plan. Participating Chartered Organizations contribute to the Settlement Trust, among other things, insurance rights, certain causes of action and $40 million contributed by Local Councils on their behalf. In exchange, Participating Chartered Organizations are designated under the Plan as Limited Protected Parties, which are released from (i) all Scouting-related Abuse Claims involving abuse alleged to have occurred on or after January 1, 1976 and (ii) Scouting-related Abuse Claims involving abuse alleged to have occurred prior to January 1, 1976, to the extent such claim is covered under an insurance policy issued by a Settling Insurance Company. A59–60.

c. **Opt-Out Chartered Organizations** have opted out of the default treatment of Chartered Organizations under the Plan or are debtors in their own bankruptcy cases and have not elected to opt into such default treatment. Opt-Out Chartered Organizations remain liable for all Scouting-related Abuse Claims *except* for Scouting-related Abuse Claims covered under an insurance policy issued by a Settling Insurance Company, which are released in exchange for a portion of the Settling Insurance Companies' total $1.656 billion contribution. A59–60.

    **Other Contributions**. The Plan also includes settlements with other critical constituencies, including (a) the JPM / Creditors' Committee Settlement, which addressed, among other things, the treatment of non-abuse general unsecured claims, non-abuse litigation claims, and JPM's secured claims under the Plan, and resolved the Creditor's Committee's challenges to JPM's prepetition security interests,

including any such challenges that the Creditors' Committee could seek standing to pursue, and (b) the TCC/Abuse Survivor Settlement, under which BSA agreed to certain governance changes to the Settlement Trust, the addition of an Independent Review Option in the TDP, and the Youth Protection Program.  A58.

**Youth Protection Measures**.  The Plan provides for the strengthening of BSA's Youth Protection Program, which was developed with the assistance of a survivors' working group, certain survivors serving on the Tort Claimants' Committee, and youth protection experts.  These improvements will ensure, among other things, that abuse survivors play a key role in shaping BSA's future youth protection efforts.  A561–65.

### 4.    Confirmation Hearing, Opinion and Confirmation Order

After a contested, 22-day confirmation hearing during which 26 witnesses testified (11 of whom were qualified as experts) and more than 1,000 exhibits were admitted into evidence, the bankruptcy court took the matter under advisement on April 14, 2022.  A61.  On July 29, 2022, the bankruptcy court issued the Confirmation Opinion, which approved the key elements of the Plan.  *See generally* A507–787.  The Confirmation Opinion did not confirm or deny confirmation of the entirety of the Plan; the bankruptcy court identified several aspects of the Plan that needed to be modified for the Plan to be confirmed.  A782.

On August 12, 2022, after modifying the Plan and preparing a revised

proposed Confirmation Order that conformed to and supplemented the Confirmation Opinion, BSA filed a motion to amend and supplement the Confirmation Opinion and for entry of the revised proposed Confirmation Order.  A12797–900.  On September 8, 2022, after three intervening hearings regarding certain aspects of the Confirmation Order (on August 18, September 1 and September 7, 2022, respectively), the bankruptcy court entered the Confirmation Order (A788–1354) and the Pre-Petition Century/Chubb Companies Claims Order on September 12, 2022 (A14129–131).  Appellants appealed the Confirmation Order to the district court.

### 5.     Affirmation Order and Plan Effective Date

On February 9 and 10, 2023, the district court held oral argument on a record that included more than 900 pages of briefing and more than 1,000 exhibits.  A63.  On March 28, 2023, the district court affirmed the Confirmation Order.  A197.  On April 19, 2023, after Appellants failed to obtain a stay of the Affirmation Order, the Plan became effective and BSA emerged from bankruptcy.  Bankr. D.I. 11119.

### 6.     Post-Effective Date Events

In the six months since the Effective Date, in accordance with the Plan, the Settlement Trust and a Delaware statutory trust ("DST") were formed and funded; BSA, Local Councils, Chartered Organizations, and Settling Insurance Companies made monetary and non-monetary contributions to the Settlement Trust; BSA and

Local Councils sold 1,050 Abuse Insurance Policies back to the Settling Insurance Companies; BSA restructured its funded debt issued by JPM; and BSA, Settlement Trust, and DST respectively assumed control of all assets dealt with under the Plan. Dist. D.I. 254 at 8–9.

The Settlement Trustee is actively managing the Settlement Trust Assets and "has been engaged in all aspects of the claims process." Dist. D.I. 254 at 9. Among other things, the Settlement Trustee has (a) distributed (and is collecting responses to) comprehensive questionnaires for Direct Abuse claimants and/or their attorneys to allow the Settlement Trustee to evaluate their claims, (b) established a document repository for claimants and/or their attorneys to view and upload documents relevant to their claims, (c) hosted numerous town-hall meetings to update claimants on the Settlement Trustee's progress, and (d) disbursed $747,825 to 295 survivors. *Id.* To advance this progress, on September 26, 2023, the bankruptcy court approved the Settlement Trustee's fraud prevention and detection measures, which will help identify fraudulent abuse claims. Bankr. D.I. 11526; A211.

The Settlement Trustee has also exercised the rights assigned to it by BSA and Local Councils by, among other things, substituting in the Illinois Action and Century Texas Action. *See Nat'l Sur. Corp. v. Houser*, No. 17-CH-14975 (Cook Cty. Cir. Ct.); *Aloha Council v. Ins. Co. of N. Am.*, No. DC-18-11896 (Dist. Ct. Tex., Dallas Cnty., July 21, 2023). The Settlement Trustee filed a motion to dismiss the

Illinois Action on July 20, 2023 and dismissed the Century Texas Action around August 3, 2023. *See Nat'l Sur. Corp. v. Houser*, No. 17-CH-14975 (Cook Cty. Cir. Ct. July 20, 2023); *Aloha Council v. Ins. Co. of N. Am.*, No. DC-18-11896 (Dist. Ct. Tex., Dallas Cnty., Aug. 3, 2023). In addition, on July 18, 2023, the Settlement Trust filed a complaint (the "Coverage Complaint") in the Northern District of Texas, *Houser v. Allianz Global Risks US Ins. Co.*, No. 3:23-cv-01592 (N.D. Tex.) (the "Coverage Action"). The Coverage Complaint names 91 insurers as defendants and seeks coverage under more than 3,000 unsettled policies issued to BSA and/or Local Councils from 1942 to 2020. *See* Coverage Compl. [D.I. 1].

## SUMMARY OF THE ARGUMENT

Following a contested 22-day trial, three post-trial hearings, and upon consideration of the extensive trial record, the bankruptcy court issued an opinion that carefully considered the facts and binding Third Circuit precedent and confirmed the Plan. Similarly, on appeal, the district court carefully considered the extensive appellate record and the arguments presented in briefing and at two days of oral arguments and affirmed. As the district court correctly held, Appellants failed to present evidence that demonstrates any clear error in the bankruptcy court's factual findings and found no error in the bankruptcy court's legal conclusions.

Claimants and *Amici* fail to demonstrate that the lower courts committed error when approving the Channeling Injunction and Releases. The bankruptcy court

correctly exercised "arising in" and "arising under" jurisdiction in the context of confirmation of the Plan and approval of the settlement of Scouting-related Abuse Claims, which channels such claims to the Settlement Trust for resolution through the TDP.  The bankruptcy court also had "related-to" jurisdiction over the third-party claims based on (a) a clear identity of interest among BSA and the Releasees; (b) shared insurance between BSA, Local Councils, and Chartered Organizations; (c) contractual indemnification obligations among BSA and the Releasees; and (d) BSA's residual interest in all Local Council property, the value of which would deteriorate as a result of further abuse litigation.

The bankruptcy court had statutory and constitutional authority to approve the Channeling Injunction and Releases, and such injunctions and releases are "integral to the restructuring of the debtor-creditor relationship." *Millennium,* 945 F.3d at 138.  Absent the Channeling Injunction and Releases, there would be no resolution, but rather, mounting litigation that would minimize or eliminate any recovery for survivors.

Lastly, the lower courts correctly found that the Channeling Injunction and Releases satisfy the applicable law under *In re Cont'l Airlines*, 203 F.3d 214 (3d Cir. 2000).  The Channeling Injunction and Releases are (a) fair because survivors will be paid in full under the Plan and (b) necessary to receive substantial contributions from or on behalf of Local Councils, Chartered Organizations, Settling Insurance

Companies and other Releasees.

All of the Claimants' other arguments also fail. Contrary to Lujan Claimants' arguments, (a) the proceeds of the Abuse Insurance Policies are property of BSA's estate, (b) the Plan protects and compensates Lujan Claimants for their alleged interests in the Abuse Insurance Policies that are the subject of the Insurance Settlements; (c) the bankruptcy court had proper jurisdiction to authorize the sale of interests in the Hartford insurance policies for 1976 and 1977. Moreover, the McCarran-Ferguson Act, as a procedural statute, does not preempt the Bankruptcy Code. Lujan Claimants also fail to show clear error by the bankruptcy court in determining that the Plan satisfies the best-interests test under section 1129(a)(7) of the Bankruptcy Code. The lower courts also correctly found that the Plan properly classifies the Lujan Claimants in accordance with section 1122 of the Bankruptcy Code because their claims are substantially similar to others in the same class, and the Plan provides for the equal treatment of holders of Direct Abuse Claims in compliance with section 1123(a)(4) of the Bankruptcy Code. Lujan Claimants' arguments for Plan resolicitation based on certain modifications that resolved the Roman Catholic Ad Hoc Committee's plan objection and included fraudulent claim prevention protections were correctly rejected by both lower courts, as such modifications were neither material nor adverse to Lujan Claimants. D&V Claimants' argument that the Plan is not fair and equitable to current and future

holders of Direct Abuse Claims, also fails as the settlement trust will be governed by comprehensive process-oriented guidelines for paying current claims, while also ensuring that sufficient funds remain to continue to compensate remaining current, as well as future claims going forward.

Insurers' appeal is premised on their incorrect argument that their rights under their Abuse Insurance Policies and coverage defenses were abrogated by the Plan. To the contrary, both the bankruptcy court and the district court correctly ruled that the Plan and the Confirmation Order explicitly preserve their rights and coverage defenses, and BSA repeatedly assured Insurers, on the record, that their rights and coverage defenses were preserved. Insurers' interest in further "clarification" is not a proper ground for appeal. Additionally, Insurers are not seeking clarification, they are seeking to impose new language to create new defenses to their potential obligations to pay future claims of survivors of childhood abuse covered by their policies. Specifically, Insurers seek to insulate themselves from "applicable law and the Plan and Confirmation Order" that they unsuccessfully challenged, asking this Court to impose language that any Settlement Trust awards to survivors that may be presented in the future to Insurers for indemnification will be inadmissible in hypothetical future litigation, an issue that is not ripe, has not been adjudicated, and is legally incorrect. Any future award covered by a Certain Insurer's policy presumably would be admissible if Insurers decline to pay the award, but this appeal

is not an appropriate forum for pre-litigating hypothetical future evidentiary disputes. If an award is issued in favor of a survivor on terms that reach a Certain Insured's policy, the claim is tendered to the Certain Insurer for payment, and the Certain Insurer declines to pay, then a court with jurisdiction over the dispute can resolve the evidentiary issues and other disputes on the then-existing facts and circumstances. The bankruptcy court did not err in not resolving non-justiciable hypothetical dispute over which it had no jurisdiction.

Insurers have relegated to the back of their brief their previous lead argument that the bankruptcy court erred in finding that BSA proposed the Plan in good faith, and that the district court erred in affirming that finding, and have changed their arguments. Insurers no longer argue that BSA colluded with survivors or that the court failed to consider the totality of their evidence, but rather have limited their challenge to the assertion that BSA failed to consider Insurers' interests. The test for whether the Plan was proposed in good faith is whether (a) the Plan fosters a result consistent with Bankruptcy Code's objectives, (b) was proposed with honesty and good intentions and with a basis for expecting that reorganization can be effective, and (c) reflects fundamental fairness in dealing with creditors. Insurers

are not even creditors.[8]  The bankruptcy court made detailed findings of fact of good faith under the governing tests.  Additionally, the bankruptcy court also correctly found that BSA did consider and protect Insurers' interests, based on a volume of largely uncontested evidence, and Insurers have not appealed those findings.  Moreover, the bankruptcy court further protected Insurers by requiring certain modifications to a prior plan in response to Insurers' objections, which modifications were included in the Plan.  The district court's order affirming the Confirmation Order should be affirmed.

## ARGUMENT

## I.    The District Court Standard of Review Was Appropriate

Lujan Claimants argue that the bankruptcy court lacked core "arising under" or "arising in" jurisdiction to approve the Channeling Injunction and Releases and had, at most, only "related-to" jurisdiction.  Lujan Claimants contend that this distinction matters because, if the court had only "related-to" jurisdiction, the district court purportedly erred in reviewing the bankruptcy court's findings of fact under a clear-error, rather than *de novo*, standard of review.  Lujan Br. at 10.   D&V Claimants do not join in this argument, and for good reason: it is meritless.

---

[8]    Some Insurers have filed proofs of claim for alleged secured or unsecured claims, but they are not raising good faith objections in that capacity and are being paid in full.

First, the bankruptcy court had core "arising in" and "arising under" jurisdiction. As set forth below with respect to subject matter jurisdiction, the bankruptcy court did not adjudicate any underlying abuse claims at confirmation. Instead, it resolved "countless confirmation-related issues and objections" (A170) and confirmed, pursuant to section 1129 (and at least four other confirmation-related requirements) of the Bankruptcy Code, a plan of reorganization that includes third-party releases and a process to channel and later resolve through the Settlement Trust the underlying Abuse Claims, either consensually or in a court of competent jurisdiction. The bankruptcy court did not issue any final judgments on the merits of any Abuse Claims. A687; A691 ("The TDP do not settle any Abuse Claims."). Confirmation of the Plan falls squarely within the bankruptcy court's core jurisdiction. Because the bankruptcy court had core jurisdiction to issue a final order approving the Channeling Injunction and Releases under the Plan, the district court correctly reviewed the bankruptcy court's factual findings for clear error and legal determinations *de novo* (as should this Court).[9]

---

[9] The TDP, which mimic BSA's prepetition claims settlement practices, provide "multiple options" for holders of Direct Abuse Claims to obtain compensation for such claims, including the pursuit of such claims in the tort system with a jury trial. A678; A111; A1034–37 (TDP Art. XII (Tort System Alternative)); *see also* A158; A553; A1034 (TDP Art. XII.A).

Second, and perhaps more importantly, it makes no practical difference what type of jurisdiction the bankruptcy court had—core versus non-core—because Claimants consented to a final determination by the bankruptcy court. 28 U.S.C. §157(c)(2); *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683–85 (2015). As a matter of law, such consent need not be express and can be established through a party's actions that evidence a waiver of any objection to final adjudication by the bankruptcy court. *Wellness*, 575 U.S. at 683–85; *Millennium Lab*, 575 B.R. 252, 288 (Bankr. D. Del. 2017). Claimants tried the case in the bankruptcy court without ever objecting to the court's determination of the non-debtor injunctions by final order.[10] Indeed, Lujan Claimants conceded in their district-court appeal brief that the bankruptcy court's decision was a final order, subject to appellate jurisdiction under 28 U.S.C. §158(a)(1) and reviewed only for "clear error."[11] D&V Claimants

---

[10]  A10664–Argument Tr.), A20106–16 (Feb. 10, 2023, District Court Hr'g Tr.) Lujan Br. at 3.

[11]  A10664–709 (Lujan Claimants' Plan Objection); A11930–44 (Lujan Claimants' Supplemental Plan Objection); A5558–93 (Confirmation Hr'g Tr. at 140:17–175:25); A5687–92 (Confirmation Hr'g Tr. at 271:13–274:3); A5707–15 (Confirmation Hr'g Tr. at 289:22–297:4); A06109–71 (Confirmation Hr'g Tr. at 68:24–130:24); Bankr. D.I. 9693 (Lujan Claimants' Letter to Court); A13468–78 (Sept. 1, 2022, Bankr. Hr'g Tr. 100:2–110:6); A14844–931 (Lujan Claimants' District Court Opening Brief); A19673–717 (Lujan Claimants' District Court Reply Brief); A19982–95 (Feb. 10, 2023, District Court Hr'g Tr. 30:25–43:17); A20043–50 (Feb. 10, 2023, District Court Hr'g Tr. 91:24–98:8); A20106–16 (Feb. 10, 2023, District Court Hr'g Tr. 154:12–164:18); Lujan Br. at 3.

likewise so concede in their brief in this Court. D&V Br. at 5, 14. To be sure, Claimants argued in the bankruptcy court that no plan may contain non-consensual, third-party releases, but they never claimed that the bankruptcy court had to issue proposed findings of fact subject to *de novo* review in the district court. They therefore waived the issue.

Even though the district court applied a clear-error standard to review the Channeling Injunction and Releases (A113), the district court's extensive analysis of the appeal and voluminous evidentiary record, embodied in its 155-page opinion, far exceeds the perfunctory act of reviewing and entering proposed findings of fact and conclusions of law as is common practice in many cases. BSA submits that the district court's exacting review and analysis is tantamount to *de novo* review.

Finally, to the extent this Court determines that an Article III court must affirm the Channeling Injunction and Releases under the Plan pursuant to *de novo* review, it is undisputed that this Court, as an Article III court, has the power to approve the releases as part of the Plan. Accordingly, even if the bankruptcy court lacked the jurisdiction to do so, this Court may and should confirm the Plan. *See Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 40 (2014) ("[E]ven if [appellant] is correct that the bankruptcy court's entry of judgment was invalid, the District Court's *de novo* review and entry of its own valid final judgment cured any error"); *Mastro v. Rigby*, 764 F.3d 1090, 1094 (9th Cir. 2014) ("The Supreme Court held

that even if consent does *not* permit a bankruptcy court to decide finally a *Stern* claim, any error is 'cured' when a district court conducts 'de novo review' and enters 'its own valid final judgment'") (quoting *Arkison*); *In re Purdue Pharma L.P.*, 69 F.4th 45, 85 (2d Cir. 2023) (affirming bankruptcy court's confirmation of plan of reorganization after district court reversal); *In re Mosdos Chofetz Chaim Inc.*, Nos. 22-33, 22-36, 2023 U.S. App. LEXIS 179, at *8 (2d Cir. Jan. 5, 2023) ("The Court need not decide whether the bankruptcy court lacked constitutional authority because, when a district court reviews a bankruptcy court's decision *de novo* and enters its own judgment, it cures any constitutional violation that may have occurred.") (citing *Arkison*).

## II.    The Bankruptcy Court Had Subject Matter Jurisdiction to Approve the Channeling Injunction and Releases

Standard of Review: This Court reviews *de novo* whether the bankruptcy court had subject matter jurisdiction and the factual findings underlying such determination for clear error.  *See In re W.R. Grace & Co.*, 591 F.3d 164, 170 n.7 (3d Cir. 2009).

Claimants challenge the bankruptcy court's subject matter jurisdiction to approve the Channeling Injunction and Releases, which enjoin and release only Scouting-related Abuse Claims against certain Scouting-related third parties.  D&V Br. at 21–32; Lujan Br. at 8–28.  The record evidence and the bankruptcy court's detailed and "careful" findings support both lower courts' findings that the

bankruptcy court had subject matter jurisdiction over such third-party Scouting-related Abuse Claims.  A77–98.

### A.    "Arising In" and "Arising Under" Jurisdiction

The bankruptcy court had jurisdiction to confirm the Plan containing the Channeling Injunction and Releases because it was a proceeding that "'by its very nature…could only arise in the context of a bankruptcy case.'"  A631–32 (quoting *In re New Century TRS Holdings, Inc.*, 505 B.R. 431, 441 (Bankr. D. Del. 2014)). Claimants argue that the bankruptcy court erred because parties cannot "create" subject matter jurisdiction and that the bankruptcy court needed a basis for jurisdiction over third-party claims against nondebtors "*before* the court considered them."  D&V Br. at 22-23 (emphasis in original); Lujan Br. at 9–10 (citing *Combustion Eng'g*, 391 F.3d at 228).[12]  But these arguments, based on four different Bankruptcy Code statutes, overlook the fundamental premise, noted by this Court and numerous lower courts within this Circuit, that a confirmation hearing

---

[12] *Combustion Engineering* did not address "arising in" or "arising under" jurisdiction, but focused on a detailed "related to" jurisdiction analysis. 391 F.3d at 225–26; A632–33; A81–82.  As the district court here observed, when this Court does not address an issue, one should not "jump to conclusions." A81–82 (citing *In re Essar Steel Minn., LLC*, 47 F.4th 193, 199–200 (3d Cir. 2022).  This Court's silence on "arising in" and "arising under" jurisdiction is not a determination by this Court that the bankruptcy court (or district court exercising bankruptcy jurisdiction) did not have such authority to confirm (or affirm) confirmation of the Plan containing the Channeling Injunction and Releases.

necessarily "could arise only in the context of a bankruptcy case." *See Stoe v. Flaherty*, 436 F.3d 209, 218 (3d Cir. 2006). Further, Claimants erroneously assume that the bankruptcy court was exercising jurisdiction over the third-party state-law claims to adjudicate the merits of such claims, which it patently did not (and could not) do on its own. Instead, the bankruptcy court was only approving (1) the Abuse Claims Settlement incorporated in the Plan, which channels the claims to a trust that has assumed liability for the claims, and, in turn, releases a narrow set of Scouting-related Abuse claims as to the Releasees, and (2) the TDP, which are merely "a process under which Abuse Claims may ultimately be settled." A691.

The bankruptcy court also had jurisdiction to confirm of the Plan because confirmation was a proceeding "arising under" the Bankruptcy Code. A proceeding "arises under" the Bankruptcy Code "when the cause of action is based on a right or remedy expressly provided by the Bankruptcy Code." *In re Essar Steel*, 47 F.4th at 197 (internal quotation omitted); A79.[13]

Here, the Channeling Injunction and Releases, which are integral to the "essential" settlements memorialized in the Plan (A667–68; A120–21), were considered in the context of Plan confirmation. A630–42 (citing *In re Charles St. African Methodist Episcopal Church of Bos.*, 499 B.R. 66, 99 (Bankr. D. Mass.

---

[13] *See* Section III below regarding the bankruptcy court's statutory authority to approve the Channeling Injunction and Releases.

2013)) (holding that a plan of reorganization was the "quintessential bankruptcy matter" and "the court undoubtedly has jurisdiction to adjudicate the plan, even without recourse to its related-to jurisdiction."). Because the bankruptcy court had core subject matter jurisdiction, it appropriately entered a final order approving the Channeling Injunction and Releases as part of Plan confirmation.

### B.    "Related To" Jurisdiction

Based on an extensive record, which both lower courts consistently relied upon and referenced, the bankruptcy court "at a minimum" had "related to" jurisdiction to approve the Channeling Injunction and Releases.   A82; A633. Bankruptcy courts have "related-to" jurisdiction over proceedings, including third-party claims, where "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984); *see also Combustion Eng'g*, 391 F.3d at 226 ("[S]uits between third parties that conceivably may have an effect on the bankruptcy estate" are "'related to' a title 11 case."); *accord Celotex*, 514 U.S. at 308.   An action satisfies the "conceivable-effect" test "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Pacor*, 743 F.2d at 994; A82–83.   The "key word [in the *Pacor* test] is 'conceivable.' Certainty, or even likelihood, is not a requirement." *Marcus Hook*, 943 F.2d at 264.

Whether a claim is sufficiently "related to" a bankruptcy case to warrant the exercise of subject matter jurisdiction depends on the facts and circumstances. *In re W.R. Grace & Co.*, 591 F.3d at 174 n.9; *see also* A83. Here, based on extensive trial and appellate records, both lower courts exercised "related to" jurisdiction with respect to the Abuse Claims "for any or all" of several reasons, including: (1) a clear identity of interest based on interconnectedness between BSA and other Releasees, *see* A646–48; A84–91; A1617–18 (Confirmation Hr'g Tr. at 263:14–264:1); (2) shared insurance among BSA, Local Councils, and Chartered Organizations, which, if eroded, would reduce property of BSA's estate that would otherwise be available for distribution to creditors, *see* A646–47; A91–94; A1617–18 (Confirmation Hr'g Tr. at 263:14–264:1); (3) contractual indemnification obligations among BSA, Local Councils and certain other Releasees, including Chartered Organizations and BSA's Representatives, which obligations, when triggered, would deplete property of the estate, *see* A635–36; A640; A94–97; and (4) BSA's residual interest in Local Councils' property in the event of any Local Council's dissolution or the revocation of its charter, the value of which would be diminished by continued abuse-related litigation. A517 n.25; A633–34; A97–98. On the foregoing bases, "each of which is supported by careful findings" and extensive evidence, the third-party claims subject to the Channeling Injunction and Releases have a "conceivable effect" on BSA's estate. A633–38. The district court therefore correctly determined that the

bankruptcy court did not err in exercising "related to" jurisdiction to confirm the Plan with the Channeling Injunction and Releases.  A98.

### 1.   Interconnectedness

The district court correctly found no error in the bankruptcy court's determination that there is a "clear identity of interest" based on interconnectedness among BSA and the Releasees.  A91.

"Related to" jurisdiction is appropriately exercised where there is an identity of interest between a non-debtor codefendant and the debtor, such that the debtor is the real party defendant.  *See McCartney v. Integra Nat'l Bank North*, 106 F.3d 506, 510–11 (3d Cir. 1997) (extending the automatic stay to nondebtor codefendants where there was a sufficient identity of interests).

According to this Court, "[t]he proper inquiry"

> is to review the law applicable to the claims being raised against the third party (and when necessary to interpret state law) to determine whether the third-party's liability is wholly separate from the debtor's liability or instead depends on it….[T]his approach does not require the reviewing court to decide state-law claims on the merits. It does, however, require it to ascertain what liability under the relevant law demands.

*In re W.R. Grace & Co.*, 13 F.4th 279, 286 (3d Cir. 2021).  A claim against a third party may be derivative even if the claim is based on the third party's own misconduct.  *See id.*  The mere fact that "a third party is alleged to have engaged in some wrongdoing is not enough to render a claim against it independent if its liability depends on the debtor's liability."  *Id.*

41

Here, the main theories of liability against Local Councils and Chartered Organizations are negligence and respondeat superior.[14]  A522–23; A651–53; A87–89;  *see generally*  A24208–85; A24345–69; A24500–74 (state court litigation documents).  The negligence-based Scouting-related Abuse Claims asserted against Local Councils and Chartered Organizations are not, and could never be, "wholly separate from the debtor's liability."  *In re W.R. Grace & Co.*, 900 F.3d 126, 137 (3d Cir. 2018);  *see also* A652; A87.  The liabilities of the Local Councils and Chartered Organizations in this case "depend[] on the debtor's liability."  900 F.3d at 136;  *see also* A651–53; A87.  "Abuse Survivors often assert such dependence."  A87–90 (citing relevant allegations from certain Claimants' complaints).  Claimants' claims relate to the Scouting system that BSA designed and implemented at a local level by

---

[14]  Lujan Claimants' contention that survivors hold independent claims against non-debtors is unsupported by any evidence and without merit.  A656–57; A90. Critically, Lujan Claimants filed proofs of claim asserting that BSA bears responsibility for Scouting-related Abuse, and in the same proofs of claim identify both Local Councils and Chartered Organizations for the very same liabilities.  A647; A24581 (redacted proof of claim); A26233 (proof of claim in Archbishop of Agaña bankruptcy case alleging same abuse).  Indeed, the bankruptcy court found that prepetition claimants, "including the D&V and Lujan Claimants, treated BSA, Local Councils and Chartered Organizations as 'one organization,' each liable for the actions of the other and with BSA in ultimate control." A677;  *see also* A6450 (Griggs Declaration ¶ 19) ("Typically, an Abuse Claim was filed jointly against the BSA, the relevant Local Council, and the relevant Chartered Organization."); A6446 (Griggs Declaration ¶ 6) ("I am also not aware of any Abuse Claims made against any Chartered Organizations that involved allegations of sexual abuse related to Scouting, which did not include either the BSA or a Local Council as a co-defendant.")

granting charters to Local Councils and Chartered Organizations in accordance with BSA's Rules and Regulations. A521–23, A651–53; A88. Local Councils and Chartered Organizations follow BSA's protocol with respect to volunteers. A517–18; A88. Importantly, a part of that protocol involves BSA maintaining an ineligible volunteer file. A521; A88. BSA's youth protection standards and Scouting programming are also central to the plaintiffs' various negligence-based theories of liability. A889–89 (citing A646–52 nn.451–53). Indeed, it is these policies and procedures that guide factfinders to determine whether there was negligence. *See generally* A520–23.

Claimants cannot plead a cause of action under these negligence theories without directly implicating BSA's asserted wrongdoing. A532; A646; A651; A89–90; A6446 (Griggs Declaration ¶ 6); A6450 (noting that pending abuse claims generally included BSA as a defendant or co-defendant); *see, e.g.*, A24373–74 (state court complaint ¶ 11). Nor could Local Councils or Chartered Organizations properly respond to a case under these negligence theories without implicating BSA's standards, programming, management, and the ineligible volunteer files. A520–23, A651–53; A90; A6450; A6453–54 (Griggs Declaration ¶¶ 18–19, 29–30). Liability in these negligence cases is rooted in a system that was created by, and necessarily implicates at every level, BSA. A521; A651–53; A89; A6446; A6450 (Griggs Declaration ¶¶ 6, 18–19); *see, e.g.*, A24373–74 ¶ 11. This is reflected in

BSA's historic practice of jointly defending and settling abuse claims on behalf of Local Councils and Chartered Organizations.[15]   *See* A89; A6445–47; A6450; A6458–59 (Griggs Declaration ¶¶ 4–9, 17–18, 20, 48).   Because BSA's conduct was always at issue in Abuse Claims, BSA was the "real party defendant" in defending Abuse Claims.  *See A.H. Robins Co.*, 788 F.2d 994, at 999 (4th Cir. 1986); *Integra Nat'l Bank N.A.*, 106 F.3d at 510–11; A89 (acknowledging BSA's historical prepetition practices).

The Plan clearly provides that liability that is not connected to BSA is not released.  For example, with respect to Mixed Claims (which are claims that include both Scouting and non-Scouting-related Abuse), only those portions of Mixed Claims arising from Scouting will be channeled and released.  *See* A867–68 ("Abuse Claim" definition); A895 ("Mixed Claim" definition); A907 ("Roman Catholic Settlement" and "Roman Catholic Settlement Agreement" definitions).   There can therefore be no legitimate concern that there is only an "incidental" relationship connecting the Channeling Injunction and Releases to BSA.  *W.R. Grace*, 900 F.3d at 137; A91.

Despite the overwhelming evidence of interconnectedness, Claimants assert that the interconnectedness of BSA, Local Councils, and Chartered Organizations is

---

[15]    Claimants' own prepetition complaints rely upon the interconnected relationship that they now attempt to "downplay."  A89–90.

somehow "not enough" without offering any evidence of their own in support.[16] *See* D&V Br. at 28–30; Lujan Br. at 19–22. As the district court correctly found, there is no error in the bankruptcy court's determination that there is a clear identity of interest based on interconnectedness among BSA and the Releasees. A91; A633–37; A646–49.

## 2. Shared Insurance

This Court has also recognized that courts have found "related to jurisdiction over claims against non-debtors based in part on shared insurance policies."[17]

_____

[16] In support of their erroneous position that BSA and other members of the tripartite group are not interconnected and that BSA has no control over Local Councils or Chartered Organizations, D&V Claimants rely on a declaration of a now-former BSA employee, which was filed in a Scouting-related abuse case in Oregon more than twelve years ago. D&V Br. at 28. The declaration is in the record, but was not admitted for the truth of the matter asserted therein. A12733 ¶ 3. In addition to being inadmissible hearsay, the declaration fails to rebut the uncontested evidence in the record regarding the interconnectedness and control-based relationship among BSA, Local Councils, and Chartered Organizations.

[17] The record supports that for more than 45 years, BSA's insurance program has provided coverage for Abuse Claims to all Local Councils and, by 1976, all Local Councils were added as "named insureds" under BSA's insurance policies. A91–92 (citing A6705 ¶ 11; A6876 ¶¶ 15, 17, 18; A3370 (Confirmation Hr'g Tr. at 19:6–7). Starting in 1978, BSA specifically included Chartered Organizations as insureds on its insurance policies, with some variation in coverage provided by primary and excess layers with some variation in coverage. A647. Some (but not all) Chartered Organizations are also listed as additional insureds on their Local Council's independent insurance policies. A652; A24674; A6877; A6880 (Gutzler Declaration ¶¶ 19, 25); A3373 (Confirmation Hr'g Tr. at 22:12–19). In addition, independent policies issued to Local Councils also insured Chartered Organizations as part of their Annual Unit Charter Agreement. A635; A3454–55

*Combustion Eng'g*, 391 F.3d at 226; A83; A91–94.  Here, the district court held that "[a] dollar-for-dollar reduction of the debtor's available insurance coverage—property of the estate under section 541 of the Bankruptcy Code—without the need for an intervening action is precisely the type of effect on the estate that can adversely affect a debtor's reorganization and provide the basis for 'related to' jurisdiction over a third-party claim."  A92; *SN Liquid., Inc. v. Icon Int'l, Inc.* (*In re SN Liquid., Inc.*), 388 B.R. 579, 584 (Bankr. D. Del. 2008) ("Depletion of insurance proceeds which results from indemnification for defense costs would adversely affect the Debtors' estate."); *see also MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92–93 (2d Cir. 1988)  (noting that where "third parties [sought] to collect out of the proceeds of Manville's insurance policies on the basis of Manville's conduct…plaintiffs' claims are inseparable from Manville's own insurance coverage and are consequently well within the bankruptcy court's jurisdiction over Manville's assets."); *In re Quigley Co.*, 676 F.3d 45, 47 (2d Cir. 2012) ("[W]here litigation of [the suits] against Pfizer would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy estate of Quigley, the exercise of bankruptcy jurisdiction to enjoin these suits was appropriate.").[18]

---

(Confirmation Hr'g Tr. at 103:22–104:2); A23284–85 (BSA Annual Charter Agreement).

[18]  D&V Claimants reassert an argument that was flatly rejected by the district court—that shared insurance is insufficient to confer "related to" jurisdiction.

The record here contains "ample evidence of complex and competing claims against BSA's insurance which supports subject matter jurisdiction over claims against the Releasees."   A94.   Indeed, the shared insurance is subject to per-occurrence limits and, in many instances, aggregate policy limits.  A634.  BSA's insurance policies are also generally subject to combined single limits, which caps the amount of insurance available for a single occurrence regardless of the number of insureds.  *See* A634; A25076–26095 (INA and Hartford Insurance Policies).  In other words, "if an insurer paid out its per occurrence limits to plaintiff A to either a Chartered Organization or Local Council, there would be no insurance remaining to respond to a claim on the policy by BSA for Abuse alleged against it by plaintiff." A634; A94.  No second suit is necessary.  A636; A94.  As the district court correctly concluded, "[i]t is settled law that bankruptcy courts have 'related to' jurisdiction over such claims against insurance assets."  A93.

### 3.   Contractual Indemnification

This Court also recognizes that indemnification rights of non-debtors against a debtor support "related to" jurisdiction over third-party claims where "the right to

---

D&V Br. at 32.  This argument is contrary to clear authority of this Court.  A93. Moreover, D&V Claimants' continued reliance on *Continental* is misplaced because the *Continental* Court "did not address subject matter jurisdiction" and reasoned that shared insurance by itself was not sufficient to justify the third-party releases at issue in that case.  A94.   Here, a litany of factors support the Channeling Injunction and Releases.

indemnification is clearly established and has accrued upon a filing of a civil action." A94–95 (citing *In re Lower Bucks Hosp.*, 488 B.R. 303, 314 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014)). To give rise to subject matter jurisdiction, such indemnification rights cannot be contingent on the factual findings of subsequent litigation. *Id.* (citing *Combustion Eng'g*, 391 F.3d at 231 (indemnification rights are not clearly established or accrued where the lawsuit "would not, itself, result in the indemnification against the debtor"); *In re Fed.-Mogul*, 300 F.3d 368 (same)).

The district court correctly affirmed the bankruptcy court's finding that BSA's and Local Councils' indemnification obligations support the bankruptcy court's exercise of "related to" jurisdiction. A634; A96–97. The record is clear that Chartered Organizations have asserted contractual claims (as well as common law claims) against both BSA and Local Councils for indemnification for losses related to Abuse Claims, including in thousands of proofs of claim filed in the Chapter 11 Cases. A634 (citing A26160–215 (Proofs of Claim)); A95. In recognition of the critical roles that Chartered Organizations and Local Councils play in the delivery of Scouting, BSA adopted board resolutions in which it agreed to defend and indemnify Chartered Organizations, in addition to maintaining and providing general liability insurance for Chartered Organizations in connection with the

delivery of Scouting.[19]  A95; A635.  Further, every year each Local Council signs an Annual Charter Agreement with the applicable Chartered Organization, which affords the Chartered Organization a contractual right of indemnification against the Local Council with respect to any Scouting-related Abuse Claim.  A96.  Since 2014, the Annual Charter Agreements have provided that the "[t]he Local Council agrees to:…[i]ndemnify the Charter Organization in accordance with the resolutions and policies of the National Executive Board of the Boy Scouts of America."  A96; A6741 (Sugden Declaration ¶ 69).  As discussed below, the record establishes that Local Councils' indemnification obligations to Chartered Organizations may diminish BSA's residual interest in Local Council property.[20]  A634; A96.

---

[19] Lujan Claimants argue here, but did not argue below, that BSA's proof of claim filed in the bankruptcy case ("AOA Bankruptcy") of Archbishop of Agaña ("AOA") disproves any indemnification obligation to Chartered Organizations by BSA.  Lujan Br. at 25–26.  Because Lujan Claimants could have raised this argument at the district court but failed to do so, it is waived.  *See Hormel v. Helvering*, 312 U.S. 552, 556 (1941) (explaining that the doctrine of appellate waiver "is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues."); *Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 249 (3d Cir. 2013) ("We generally refuse to consider issues that the parties have not raised below.").  Even if preserved, Lujan Claimants' argument is irrelevant; the AOA's proof of claim filed in BSA's bankruptcy asserts indemnification and insurance-related obligations.  *See, e.g.* A5433–36 (Confirmation Hr'g Tr. at 15:5–18:6); A6316 (Confirmation Hr'g Tr. at 82:8–17).

[20] D&V Claimants argue that the Annual Charter Agreements do not actually create indemnity obligations because they did not exist at the time that most Abuse Claims arose.  D&V Br. at 27.  This, too, is unavailing and rejected by the lower courts.  "The promises in these agreements are broad enough to relate to claims

The record further demonstrates that BSA's and Local Councils' contractual indemnification obligations are immediate, clearly established, accrued by the filing of Abuse Claims, and in no way dependent on potential third-party claims. A636; A95–96. No second lawsuit is necessary to establish the existence of this liability. A636; A97.

### 4.    BSA's Residual Interest in Local Council Property

The district court also correctly determined BSA's residual interest in Local Council property constitutes property of the estate. Indeed, bankruptcy courts indisputably have jurisdiction over property of the debtor. A98 (citing 28 U.S.C. § 1334(e) for granting "exclusive jurisdiction…of property of the estate"). And claims against property of the estate indisputably fall within a bankruptcy court's

---

whenever they actually occurred." A96; *see also* A636 n.422. D&V Claimants also suggest, for the first time on appeal, that postpetition contracts containing indemnification obligations would constitute prohibited preferential or fraudulent transfer under the Bankruptcy Code. D&V Br. at 27. D&V Claimants are precluded from raising new arguments at this juncture (*see Freeman*, 709 F.3d at 249), and in any event D&V Claimants' conclusory arguments are unavailing, as the indemnity agreements were in place for many years prepetition, and the 2020 agreement (a prepetition contract), the form of which is in the record (A23284–85), was entered into in the ordinary course of business and extended the same ordinary course protections afforded to Chartered Organizations in exchange for their material contributions to Scouting. *See* D&V Br. at 26–27; *See also* A635–36; A6741 (Sugden Declaration ¶ 69) (Since 2014, the Annual Charter Agreements have provided that the Local Council agrees to "[i]ndemnify the Chartered Organization in accordance with the resolutions and policies of the National Executive Board of the Boy Scouts of America.").

"related to" jurisdiction.  *See Pacor*, 743 F.2d at 996 n.15 (actions that "sought to affect property of the estate" are within "related to" jurisdiction).

The record shows BSA holds a contingent interest in Local Council property that would be triggered by BSA's termination of a Local Council charter or by the dissolution of a Local Council.  A98.  This interest is set forth in BSA's Bylaws and Rules and Regulations, as well as in the form of Local Council bylaws.  A23274–75 (BSA Bylaws Art. VI § 1, cl.2); A23294 (BSA Rules and Regulations Art. III).  Although Local Councils are legally separate entities that hold title to property in their own name, such property automatically reverts to BSA upon the revocation of the Local Council's charter or the Local Council's dissolution.  A98.  The district court determined that BSA's residual interest is indisputably "property of the estate."  A98.  Accordingly, any Abuse Claim that diminishes the assets of a Local Council or triggers the Local Councils' indemnification obligations to Chartered Organizations would also necessarily diminish the assets of BSA's estate.[21]  A98; A634.

---

[21]  D&V Claimants rehash the argument that, because the residual interest is subject to all superior interests, including valid claims against a Local Council, payment of claims by a Local Council would not diminish BSA's interest because "only what is left *after paying claims* is the total of BSA's interest."  D&V Br. at 33.  This has no bearing on the district court's finding that BSA has a residual interest in *all* Local Council property, and the payment of debts by a Local Council, including on account of Abuse Claims, reduces the value of that residual interest to the detriment of the estate.  A97.

Lujan Claimants argue, for the first time, that BSA's residual interest is a contingent remainder which violates the rule against perpetuities and is therefore invalid. Lujan Claimants have waived this argument by failing to raise it in the district court appeal. *See Hormel*, 312 U.S. at 556; *Freeman*, 709 F.3d at 249). The argument is nonetheless meritless.

First, given that there is a present fixed right to BSA's future enjoyment of the property, BSA's residual interest qualifies as a vested remainder, and not as a contingent remainder. Vested remainders do not violate the rule against perpetuities. "A vested remainder is one in which there is a present fixed right to future enjoyment of the property . . . Only his possession of the property in which the interest exists is postponed until the termination of the particular precedent estate." *Kahn v. Rockhill*, 28 A.2d 34, 36 (N.J. Ch. 1942). "The word 'vest' means to give an immediate, fixed right of present or future enjoyment." *See Atkinson v. Kettler*, 372 S.W.2d 704, 711 (Tex. Civ. App. 1963). Local Council charters are issued for a period not exceeding one year and must be renewed annually. A23274 (BSA Bylaws, Art. VI, § 1, cl. 1). If a Local Council charter is not renewed in any given year, the Local Council charter would be deemed to have been revoked, and as a result, the local counsel property would automatically revert to BSA. A23294 (BSA Rules and Regulations Art. III). BSA agrees that it may not possess such property until the Local Council's charter is revoked or the Local Council is dissolved, but in no event is it uncertain when the

52

annual expiration of the Local Council charter will occur.  Given the fixed nature of the condition precedent, BSA's interest is already vested, and therefore, not in violation of the rule against perpetuities.

Second, to the extent the property is held in charitable trust, it is unclear if the rule against perpetuities even applies.  *See In re Roman Cath. Archbishop of Portland in Oregon*, 345 B.R. 686, 694 (Bankr. D. Or. 2006) (finding that the rule against perpetuities does not apply to a charitable trust).

Finally, even if the rule against perpetuities applies, Lujan Claimants have neither established which jurisdiction's laws would govern (the rule against perpetuities varies by jurisdiction with most taking a "wait-and-see" approach) nor have they created any factual record for this Court to determine that the rule was violated.  The Court should reject this argument as waived and, in any event, meritless.

## III.   Statutory Authority

Standard of Review:  This Court reviews *de novo* whether the bankruptcy court had statutory authority.  *Millennium*, 945 F.3d at 133 n.5.

Contrary to Claimants' and *Amici*'s arguments, this Court's long-standing precedent establishes that bankruptcy courts have statutory authority to approve nonconsensual third-party releases.  *See* D&V Br. at 33–40; Lujan Br. at 28–29. Recognizing that chapter 11 cases present many complex issues, Congress enacted

several provisions that provide bankruptcy courts the flexibility to accommodate unique, case-specific circumstances. A100; *see also* A641; 2 COLLIER ON BANKRUPTCY ¶ 105.01 (16th ed. 2023) ("The equitable origins of the bankruptcy power suggest substantial leeway to tailor solutions to meet the diverse problems facing bankruptcy courts."). These provisions include sections 105(a), 1123(a)(5), and 1123(b)(6) of the Bankruptcy Code, which both lower courts correctly identified as the statutory bases for the bankruptcy court's authority to approve the Channeling Injunction and Releases in the Plan:

- Section 105(a) empowers the court to adopt flexible remedies, consistent with its powers as a court of equity, as "necessary or appropriate to carry out the provisions of" the Bankruptcy Code.

- Section 1123(a)(5) requires a plan to provide "adequate means" of implementation "[n]otwithstanding any otherwise applicable nonbankruptcy law" and provides a non-exhaustive list of potential mechanisms.

- Section 1123(b)(6) allows a plan to include "any other appropriate provision not inconsistent with applicable provisions of [the Bankruptcy Code]."

A641; A100.[22]

---

[22] D&V Claimants argue, for the first time, that the Channeling Injunction and Releases are inconsistent with section 523(a) of the Bankruptcy Code. D&V Br. at 37–38. This argument is meritless, as section 523(a) of the Bankruptcy Code exempts certain categories of debts from the discharge granted to *individual* debtors. *See* 11 U.S.C. § 523(a)(2); *Archer v. Warner*, 538 U.S. 314 (2003) (addressing nondischargeability of debt of debtors that are individuals). BSA is not an individual.

The broad language in section 1123(b)(6) is unambiguous and signals that Congress granted courts the "catchall" authority to approve chapter 11 plan provisions necessary to make complex and varied reorganizations work. *See Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009) ("[T]he whole value of a generally phrased residual clause" such as section 1123(b)(6) "is that it serves as a catchall for matters not specifically contemplated."); 11 U.S.C. § 1123(b)(6) (including "*any* other . . . provision," so long as it is "appropriate" and "not inconsistent with the applicable provisions" of the Bankruptcy Code (emphasis added)). Congress' use of "any," which has an "expansive meaning," *Dep't. of Hous. & Urb. Dev. v. Rucker*, 535 U.S. 125, 131 (2002), demonstrates that it intended to confer the flexibility needed to include the provisions essential for successful reorganizations, such as the Channeling Injunction and Releases, when appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code. Congress' intent behind section 1123(b)(6) demonstrates that it "entrusted" bankruptcy courts "with broad equitable powers to balance the interests of the affected parties, guided by the overriding goal of ensuring the success of the reorganization." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'Ship*, 507 U.S. 380, 389 (1993). Indeed, a bankruptcy court's power extends to "all matters connected with the bankruptcy estate." *Celotex*, 51 U.S. at 308. Additionally, section 1129(a)(1) requires a plan to comply "with the applicable provisions of [the

Bankruptcy Code]" and provides authority to approve third-party releases.    11
U.S.C. § 1129(a)(1).

When "viewed together," these provisions confer what the Supreme Court has
described as a bankruptcy court's "residual authority" to confirm plans that enable
successful and value-maximizing reorganizations, including relief not specifically
authorized elsewhere in the Bankruptcy Code, so long as such reorganizations are
not otherwise inconsistent with the Bankruptcy Code.    A100–01 (citing *United
States v. Energy Res. Co.,* 495 U.S. 545, 549 (1990)).

In *Energy Resources*, the Supreme Court held that the bankruptcy court had
the authority under sections 105(a) and 1123(b)(6) to reallocate the debtor's tax
liabilities if the bankruptcy court determines that such allocation is "necessary for a
reorganization's success"—even if "[t]he Bankruptcy Code does not explicitly [so]
authorize." *Energy Res.*, 495 U.S. at 549, 551.    In particular, the Supreme Court
held that this residual authority existed to effectuate relief appropriate and
"necessary to the success of a reorganization plan." *Id*. at 551; *see also United States
v. Pepperman*, 976 F.2d 123, 130 (3d Cir. 1992) (noting that "the [Supreme] Court
in *Energy Resources* consistently linked its holding with the fact of reorganization
and the debtor's need for rehabilitation").    In so holding, the Supreme Court
observed that section 1123(b)(6), together with section 105(a), codified the
"traditional understanding that bankruptcy courts, as courts of equity, have broad

authority to modify creditor-debtor relationships." *Energy Res.*, 495 U.S. at 549.

D&V Claimants and *Amici* fail to mention, much less distinguish, *Energy Resources*. Courts and commentators have noted the similarity between the tax allocation orders upheld in *Energy Resources* and non-debtor releases.[23] This Court has construed *Energy Resources* to provide that bankruptcy courts have "power to do what is necessary to get the plan confirmed," *In re Kaplan*, 104 F.3d 589, 598 n.19 (3d Cir. 1997), and that "a showing of need for a reorganization or similar purpose" is sufficient grounds for bankruptcy courts to craft flexible remedies not explicitly authorized elsewhere in the Bankruptcy Code. *Pepperman*, 976 F.2d at 131.

This Court, courts within this Circuit, and other Circuits (including the Second Circuit)[24] have repeatedly recognized the statutory authority of bankruptcy courts to

---

[23] *See, e.g.*, *In re Bestway Prods., Inc.*, 151 B.R. 530, 538 n.27 (Bankr. E.D. Cal. 1993) (indicating that the tax allocation order in *Energy Resources* is the "functional equivalent of a discharge for specific debts for someone other than the debtor"); Joshua M. Silverstein, *Hiding in Plain View: A Neglected Supreme Court Decision Resolves the Debate Over Non-Debtor Releases in Chapter 11 Reorganizations*, 23 EMORY BANKR. DEV. J. 13, 115 (2006) (noting that both tax allocation orders and channeling releases "permit the modification of *non-debtor* obligations" and that "while both . . . restrict[] the *sources* from which the creditor may recover, neither actually abrogates the creditor's legal *right* to payment") (emphasis added and internal citation omitted).

[24] In *Purdue Pharma*, the Second Circuit concluded that there is "no reason grounded in the text of the Bankruptcy Code to bar the inclusion of third-party

issue nonconsensual third-party releases under appropriate circumstances. *See, e.g.*, *Gillman v. Cont'l Airlines* (*In re Cont'l Airlines*), 203 F.3d 203, 214–15 (3d Cir. 2000) (holding that a third-party injunction would be proper under section 105(a) if the proponents of the injunction demonstrated with specificity that such an injunction was both necessary to the reorganization and fair); *In re Glob. Indus. Techs.*, 645 F.3d 201, 206 (3d Cir. 2011) (explaining that a third-party injunction under section 105(a) requires showing with specificity that an injunction is both necessary to the reorganization and fair) (citing *Cont'l Airlines*, 203 F.3d at 214); *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 657 (7th Cir. 2008) (The "residual authority" derived from sections 105(a) and 1123(b)(6) "permits the bankruptcy court to release third parties from liability to participating creditors if the release is 'appropriate' and not inconsistent with any provision of the Bankruptcy Code."); *In re Seaside Eng'g & Surveying*, 780 F.3d 1070, 1076–79 (11th Cir. 2015) (citing section 105 when approving third-party releases); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93–94 (2d Cir. 1988) (citing section 105(a) when affirming order enjoining suits against third parties)*; In re A.H. Robins Co.*, 88 B.R. 742, 754 (E.D. Va. 1988) (citing section 105 when approving thirdparty releases); *In re Signal Int'l, Inc.*, No. 15-11498 (MFW) (Bankr. D. Del. Nov. 24, 2015) [D.I. 555] at 11

---

releases in plans of reorganization."  *In re Purdue Pharma*, *L.P.,* 69 F.4th 45, 75 (2d Cir. 2023) .

(finding that the plan provides adequate and proper means for its implementation, including third-party releases, thereby satisfying section 1123(a)(5)).

*Amici*, however, argue that this Court in *Continental* "strongly implied" that nonconsensual nondebtor releases are not valid, raised statutory and jurisdictional issues with the validity of such releases, and "did *not* state that there were some conditions that might satisfy *nonconsensual* releases."   Amicus Br. at 13–14 (emphasis in original).    But this Court in *Continental* distinguished the nonconsensual third-party release in that case from the those approved in mass-tort cases like *Manville* (asbestos), *Robins* (Dalkon Shield), and *Drexel* (securities litigation), which were "fair" and "given in exchange for reasonable consideration." *Cont'l Airlines*, 203 F.3d at 215.   The *Continental* Court determined that the proposed release and permanent injunction "[did] not pass muster under even the most flexible tests for the validity of non-debtor releases" and were "so clearly invalid under any standard, [that the Third Circuit] need not speculate on whether there are circumstances under which we might validate a non-consensual release that is both necessary and given in exchange for fair consideration."  *Id.* at 214 n.11. This Court later held in *Global Industrial Technologies*: "For the Plan to be approved as designed (*i.e.*, with the inclusion of the Silica Injunction), the debtors needed to show that the Plan's resolution of silica-related claims is necessary or appropriate under 11 U.S.C. § 105(a), which, under our current precent, requires showing with

specificity that the Silica Injunction is both necessary to the reorganization and fair."
*Glob. Indus.*, 645 F.3d at 206.

D&V Claimants and *Amici* argue that the Supreme Court has limited the equitable authority of bankruptcy courts. *See* D&V Br. at 42–44; Amicus Br. at 16–24. But the authorities proffered by D&V Claimants and *Amici* are distinguishable. Indeed, D&V Claimants rely on case law standing for the proposition that a bankruptcy court may not rely on its "residual authority" to disregard or contravene *express provisions* of the Bankruptcy Code. *See Law v. Siegel*, 571 U.S. 415, 421 (2014) (reversing an order that disregarded a homestead exemption and holding that, "in exercising those statutory and inherent powers [of section 105(a)], a bankruptcy court may not contravene specific statutory provisions"); *Czyzewski v. Jevic Hold. Corp.*, 137 S. Ct. 973, 986 (2017) (holding that a bankruptcy court may not rely on its equitable powers to disregard the "basic priority rules" of the Bankruptcy Code). In contrast to *Law* and *Czyzewski*, the Channeling Injunction and Releases here are not inconsistent with any provision of the Bankruptcy Code. As noted above, this Court and seven other circuit courts of appeal have recognized that bankruptcy courts are authorized to approve non-consensual third-party releases under appropriate circumstances. *Amici* rely on *Combustion Eng.*, which focused primarily on whether section 105(a) alone can confer an independent basis for subject matter jurisdiction. *In re Combustion Eng.*, 391 F.3d at 225. But here, the

bankruptcy court correctly exercised its inherent equitable power, "in appropriate circumstances" and consistent with sections 105(a), 1123(a)(5), and 1123(b)(6) of the Bankruptcy Code, and the district court correctly affirmed and observed that, based on such provisions, this Court (among other Circuits and lower courts) have recognized bankruptcy courts' statutory authority to issue nonconsensual third-party releases under appropriate circumstances.  A640-42; A99–103.

D&V Claimants further argue that because the Channeling Injunction and Releases provide non-debtors with a discharge from state-law tort claims, they constitute a legal remedy unauthorized by the bankruptcy court's equitable powers. D&V Br. at 46.  This argument, too, is unavailing.  The Channeling Injunction and Releases are not the equivalent of a discharge.  *Millennium Lab,* 575 B.R. at 273 ("An order confirming the plan with releases does not rule on the merits of the state law claims being released."), *aff'd* 591 B.R. 559 (D. Del. 2018), *aff'd* 945 F.3d 126 (3d Cir. 2019).  The Scouting-related Abuse Claims are channeled to the Settlement Trust and the claimant is free to pursue its claim in the tort system in accordance with the TDP.  A10121–22 (TDP Arts. VII.F, VII.G); A1034 (TDP Art. XII).

Claimants also argue that the Channeling Injunction and Releases are prohibited under sections 524(e) and 524(g).  D&V Br. at 35, 40; Lujan Br. at 28–29.  But this Court has rejected the argument that section 524(e) bars nonconsensual third-party releases.  *In re PWS Holding Corp.*, 228 F.3d 224, 247 (3d Cir. 2000)

(determining that *Continental* "did not treat § 524(e) as a per se rule barring any provision in a reorganization plan limiting the liability of third parties"). Rather, the releases in *Continental* were invalidated because the "hallmarks" of permissible non-consensual releases were "absent," "[p]laintiffs received no consideration" and there was "nothing in the record" in terms of specific factual findings demonstrating the necessity of the releases. *Cont'l Airlines*, 203 F.3d at 215.

Similarly, section 524(g), which expressly authorizes third-party releases in asbestos cases, does not render such releases impermissible in non-asbestos cases. A642; A102; *see also* Bankruptcy Reform Act, Pub. L. 103-394 § 111(b) (1994); 140 Cong. Rec. 27,692 (Oct. 4, 1994); *Purdue Pharma*, 69 F.4th at 76. Congress enacted a rule of construction in section 524(g) that contradicts the inference that the Claimants ask this Court to make. *See* Pub. L. 103-394 § 111(b). In fact, Congress specifically noted in enacting section 524(g) that "[n]othing in . . . the amendments made by [§ 524(g)-(h)] shall be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization." A642; A102–03 (citing Pub. L. 103-394 § 111(b)); *see also* 140 Cong. Rec. 27, 692. Accordingly, Congress expressly provided that section 524(g) cannot be used to prohibit Plan-related injunctive relief. A642; A102–03.

**IV.    Constitutional Authority**[25]

Standard of Review:   This Court reviews *de novo* whether the bankruptcy

court had constitutional authority.  *Millennium*, 945 F.3d at 133 n.5.

This Court has ruled that a bankruptcy court has constitutional authority to

enter a final order confirming a plan of reorganization containing nonconsensual

third-party releases and injunctions if such provisions are 'integral to the debtor-

creditor relationship.  *See Millennium,* 945 F.3d at 126; A630.  In *Millennium Lab

Holdings*, this Court held that "a bankruptcy court is within constitutional bounds

when it resolves a matter that is integral to the restructuring of the debtor-creditor

relationship."  945 F.3d at 137–40; *Langenkamp v. Culp*, 498 U.S. 42, 44 (1990)

(affirming that matters that are "integral to the restructuring of the debtor-creditor

relationship" fall within the bankruptcy court's constitutional powers of

adjudication); *see also* A630; A641–42; A99–100.  Here, both lower courts correctly

determined that the Channeling Injunction and Releases were integral to the

restructuring.  A667–68; A99–100.

The record demonstrates that, without the Channeling Injunction and

Releases, the settlements would not be achieved and claimants would be left "racing

to the courthouse, filing suits across the country" with only "minimal recoveries in

---

[25]  Lujan Claimants do not challenge the bankruptcy court's constitutional authority to grant the Channeling Injunction and Releases.

sight," and leaving claimants receiving "only the pennies that a BSA-only bankruptcy plan would bring." A699; A671; A678; A106. Consequently, the bankruptcy court properly concluded that the Channeling Injunction and Releases are the "cornerstone of the Plan." A667–68; A47. This conclusion is well supported by the record, and D&V Claimants have not disputed this holding, much less proved that it was erroneous.

D&V Claimants and *Amici*'s stated concerns regarding the constitutional limits of third-party releases under *Erie v. Tompkins*, are rooted in a fundamental misconception of the Plan. *See* D&V Br. at 49–53; Amici Br. at 24–27 (citing *Erie v. Tompkins,* 304 U.S. 64 (1938). Their view of the Plan—that the bankruptcy court is adjudicating the merits of Abuse Claims under federal common law—is wrong. The bankruptcy court was not asked, and is not required, to adjudicate or resolve any of the Abuse Claims under the Plan. Instead, the TDP provide for liquidation of such claims through a voluntary settlement or a claimant's election to pursue his or her claim in the tort system. A10121–22 (TDP Arts. VII.F, VII.G); A1034 (TDP Art. XII). Accordingly, the bankruptcy court is not "extinguishing claims" without adjudication on the merits by a court of competent jurisdiction. *See* D&V Br. at 49–53; Amici Br. at 24–27. The bankruptcy court can constitutionally preclude claims—including via channeling and releases—that it does not have the

constitutional authority to adjudicate on the merits.  *See B&B Hardware, Inc. v. Hargis Indus.,* Inc., 575 U.S. 138, 149-51 (2015).

Even if D&V Claimants and *Amici* have correctly interpreted the Plan (which they have not), the holding of *Erie v. Tompkins* is not implicated here.  The bankruptcy court did not—and need not—utilize a "body of judge-made law" to approve the releases under the Plan.  Amici Br. at 12.  Rather, the bankruptcy court interpreted and applied provisions of the Bankruptcy Code within the framework of the chapter 11 cases to approve the Channeling Injunction and Releases.  While federal courts, including bankruptcy courts, do not have the constitutional authority to create new common law, they do have the authority to interpret and apply existing federal laws, including provisions of the Bankruptcy Code, to resolve disputes that arise in the context of the chapter 11 cases.  Both lower courts correctly applied existing statutes to the specific facts of these chapter 11 cases and thus, did not create any new legal doctrines.  A99–103; A640–42.  Therefore, the bankruptcy court had constitutional authority to grant the Channeling Injunction and Releases.

## V.    The Channeling Injunction and Releases Are Appropriate and Supported by Unrebutted Evidence

Standard of Review:  This Court reviews the bankruptcy court's factual findings related to the Scouting-Related Releases and Channeling Injunction for clear error.  *In re Exide Holdings, Inc.*, No. 20-11157 (CSS), 2021 WL 3145612, at *12 (D. Del. July 26, 2021).

In this Circuit, the *Continental* hallmarks of necessity to the reorganization and fairness to creditors guide the bankruptcy court's review of proposed third-party releases. *Cont'l Airlines*, 203 F.3d at 212; A628–29; A103. Here, the bankruptcy court correctly applied this "uncontroverted" legal standard. A645–69; A676–82, 163–68; A103–13. The bankruptcy court's decision approving the Channeling Injunction and Releases is supported by a "detailed and thorough review of the relevant facts" (A103) and "countless specific findings of fact that support each aspect of the necessity and fairness of Channeling Injunction and Releases under *Continental*." A112. As the district court determined, Claimants failed to demonstrate "any error in the bankruptcy court's analysis under the Third Circuit standard." A113. This Court should reach the same conclusion.

## A. The Channeling Injunction and Releases Are Necessary to BSA's Reorganization

It is indisputable that the Channeling Injunction and Releases are necessary to BSA's reorganization. A676; A106–08. As discussed above, the charitable mission of Scouting is uniquely delivered through a tripartite system comprised of BSA and Related Non-Debtor Entities, Local Councils, and Chartered Organizations. A50; A633–34. The record established that BSA develops the Scouting program but relies on Local Councils to facilitate delivery of the program. A51; A6549 (Whittman Declaration ¶ 14); A6704 (Sugden Declaration ¶ 10). Local Councils provide essential services, including funding, recruiting, training, and rule enforcement.

A51; A6549–50 (Whittman Declaration ¶ 15); A6704 (Sugden Declaration ¶ 11); A1371 (Confirmation Hr'g Tr. at 17:18-21).  They also own and operate hundreds of camps and other properties that host Scouting activities. A51; A6549 (Whittman Declaration ¶ 15). Through Local Councils, BSA maintains relationships with Chartered Organizations, which, in turn, sponsor tens of thousands of Scouting units. A51; A6550 (Whittman Declaration ¶ 16); A6732–33 (Sugden Declaration ¶ 55). Through their common mission, shared insurance, indemnification rights and obligations, and BSA's contingent interest in Local Council property, these entities' liabilities for Abuse Claims are inextricably intertwined.  A91–92; A633–34.

To unlock the value of the Abuse Insurance Policies—BSA's most valuable asset—BSA needed to ensure that all of the entities that could have sought defense or indemnity from the Settling Insurance Companies as insureds under Abuse Insurance Policies were released from all Abuse Claims.[26]  Without the Channeling Injunction and Releases, the Settling Insurance Companies would not have settled their coverage for Abuse Claims by making their collective $1.656 billion

---

[26] Lujan Claimants erroneously assert that there was no evidence that the Chubb Companies issued insurance policies to "BSA or any other entity."  Lujan Br. at 34.  The schedule to the Century and Chubb Companies Insurance Settlement, which is an exhibit to the Plan, includes numerous policies issued by Chubb Custom Insurance Company and Federal Insurance Company, among other Chubb Companies.  *See* Bankr. D.I. 8817 (Century and Chubb Companies Insurance Settlement Agreement); *see also* A875–76 (Plan definition of "Chubb Companies").  Lujan Claimants presented no contrary evidence.

contribution to the Settlement Trust in exchange for being designated as Protected Parties.  A107–08 (citing A6810 (Patton Declaration ¶ 31)); *see also* A667.  The Settling Insurance Companies would never have agreed to settle only a portion of their insurance coverage (*i.e.*, coverage obligations to BSA) knowing that they would continue to face Local Councils' and Chartered Organizations' claims for defense and indemnity on account of Scouting-related abuse claims.  A570; A664–65; A3817–18 (Confirmation Hr'g Tr. at 79:11-21, 80:2-12).  Nor would such a partial insurance settlement have achieved BSA's restructuring objectives for the reasons stated above.  A107–08 (citing A3804–05 (Confirmation Hr'g Tr. at 66:23–67:2)) ("[A]bsent these insurance settlements…I'm not sure that the BSA would have been able to reorganize."); A666–67.

Without releases in favor of Local Councils and Chartered Organizations, such entities have declined to make substantial contributions of cash and other valuable assets to the Settlement Trust, and there would likely be "significant" Local Council bankruptcy filings and a meaningful negative impact on membership and operations due to continued Scouting-related abuse litigation in the tort system.  A105 (citing A666–67). Moreover, defendants in the tort system could not have accessed their most valuable asset—insurance—to which all Chartered Organizations and Local Councils have rights.  The testimony presented on these issues at confirmation was uncontroverted.  A105.  For these reasons, it was

necessary to obtain comprehensive releases for BSA, Related Non-Debtor Entities, Local Councils, and Chartered Organizations to globally resolve Scouting-related Abuse Claims and preserve the mission of Scouting.

Lujan Claimants assert that the Channeling Injunction and Releases were not necessary for BSA's reorganization for three reasons. First, Lujan Claimants reference a previous iteration of the Plan, which included a "BSA Toggle Plan" option that would not have released Local Councils or Chartered Organizations. A105. As the district court observed, there is "no evidence that such a plan would have been feasible—either for the future of the BSA or as a means of providing compensation" to survivors. A105 (emphasis added). Indeed, BSA never sought approval of a disclosure statement or solicited votes on this version of the plan, and even if it had done so, it is unclear whether the bankruptcy court would have confirmed a plan proposed to be "crammed down"[27] on abuse survivors. A8681 (Bankruptcy Court: "[t]o solicit a plan that has no abuse survivor support is not an attractive option"); *see also* A105.

Second, Lujan Claimants emphasize that previous versions of the Plan and the aborted restructuring support agreement (which formed the foundation for many

---

[27] The BSA Toggle Plan provided that BSA would seek confirmation in accordance with section 1129(b) even if the Plan was not accepted by holders of Abuse Claims. A105; Bankr. D.I. 6445. The BSA Toggle Plan was superseded by a plan with no toggle option, which BSA filed nine weeks later. A8855–62.

components of the Plan, the "RSA") did not include certain of the settlements ultimately incorporated in the Plan.  Lujan Br. at 32-33.  For that reason, Lujan Claimants assert, the Channeling Injunction and Releases were not necessary.  *Id*. (noting that previous versions of the Plan did not release Century, Clarendon, Zurich, or the Roman Catholic Entities and arguing that the RSA did not depend on releasing Chartered Organizations).   But this overlooks that these very parties, with which BSA and other constituents ultimately negotiated settlements, had serious objections to the plan reflected in the RSA.  Without the settlements with such parties, there was no certainty that such a plan would have been confirmed over objections.  The district court correctly rejected this argument as there is "no evidence that such earlier versions of the Plan would have been feasible" and such argument "ignores the evidence establishing that the Channeling Injunction and Releases . . . are necessary."  A108.  And if there were such evidence, this argument misconstrues *Continental*, which does not require the bankruptcy court to determine that another plan other than the one before it containing third-party releases is feasible.

Third, Lujan Claimants argue that there was no evidence and no determination that BSA's reorganization requires the release of Roman Catholic Entities.  Lujan Br. at 34.  This is wrong.  The lower courts' findings related to the necessity of

releases for Participating Chartered Organizations[28] include Roman Catholic
Entities (and any other religious Chartered Organizations that did not become Opt-
Out Chartered Organizations).     A108 (citing Plan Art. V.S.8); A676–77.
Consequently, "Lujan Claimants' argument ignores the evidence establishing that
the Channeling Injunction and Releases for Participating Chartered Organizations
(which includes Roman Catholic Entities and religious Chartered Organizations) are
necessary," and the bankruptcy court, as affirmed by the district court, did not err in
making such finding.  A108 (citing A6810 (Patton Declaration ¶¶ 30–31)); A6740–
42 (Sugden Declaration ¶¶ 67–70); A6619–24 (Whittman Declaration ¶¶ 191–93,
199).

In sum, BSA's restructuring objectives could only be achieved through a Plan
that provided for the Channeling Injunction and Releases.  A108–09; A676–77.  As
the district court concluded based on the extensive evidentiary record, Lujan
Claimants have failed to prove that the bankruptcy court erred in concluding that the
Channeling Injunction and Releases were necessary to BSA's reorganization or that
the district court erred in affirming the bankruptcy court's determination.  A108–09.

## B.    The Channeling Injunction and Releases Are Fair

*Continental*'s "fairness" hallmark requires that the parties whose claims are

---

[28] The Plan definition of Participating Chartered Organizations expressly includes
Roman Catholic Entities.  A897–98.

being released receive "adequate consideration" in exchange for such releases. *Cont'l Airlines*, 203 F.3d at 212–13; *Mallinckrodt*, 639 B.R. at 867. Here, the lower courts did not err in determining that the Channeling Injunction and Releases are fair because the Plan provides for adequate consideration. A110–11. Indeed, under the Plan, Abuse Claims will receive payment *in full*. *See* A677. Holders of Abuse Claims are therefore "being treated fairly for the releases they are granting." A677. And as addressed herein, Claimants have failed to present any evidence in the extensive record to challenge this "critical finding." A109–13; A677–81.

Undeterred, Claimants argue that they are being forced to release claims against Local Councils, Chartered Organizations, and Settling Insurance Companies, but "will not receive any additional compensation" on account of such non-debtors' cash and non-cash contributions, including contributions of insurance rights. D&V Br. at 54; Lujan Br. at 30. Both lower courts correctly determined that "D&V and Lujan Claimants will receive under the Plan all the compensation to which they would be entitled in the tort system" (*i.e.,* payment in full), which is the relevant inquiry under *Continental*. A110–11; A653. It is black-letter law in bankruptcy that a creditor cannot receive more than full payment on a claim. *See, e.g.,* 11 U.S.C. § 1129(b)(1) (providing that a plan must be fair and equitable); H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 414 (1977) ("One requirement applies generally to all classes before the court may confirm under [1129(b)]. No class may be paid more than in

72

full.").

Claimants further argue that the Channeling Injunction and Releases are not fair because claimants who assert separate claims against a Chartered Organization or Local Council will receive the same compensation as claimants asserting one claim against BSA only. D&V Br. at 54. As an initial matter, the Plan only releases Scouting-related Abuse Claims.[29] A867; A980–94. All Scouting units are sponsored by a Chartered Organization, all Chartered Organizations enter into a charter agreement with a Local Council, and all Local Councils are authorized to grant charters by BSA. A1371 (Confirmation Hr'g Tr. at 17:14-17). Accordingly, any individual with a Scouting-related Abuse Claim has identical claims against each entity at each level of Scouting's organizational structure. D&V Claimants' argument ignores the lower courts' findings that the Channeling Injunction and Releases are

> consistent with the way that claimants sued and settled with BSA—as a group. Prepetition claimants, including the Lujan Claimants and the D&V Claimants, treated BSA, Local Councils and the Chartered Organizations as one organization, each liable for the actions of the others and with BSA in ultimate control.

A111; A677.

---

[29] Claims that do ***not*** involve Scouting-related abuse are ***not*** being released. Even for Mixed Claims, ***only*** the portion of the Abuse related to Scouting is released.

The fairness of the Channeling Injunction and Releases is also evidenced by survivors' having "overwhelmingly accepted" the Plan. A110; A6566 (Whittman Declaration ¶ 56). Specifically, the uncontroverted evidence shows that more than 85% of Direct Abuse Claims and more than 82% of Indirect Abuse Claims voted to accept the Plan, which constitutes "overwhelming acceptance."[30]  A110; A677. Both lower courts also accounted for the broad-based support for the Plan from the Tort Claimants' Committee, the Future Claimants' Representative, the Creditors' Committee, the Coalition, the Settling Insurance Companies, and JPM. A110; A677. Finally, as the district court held, there is no basis to disturb the bankruptcy court's determination that the settlements in the Plan are preferable to the alternative based on a thorough review of, among other things, the fairness of the settlements and impediments to collection from such parties outside of bankruptcy. A110; A677–81.

---

[30] D&V Claimants frivolously argue that only 59% of survivors voted in favor of the Plan when the number of accepting survivors is divided by the *total* number of unique and timely proofs of claim. But it is settled law that, in measuring class acceptance under section 1126(c) of the Bankruptcy Code, only the ballots cast by voting creditors are counted. *See* 11 U.S.C. § 1126(c); H.R. Rep. No. 95–595, at 410 (1977) ("The two-thirds and one-half requirements are computed based on a denominator that equals the amount or number of claims that have actually been voted for or against the plan, rather than the total number and amount of claims in the class"); *see also* 7 Collier on Bankruptcy ¶ 1126.04 (16th 2023) ("[O]nly creditors that actually voted count in determining whether the requisite majorities in number and amount are met.").

Also unavailing is Claimants' argument that specific findings of fact were required to be made with respect to the amount of contributions by each Local Council and Chartered Organization, or that contributions from Local Councils were required to be earmarked for particular survivors. *See* D&V Br. at 57-58; Lujan Br. at 30. These arguments find no support in the case law,[31] and the bankruptcy court's specific findings as to the substantial contributions by Local Councils and Chartered Organizations were supported by uncontroverted evidence. In particular, the Local Council Settlement Contribution was allocated among all of the Local Councils pursuant to a formula that the lower courts concluded fairly and equitably accounts for disparities between Local Councils' claim exposure, applicable statutes of limitation and financial capacity (A110–11) and was reached after months of mediation with the Tort Claimants' Committee, the Future Claimants' Representative, and the Coalition, all of which had an incentive to ensure that the formula maximized creditor recoveries. A657–58. As to Chartered Organizations,

---

[31] In *Continental*, the Third Circuit determined that the bankruptcy court "never specifically addressed the release and permanent injunction" of the released claims and that the confirmation order lacked "***any*** findings" regarding the necessity or fairness of the releases. *See Cont'l Airlines*, 203 F.3d at 214 (emphasis added). This is obviously not the case here, where the district court affirmed the bankruptcy court's numerous detailed findings of fact, which cited to the record evidence "hundreds of times," and thoroughly addressed and supported every aspect of the Channeling Injunction and Releases in light of the *Continental* hallmarks. A109–13, 170; A677–81.

the significant value of the insurance rights that they contributed to the Settlement

Trust and other non-monetary commitments under the Plan provided uncontroverted

evidence of the fairness of the Releases.  A109–13; A677–81.

Claimants do not dispute certain other lower court determinations that support

the fairness of the Channeling Injunction and Releases, including: (a) "more timely

assessment and payment" of claims, and "more equal treatment across claimants,"

compared to resolution in the tort system; (b) the "multiple options" provided under

the Trust Distribution Procedures to holders of Direct Abuse Claims to pursue

litigation in the tort system; and (c) survivors' need for global resolution after

waiting decades for compensation and closure.  A111 (citing A677–81 and A6560–

66 (Whittman Declaration ¶¶ 43–51, 53–56)).

### C.    D&V Claimants' Arguments Based on *LTL Management* Are Meritless

D&V Claimants' arguments based on this Court's decision in *LTL*

*Management* are irrelevant and should be rejected.  D&V Br. at 11, 17–21.  This

Court dismissed LTL Management's chapter 11 case due to the debtor's lack of

financial distress.  *LTL Mgmt. LLC v. Those Parties Listed on App'x A to Complaint*

*(In re LTL Mgmt. LLC)*, 64 F.4th 84, 110 (3d Cir. 2023).  The *LTL Management*

appeal had nothing to do with a plan of reorganization or third-party

releases.  Contrary to D&V Claimants' argument, this Court's *LTL Management*

decision does not remotely support the proposition that, for a non-debtor to benefit

from releases under a chapter 11 plan, it must file for bankruptcy protection itself or be in financial distress.[32]   D&V Br. at 21.   As addressed above, the *Continental* hallmarks of fairness and necessity govern whether third-party releases are appropriate, and it is the non-debtor's contribution to the plan in exchange for the releases—not the non-debtor's financial distress or lack thereof—that informs, in relevant part, whether the hallmarks are satisfied.

### D.   The *Master Mortgage* Factors Are Satisfied

*Continental* articulates the prevailing standard for approval of nonconsensual third-party releases in the Third Circuit—*i.e.*, whether the hallmarks of fairness and necessity to the reorganization are present, as supported by specific factual findings by the bankruptcy court.   *See* 203 F.3d 203 (3d Cir. 2000); A103 n.9; D&V Br. at 53–54; Lujan Br. at 29–30.   In its "thorough analysis," the bankruptcy court acknowledged that the factors applied in *In re Master Mortgage*, 168 B.R. 930 (Bankr. W.D. Mo. 1994), although not dispositive, help "inform the analysis of whether the *Continental* hallmarks have been met."   A646; A103.   The district court appropriately determined that the bankruptcy court did not err in making any findings or in its analysis related to the fairness and necessity of the Channeling

---

[32]   Indeed, the Court determined that the financial condition of LTL's non-debtor shareholder was relevant to the dismissal analysis "only to the extent it informs our view of the financial condition of LTL itself."   *LTL Mgmt.*, 64 F.4th at 106.

Injunction and Releases both under *Continental* and *Master Mortgage*.  A113; A103 n.9.

The *Master Mortgage* factors assess whether (a) there is an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate, (b) the non-debtor has contributed substantial assets to the reorganization, (c) the injunction is essential to reorganization such that without it, there is little likelihood of success, (d) a substantial majority of the creditors agree to such injunction: specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment, and (e) the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction. *Master Mortgage*, 168 B.R. at 935.  "Factor [c] speaks to necessity; the other four factors generally speak to fairness."  A646.  Claimants fail to demonstrate that the Channeling Injunction and Releases do not bear the *Continental* hallmarks or that any of the *Master Mortgage* factors, which serve as guideposts in the *Continental* analysis, have not been satisfied.

### 1.    Identity Of Interest

As discussed above, the extensive evidentiary record demonstrates a clear identity of interest among BSA, Local Councils, Chartered Organizations, Related Non-Debtor Entities, their respective Representatives, and Settling Insurance

Companies.  A645 (determining that a "a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.").  This identity of interest is supported by the following: (a) the parties' interconnectedness and interdependence in delivering Scouting and joint responsibility for Scouting-related Abuse Claims, (b) shared insurance, (c) contractual indemnity, and (d) BSA's residual interest in Local Council property.  Additionally, there is an identity of interest between BSA and the Settling Insurance Companies "because they are the Debtors' insurers."  A648 ("No holder" alleges "a separate claim against any Settling Insurer on account of its own conduct").  This factor weighs in favor of approving the Channeling Injunction and Releases.

### 2.    Contribution Of Substantial Assets to the Reorganization

Claimants argue that the "substantial contribution" factor is not met or weighs against the Channeling Injunction and Releases.  D&V Br. at 58–59; Lujan Br. at 36–37.  As discussed in detail herein, the bankruptcy court found that each Releasee was making a substantial contribution in exchange for the benefit of the Channeling Injunction and Releases, "result[ing] in a trust that will pay Direct Abuse Claims in full."  A653–61; A76.[33]

---

[33] And even if the Plan were not likely to pay holders of Abuse Claims in full (which it is), the bankruptcy court reasoned that a "well-funded trust need not pay claimants in full for the contribution to be substantial" under *Master Mortgage*. A653 n.455.

### a.    Settling Insurance Companies

The substantial contribution analysis is the same as the *Martin* test, which considers (1) the probability of success in litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved, and the expense (4) the paramount interest of the creditors.    A654; A121–24.    As established by the uncontroverted testimony of Mssrs. Desai, Whittman, and Patton, and Dr. Bates and Ms. Gutzler, each settlement with the Settling Insurance Companies was fair in light of the disputed coverage issues, the allocation analysis performed by Ms. Gutzler, and, as to Century and Chubb Companies, concerns regarding collectability.    A654; A122–23.

### b.    Local Councils

Local Councils' contribution is also substantial.    A657.    Lujan Claimants argue that the valuation of Local Council assets presented at confirmation was "inaccurate and incomplete."    Lujan Br. at 36.    But the bankruptcy court credited Mr. Whittman's analysis of the Local Council Settlement Contribution relative to Local Councils' insurance rights, unrestricted net assets, number of claims, geographic location (relevant to applicable statutes of limitations), and ability to contribute.    A657.    Mr. Whittman further testified that the formula used by Local Councils to apportion the aggregate Local Council Settlement Contribution among the 250 Local Councils was fair and reasonable and maximized the value being

contributed to the Settlement Trust.    A657.    No witnesses were presented to contradict Mr. Whittman's testimony, nor is any contradictory evidence in the record of this appeal.    Lujan Claimants' reliance on certain excerpts from a deposition of a representative of the Aloha Council taken on December 2, 2021 (Lujan Br. at 36–37) is inadmissible hearsay and not in the record.    Even so, it is unavailing because the Local Council real property at issue is subject to state-law use restrictions imposed by charitable donors and cannot be used to satisfy creditor claims.[34]

### c.    Chartered Organizations

Lujan Claimants also argue that the Participating Chartered Organizations (specifically, the Roman Catholic Entities) do not provide value to the Settlement Trust in exchange for the Channeling Injunction and Releases.  Lujan Br. at 37.  This argument ignores the substantial value the Participating Chartered Organizations are contributing in the form of valuable insurance rights and monetary consideration being paid on their behalf.[35]

---

[34] *See, e.g.*, *Hobbs v. Bd. of Educ. of N. Baptist Conv.,* 126 Neb. 416 (Neb. 1934) (collecting cases) (finding restricted donations fund gave rise to a charitable trust and preserved the donation from distribution to creditors because "to put any other construction upon the instruments evidencing the donations would destroy and render nugatory the benevolent intentions of the donors.").

[35] Plus, for Mixed Claims (claims that assert Scouting and non-Scouting-related Abuse), *only* those portions of Mixed Claims arising from Scouting will be channeled and released.

Participating Chartered Organizations' contributions were substantial: (a) the assignment of the Participating Chartered Organizations' rights under BSA Insurance Policies and Local Council Insurance Policies, which unlocked access to insurance assets with coverage estimated by the bankruptcy court valued between $4.2 and $4.4 billion A60; A581–82, A660–61, A6908 (Gutzler Declaration ¶ 121), A3391–92 (Confirmation Hr'g Tr. at 40:13–41:11); (b) the Supplemental LC Contribution of $40 million (paid by Local Councils on the Chartered Organizations' behalf), A58; A659–60, A6733–36 (Sugden Declaration ¶¶ 56–58); (c) the funding of 25% of the Settlement Growth Payment[36] (paid by Local Councils and BSA on behalf of the Chartered Organizations), A660, A6733–36 (Sugden Declaration ¶¶ 56–58); (d) the assignment of Participating Chartered Organizations' own causes of action against Non-Settling Insurance Companies for the period prior to January 1, 1976, A57; A660, A6619–20 (Whittman Declaration ¶ 191); and (e) the waiver of Participating Chartered Organizations' Indirect Abuse Claims, which include substantial indemnity claims, asserted in thousands of proofs of claim.  A660; A5821 (Confirmation Hr'g Tr. at 95:21–24).  Moreover, Roman Catholic Entities have agreed, among other things, to work with BSA and Local Councils to support

---

[36] This is a variable payment made to the Settlement Trust, subject to certain conditions, and calculated based on the growth in total members and volunteers.

Scouting and BSA's youth protection efforts.  A545–46.

There is no basis to disturb the bankruptcy court's determination that the Releasees' contributions are substantial or the district court's affirmation thereof. A659–61.

### 3.    A Substantial Majority of Impacted Creditors Support the Plan

Over 85% of holders of Direct Abuse Claims voted in favor of the Plan. A110; A662.  Claimants, however, argue that BSA "lost the vote" because fewer than 90% of holders of Direct Abuse Claims voted to accept.  Lujan Br. at 38; D&V Br. at 59–60.  There is no legal basis for imposing any such arbitrary threshold for purposes of determining whether a "substantial majority" of survivors support the Plan.  The district court correctly determined that "[t]he final voting results following solicitation of votes on the Plan demonstrate overwhelming creditor support for the Plan, with all voting classes voting to accept."  A56–57; A662; A12168–12170 (Final Vote Tabulation).

Courts within this Circuit have approved third-party releases with similar acceptance rates.  *See, e.g.*, *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) [D.I. 2120] (approving third-party releases where 74–78.18% of the affected classes voted to accept the plan); *In re The Weinstein Co. Holdings, LLC*, No. 18-10601 (MFW) (Bankr. D. Del. Jan. 26, 2021) [D.I. 3203] (approving third-party releases where 82.98% of the affected class voted to accept the plan).

The 75% requirement of section 524(g) can also be used as a proxy to the extent there is a floor on what constitutes a "substantial majority." A662.

Lujan Claimants assert that even if the overall acceptance rate constitutes a substantial majority, the bankruptcy court was required to consider claimant votes in relation to each individual Local Council or Chartered Organization. Lujan Br. at 38. The bankruptcy court properly rejected this granular analysis because, as the court explained, the Plan is a global resolution of Abuse Claims—not a resolution of claims against only one or piecemeal groups of Local Councils or Chartered Organizations. A662. Moreover, it would have been impracticable to divide holders of more than 82,200 Direct Abuse Claims into a myriad of additional subclasses based on their asserted claims against one or more of the hundreds of Local Councils or thousands of Chartered Organizations. Indeed, "many holders of Direct Abuse Claims did not name a Local Council or Chartered Organization in their proofs of claim." A757. Thus, there is no competent evidence supporting the need for any further granularity in tallying votes to accept or reject the Plan. This factor was satisfied.

### 4. The Plan Provides for the Payment in Full of the Abuse Claims

Claimants appeal that holders of Abuse Claims will likely be paid in full or substantially in full under the Plan. *See* D&V Br. at 60–68; Lujan Br. at 39–41. They also appeal the credibility of Dr. Bates's testimony on the range of aggregate

values of Direct Abuse Claims. *Id*. To appeal those findings of fact, Claimants must prove "clear error." The bankruptcy court's findings are not clearly erroneous, but supported by all of the record evidence. Indeed, Claimants did not introduce any contrary evidence whatsoever.

The bankruptcy court found that Dr. Bates's uncontroverted valuation analysis was "thorough and credible based on the data available" and "undisputed." A71 (quoting A578).[37] The bankruptcy court found, and the record reflects, that Dr. Bates "was qualified without objection as an expert in claim valuation, mass tort matrices and trust distribution structures." A179; A571. To arrive at a range of aggregate values for Abuse Claims, Dr. Bates employed a frequency-severity model, which the bankruptcy court found "is an accepted valuation methodology within the valuation community" and is the methodology that Dr. Bates employs in each of the many "mass tort case[s] in which he has provided expert testimony." A68 (quoting A571); A2746–47 (Confirmation Hr'g Tr. at 115:4–116:2).

Based on its assessment of Dr. Bates's credentials, analysis, and credibility, the bankruptcy court determined that the best estimate of the aggregate value of the Abuse Claims fell within the lower quartile ($2.4 billion–$3.6 billion) of Dr. Bates's

---

[37] The specific findings regarding Dr. Bates' testimony and related evidence are described in detail by the bankruptcy court (A570–79) and the district court. A67–74.

range of $2.4 billion to $7.1 billion.  A578–79; A71; A2728 (Confirmation Hr'g Tr. at 97:10–23); A2821–22 (Confirmation Hr'g Tr. at 190:17–191:6).  For this reason, and because of the value of the substantial contributions detailed above, the district court affirmed, in a detailed and well-reasoned opinion after conducting a thorough review of the bankruptcy court's findings and the record, that the bankruptcy court properly determined that "the Plan provides for payment in full."  A663–64; A76.[38]

Claimants further challenge the substantial-payment determination, arguing incorrectly that "recovery up to 100%" depends on hypothetical future insurance settlements.  *See* D&V Br. at 64; Lujan Br. at 40.  The bankruptcy court determined that, under the Plan, the "fully noncontingent funding is $2,484,200,000…is already within the [$2.4 billion to $3.6 billion] range of Direct Abuse Claims."  A583; A74–75.  There is also ample opportunity for the Settlement Trust[39] and, in certain circumstances, individual claimants, to pursue unsettled insurance coverage through

---

[38]  Lujan Claimants cite (Lujan Br. at 40) an out-of-circuit decision involving a non-mass tort debtor, *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 771–78 (Bankr. N.D. Tex. 2007).  *Wool Growers*, where the bankruptcy court determined that the plan did not provide for payment in full when the evidence established that creditors would recover only sixty to seventy percent of their claim, is opposite of the findings here.  *Id.*  Here, the bankruptcy court found payment in full based on the uncontroverted, credible evidence.

[39]  Indeed, the Settlement Trustee has commenced the Coverage Action against a Non-Settling Insurer.

negotiated settlements or litigation.[40]  Lujan Claimants also criticize the Independent Review Option as "illusory" because the Non-Settling Insurance Companies from whom the Excess Award Fund is to be funded "may never pay anything to the Trust." Lujan Br. at 40–41.  Neither Appellants submitted any evidence to support their respective positions or contradict BSA's experts, whose testimony was undisputed, "methodical and credible."  A581; A62.

After accounting for committed, but contingent, funding and available allocated insurance against Non-Settling Insurance Companies, both lower courts determined the funding for the Settlement Trust is "well over" the initial benchmark valuation and "comfortably" within the aggregate range.  A583–84; A74.  Both lower courts also accounted for an additional estimated $4.2 to $4.4 billion in currently unallocated insurance against Non-Settling Insurance Companies, as well as additional unliquidated contributions from Chartered Organizations, which

---

[40]  Indeed, the Independent Review Option under the Trust Distribution Procedures provides a pathway for recoveries that exceed the $2.7 million cap applicable to a Trust Claim Submission.  A554; A195; A6694–95 (Azer Declaration ¶ 55); see A2729–30 (Confirmation Hr'g Tr. at 98:14–99:1) ("[The Independent Review Option] [b]asically remov[es]…a windfall that the excess insurers had obtained in the original draft of the TDP.").  The purpose of the Independent Review Option is to replicate the amount a reasonable jury would award for the Direct Abuse Claim and provides claimants that believe they have particularly high-value claims the opportunity to prove such claims and pursue higher recoveries and unsettled insurance coverage.  A1037–38 (TDP Art. XIII.A).

provide a total potential recovery of more than $7 billion.  A581–84; A74–75; A6908 (Gutzler Declaration ¶ 121); A3391–92 (Confirmation Hr'g Tr. at 40:13–41:11).[41] Therefore, the bankruptcy court correctly determined that BSA has shown that Direct Abuse Claims will likely be paid in full.  A584–85.  As the district court correctly observed, "[n]either D&V nor Lujan Claimants provided any expert or evidence at trial to prove otherwise."  A75.  Neither Appellant can demonstrate that the court's findings of fact were clearly erroneous.

Lacking any evidence to contradict Dr. Bates's "methodical and credible" opinions, Claimants argue that Dr. Bates' testimony is unreliable or inaccurate based upon their own flawed interpretations of the TDP.  Lujan Br. at 39–40; D&V Br. at 61, 64–67.  The bankruptcy court rejected such arguments as "not supported by the record."  A71.  The record is that Dr. Bates's belief that the aggregate value of Abuse Claims was most likely in the lower quartile of the aggregate range was "the result of updated information and not any change in the methodology."  A574 n.241; A2813–17 (Confirmation Hr'g Tr. at 182:12–186:11).

---

[41] The precise timing of a contributing party's payment into the Settlement Trust does not affect the substantial-payment-in-full analysis.  Indeed, all recoveries under the TDP are assumed to depend on the receipt of all committed contributions to the Settlement Trust, which have variable timing.  *See, e.g.*, A11235–36 (Hartford Insurance Settlement Agreement §§ IV.B–C) (providing for an initial payment date and then later, after certain conditions are met, an additional payment date).

Contrary to D&V Claimants' incorrect assertion that the TDP only allows the value to be "ratcheted up, not down," D&V Br. at 66–67, the district court correctly observed that Dr. Bates tested his assumptions developing "a list of 'plus' and 'minus' factors that would move the Initial Benchmark Valuation up and down, as applicable." A70 (citing A2896–2807 (Confirmation Hr'g Tr. at 165:8–12; 175:21–176:2)). By way of example, section VIII.D of the TDP provides that the Settlement Trustee may assign a mitigating scaling factor in the range of 0 to 1 based upon any factors she believes are relevant, including (a) absence of protective party relationship or presence of a responsibility party that is not a protected party, (b) other settlements, awards, contributions or limitations, (c) statutes of limitation or repose, or (d) absence of a putative defendant. Through these mitigating and aggravating scaling factors, the TDP helps ensure that new claims are treated consistently with prior practices. A173–74 (citing A2838–55 (Confirmation Hr'g Tr. at 207:15–209:8–10, 12; 223:11–224:12); A2937 (Confirmation Hr'g Tr. at 33:2–4)).

Simply put, there is no single determinative factor when evaluating a claim. Rather "the TDPs require the trustee to essentially evaluate the claims based [on] what they would have been evaluated in the tort system, taking account of all defenses and all other factors that would affect the value of the claims." A2943 (Confirmation Hr'g Tr. at 39:14–21). When asked about this exact issue at

confirmation,[42] Dr. Bates explained that the hypothetical base case assumes a single abuser where there was "a fairly high degree of institutional responsibility" and that the value is

> designed to be used with a mitigating scaler, which means we have to start it with a relatively high value so that, through the use of a scaler which is between zero and one, we reduce the value to the appropriate level….

A2945–46 (Confirmation Hr'g Tr. at 41:10–15; 41:17–42:2).

Having conducted an extended confirmation hearing and thoroughly evaluating all of the evidence, including Dr. Bates' testimony, the bankruptcy court concluded that "Dr. Bates's analysis was thorough and credible based on the data available.  It was also undisputed."  A578.  "[N]one of the objectors challenged his use of the frequency severity model, suggested another analysis or undercut his conclusions."  A578.

Nor does the likely number of Future Abuse Claims undermine the substantial-payment-in-full analysis.  Dr. Bates's valuation range includes an estimate of 400 Future Abuse Claims.  A575 n.246; A2829–30 (Confirmation Hr'g Tr. at 198:20–199:19).  Contrary to Claimants' contentions, the bankruptcy court gave no weight to Mr. Patton's testimony regarding the number or value of Future

---

[42]  D&V Claimants do not dispute that they had opportunity to cross-examine Dr. Bates on this specific issue and did in fact cross-examine him.  A19972–73 (District Court Appeal Hr'g Tr. at 20:25–21:7).

Abuse Claims, finding that Mr. Patton had not been offered for the purpose of valuing Direct Abuse Claims, that he is not an expert, and that "there was no support offered for [his] position." A575 n.246.

D&V Claimants observe that, in the Disclosure Statement, the Tort Claimants' Committee estimated the range of aggregate value of Abuse Claims at $13.5 billion to $73.2 billion. D&V Br. at 67–68 (citing Bankr. D.I. 6445 (Disclosure Statement)). But the Tort Claimants' Committee did not offer any expert witness testimony to support such an aggregate valuation, and the bankruptcy court did not give any evidentiary weight to the Tort Claimants' Committee's unsupported estimate. A73–74. The bankruptcy court's reliance upon Dr. Bates's uncontroverted and well-reasoned expert opinion instead of unsubstantiated statements by non-experts was properly affirmed by the district court. A74.

### 5. The Injunction Is Essential to Reorganization

BSA's charitable mission of Scouting is unique, as it depends on a complex organization of thousands of unaffiliated entities working together to deliver the programming designed by BSA, under standards promulgated by BSA, across the country. A50–51. Since the outset of its restructuring, BSA has consistently stated that it has two goals: to achieve a global resolution of abuse claims and to preserve the mission of Scouting. A7033 ¶ 10. Indeed, the latter is not possible without the former. The Plan includes a series of settlements that together provide the basis for

abuse claims to seek compensation from a Settlement Trust with assets expected to pay them in full.  A664.   And as the record reflects, for the Settlement Trust to receive those assets, the Channeling Injunction and Releases "are required"; it is "illogical" to believe these settlements could be achieved without releases.  A664–68; A106–07; A6589–639 (Whittman Declaration ¶¶ 106, 134, 154–55, 170, 184, 192, 238); A6807–08 (Patton Declaration ¶ 23); A3268 (Confirmation Hr'g Tr. at 140:9–25); A3765–855 (Confirmation Hr'g Tr. at 27:10–17, 44:8–12, 47:4–21, 117:15–18).

Claimants have failed to prove that the district court clearly erred in affirming the bankruptcy court's conclusion that the parties contributing to the Settlement Trust would not have done so without the Channeling Injunction and Releases.  A664–68; A106.  Without these settlements, each of the Releasees would be forced to divert the hundreds of millions of dollars in settlement funds into a massive, protracted, complex litigation process to the detriment of abuse survivors, many of whom have waited decades for compensation.  A168; A121–23.  Further, without the Channeling Injunction and Releases, abuse survivors would be forced to individually pursue the settling Local Councils and Chartered Organizations in a race to the courthouse that would ultimately lead to lower recoveries for survivors.  A677; A106.  In this scenario, many Local Councils and Chartered Organizations would be forced to file their own bankruptcies in the process, further delaying and

diminishing funds available to compensate abuse survivors. A666–67; A2469–70 (Confirmation Hr'g Tr. at 35:15–36:9); A6705 (Sugden Declaration ¶ 11). Continuous litigation would also deplete BSA's assets and jeopardize BSA's successful reorganization and ability to fulfill its charitable mission.

The district court properly affirmed the bankruptcy court's findings that, based on the overwhelming evidence, the Channeling Injunction and Releases are the "cornerstone of the Plan." A667–68; A47. The fifth *Master Mortgage* factor clearly supports the Channeling Injunction and Releases.

### E. *Purdue*[43] Does Not Alter This Court's Analysis

*Purdue* does not impact this Court's analysis of the issues on appeal because of several key differences. First, BSA's Plan was effective and fully implemented six months ago whereas the *Purdue* plan is neither effective nor consummated in any respect. Second, the bankruptcy court below determined, and the district court affirmed, that "Direct Abuse Claims will be paid in full." A585; A142. In contrast, none of the courts in *Purdue* found that the opioid trust provides claimants with payments in full; rather, the *Purdue* courts applied a "fair payment" standard. *See generally Purdue Pharma*, 69 F.4th 45. Third, BSA is a congressionally chartered non-profit corporation, the non-debtors protected under the Plan include non-profit

---

[43] *William K. Harrington, United States Trustee, Regions 2 v. Purdue Pharma L.P., et al.*, S. Ct. Case No. 23A87 (2023) ("*Purdue*").

Local Councils and Chartered Organizations that deliver the charitable mission of Scouting, and none of the Plan's releases of third-party claims against non-debtors would be prohibited in bankruptcy cases filed by such debtors. A49–50. In contrast, the non-debtor protected parties in *Purdue*, the Sackler family, are natural persons who are shareholders of the Purdue debtors and face liability for fraud, which could not be discharged even if such individuals filed their own bankruptcy cases. *See* 11 U.S.C. § 523(a)(2), (4), (6). Fourth, the appellant in *Purdue*—the United States Trustee—was also a party in interest in these Chapter 11 Cases and did not appeal the Confirmation Order. *Purdue* should have no bearing on the merits of these appeals.

## VI.    Lujan Claimants' Challenge of the Insurance Settlements Lacks Merit

<u>Standard of Review</u>: This Court reviews the bankruptcy court's approval of the Insurance Settlements for an abuse of discretion ("deferential standard of review"), *In re Nutraquest, Inc.*, 434 F.3d 639, 645 (3d Cir. 2006), and statutory interpretation and legal conclusions related to the Insurance Settlements *de novo*. *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 166 (3d Cir. 2001).

Lujan Claimants challenge certain additional aspects of the Insurance Settlements incorporated in the Plan, including on the grounds that: (a) the proceeds of the Abuse Insurance Policies were not property of BSA's estate; (b) the Plan fails to adequately protect and compensate Lujan Claimants for their alleged interests in

the policy proceeds; (c) the bankruptcy court lacked jurisdiction to authorize the sale of interests in 1976 and 1977 Hartford Policies; and (d) the McCarran Ferguson Act reverse preempts the Bankruptcy Code, which prohibits Lujan Claimants' claims against the Settling Insurance Companies from being channeled to the Settlement Trust. Lujan Br. at 41–68. Both lower courts considered and properly rejected these arguments. A600–26; A121–37. This Court should affirm.

### A. The Insurance Settlements were Properly Approved and the Settlement Amounts Appropriate under the *Martin* Standard

Courts within this Circuit consider the following factors to determine whether to approve a settlement under Bankruptcy Rule 9019: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 393 (3d Cir. 1996).

Lujan Claimants argue that the Insurance Settlements should not have been approved because "no insurance settlement involves payment up to the limits," and "[w]ithout full payment, Survivors should be free to recover the remaining payment owed under the policies from the insurers." Lujan Br. at 57. This argument is nonsensical and should be rejected.

To approve a settlement under *Martin*, a court "need only conclude that the settlement falls within the reasonable range of litigation possibilities somewhere

above the lowest point in the range of reasonableness." A588; A596; A122. Here, both lower courts appropriately analyzed the Insurance Settlements under the *Martin* factors based on an extensive and "uncontroverted evidentiary record," which evidenced the careful exercise of BSA's business judgment in approving each Insurance Settlement after extensive arm's-length, mediated negotiations. *See* A588–96; A121–24. Importantly, the bankruptcy court observed that without the approximately $1.656 billion that the Settling Insurance Companies will contribute to the Settlement Trust, "there is no Plan." A585–86; A123–24. The Insurance Settlements "resolv[e] complex insurance coverage issues, saving years of litigation and expense and yielding more timely recoveries for holders of Direct Abuse Claims." A589; A122.

There is no requirement that a bankruptcy settlement "be the best that can be achieved." A596. Indeed, if the law required payment of 100% of the non-debtor's alleged liability under a settlement (which it does not), settlements would be exceedingly rare. Moreover, like all other holders of Abuse Claims, Lujan Claimants are receiving payment in full of their Abuse Claims under the Plan. A582–85; A6905–10 (Gutzler Declaration ¶¶ 110–30). Accordingly, they cannot plausibly allege any injury attributable to the settlement amounts. Lujan Claimants have not shown that the lower courts' determinations regarding the Insurance Settlements "rest on a clearly erroneous finding of fact, an errant conclusion of law

or an improper application of law to fact." *Id.* (internal quotation marks and citation omitted).  The Court should not disturb the lower courts' determination that BSA satisfied the *Martin* test with respect to the Insurance Settlements.

### B.    Abuse Insurance Policies and Local Council Insurance Policies Are Property of the Estate

Pursuant to the Insurance Settlements and the Plan, Local Councils assigned their interests in Local Council Insurance Policies to BSA, which, in turn, sold such policies, as well as its Abuse Insurance Policies to the applicable Settling Insurance Companies pursuant to section 363 of the Bankruptcy Code.  A943–49 (Plan Art. V.S.4); A6739–40 (Sugden Declaration ¶ 66).

Lujan Claimants erroneously argue that non-debtor Abuse Insurance Policies and proceeds of BSA Insurance Policies were not property of BSA's estate and that such policies or interests in policies may not be sold free and clear of liens, claims and interests under section 363(f).  Lujan Claimants' arguments fail for several reasons.

#### 1.    The Proceeds of BSA Insurance Policies Are Property of BSA's Estate

Lujan Claimants argue that "injured persons, including Survivors, have a right to receive and keep those proceeds when the insurer pays on the claim."  Lujan Br. at 54.  Even if Lujan Claimants had a legally cognizable property interest in the proceeds of the Abuse Insurance Policies (they do not), such interest would not

divest BSA's bankruptcy estate of its entitlement to the proceeds. As this Court held in *In re Nutraquest, Inc.*, 434 F.3d at 647 n.4—a case Lujan Claimants rely on—insurance proceeds are not property of the estate if the policy ***only*** covers claims of non-debtors to the exclusion of the debtors. *See* A603–04 (observing that "[w]hen the liability insurance policy only provides direct coverage to the directors and officers the proceeds are not property of the estate."). Here, the debtor is an insured and entitled to coverage under the BSA policies at issue.[44] 434 F.3d at 647 n.4.

Lujan Claimants are not named beneficiaries under any of the Abuse Insurance Policies. *See In re W.R. Grace & Co.*, 475 B.R. 34, 83 (D. Del. 2012) *aff'd*, 729 F.3d 332 (3d Cir. 2013). The mere fact that the "Lujan Claimants can pursue direct action claims against non-settling insurers," Lujan Br. at 55, does not equate to a present entitlement to such insurance proceeds. As described in detail below, the Guam direct-action statute provides Lujan Claimants only with a procedural right that enables a plaintiff to name a defendant's insurer in any claim

---

[44] In *In re Edgeworth*, another case Lujan Claimants rely on, the Fifth Circuit held that proceeds were not property of the debtor's estate because the debtor was not named a beneficiary under the policy. For that reason, the debtor had no "legally cognizable claim" to the proceeds. 993 F.2d 51, 56 (5th Cir. 1993). As the district court in *W.R. Grace* explained, *Edgeworth* "explicitly recognized that, in general, "[p]roceeds of…insurance policies, if made payable to the debtor rather than a third party such as a creditor, are part of the estate" and that "courts in mass tort bankruptcies commonly include insurance proceeds as property of the estate to avoid a 'free-for-all against the insurer." *In re W.R. Grace*, 475 B.R. at 82 (distinguishing *Edgeworth*).

against defendant, and not a substantive right such as an independent cause of action against the defendant's insurer. A621–22; A144. Accordingly, there is no basis for Lujan Claimants' contention that they have a property interest in the proceeds of Abuse Insurance Policies either under the Guam statute or under the policies themselves.

Lujan Claimants also argue that the bankruptcy court lacks jurisdiction over the 1976 and 1977 Hartford policies for coverage of child sexual abuse claims because BSA previously released its rights to such coverage. Lujan Br. at 64–65. But the scope of those releases remains disputed, and Local Councils and Chartered Organizations, which were not parties to the settlement agreement containing the referenced releases, have asserted that their own coverage rights under those policies were not impacted by the settlement. A6892 (Gutzler Declaration ¶ 65); A9463–64 (Disclosure Statement Art. III.F.3). Moreover, the settlement did not settle claims for possible coverage of claims other than child sexual abuse. A6301 (Confirmation Hr'g Tr. at 67:2–16). The bankruptcy court has proper jurisdiction over the 1976 and 1977 Harford policies because BSA is selling its residual rights for coverage of claims other than child sexual abuse and child sexual abuse claims, if any, as well as the interests of Local Councils and Chartered Organizations which were contributed to BSA and became part of BSA's estate. A600. To the extent Lujan Claimants assert that the settlement extinguished all coverage for child sexual abuse under 1976

and 1977 Harford policies, including the interests belonging to BSA, Local Councils, and Chartered Organizations, they, too, would have no remaining claim to those policies and their argument would still be meritless.

> **2.   Local Council Insurance Policies Are Property of BSA's Estate and Therefore Properly Sold Back to the Applicable Settling Insurance Companies**

Similarly, Lujan Claimants argue that non-BSA insurance policies and the released BSA policies are not property of the bankruptcy estate and cannot be disposed of "free and clear under sections 363(f), 1123(a)(5)(D), or 1129(b)(2)(A)(ii) of the Bankruptcy Code." Lujan Br. at 65–68.

Based on the record, the bankruptcy court correctly found that "[a]ny Local Council Insurance Policies, once assigned to BSA in connection with the Plan, will be property of the estate." A600 (citing 11 U.S.C. § 541(a)(7)) (property of the estate includes "[a]ny interest in property that the estate acquires after the commencement of the case"). Contrary to Lujan Claimants' argument, property assigned to a debtor postpetition unquestionably becomes property of the estate. *See, e.g., In re CBI Holding Co.*, 529 F.3d 432, 459 (2d Cir. 2008) (holding that a creditor's claims that were assigned to debtor properly became property of the estate under section 541(a)(7) and explaining that "[a]llowing a debtor's creditors to assign their claims for the benefit of the debtor's estate permits debtors, creditors, and bankruptcy courts the flexibility in reorganizing or liquidating a debtor's assets necessary to achieve

efficient administration of the reorganization").

Lujan Claimants' reliance on *In re Aegean Marine Petroleum Network, Inc.* is irrelevant to whether assigned insurance policies are estate property. 599 B.R. 717 (Bankr. S.D.N.Y. 2019). *Aegean Marine* solely concerned the bankruptcy court's authority to grant third-party releases based on evidence that did not satisfy the Second Circuit's standard for approval of nonconsensual third-party releases in a plan of reorganization. *Id.* It did not address settlements under section 363 of the Bankruptcy Code or Bankruptcy Rule 9019. *See id.*

Lujan Claimants' new argument that some property "within the meaning of § 541(a)(1) must be used to acquire the 'interest in property'" for § 541(a)(7) to apply—which was never raised before the lower courts[45]—equally misses the mark. Lujan Br. at 65–68. The out-of-Circuit cases that Lujan Claimants rely upon are chapter 7 cases of individual debtors that discuss whether a post-petition claim belongs to a chapter 7 trustee pursuant to section 541(a)(7). *Id.* at 66–67. Here, "there is . . . a settlement of an insurance policy in a mass tort case which proposes a reorganization, not a liquidation, and in which the insurance policies and proceeds are key assets," and the Local Council Insurance Policies are voluntarily contributed

---

[45] Unpreserved arguments are waived and should not be considered. *See, e.g.*, *Thompson*, 2020 WL 1531333, at *7 n.3; *Watkins*, 2016 WL 1166323, at *4 n.4; *Mallinckrodt*, 639 B.R. at 892 n.178.

to BSA pursuant to the Plan.  A598, A605; A943–50 (Plan Art. V.S.4).  This argument also "ignores the premise of this Plan" (A605) and fails to cite to any evidence in the record contrary to the bankruptcy court's careful findings.

As addressed herein, courts considering factually analogous cases have consistently held that property assigned to a debtor post-petition unquestionably becomes property of the estate.  For that reason, the Court should affirm the lower courts' conclusions that the Local Council Insurance Policies are property of BSA's estate and therefore properly sold back to the applicable Settling Insurance Companies.

## C.    The Plan Adequately Protects and Compensates Lujan Claimants for Their Alleged Interest in the Abuse Insurance Policies That Are the Subject of the Insurance Settlements

Lujan Claimants acknowledge that "the Plan treats [them] the same as all other Survivors," Lujan Br. at 62, but nonetheless object to the Plan and Insurance Settlements incorporated therein because they do not afford them enhanced recoveries above and beyond those of other holders of Abuse Claims on account of Lujan Claimants' purported "direct-action" rights.

As both lower courts correctly identified, the Guam direct-action statute is only a "procedural statute" that provides tort claimants with a procedural right to bring claims directly against insurers—it is not a "cause of action."  A622; A128–29.

As noted above, direct-action rights under Guam law simply provide a procedural vehicle for a plaintiff to directly name the insurance company as a defendant in an underlying lawsuit against an insured. *See Reyes v. United States*, No. 08-00005, 2010 WL 5207583, at *7 (D. Guam Dec. 15, 2010) (holding that Guam's direct-action statute does not provide a separate cause of action against the insurer). In other words, a direct-action right against an insurance company is wholly derivative of the claim against the insured. *See Townsend v. Benavente*, 339 F.2d 421, 422 n.3 (9th Cir. 1964) ("Derivative liability of an insurer may be established in the principal action under Guam's 'direct action' statute."). A direct-action plaintiff is not entitled to any *additional* recovery beyond what the plaintiff could have recovered against the insured. *Reyes*, 2010 WL 5707583, at *7.

Indeed, courts have emphasized that Guam's direct-action statute does not expand the rights of injured parties beyond the terms of the insurance policy, as "[t]he express language of § 18305 limits the 'right of direct action against the insurer *within the terms and limits of the policy.*'" *Heikkila v. Sphere Drake Ins. Underwriting Mgmt., Ltd.*, No. CIV. 96-00047, 1997 WL 995625, at *5 (D. Guam Aug. 29, 1997) (emphasis in original) (citing *Capital Ins. & Surety Co. Inc. v. Kelly*, 361 F.2d 567 (9th Cir. 1966) (holding that plaintiff could not prosecute a claim directly against an insurer, notwithstanding Guam's direct-action statute, because, under the policy, any claim by an insured must be arbitrated pursuant to the terms of

the policy and could not be litigated)).  Accordingly, Lujan Claimants' interest in the Abuse Insurance Policies is no greater than that of any other holder of an Abuse Claim.

Lujan Claimants also assert that the Plan was unconfirmable because it incorporates Insurance Settlements that "impermissibly modify Lujan Claimants' rights to insurance proceeds."  Lujan Br. at 58.  In support of their argument, Lujan Claimants point to the findings in *W.R. Grace*, 475 B.R. at 83, and the existence of Guam's direct-action statute. *Id.* (holding that one way for a claimant to demonstrate a legal right to collection could be "a state statute crafted by the legislature conferring a right upon the parties to pursue a direct action for the proceeds"). However, in *W.R. Grace*, the court explained that "the claiming party must show that it has a right to the insurance proceeds because the insured is in some way liable to the claimant[, such as]…by obtaining a judgment against the tortfeasor.  Absent liability, the claimant has no right to collect the proceeds."  475 B.R. at 84 n.40.  The court further explained that "the injured party has no more than an expectation that he/she will be able to collect from the insured prior to obtaining a judgment," and that, particularly in the context of mass tort bankruptcies, this expectation should not preclude approval of a settlement of insurance claims that is in the best interest of personal injury claimants as a whole.  *Id.* at 85 (citing *In re Dow Corning Corp.*, 198 B.R. 214, 242 (Bankr. E.D. Mich. 1996).

Lujan Claimants do not have an existing judgment against, or settlement with, BSA and their claims remain heavily contested. Similar to the claimants in *W.R. Grace*, Lujan Claimants have no more than an expectation of recovery, and they cannot assert a present right to the proceeds of the BSA Insurance Policies. *See W.R. Grace*, 475 B.R. at 85. Lujan Claimants' procedural right to join an insurer to a tort action as a co-defendant is not an affirmative claim or right to payment. Accordingly, the Plan and Insurance Settlements do not impermissibly modify any right belonging to Lujan Claimants.

Lujan Claimants also demand "adequate protection and compensation for their interests in the insurance policies." Lujan Br. at 61. These objections rest on the same mistaken belief that Guam's direct-action statute affords Lujan Claimants a property interest in the proceeds of Abuse Insurance Policies or enhanced priority over other Abuse Claims against BSA. But as the bankruptcy court explained:

> the Guam District Court describes the direct action as procedural in nature, not substantive….[I]t is a procedural law granting standing to sue or, at best, some collection remedy for a creditor of the policyholder in the event the creditor can prove the policyholder's liability and the policy covers the loss.

A621–22.

Because the direct-action statute "does not provide the Lujan Claimants with rights in the Abuse Insurance Policies themselves…no adequate protection is required." A625–26. To the extent Lujan Claimants' alleged direct-action rights

did entitle them to adequate protection, the Plan adequately protects and compensates them for their interests.  A626.

Lujan Claimants argue that the requirements of section 1123(a)(5)(D), which requires that a plan provide adequate means for its implementation including a sale of estate property, prevent approval of the Insurance Settlements and associated sale of the insurance policies due to Guam's direct-action statute.  Lujan Br. at 60.  The bankruptcy court approved the sale of the BSA Insurance Policies free and clear of Lujan Claimants' direct-action rights pursuant to section 363.  A625.  As such, any objection based on section 1123(a)(5)(D) is irrelevant.

In further support, BSA adopts and incorporates by reference the arguments set forth in Section III.B(2)(c) of Settling Insurance Companies' brief, with respect to this argument.

### D.    McCarran-Ferguson Act Does Not Reverse Preempt the Bankruptcy Code

Lujan Claimants further argue that the Plan impermissibly conflicts with the Guam direct-action procedural statute.  Lujan Br. at 41–44 (citing 22 Guam Code Annotated § 18305).   Lujan Claimants incorrectly assert that the McCarran-Ferguson Act (the "MFA"), 15 U.S.C. § 1012(b), which provides an exception to federal preemption with respect to laws governing the "business of insurance," reverse preempts the Bankruptcy Code.  Lujan Br. at 43–44.  But the bankruptcy court correctly determined that the goal of the direct-action statute was "not

policyholder protection" or to "change the payment provisions of the policy or the spread of risk between the insurer and insured." A622; A131–32. Lujan Claimants did not introduce any evidence to the contrary, showing how Guam's direct-action procedural statute protected policyholders, changed payment provisions, or spread risk between the insurer and the insured. After a thoughtful analysis of the Third Circuit standard for the application of the MFA, the bankruptcy court correctly concluded that the "Guam direct action statute does not regulate the business of insurance as that term is used in the [MFA, and]…does not prohibit the channeling of the Lujan Claimants' claims to the Settlement Trust thereby effectively extinguishing their procedural right to sue an insurance company." A615–23. Further, the district court carefully distinguished the three cases Lujan Claimants rely on—*Evans, Wadsworth*, and *Reis*—finding that none of those cases require a different outcome. A136. Lujan Claimants failed to demonstrate any error in the district court's legal conclusions with respect to this issue and have again failed to demonstrate error in this appeal. A137.

In further support, BSA adopts and incorporates by reference the arguments set forth in Section V of Future Claimants' Representative's brief and Section III.B(2)(b) of Settling Insurance Companies' brief, with respect to this argument.

## VII. The Plan Satisfies the Best-Interests Test under Section 1129(a)(7)

Standard of Review: This Court reviews lower courts' factual findings for

clear error and legal conclusions *de novo*. *HomeBanc Mort'g*, 945 F.3d at 811.

Lujan Claimants erroneously assert that the district court erred in affirming the bankruptcy court's determination that the Plan satisfies the "best-interests test" under section 1129(a)(7) of the Bankruptcy Code. Lujan Claimants contend, without evidence, that the Plan's release of their claims against non-debtors violates the best-interests test because in a hypothetical liquidation such claims would be preserved and entitle the Lujan Claimants to a greater recovery than what they are receiving under the Plan. *See* Lujan Br. at 72–73. As the district court correctly held, these arguments fail on multiple grounds. A137; 11 U.S.C. § 1129(a)(7).[46]

First, the uncontroverted evidence at the confirmation trial demonstrated that the Plan satisfied section 1129(a)(7) and the best-interests test. A6640–69 (Whittman Declaration ¶¶ 240–81). Moreover, though not required, BSA included a consolidated liquidation analysis of the Local Councils (in addition to the hypothetical liquidation analysis for BSA) and adjusted its analysis to account for the impact of a hypothetical liquidation on insurance recoveries as compared to the Plan. A138. As both courts correctly point out, no party, including Lujan Claimants, offered any evidence to rebut BSA's three separate liquidation analyses prepared by BSA's expert. A138; A758–59.

_____

[46] As a "[d]etermination of liquidation value is a factual inquiry," the district court correctly affirmed the bankruptcy court's findings. A137.

Second, there is no requirement in the Bankruptcy Code that the value of recoveries from non-debtors be included in the liquidation analysis.  Indeed, section 1129(a)(7) requires that an impaired creditor "receive or retain under the plan ***on account of such claim or interest*** property of a value, as of the effective date of the plan, that is not less than the amount that such holder would ***so receive or retain if the debtor*** were liquidated under chapter 7."   11 U.S.C. § 1129(a)(7) (emphasis added).

As the bankruptcy court held—and the district court agreed—the plain language of section 1129(a)(7) does not support Lujan Claimants' argument because it focuses only on claims against the debtor.  A760; A139–40.  "[A]s a matter of grammar," the required comparison under section 1129(a)(7) "is between the amount that the objecting creditor would receive under the plan on account of its claim and ***what it would 'so' receive—that is, on account of its claim—if the debtor*** were liquidated under chapter 7." A756; A139–40 (citing *Purdue Pharma*, 633 B.R. at 110) (emphasis added)).[47]   The amount that a creditor may receive or retain on account of claims against third parties in a liquidation is therefore irrelevant to the section 1129(a)(7) analysis.  This correctly "leaves an analysis of third-party releases to the relevant third-party standard" and forecloses any backdoor challenge to such

---

[47]   A140 n.13 (collecting cases).

releases under a standard other than *Continental*. A756; A140.

Lujan Claimants continue to rely on an out-of-circuit bankruptcy court decision, *In re Conseco*, as the only support for their best-interests-test argument. Lujan Br. at 71. Not only do Lujan Claimants misrepresent the findings in that case, but the statement they rely on—that a "plan of reorganization is unconfirmable for violating the best interests of creditors test, where the plan requires that creditors who are entitled to a Chapter 7 liquidation distribution must release nondebtors in order to receive any payment under the Chapter 11 plan"—was made in *dicta* describing a prior version of the plan at issue in the decision. A140; *see* Lujan Br. at 71. The *Conseco* plan involved voluntary releases, not "compulsory releases that would require justification by special circumstances." *In re Conseco*, 301 B.R. 525, 527–28 (Bankr. N.D. Ill. 2003). As the district court correctly reasoned, *Conseco*'s holding did not call into doubt the cases in this circuit finding that "the condition requiring a release in order to receive a distribution does not violate the best interest of creditors test." A141 (quoting *In re Wash. Mut., Inc.*, 461 B.R. 200, 251 (Bankr. D. Del. 2011), *vacated on other grounds*, No. 08-12229 (MFW), 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012)).

Third, even if this Court disagrees with the lower courts and concludes that claims released under a plan against non-debtors should be considered under section 1129(a)(7) in certain circumstances, the bankruptcy court's determination, affirmed

by the district court, that holders of Abuse Claims will likely be paid in full necessarily shows that "the Plan, by definition, meets the best interest test as to claimants in Class 8." A761; A142 (citing *In re Quigley Co., Inc.*, 437 B.R. 102, 145 (Bankr. S.D.N.Y. 2010)).

Finally, Lujan Claimants' alleged claims against certain of the non-debtor entities are speculative, and they have offered no evidence of the value of their claims against such non-debtors or ability to recover against insurers. A141.[48]

As both lower courts recognized, in the few cases where a court has accounted for the value of claims against third parties in the best-interests test, they have done so when such claims "are neither speculative nor incapable of estimation and exist as of the date of the hypothetical chapter 7 case." A756; A141; *see also In re Ditech Holding Corp.,* 606 B.R. 544, 610–15 (Bankr. S.D.N.Y. 2019) (holding that "when weighing [third-party] claims in a liquidation analysis, the claims cannot be speculative or incapable of estimation"); *Quigley*, 437 B.R. at 145 (same). The bankruptcy court distinguished the Chapter 11 Cases from *Ditech* and *Quigley*, noting that there are "82,209 different claims against tens of thousands of different

---

[48] Although BSA performed a liquidation analysis of Local Councils, *see* A6662 (Whittman Declaration ¶ 273), it would be unduly speculative and impossible to repeat this exercise for Chartered Organizations on a claim-by-claim basis, and such exercise is not required. It is neither appropriate nor practical to include speculative and unliquidated claims against third parties in a liquidation analysis, and section 1129(a)(7) does not require a debtor to do so.

third-parties such that it would be impossible to value any particular claims."  A757; A141.  The bankruptcy court also recognized that many claims were substantively deficient, which would render meaningful estimation impossible since "many holders of Direct Abuse Claims did not name a Local Council or Chartered Organization in their proofs of claim."  A757.

As the district court stated, "[i]n response to Lujan Claimants' speculation that their claims are worth substantial amounts, the Bankruptcy Court noted that, on average, [each of] the prepetition settlement of claims against BSA for Abuse committed by the same perpetrator, Brouillard…settled for $57,000."  A757; A141–42.[49]  The district court correctly concluded, "[i]f Lujan Claimants' claims and potential recoveries in a chapter 7 liquidation were not highly speculative and unliquidated, but instead could be reliably calculated, they should have produced evidence to that effect to rebut BSA's liquidation analysis."  A142.

Because Lujan Claimants have offered no basis or evidence that would support a reversal of this determination, their best-interests arguments fail.  For these reasons, the lower courts' rulings should be affirmed.

---

[49]  Many of Lujan Claimants' claims assert abuse perpetrated by Father Brouillard, a Catholic priest of the AOA, and Scoutmaster and constitute Mixed Claims (claims against AOA relate to Scouting and claims against BSA relate to AOA).

## VIII. The Plan Properly Classifies the Claims of the Lujan Claimants under Section 1122(a)

Standard of Review: This Court reviews lower courts' factual findings for clear error and legal conclusions *de novo*. *HomeBanc Mort'g*, 945 F.3d at 811.

With minimal explanation, Lujan Claimants further complain that the Plan violates section 1122 of the Bankruptcy Code because their claims are not "substantially similar" to other Direct Abuse Claims in Class 8. Unlike other abuse claimants, they argue, Lujan Claimants hold direct-action procedural rights against the Insurance Companies.[50] *See* Lujan Br. at 74–75.[51] Both lower courts rejected this argument, and Lujan Claimants have not presented any basis for this Court to upset these careful findings.

Section 1122(a) provides that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). As this Court has

---

[50] Lujan Claimants attempt to create a distinction by noting that a "Direct Action Claim" and "Abuse Claims" are separately defined and listed as "Released Claims" in the Hartford Insurance Settlement Agreement. Lujan Br. at 75. But a "Direct Action Claim" under the Hartford Insurance Settlement Agreement is a claim asserted by a holder of a Direct Abuse Claim (*i.e.*, an ordinary Abuse Claim) and not a direct action procedural claim like those asserted by the Lujan Claimants. A882 (Plan Art. I.A.99).

[51] Lujan Claimants no longer argue that they should have been separately classified because they are also subject to an open civil statute of limitations. Such argument was rejected by both lower courts. A703–04; A142–45.

recognized, a plan proponent has significant flexibility in creating multiple classes under a plan if there is a reasonable basis and all claims in a class are substantially similar. *See, e.g.*, *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (classification proper in a cram-down plan where each class represents a voting interest "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed"); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159 (Bankr. D. Del. 2006) (section 1122 satisfied "when a reasonable basis exists for the structure, and the claims or interests within each particular class are substantially similar").

Lujan Claimants mistakenly assert that the reference in section 1122 to "substantially similar" claims requires that all claims within a class be identical in all respects. Lujan Br. at 74–75. But as the district court correctly observed, this is not the law. A144. For a class of claims to be substantially similar, the question is "whether the claims in a class have the same or similar legal status in relation to the debtor." *In re Piece Goods Shops Co., L.P.*, 188 B.R. 778, 788 (Bankr. M.D.N.C. 1995) (recognizing debtor could appropriately classify all types of unsecured claims in a single class); *see also In re AOV Indus., Inc.*, 792 F.2d 1140, 1150–51 (D.C. Cir. 1986) ("[T]he focus of the classification is the legal character of the claim as it relates to the *assets of the debtor*") (emphasis in original). Both lower courts concluded that Lujan Claimants' claims share the same legal status in relation to BSA as all

other Direct Abuse Claims. All holders of Direct Abuse Claims have unliquidated and unsecured claims for abuse against BSA and, accordingly, "exhibit a similar effect" on BSA's estate. *W.R. Grace*, 475 B.R. at 110.

The asserted differences between Lujan Claimants and other Abuse Claims— purported direct-action procedural rights—do not change the character of those claims against BSA. Indeed, both lower courts correctly held that a direct-action right is merely a procedural right that does not change the character of a claim. A704; A144.

Finally, the district court correctly determined that Lujan Claimants are not "parties aggrieved" with appellate standing on this issue because Direct Abuse Claims (including the claims of Lujan Claimants) will likely be paid in full under the Plan and Lujan Claimants did not assert any grounds for error. A142 n.14. While acknowledging that this issue "is a purely academic one," the district court went on to analyze section 1122(a), concluding that there was no error in the bankruptcy court's determination that BSA demonstrated, by a preponderance of the evidence, that Lujan Claimants were properly classified under section 1122(a). A145.

Lujan Claimants have failed to substantiate their contention that the lower courts erred in their plan classification determinations. This Court should affirm.

## IX. The Plan Provides for Equal Treatment of Holders of Class 8 Abuse Claims under Section 1123(a)(4)

Standard of Review: This Court reviews lower courts' factual findings for

clear error and legal conclusions *de novo*. *HomeBanc Mort'g*, 945 F.3d at 811.

Lujan Claimants erroneously assert that the Plan violates the equal-treatment requirement of section 1123(a)(4) of the Bankruptcy Code because they claim to be providing greater consideration than other survivors without commensurate compensation. Lujan Br. at 75–76.

As both lower courts correctly observed, "Lujan Claimants' unequal treatment argument is 'really just a flip side of the Lujan Claimants' § 1122(a) argument,' in which they seek separate classification and enhanced treatment under the Plan on account of their direct-action rights." A146; A711. What Lujan Claimants are actually seeking is preferential treatment for themselves to the detriment of other survivors, which is not warranted on any grounds.

Section 1123(a)(4) requires that a plan shall "provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment" for such claim. In the Third Circuit, this means that "all claimants in a class must have the same opportunity for recovery." *W.R. Grace*, 729 F.3d at 327; A708 n.572; *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 356 (Bankr. D. Del. 2011).

The Lujan Claimants' direct-action rights are procedural in nature—they are not additional or incremental claims. A621–22; A131. As Abuse Claims in Class 8 under the Plan, they are receiving the same opportunity for recovery as all other

Class 8 survivors.[52]  A711–13; A145.  Class 8 Abuse Claims "are all disputed and unliquidated," and "[t]he treatment for each [such] claimant is specified in the TDP, which provide each claimant multiple avenues to liquidate his claim, at the election of the claimant."  A712; A145.  Lujan Claimants do not contend that their opportunity to recover on their claims differs from other holders of Class 8 Abuse Claims.  Lujan Br. at 74–75.  Accordingly, Lujan Claimants are receiving the same opportunity to recover on their claims, consistent with section 1123(a)(4).  A145–46.

Lujan Claimants also argue that because only some holders of Class 8 Abuse Claims are deemed under the Plan to release the Chartered Organizations that are co-liable for their claims, this constitutes unequal treatment in contravention of section 1123(a)(4).  Lujan Br. at 76–77.  Even if Lujan Claimants had properly preserved this argument on appeal (which they have not),[53] Lujan Claimants' claims

---

[52]  Lujan Claimants argue unequal treatment because they are giving up "more rights" than other survivors.  Lujan Br. at 77 (citing *Quigley,* 437 B.R. at 146, which relied on *In re AOV Indus., Inc.*, 792 F.2d 1140 (D.C. Cir. 1986)).  As the bankruptcy court correctly held, *AOV* is not binding on this Court, which applies an equality of opportunity standard, and a claim-by-claim analysis per class is "unworkable" in this case with over 82,000 Abuse Claims.  A712–13.

[53]  The district court considered and rejected this argument despite Lujan Claimants only raising it during oral argument and a late-filed objection.  A146–A147.  BSA maintains that this issue was not properly preserved on appeal and therefore waived.  *See, e.g., Thompson*, 2020 WL 1531333, at *7 n.3; *Watkins*, 2016 WL 1166323, at *4 n.4; *Mallinckrodt*, 639 B.R. at 892 n.178.

against the Archbishop of Agaña, an Opt-Out Chartered Organization, are uniquely preserved under the Plan.  A673–75.  Lujan Claimants are not, "parties aggrieved" by this purported issue (A675; A147), and thus, lack standing to advance this argument.  A147.

Even if Lujan Claimants had standing (which they do not), their argument should be dismissed as nothing more than a baseless effort to recover more than in full on their claims.

## X.    Lujan Claimants Lack Standing to Assert That the Plan Violates AOA's Automatic Stay, and Such Arguments Are Moot

Standard of Review: This Court reviews *de novo* whether the automatic stay was violated and a party has standing.  *In re Linear Elec. Co.*, 852 F.3d 313, 320 (3d Cir. 2017); *Glob. Indus.*, 645 F.3d at 209.

Before the Petition Date, AOA filed the AOA Bankruptcy in Guam to address abuse claims asserted against AOA (the "Guam Court").[54]  AOA was a Chartered Organization, and the perpetrator of abuse within AOA was a longtime Catholic priest and Scoutmaster.  A4788 (Confirmation Hr'g Tr. at 22:1–19).  AOA and BSA

---

[54]    *See In re Archbishop of Agaña*, Case No. 19-00010 (Bankr. D. Guam).

each objected to the other's proposed plan of reorganization. A18785–802; A12730–31.

On September 27, 2022, BSA and AOA resolved their respective plan objections and AOA's appeal of the Confirmation Order (the "AOA Stipulation"). A14692–712; A19083–92. AOA's plan was revised to be consistent with BSA's Plan, and both plans of reorganization, as confirmed by the respective bankruptcy courts, work in tandem to allow holders of Abuse Claims, including Lujan Claimants, to pursue compensation. *See, e.g.*, A18867–68 (AOA Hr'g Tr. at 33:10–34:4); A18967 (AOA Plan § 13.7). AOA's confirmed plan provides as follows with respect to BSA's Plan:

> Nothing in this Plan . . . affirmatively authorizes the Trust, Reorganized Debtor, any Protected Party, Class 3 Claimant, or Class 4 Claimant to act in violation of applicable law or affirmatively authorizes such persons to violate . . . any relevant and operative provision(s) of the BSA Confirmation Opinion, the BSA Plan, or the BSA Confirmation Order, including the injunctions and releases provided or approved thereunder.

A18969.

On October 5, 2022, after AOA's plan was confirmed, AOA withdrew its appeal of the Confirmation Order in accordance with the AOA Stipulation. A14690–91. On February 8, 2023, AOA's plan became effective and AOA's

bankruptcy case was closed on June 22, 2023. *See In re Archbishop of Agaña*, Case No. 19-00010 (Bankr. D. Guam) [D.I. 1155, 1204].

Lujan Claimants argue that the Plan violates AOA's automatic stay. Lujan Br. at 68–70. This argument should not be considered for at least two reasons. First, Lujan Claimants lack standing. AOA is the only party with standing to assert a stay violation under applicable law, and it has not appealed the Affirmation Order. Ninth Circuit law, which governs the AOA Bankruptcy and application of the AOA's automatic stay, holds that "a creditor has no independent standing to appeal an adverse decision regarding a violation of the automatic stay." *In re Pecan Groves of Ariz.*, 951 F.2d 242, 245 (9th Cir. 1991); *see also* A126–27. Creditors such as Lujan Claimants may not enforce alleged stay violations. A126–27 (citing *In re Barrett*, 833 F. App'x 668, 670 (9th Cir. 2020)).

Second, Lujan Claimants' arguments have been rendered moot by AOA's emergence from bankruptcy. AOA emerged from bankruptcy and its plan was consummated eight months ago. *In re Archbishop of Agaña*, Case No. 19-00010 (Bankr. D. Guam) [D.I. 1155, 1204]. AOA's automatic stay terminated upon AOA's emergence from bankruptcy. *See* 11 U.S.C. § 362(c)(2) ("[T]he stay of any other act . . . continues until the earliest of . . . (C) . . . the time a discharge is granted or denied."); *Rauso v. Martinez*, Nos. 20-2927 and 21-1503, 2022 WL 4965388, at *3 (3d Cir. Oct. 4, 2022) ("[T]he automatic stay ends when a discharge is granted.").

The AOA Stipulation, withdrawal of AOA's appeal of the Confirmation Order, and closure of AOA's bankruptcy case foreclose the Lujan Claimants ability (already defective for lack of standing) to argue that the Confirmation Order or Affirmation Order violates AOA's automatic stay.

## XI.    The Plan Treats Holders of Future Abuse Claims Fairly and Equitably

<u>Standard of Review</u>: This Court reviews lower courts' factual findings for clear error and legal conclusions *de novo*. *HomeBanc Mort'g*, 945 F.3d at 811.

D&V Claimants summarily argue, without any competent evidence or legal authority, that the treatment of Class 8 Abuse Claims under the Plan is unfair because Future Abuse Claims[55] were not required to be filed by the Bar Date, and thus the TDP's customary mechanism for ensuring fair and equal treatment between current and future claims (*i.e.*, a holdback) means the current claims will have to wait for a full recovery.  D&V Br. at 68–69.  Even if this issue had been properly preserved on appeal (which it was not),[56] the district court correctly concluded that D&V Claimants are "not 'parties aggrieved' with appellate standing on this issue" because

---

[55] A "Future Abuse Claim" is a Abuse Claim held by a claimant who, as of the Petition Date, (a) had not attained eighteen (18) years of age, or (b) was not aware of such Direct Abuse Claim as a result of a "repressed memory."  A886.

[56] D&V Claimants did not raise this issue in any briefing before the bankruptcy court.  A148.  Unpreserved arguments are waived and should not be considered. *See, e.g.*, *Thompson*, 2020 WL 1531333, at *7 n.3; *Watkins*, 2016 WL 1166323, at *4 n.4; *Mallinckrodt*, 639 B.R. at 892 n.178.

they are receiving payment in full. A148 n.15. Moreover, "incorporating the fair and equitable treatment of Future Abuse Claims into the Plan was necessitated by due process concerns," and provides future claimants with additional time to file their as-yet unmanifested claims.[57] A148–49. Providing holders of Future Abuse Claims with additional time to assert their claims is unavoidable because, by definition, as the holder of a "future" claim, the claimant is unable to assert his or her claim by the Bar Date. Accordingly, modified procedures for submission of future claims comports with principles of fairness, due process, and common sense. A148–49. As the district court found, "in any event, all such claimants receive the same treatment, as required by section 1123(a)(4)." A148–49.

As evidenced by the TDP, the Settlement Trust is governed by comprehensive process-oriented guidelines to ensure sufficient funds remain to pay future claims notwithstanding the payment of current claims. A148–49. As the district court recognized, "[d]istributions from the Settlement Trust to current Direct Abuse Claims will not be delayed because of Future Abuse Claims; rather, the Settlement

---

[57] *See, e.g.*, *In re USA Gymnastics*, No. 18-09108 (RLM) (Bankr. S.D. Ind. Dec. 16, 2021) [D.I. 1776] at *21, 26–27 (confirming plan under which sexual abuse claimants that qualified as "Future Claimants" were not subject to the claims bar date); *In re Emons Indus. Inc.*, 220 B.R. 182, 186, 19–92 (Bankr. S.D.N.Y. 1998) (confirming plan where "subsequent" personal injury claimants, who were unknown to debtor at the time the bar date was fixed, were not subject to the bar date, and were appropriately classified in the same class as current claimants).

Trustee may make distributions to holders of current or future Direct Abuse Claims when those claims are allowed under the procedures set forth in the TDP."  A149; *see, e.g.*, A1030–32 (TDP Art. IX (providing process for payment upon final determination of an Allowed Abuse Claim)); A1103–07 (Settlement Trust Agreement, Art. 4 (same)).  Accordingly, D&V Claimants' argument that the Plan is not fair and equitable to holders of current Direct Abuse Claims is unfounded and should be rejected.

## XII.  The Post-Solicitation Plan Modifications Were Proper

<u>Standard of Review</u>: This Court reviews lower courts' factual findings for clear error and legal conclusions *de novo*.  *HomeBanc Mort'g*, 945 F.3d at 811.

Lujan Claimants argue that the Plan requires resolicitation because BSA materially and adversely modified the Plan by (a) incorporating modifications that resolved the Roman Catholic Ad Hoc Committee's Plan objection (the "<u>RCAHC Resolution</u>") and (b) adding an "undisclosed and unsolicited" audit program to identify and address fraudulent claims.  Lujan Br. at 77–82.  Lujan Claimants "misstate the facts and timing of the [RCAHC Resolution]" and fail to explain how any change could be deemed material and adverse to Lujan Claimants "when holders of Direct Abuse Claims are likely to be paid in full under the Plan—both before and after Plan modifications were made."  A152; A154.  Incredible on its face, Lujan Claimants' argument that their claims could be negatively impacted by bankruptcy

court-mandated fraud-prevention protections must also be rejected. A156.

### A.    The RCAHC Resolution

As the district court found and the record reflects, Lujan Claimants had "ample time" to consider and object to the "discrete [Plan] modifications requested by BSA," but they failed to timely object to any specific findings and preserve these arguments for appeal. A151–52; A13476 (Sept. 1, 2023 Hr'g Tr. at 111:1–17). Lujan Claimants fail to demonstrate any error in this finding. A154.

Even if this issue was properly preserved (which it is not), Lujan Claimants' misstated facts and arguments are "unavailing." A152. The Bankruptcy Code permits modifications of a plan "at any time" prior to confirmation, and that all voting creditors who previously accepted a plan will be deemed to have accepted the modified plan. 11 U.S.C. § 1127(a). Bankruptcy Rule 3019(a) specifies that post-solicitation plan modifications do not require resolicitation if the modifications do not adversely change the treatment of parties who previously *voted in favor of* the plan. Fed. R. Bankr. P. 3019(a). Courts in this Circuit have found that only "material" and "adverse" modifications require resolicitation. *See In re Fed.-Mogul Glob. Inc.*, No. 01-10578 (JFK), 2007 WL 4180545, at *39 (Bankr. D. Del. Nov. 16, 2007); *In re Century Glove, Inc.*, No. 90-400 (SLR), 1993 WL 239489, at *3–4 (D. Del. Feb. 10, 1993).

As the district court correctly determined, plan modifications are immaterial

unless they materially "affect[] a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance." A154. As such, "it is unclear how any change could be deemed material and adverse to Lujan Claimants," each of whom—except one—voted to reject the Plan, "when holders of Direct Abuse Claims are likely to be paid in full under the Plan—both before and after Plan modifications were made." A154.

Lujan Claimants take issue with the releases in favor of the Roman Catholic Entities, arguing that they "expanded" the scope of Releasees under the Plan to include Chartered Organizations and related entities against which Lujan Claimants have claims. Lujan Br. at 78–79. Lujan Claimants further argue that there was "no proof" that such "undisclosed, unexamined" Roman Catholic Entities should have been entitled to releases as Participating Chartered Organizations. *Id.*

Based on the record, the terms of the RCAHC Resolution were fully disclosed as part of the Twelfth Mediator's Report filed on March 17, 2022 and announced in open court on March 18, 2022 at the beginning of the lengthy trial. A2442–44 (Mar. 18, 2022 Confirmation Hr'g Tr. at 8:1–10:21); A12195–221; A12222–53 (Notice of Twelfth Mediator's Report and Affidavit of Service). The terms of the RCAHC Resolution, set forth in the Twelfth Mediator's Report, contained, among other

things, the definition of "Roman Catholic Entities"[58] (*i.e.*, the entities to receive protection) and specified that the terms of the RCAHC Resolution, which were set forth in the Twelfth Mediator's Report, would "be appended to and incorporated by references in the Plan or the Confirmation Order." A12199. As such, Lujan Claimants had notice of the precise terms of the RCAHC Resolution for nearly six months before the bankruptcy court entered the Confirmation Order.

Importantly, the Plan provides that ***only*** Scouting-related "Abuse Claims" are subject to the Channeling Injunction and Releases. A867–68 (Plan Art. I.A.18); A155; A627–28 (explaining relevant Plan definitions). This is equally true with respect to the Roman Catholic Entities. In other words, to the extent Lujan Claimants have claims against Roman Catholic Entities that are not related to Scouting, including portions of claims unrelated to Scouting, those claims (or portions of claims) are not released under the Plan. A155. As the district court correctly held, the RCAHC Resolution "creates no risk that the injunctions will spill past their intended effect and the Bankruptcy Court's jurisdiction." A155.

Contrary to Lujan Claimants' assertions, there were no modifications to the Plan that affect them in any adverse or material way. Even if the one Lujan Claimant that voted for the Plan changed its vote to reject, it does not move the needle, as the

---

[58] This same definition was included in the Plan.

record demonstrates that the Plan received overwhelming creditor support, with all voting classes having accepted the Plan.   A12168–70; (Claims Agent Voting Declaration).

### B.    The Fraud Prevention Audit Program

Lujan Claimants also assert that a fraud-prevention provision, required by the bankruptcy court, materially and adversely affects the Lujan Claimants such that resolicitation is required.   Lujan Br. at 80–82.   Incredibly, "[t]his argument . . . implies that Lujan Claimants' claims would be negatively impacted by a process designed to identify and address fraudulent claims."   A156.

First, the bankruptcy court conditioned confirmation of the Plan on the implementation of anti-fraud prevention measures: "If the Plan is confirmed, the Confirmation Order will provide that the Settlement Trustee will propose procedures to suss out fraudulent claims, taking into account factors she deems appropriate, which can include a cost/benefit analysis.  Those procedures will be presented to the court."   A724–25; A184.  As a result, BSA added a new provision in the Confirmation Order to address this directive.

Second, as supported by the extensive record, the TDP were never designed to pay fraudulent claims; rather, the detection of fraudulent claims is part of the review process.  A1009–83 (Trust Distribution Procedures); A156.  Modifying the Plan to include an anti-fraud provision as ordered by the bankruptcy court is

consistent with the Plan and TDP, as it "would aid in eliminating fraudulent claims from the claim pool." A156. Such a modification could not be materially adverse to Lujan Claimants; "rather such a procedure can only benefit those claimants who believe they have valid claims." A156; A13472 (Sept. 1, 2023 Hr'g Tr. at 104:10–13). Accordingly, this Court should affirm.

## XIII. The Confirmation Order and Plan Do Not Impair Insurers' Contractual Rights

<u>Standard of Review</u>: This Court reviews *de novo* the legal determination that "insurance neutrality" is a merely a standing concept, *PWS Holding*, 228 F.3d at 235, and factual findings underlying the determination that the Confirmation Order and Plan do not impair Insurers' contractual rights for clear error. *Combustion Eng'g*, 391 F.3d at 214 n.19.

Insurers argue incorrectly that the Plan abrogated their policy rights. The Plan explicitly preserves Insurers' policy rights and coverage defenses, BSA has repeatedly confirmed their intent to so preserve the policy rights and coverage defenses, and two courts have held that their policy rights and defenses are so preserved.

### A. There Is No Requirement That Plans of Reorganization Be Insurance Neutral; Insurance Neutrality Is a Standing Concept

Insurers argue that "insurance neutrality" is a confirmation requirement, and that a plan is not insurance neutral if there is any adverse impact on them, positions

that are unsupported by any authority and that are frivolous. As both the bankruptcy court and district court correctly concluded, "insurance neutrality" is a standing doctrine, not a plan requirement. A729 ("There is nothing that requires Debtors to negotiate a plan that is 'insurance neutral,' which is not a concept in the Bankruptcy Code" (*citing Purdue Pharma*, 633 B.R. at 63 ("[T]here is no requirement that a Chapter 11 plan be 'insurance neutral' in any respect.")). The point is that if an insurer is adversely impacted by a plan, it has a sufficient interest to have standing to be heard, even though it is not a creditor, to raise proper confirmation objections. The bankruptcy court recognized Insurers' standing, and they were full participants, in fact the primary participants, in the confirmation hearing, and then correctly held that so-called "insurance neutrality" is not a confirmation objection. A763.

Insurers' argument, for almost five pages, that *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 217 (3d Cir. 2004) addressed confirmation requirements, not standing, is frivolous. C.I. Br. at 35–39. This Court identified as the issue "presented on appeal," as is relevant here, "appellate standing," and held that insurers "have standing to challenge a provision of the [p]lan only if that provision 'diminishes their property, increases their burdens, or impairs their rights.'" 391 F.3d at 217.

Insurers also misstate that the Third Circuit "applied [insurance neutrality] to modify plan language in much the same way that Insurers urge here,"

> expressly vacating the district court's modification of the super-
> preemptory provision, and…reinstating the bankruptcy court's original

language because the district court's modification violated Insurers' rights [which] simply cannot be reconciled with the bankruptcy and district courts' determination in this case that insurance neutrality is a mere standing concept and is not a requirement for plan confirmation.

C.I. Br. at 35, 38.  The *Combustion* Court never suggested that insurance neutrality was a requirement for plan confirmation, and restored the provision not "because" it was required by law, but rather by stipulation because "at oral argument [debtor] stated it would be amenable to reinstating the super-preemptory provision as drafted by the Bankruptcy Court," so "in this context" the court "resolve[d] this matter." 391 F.3d at 218.  Indeed, the Court found that the stipulation divested the insurers of standing, not that it satisfied confirmation requirements.  *Id.* at 218 ("We conclude, therefore, the Objecting Insurers and London Market Insurers have no appellate standing to challenge the addition of the neutrality provision.").

Insurers likewise misstate that *Global Industrial* "endorsed a plan that includes broad insurance neutrality protections like those ordered by this Court in *Combustion Engineering* (and sought by Certain Insurers here) as critical to effectively preserving insurers' contractual rights" misstates the case.  C.I. Br. at 39–40.  This Court in *Global Industrial* did not speak to, much less endorse, that a plan needed to be insurance neutral (nor did this Court order insurance neutrality in *Combustion Engineering*).  *Glob. Indus.*, 645 F.3d at 209–15.  Rather, this Court decided an appeal from an order "denying [insurers] standing to challenge the confirmation of a plan of reorganization," and concluded that "[b]ecause [the

insurers] meet the standing requirements prescribed by Article III and the Bankruptcy Code, they must be afforded the opportunity to be heard concerning" the provisions of the plan of reorganization channeling claims. *Id.* at 203, 216. The majority in *Global Industrial*, in fact, responded to the dissent's conclusion that the bankruptcy court had already considered the insurers' arguments, so the plan would still be confirmed, by finding that the insurers were entitled to make their case for a different outcome: "we accept the logical proposition that a party, granted standing and a full opportunity to participate, may add something meaningful to the record on which the Bankruptcy Court is called to make a decision." *Id.* at 215, n.33. If insurance neutrality was required, then the Court would have responded that the plan could not be confirmed over the insurers' objection, rather than finding that the insurers simply had the right to be heard.

### B.    The Plan Is "Insurance Neutral" By Preserving Insurers' Rights and Defenses

There is no recognized definition of "insurance neutral" because it is merely a standing concept and, therefore, considers whether an insurer's rights are impacted by the plan, not whether the impact constitutes a confirmation objection. But an insurance "neutral" plan, by any definition, could mean no more than the preservation of Insurers' rights and defenses as they exist under the law, which is exactly what the Plan does here.

### 1. The Lower Courts Correctly Found the Plan and the Confirmation Order Preserve Insurers' Policy Rights and Defenses

As the district court noted: "Certain Insurers do not cite any language in the Plan or the TDP abrogating BSA's obligations under the insurance policies," and there is none. A115. To the contrary, Article X of the TDP explicitly provides:

> Pursuant to the Plan, the Settlement Trust has taken an assignment of BSA's and any other Protected Party's (to the extent provided for in the Plan) *rights and obligations* under the Insurance Policies.

A1033.

Article V.C of the TDP likewise provides that:

> Nothing in these TDP shall modify, amend or supplement, or be interpreted as modifying, amending or supplementing the terms of any insurance policy or *rights and obligations* under an Insurance Policy assigned to Settlement Trust to the extent such *rights and obligations* are otherwise available under applicable law and subject to the Plan and Confirmation Order. The rights and *obligations*, if any, of the Non-Settling Insurance Companies relating to the TDP, or any provision hereof, shall be determined pursuant to the *terms and provisions of the Insurance Policies* and applicable law.

A1017 (TDP, Art. V.C) (emphasis added).

The Confirmation Order specifies that:

> Except for the Insurance Assignment (and subject to paragraph II.I.2 of [the Confirmation] Order), or as otherwise provided in the Bankruptcy Code, applicable law, the findings made by this Court in the Confirmation Order, **nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy issued by a Non-Settling Insurance Company or rights or obligations under such Insurance Policy to the extent such rights and obligations are**

> **otherwise available under applicable law, and the rights and obligations**, if any, of any Non-Settling Insurance Company relating to or arising out of the Plan Documents, including the Plan, the Confirmation Order, and the Affirmation Order, or any provision thereof, **shall be determined pursuant to the terms and provisions of the Insurance Policies** and applicable law.

A842 (Confirmation Order ¶ 48) (emphasis added); *see*, *e.g.*, A827 (Confirmation Order ¶ 32(e)(v)(ii) ("[T]he Channeling Injunction shall not enjoin... the rights of the Settlement Trust to prosecute any action against any Non-Settling Insurance Company...subject to any Insurance Coverage Defenses."); A828 (Confirmation Order ¶ 33) ("[N]othing in the Confirmation Opinion, Plan, or this Order...shall impact (i) the rights of Local Councils, Contributing Chartered Organizations, or Participating Chartered Organizations to prosecute any action against any Non-Settling Insurance Company...subject to any Insurance Defenses."); A729 (finding that if the TDP were negotiated in bad faith and they "creates a defense in subsequent insurance litigation, the [Insurers] may reap that benefit").

The Confirmation Order also references the preservation of policy obligations:

> The Settlement Trust's rights under any insurance policies issued by the Non-Settling Insurance Companies, *including the effect of any failure to satisfy* conditions precedent or *obligations under such policies* (other than, in case of the BSA Insurance Policies, the terms of any policies or provision of applicable law that are argued to prohibit the assignment or transfer of such rights), shall be determined under the law applicable to each policy in subsequent litigation.

A795 (Confirmation Order, ¶ II.I.2(e)) (emphasis added); A116.

The district court further noted that "the bankruptcy court repeatedly referred to the obligations as part of the policies, not as having been abrogated: 'If the *obligations* form the basis for claims, *they* will be treated accordingly.  If the *obligations* are conditions precedent, then the Non-Settling Insurance Companies may be able to assert *those conditions* as a defense to performance.'"  A766 (emphasis added); A116.  As the district court stated, an "obligation" cannot form the basis of the claim or be a condition precedent if it had been abrogated.  A116.

Thus, the district court correctly held that "the TDP is explicit in not modifying the insurance policies and preserving the policy obligations…." A115.

> The Bankruptcy Court has authorized the Insurance Assignment pursuant to the Plan and the Confirmation Order, and the Settlement Trust has received *the assignment* and transfer of the Insurance Actions, the Insurance Action Recoveries, the Insurance Settlement Agreements (if applicable), the Insurance Coverage, and *all other rights or obligations under or with respect to the Insurance Policies* (but not the policies themselves) in accordance with the Bankruptcy Code.  A116 (citing A1017 (TDP, Art. V.C) (emphasis added) and the "obligations under the insurance policies are not abrogated by the Plan." A116; A766 (whether obligations are prepetition claims or conditions precedent will be decided by applicable law).
>
> The plain meaning of this provision is clear that Insurers' rights and obligations under an Insurance Policy are preserved "to the extent such rights and obligations are otherwise available under applicable law." Thus, Insurers keep the whole gamut of permissible contractual rights under state law except, for example, anti-assignment provisions that are not "otherwise available" under the Bankruptcy Code.

A117.

"If the Insurers believe that there is some future breach of their insurance

contracts, they retain the right to raise that defense to coverage." A119.

> It is for the Certain Insurers to pay covered claims, and not to pay claims that are not covered or are otherwise subject to a coverage defense. If there is future award that reaches an Insurer, and it disputes its obligation to pay that award, then it will raise its coverage defense, and that defense will be adjudicated on the then-existing facts.

A118.

### 2.    BSA Repeatedly Confirmed That the Plan and Confirmation Order Preserve Insurers' Policy Rights and Defenses

Additionally, BSA repeatedly confirmed that the Plan and Confirmation Order were intended to preserve Insurers' policy rights and defenses: "If [coverage liability] reaches their policies, then [Insurers] are obligated to make payment subject to any coverage defenses, all of which have been preserved." A19836 (Affirmation Hr'g Tr. at 55:2–6); A19920 (Affirmation Hr'g Tr. at 139:16–24) ("[W]hat the [bankruptcy court] did was to preserve the parties' rights, both the Debtors, the trustees, and the insurers, and those will be determined in some subsequent proceeding. I don't know that [the bankruptcy court] could have been any clearer about that."); *see also* A728. The unrefuted evidence is that BSA had no "intention of diluting, in any fashion, the contract provisions protecting against an impairment or change in the insurers' rights and policies." A2410 (Confirmation Hr'g Tr. at 292:12–16).

> The Operative TDP were designed by the Debtors to emulate, to the greatest extent practicable, the prepetition practices of the BSA and its insurance companies for investigating, evaluating, valuing, and

resolving Direct Abuse Claims, while simultaneously preserving all of
the rights of the Non-Settling Insurance Companies to dispute and
litigate coverage issues with the Settlement Trust.

A6673–74 (Azer Declaration ¶ 5); *see also* A2410–11 (Confirmation Hr'g Tr. at

292:17–293:11, 293:20).

### 3. The Plan Does Not Have to Specify Insurers' Rights, Nor Could It Do So Because There Are Disputes About Such Rights

Insurers argue that the language of the Plan, the Confirmation Order and the

TDP, the holdings of two courts, and BSA's assurances that Insurers' rights are

preserved is insufficient because the Plan does not include the specific terms

concerning defense and consent rights. C.I. Br. at 31–47. But debtors do not have

to include specific policy terms in plans of reorganization. It was sufficient to

provide that the Plan does not "modify, amend or supplement…*the terms of any

Insurance Policy issued by a [Certain Insurer]* or *rights or obligations under such

Insurance Policy…*" and other similar language. *See supra* pp. 131–34.

To the extent that Insurers are arguing that they are entitled to specifically

enforce policy terms concerning defense or consent rights, they are incorrect.

Insurers have never had a right to prevent BSA from settling with survivors, through

a trust or otherwise, and they have no such rights now. Any party can settle claims

against it, and an insurer's rights are limited to whether or not it will then pay for

that settlement or raise some purported defense, including with respect to any failure

to comply with consent rights.  The availability of those defenses will depend on the specific facts and circumstances of each case, and may not be enforceable where, for example, an insurer denied coverage before the settlement or was not prejudiced by such settlement.  So, Insurers' argument that their right to participate in a litigation defense and to decide whether to consent to settlements of childhood abuse claims are "fundamental to the 'bargain'" is wrong.  C.I. Br. at 41.  Indeed, the record is that BSA resolved claims prepetition, rather than litigate them, because of how difficult it is to defend the claims of childhood sexual abuse, and did so on terms consistent with those that are replicated in the TDP.  *See* A6482–83 (Burnett Declaration ¶ 48); A6492–93 (Burnett Declaration ¶ 54); *see also* A6476 (Griggs Declaration ¶ 32); A1798 (Confirmation Hr'g Tr. at 176:8–16) (testifying to an $11 million verdict).  Insurers' own expert testified that Insurers' protection is that "no action can be taken against the insurer unless…the claimant, insured, and the insurer agree in writing to settle the claim," and even that right is conditioned on the Insurers' performance with their own obligations under their policies.  A3993 (Confirmation Hr'g Tr. at 22:22–23:1).  So, the fundamental bargain struck is that BSA is free to settle claims against it at its discretion, subject only to any coverage defenses that Insurers may have.

### 4.    Insurers' Challenges to the Plan Language Are Meritless

#### a.    The Lower Courts Did Not Err in Preserving the Parties' Rights Under "Applicable Law" in Any Future Coverage Dispute

Insurers complain that the policy assignments preserved rights and obligations "subject to applicable law," a qualification applicable to all parties. As the district court noted, the "plain meaning of this provision is clear that the Insurers' rights and obligations under an Insurance Policy are preserved 'to the extent such rights and obligations are otherwise available under applicable law.'" A117. Insurers do not cite a single authority supporting their argument that the court erred in approving language that the parties' rights and obligations are subject to applicable law. The Bankruptcy Code does not insulate Insurers from applicable coverage law. *See, e.g.*, *J.P. Morgan Sec. Inc. v Vigilant Ins. Co.*, 151 AD3d 632, 633 (1st Dept 2017) (insurers' unreasonable delay in dealing with a claim for coverage relieved the insured from the obligation to obtain insurers' consent to settle and from the duty to cooperate); *Am. Ref-Fuel Co. of Hempstead v Resource Recycling, Inc.*, 281 A.D.2d 573, 574 (2d Dept 2001) (once an insurer repudiates liability, the insured is excused from any obligations under the policy); *Passaic Valley Sewerage Com'rs v. St. Paul Fire & Marine Ins. Co.*, 206 N.J. 596, 21 A.3d 1151 (2011) (insurer forfeits right to control settlements when it violates its own contractual obligations to the insured).

Insurers' ability to successfully raise coverage defenses will depend on their conduct and future facts and circumstances that give rise to any such claim, and the bankruptcy court did not err by not resolving that hypothetical future dispute now.

> The Settlement Trust's rights under any insurance policies issued by Non-Settling Insurance Companies, including the effect of any failure to satisfy *conditions precedent or obligations under such policies* (other than, in the case of the BSA Insurance Policies, the terms of any policies or provisions of applicable law that are argued to prohibit the assignment or transfer of such rights), shall be determined under the law applicable to each such policy in subsequent litigation.

A795 ¶ II.I.2(e) (emphasis added); *see also* A700 ("What insurers are obligated to pay under their policies is an insurance coverage issue that is not before the court."); A744 ("I will not anticipate how an insurance coverage court will interpret the Plan, the TDP or any confirmation order that may be entered."). Indeed, that hypothetical future dispute is not justiciable, and the bankruptcy court had no jurisdiction to determine future coverage issues. *Sherwin-Williams Co. v. Cty. of Del.,* 968 F.3d 264, 272 (3d Cir. 2020) ("A dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (quoting *Wyatt v. Gov't of the V.I.,* 385 F.3d 801, 806 (3d Cir. 2004)). The bankruptcy court's job was to consider the requirements for confirmation, not to issue rulings about hypothetical future litigation.

**b.    The Lower Courts Did Not Err in Preserving the Parties' Rights Under the Confirmation Order and Plan in Any Future Coverage Dispute**

139

Insurers also do not show error based on language in the Plan that the preservation of policy rights and defenses are subject to the Confirmation Order and Plan, again a qualification applicable to all parties. As the district court found, the assignment of policies is subject to the Plan and Confirmation Order because "an assignment [is] not otherwise contemplate[d] or authorized by the Policies." A117. The "subject to" language protects the assignment of Abuse Insurance Policies to the Settlement Trust, as permitted under blackletter bankruptcy law. *See In re Combustion Eng'g*, 391 F.3d at 218 n.27.

### c.    The Coverage Complaint Is Irrelevant and Insurers Misstate It

Insurers argue that their rights are not protected because the Coverage Complaint filed in Texas, that they misstate, alleges that: (a) "the Certain Insurers contractual rights and BSA's obligations…are abrogated by the confirmed Plan," (b) "the Certain Insurers are precluded from raising and relying upon conditions precedent and exclusions and defenses under the policies," (c) "only the rights, not the obligations under the policies were assigned as a result of the confirmed Plan…," and (d) the Insurers' "coverage defenses were considered and rejected by the courts below" and they "should be collaterally estopped from raising their contractual coverage defenses." C.I. Br. at 3, 27–28, 41–42.

The Coverage Complaint is not part of the record. Additionally, the decisions of both lower courts and the terms of the Confirmation Order and Plan control,

regardless of what the Settlement Trustee alleges in a different case.  Nonetheless, the Settlement Trustee did not make the allegations represented by Insurers.  The Coverage Complaint does not say that the Policy obligations were not assigned or that the Plan abrogated coverage defenses.  It appears that the only relevant allegation about the Plan is that: "both the Bankruptcy Court and the District Court rejected Defendants' arguments that the Plan unlawfully impaired their rights under the Insurance Policies," the opposite of claiming that the Plan impaired their rights, as they argue here.  Coverage Compl. ¶ 131; C.I. Br. at 43.

Insurers cite to an allegation that "under the terms of the Insurance Policies and applicable law," "the defendant Insurers are liable under the Policies subject to applicable attachment points and limits of liability, and that all applicable conditions precedent to coverage have been satisfied, excused, or waived," but that allegation does not even mention the Confirmation Order or Plan and is boilerplate for coverage litigation.  Coverage Compl. ¶¶ 119, 121.  Insurers argue that the Coverage Complaint "makes no mention of the Insurers' rights or defenses under the policies or the Trustee's corresponding obligations, which the courts below said were preserved" (C.I. Br. at 43), but to the extent that Insurers believe they have coverage defenses, that is an affirmative defense for them to plead.  It is not for the Settlement Trustee to predict or plead defenses.  And Insurers argue in the Texas case that the coverage court should dismiss the Coverage Complaint as non-justiciable, the

opposite of their premise that the bankruptcy court should have adjudicated their alleged rights. *See, e.g.*, Coverage Action [D.I. 226] at 1 ("The Trustee's inchoate insurance claims are unripe and non-justiciable, and fail to state claims this Court can or should adjudicate now."); Coverage Action [D.I. 213] at 6 ("In the absence of an actual, justiciable controversy, Plaintiff fails to state a claim for a declaratory judgment . . . and the Court should therefor dismiss the complaint."); Coverage Action [D.I. 211] at 14 ("[T]he Trustee has not pled that the trust has actually sought recovery for such claims from the movants. Therefore, she does not present a justiciable controversy, and her declaratory judgment cause of action fails as unripe under Rule 12(b)(1)."). Further, Insurers favorably cite to the protective insurance language in the TDP, noting that the TDP "preserv[e] insurer rights." *See* Coverage Action [D.I. 226] at 17.

### C. Insurers Ask This Court to Impose New Plan Language Not to Preserve Rights and Defenses, But to Provide Them With an Advantage in Future Hypothetical Litigation

Insurers appear to be trying to obtain a litigation advantage by imposing new language in place of the language that was included in the disclosure statement, voted on by stakeholders, litigated, and then confirmed. For instance, among other things, Insurers ask for language that "a decision by the Trust to pay (or not pay) any claim would not be admissible against the Certain Insurers…." C.I. Br. at 48. Any awards by the Settlement Trustee that are covered by an Insurer's policy presumably

would be a basis for requesting indemnification, just as prepetition settlements were presented to Insurers for indemnification. In addition to there being no conceivable confirmation requirement to address evidentiary issues in a non-justiciable future lawsuit, it would be inappropriate to include an evidentiary ruling a likely basis for a claim against Insurers would be inadmissible. Insurers have the right to argue that a future award is not covered by their policies, just as they did when BSA settled prepetition and requested indemnification, but Insurers are not entitled to an evidentiary ruling now as to admissibility of any evidence that may be offered in a future lawsuit. It is for a future court to determine what is and what is not admissible in that future case, if there is one, and to do so based on the then-existing facts and circumstances.[59]

## XIV. The Bankruptcy Court Did Not Err in Its Findings That BSA Proposed the Plan in Good Faith, and the District Court Did Not Err in Affirming Those Findings

<u>Standard of Review</u>: This Court reviews the bankruptcy court's findings of fact for clear error. *Millennium*, 591 B.R. at 570. A bankruptcy court's factual findings "may only be overturned if they are 'completely devoid of a credible

---

[59] Insurers' remaining argument regarding the assignment of non-executory contracts, C.I. Br. at 29–31, is addressed in Section II.B of Future Claimants' Representative's brief, which BSA incorporates herein by reference.

evidentiary basis or bear[] no rational relationship to the supporting data." *Fruehauf*

*Trailer*, 444 F.3d at 210.

Insurers' argument that BSA did not propose the Plan in good faith disregards

the unappealed findings of fact to the contrary, is unsupported by any factual finding,

ignores the standards for assessing a debtor's good faith, and is based on a rejected

factual assertion that BSA did not consider Insurers' interest.

### A.    Insurers' Argument Disregards the Standards for Finding That a Debtor Proposed a Plan in Good Faith

Insurers challenge the finding of the bankruptcy court that BSA proposed the

Plan in good faith and the district court's affirmance of that finding, but disregard

the established law for making such a determination and all of the unappealed

findings of fact supporting the courts' determinations.  C.I. Br. at 54–55.  Although

BSA did take into account and protect the interests of Insurers, the good faith test

under section 1129(a) is not focused on insurers, particularly insurers that refuse to

participate in the development of the plan, as Insurers did here.  *See In re Stolrow's,*

*Inc.*, 84 B.R. 167, 172 (9th Cir. B.A.P. 1988) ("[Good faith] requires a fundamental

fairness in dealing with one's *creditors*.") (emphasis added).

A plan is proposed in good faith when it "fairly achieve[s] a result consistent

with the objectives and purposes of the Bankruptcy Code."  *PWS Holding*, 228 F.3d

at 242 (citation omitted).  "In its assessment, the [c]ourt should keep[] in mind [that]

the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to

make a fresh start." *W.R. Grace*, 475 B.R. at 87 (internal quotations and citation omitted) (alterations in original). "The factors which a court should consider in determining a debtor's good faith include if the plan: (1) fosters a result consistent with the [Bankruptcy] Code's objectives; (2) has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and (3) [reflects] a fundamental fairness in dealing with the creditors." *Id.* at 87–88 (citation omitted).

Courts examine the "totality of the circumstances" when analyzing these factors, none of which is dispositive. *W.R. Grace*, 475 B.R. at 88; *In re Am. Capital Equip., LLC*, 688 F.3d 145, 157 (3d Cir. 2012) (stating that the good faith inquiry "'requires an examination of all of the facts and circumstances and depends upon an amalgam of factors, none of which is dispositive'") (internal citation omitted). "[T]hat there might be another plan, or even a better one, is not grounds to find a lack of good faith." A752; A167; *In re Tonopah Solar Energy, LLC*, No. 11844 (KBO), 2022 WL 982558, at *8 (D. Del. Mar. 31, 2022) (affirming finding of good faith under section 1129(a)(3) "[e]ven assuming a better settlement could be reached"); *In re Spansion, Inc.*, 426 B.R. 114, 128 (Bankr. D. Del. 2010) ("Even assuming the Alternative Rights Offering provides 'a better deal' for some creditors, the Debtors' refusal to accept the proposal does not, on its own, demonstrate 'bad faith.'") (citing *In re Celotex Corp.*, 204 B.R. 586, 611–12 (Bankr. M.D. Fla. 1996)).

"It is recognized that [b]ankruptcy courts are in the best position to ascertain the good faith of the parties' proposals." *Id.*; *see also CoreStates Bank, N.A. v. United Chem. Techs.*, 202 B.R. 33, 57 (E.D. Pa. 1996) ("The Bankruptcy Judge was in the best position to assess the legitimacy and honesty of each party's proposal…. The Court will not disturb findings with regard to those issues in light of the present record."). Consequently, "the good faith determination is a factual inquiry" committed to the bankruptcy court's sound discretion as fact finder." *In re Exide Holdings, Inc.*, No. 20-11157 (RGA), 2021 WL 3145612, at *11 (D. Del. July 26, 2021). The bankruptcy courts enjoy "considerable discretion" in making those "factually specific," "case-by-case" determinations of good faith. *See, e.g.*, *PWS Holding*, 228 F.3d at 242; *see also W.R. Grace*, 475 B.R. at 87. "[D]enial of bankruptcy relief based on a lack of good faith 'should be confined carefully and is generally utilized only in egregious cases.'" *In re Walker*, 628 B.R. 9, 17 (Bankr. E.D. Pa. 2021) (quoting *In re Falch*, 450 B.R. 88, 93 (Bankr. E.D. Pa. 2011)).

A bankruptcy court's factual findings "may only be overturned if they are 'completely devoid of a credible evidentiary basis or bear[] no rational relationship to the supporting data.'" *Fruehauf Trailer*, 444 F.3d at 210 (quoting *Citicorp Venture Capital*, 323 F.3d at 232); *Burtch*, 698 F. App'x at 714 ("Clear error occurs only if the bankruptcy court's finding is 'completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the

supportive evidentiary data.'" (internal quotations omitted)).  Here, the bankruptcy court held a twenty-two-day trial, and considered the testimony of twenty-six witnesses, including "portions of six video depositions," "over one thousand exhibits," "designated and counter-designated portions of eight depositions," and also held six days of oral argument. A569.  The bankruptcy court made its findings "based on the record," the aggregation of all of the evidence admitted at trial, stating that its findings of fact were drawn from "the trial testimony and the admitted exhibits" and citing the record hundreds of times.[60]  A514 n.1; A569; A702 n.558. As the district court held, "Certain Insurers do not challenge a single factual finding underlying the Bankruptcy Court's good faith determination."  A164; *see also* A19795.

**B.**  **The Bankruptcy Courts' Factual Findings of Good Faith Are Supported by Overwhelming and Largely Uncontroverted Evidence, and Insurers Have Not Appealed Them**

The evidentiary record established that BSA filed the Chapter 11 Cases due to the "tremendous financial pressure" imposed by the sharp increase in the number of Abuse Claims, and maintained two consistent objectives: (a) to timely and

---

[60]  The Confirmation Opinion contains 765 footnotes, a sizeable portion of which cite evidence from the trial record.  The section of the Confirmation Opinion addressing BSA's satisfaction of section 1129(a)(3) alone contains approximately fifty citations to the evidentiary record (*i.e.*, references to declarations, submitted evidence and trial testimony).

equitably compensate abuse survivors, and (b) to emerge from bankruptcy with the capability to continue to carry out its charitable mission. *See* A168; A6560 (Whittman Declaration ¶ 43 ("[T]he goal for the Debtors, a non-profit organization, has been to (a) provide an equitable, streamlined, and certain process by which abuse survivors may obtain compensation for Abuse and (b) ensure that the Reorganized BSA has the ability to continue its vital charitable mission.")); A6566 ¶ 55 ("[T]he Plan contains a series of compromises that represent a good faith effort to achieve consensual resolution, maximize recoveries for creditors, resolve Scouting-related Abuse Claims as a whole, and provide recoveries for abuse survivors through the Settlement Trust."); A1395 (Confirmation Hr'g Tr. at 41:20–25) ("The two goals that the organization set out to achieve [were] the ability to equitably compensate victims to historical abuse, and two, allowing for the mission of scouting to continue."). BSA worked to reorganize through "a global resolution that balanced the competing interests of Chartered Organizations, Insurance Companies, and abuse survivors" and "provided the BSA with the opportunity to survive the Bankruptcy and fulfill its mission of Scouting." A6519 (Desai Declaration ¶ 23). As the bankruptcy court found, Insurers introduced no evidence refuting BSA's honest intent to compensate creditors and to reorganize. A169.

The bankruptcy court correctly made the finding of fact that the (a) "Plan has been proposed in good faith," (A793 (Confirmation Order, ¶ II.D)), (b) BSA did not

collude with the Coalition or other plaintiff representatives (A729), (c) the TDP do not inflate Insurers' quantum of liability (A576), and (d) "[t]he Plan fosters a result consistent with the Code, is proposed for the purpose of reorganizing and delivers value to creditors," (A239; A168; A793) (Confirmation Order ¶ II.D). As the bankruptcy court found, "[m]any survivors have been waiting for thirty, forty or even fifty years to tell their stories and receive a meaningful recovery. This Plan makes that happen." A671; A169. "Overall, I find that the claims being compromised bring significant value to the estate, enabling Debtors to fund the Settlement Trust with substantial insurance proceeds in a timely fashion." A595; A169. Moreover, the district court expressly found that there was "no support in the record for Insurers' argument that the Plan was proposed with ulterior motives, that the Plan's development process suffered from BSA's unclean hands, or that the Plan process otherwise indicates a lack of good faith." A172.

When determining whether a plan is proposed in good faith, courts sometimes "focus[] 'more to the process of plan development than the content of the plan.'" *In re Emerge Energy Servs. LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *16 (Bankr. D. Del. Dec. 5, 2019) (quoting *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 261 (Bankr. S.D.N.Y. 2014)); *see also In re RTI Holding Co., LLC*, No. 20-12456 (JTD), 2021 WL 4994414, at *9 (Bankr. D. Del. Oct. 27, 2021) (quoting *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010)). Thus, in finding

good faith, courts routinely rely on the fact that a plan was formulated based on settlements reached in mediation. *See, e.g., Exide Holdings*, 2021 WL 3145612, at *12 ("[T]he plan was premised on the court-appointed mediators' settlement proposal after lengthy arm's length negotiations. The global settlement was overwhelmingly supported by all key stakeholder...and was fully consistent with the objectives of chapter 11....[T]he plan was proposed in good faith as a way to preserve the proposal made by the mediators."); *In re Peabody Energy Corp.*, 933 F.3d 918, 927 (8th Cir. 2019) ("[The] Debtors proposed their plan in good faith. The record shows that the Debtors mediated with their creditors to resolve a major dispute between those creditors. The Debtors reached a settlement with substantial input from the negotiating parties."); *In re Roman Catholic Archbishop of Portland*, No. 04-37154 (EP), 2007 Bankr. LEXIS 1180, *18–19 (Bankr. D. Or. Apr. 13, 2007) [D.I. 5065] at 13 ("I find that the plan has been proposed in good faith and not by any means forbidden by law. The plan is the result of months of negotiations and mediation, and has the support of the vast majority of the affected parties.").

The process followed here further demonstrates good faith. BSA's bankruptcy was complicated, involving tens of thousands of survivors and other creditors on the one hand, and numerous sophisticated insurers on the other. With the tireless help of one or more of the bankruptcy court-appointed mediators, BSA engaged in hard-fought, good-faith, and complex negotiations for almost two years

with more than twenty-five separate parties. *See* A537, A56–57. Hundreds of formal and informal mediation sessions produced settlements and resolutions that form the backbone of the Plan and provide at least $2.46 billion in cash and property plus significant unliquidated assets, including valuable insurance rights, to the Settlement Trust for the benefit of holders of Abuse Claims. *See supra* pp. 16–24.

The bankruptcy court found that these settlements were the result of "hard-fought negotiations with the help of seasoned mediators." A668. The bankruptcy court also found:

> This is an extraordinary case crying out for extraordinary solutions. Two years of mediation by capable lawyers has yielded a Plan supported by Debtors, JPM, the [Creditors' Committee], the [Tort Claimants' Committee], the [Future Claimants' Representative], the Coalition, the Settling Insurers and 85.72% of Direct Abuse Claimants. The combination of the monetary and non-monetary aspects of the Plan are fair to the holders of Abuse Claims.

A681; *see* A47–48.

BSA's internal process further demonstrates its good faith. BSA is a charitable organization and operates largely through volunteers, including some of the most accomplished people in the country. *See* A6513–14 (Desai Declaration ¶¶ 6–9); A10465–68 (National Executive Board Members); A20469–71 (National Executive Board Members). Mr. Desai, a volunteer member of BSA's National Executive Board, the National Executive Committee, and the Bankruptcy Task Force, testified to the nearly 100 board and committee meetings where the numerous

resolutions and settlements that culminated in the Plan were carefully reviewed and

approved.  A6511–12, A6517 (Desai Declaration).

> [D]uring [these] meetings, the NEB, NEC, and BTF reviewed
> presentations prepared by the Debtors' advisor team describing the
> various potential terms and provisions of the settlements that now
> constitute the terms of the Plan and highlighting the advantages and
> disadvantages of entering into such agreements. The factors considered
> included the contributions from the BSA and Local Councils to a
> Settlement Trust for abuse survivors, the parties included in the Plan,
> the ability to make further settlements with Chartered Organizations
> and Insurance Companies and any related limitation, the costs required
> under the Plan, the conditions applicable to the Settlement Trust and
> the Trust Distribution Procedures, youth protection issues, trust
> governance, the alternatives to entering into the Plan, and the risks of
> achieving a successful confirmation of a plan of reorganization. The
> Plan was approved only after careful deliberation of these and other
> considerations.

A6517 (Desai Declaration); A589–596.

Good faith is further demonstrated by the work of top-tier economists and

attorneys with substantial expertise in mass torts, insurance and bankruptcy law to

formulate the terms of the TDP to replicate BSA's prepetition claim resolutions. *See*

*infra* pp. 162–65.  Establishing a settlement trust designed to provide fair, expedited,

and cost-effective compensation to survivors of childhood sexual abuse, funded with

the assets available to BSA, is a paradigm of honesty and good intentions for the

bankruptcy cases. *See In re Maremont Corp.*, 601 B.R. at 20–21 (finding that plan

"providing a fair and equitable resolution" of the debtors' asbestos personal injury

claims and "maximizing the returns available to creditors and other parties in

interest" was proposed in good faith). And BSA's good faith is also demonstrated by its decision to propose the highly respected former bankruptcy judge Barbara Houser to administer the Settlement Trust, who even Insurers supported. A6675–76 (Azer Declaration); A6459 (Griggs Declaration); A548–49; A190; A1107 (Settlement Trust Agreement § 5.1).

The Plan's fundamental fairness is likewise demonstrated by the overwhelming creditor support. *See* A676–77; A56–57. Every major creditor constituency supports the Plan. A676–77; A56–57. Additionally, over 85% of survivors voted for the Plan. As the bankruptcy court found, "[t]here are 82,209 claimants whose views need to be considered, and as I said previously, in the context of this case, I consider 85% to be overwhelming acceptance." A676–77; A110. Only 0.2% of survivors objected to the Plan.

In finding good faith, the bankruptcy court also relied on the fact that Insurers had introduced no evidence supporting their allegations of bad faith:

> I was underwhelmed with, I don't know if that's the right word, the lack of evidence of bad faith, if you will, on this record. I heard the testimony and I didn't see anything to support this objection or to support the insurers' position on this….So I am with [BSA] on this.

A4943–44 (Confirmation Hr'g Tr. at 44:18–45:1); *see also* A4960–61 at (Confirmation Hr'g Tr. at 61:12–62:6) (Court: "*I'm not persuaded* by [Insurers' argument regarding the bad faith of the proposed trust mechanism] either." (emphasis added)); A729 ("Based on this record…I cannot find that

Debtors…proceeded in bad faith.").  Notably, Insurers were provided discovery into

the mediation, over the mediating parties' objections, based on their allegations BSA

was colluding in bad faith with survivors in the mediation to inflate awards.  A726.

And that access just further confirmed that Insurers' allegations were baseless.

Nonetheless, Insurers continued to argue that the discovery demonstrated collusion,

even though it demonstrated the opposite.  As the bankruptcy court found: "In their

confirmation objection, the Certain Insurers represent that 'the results of that

discovery were damning.'  I disagree."  A726.

The bankruptcy court also balanced confirmation of the Plan against the

alternative: "[w]ithout this Plan, litigation goes one of two ways…Claimants may

race to courthouses across the country suing Local Councils and Chartered

Organizations" or they would "recover only the pennies that a BSA-only bankruptcy

plan would bring."  A106 ("BSA-only plan would spiral the organization into a

'death trap of litigation with minimal recoveries in sight'").  In addition, when parties

sought to terminate BSA's exclusive period to file a plan of reorganization, the

bankruptcy court stated that "protracted litigation…has the potential to...end the Boy

Scouts as it currently exists."  A8681–82 (May 19, 2021, Hr'g Tr. at 100:24–101:3).

The bankruptcy court's comprehensive factual findings of good faith are

unappealed and easily satisfied the standards governing whether a plan is proposed

in good faith under Section 1129(a) of the Bankruptcy Code.  Indeed, those findings,

supported by a largely uncontested record, could support no other finding.  The

district court's order affirming the bankruptcy court's Confirmation Order should be

affirmed.

### C.    The Bankruptcy Court's Finding That BSA Proposed the Plan in Good Faith, and the District Court's Affirmance, Are Correct Under any Standard of Review

Relying solely on *In re LTL Management*, 58 F.4th 738 (3d Cir. 2023),

Insurers argue that the lower courts' determinations of good faith are determinations

of "ultimate fact" and reviewed *de novo*.  *LTL Management* addressed good faith in

filing a bankruptcy petition under section 1112(b) of the Bankruptcy Code, not

section 1129(a), the statute here at issue.  As the district court found, based on the

distinctions between a good faith determination relating to the filing of a bankruptcy

petition and the statutory requirement for proposing a plan in good faith, it is not

clear that the good faith determination is an "ultimate fact" for purposes of section

1129(a)(3).  A166, n.17 (citing *In re Plant Insulation Co.*, 544 F. App'x 669, 671

(9th Cir. 2013) ("The bankruptcy court's finding of good faith is evaluated for clear

error."); *In re Am. Capital Equipment, LLC*, 688 F.3d 145, 157 (3d Cir. 2012) (noting

distinctions between judicial doctrine determination of good faith in filing of

bankruptcy petition versus the statutory good faith requirement for confirmation

pursuant to § 1129(a)(3)).

In any case, a *de novo* review would need to be based on the underlying

findings of fact. Specifically, this Court held in *LTL* that "[w]hile the underlying basic and inferred facts require clear-error review, the culminating determination of whether those facts support a conclusion of good faith gets plenary review as 'essentially[] a conclusion of law.'" *LTL Mgmt.*, 64 F.4th at 100. Thus, if the finding that the Plan was proposed in good faith is subject to *de novo* review, then the appeal must be denied because Insurers do not challenge any of the bankruptcy court's findings of fact related to good faith, nor could they satisfy the high burden of demonstrating such findings are "completely devoid of a credible evidentiary basis or bear[] no rational relationship to the supporting data." *See supra* pp. 145–47. To the contrary, the bankruptcy court's good faith findings are supported by essentially the entire evidentiary record, and there is no evidence to support a contrary finding. Indeed, the district court found that Insurers' allegations of bad faith were unsupported by any evidence. A172 ("Certain Insurers introduced no evidence to support those arguments [alleging bad faith] or to show that the Bankruptcy Court committed clear error in rejecting their position). On that unappealed record of findings, there could be no conclusion other than that BSA proposed the Plan in good faith, and the district court did not err in concluding that "upon de novo review of 'the culminating determination of whether th[e] facts support[ed] a conclusion of good faith,' I find no error in the Bankruptcy Court's determination based on its detailed analysis of objections and ample support in the record." A196.

**D.**   **Insurers' Argument That the Bankruptcy Court Failed to Consider the Interests of Insurers Is Incorrect and Would Not Show That the Lower Courts Erred in Finding That Plan Was Proposed in Good Faith**

Insurers disregard the standards for determining whether the Plan was proposed in good faith, relying instead on inapposite cases. Additionally, Insurers disregard the court's unappealed findings of fact of good faith and that BSA considered and protected Insurers' interests.

**1.**   **The Cases That Insurers Rely On Instead Of the Established Law for Evaluating Good Faith Are Inapposite**

Insurers' exclusive focus on their interest in not paying claims under their policies is misplaced. As noted above, Insurers ignore the standards for evaluating whether a debtor proposed a plan in good faith, and one honest purpose in reorganization is to maximize the assets of the estate. *Thgh Liquidating*, 2020 WL 5409002, at *7. *In re Thgh Liquidating LLC*, No. 19-2215 (RGA), 2020 WL 5409002, at *7 (D. Del. Sept. 9, 2020) (One "honest" purpose in developing a plan of reorganization is to "maximiz[e] value for the Debtors, their estates, and their creditors."); see also *W.R. Grace*, 475 B.R. at 88 (*citing Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)) ("The Supreme Court of the United States has specifically identified two purposes of Chapter 11 as: (1) preserving going concerns; and (2) maximizing property available to satisfy creditors."). Insurers are not creditors, but rather issued policies to BSA, which are

property of the estate (A600). Consequently, BSA had a valid interest in preserving and maximizing the value of its insurance portfolio. That is not to say that BSA could develop a plan to improperly inflate Insurers' liability, but the standards for evaluating whether a debtor proposed a plan in good faith does not even address, much less are they controlled by, an insurer's interest in not paying claims under the policy it issued.

Insurers cite a handful of totally inapposite cases that either reject Insurers' argument, do not address the issue, or affirm a bankruptcy court's findings of bad faith on a record of bad faith, the opposite of the findings and the record here. C.I. Br. at 54–55 (citing *In re Fed.-Mogul*, 684 F.3d 355, 381 (3d Cir. 2011) (overruling insurers' plan objection to trust distribution procedures that increased the insurers' exposure and disincentivized the defense of claims); *In re SGL Carbon*, 200 F.3d 154, 167 (3d Cir. 1999) (dismissing a bankruptcy petition under section 1112(b) because the financially-healthy debtor did not enter chapter 11 with a valid reorganization purpose, but rather "to gain tactical litigation advantages."); *In re Am. Cap. Equip.*, 688 F.3d 145, 158 (3d Cir. 2011) (affirming bankruptcy court's finding that a plan was not proposed in good faith because the trust did not pay asbestos claims, but rather was funded by asbestos claimants to pay only creditors and insurers, and there was an "inherent conflict of interest" that financially incentivized the debtors to "sabotage their own defense" due to a kickback mechanism)).

*Global Industrial* is a good example. There, the Third Circuit did not rule on good faith, but found that the bankruptcy court erred in holding that the insurers had no standing to object to a plan where their policies were being transferred to a trust, and where the insurers had submitted substantial evidence that 91.5% of the claims were not legitimate. *Glob. Indus.*, 645 F.3d at 207–08. Indeed, the insurers produced evidence showing that the diagnosing physicians had been barred in other mass tort cases for making "questionable to abysmal" diagnoses in a van sitting in parking lots and for claimants that had already been diagnosed with asbestos-disease. *Id.* at 207 n.16. The Third Circuit noted that having both an asbestos and silicon related disease is so improbable that "[a] golfer is more likely to hit a hole in one than an occupational medicine specialist is to find a single case of silicosis and asbestosis." *Id.* at 207. Further, the bankruptcy court found that there was record evidence that "[the debtor] had sold out [the insurers] by setting up a system in which they would pay for newly ginned-up silica claims in exchange for asbestos claimants casting their votes in favor of the [plan]." *Id.* at 214. Indeed, the debtors obtained a list of silica claimants from another company's bankruptcy and then solicited those claims to gain confirmation votes, causing the "explosion of silica claims." *Id.* The bankruptcy court made the opposite findings here, and did so on a record of good faith.

**2.    The Plan and the Confirmation Order Do Not Abrogate Insurers' Rights and Defenses**

Insurers' argument that BSA did not consider their interests is based on their assertion that the Plan and the Confirmation Order abrogated the Policy obligations and coverage defense.  C.I. Br. at 54–55.  As addressed above, Insurers' assertion is incorrect, eliminating their basis for challenging good faith.  *See supra* pp. 131–34.

**3.    Insurers' Argument Also Fails Because the Bankruptcy Court Made Factual Findings That BSA Properly Considered Insurers' Interests, and Those Findings Have Not Been Appealed**

Insurers' argument that BSA did not consider their interests fails because the bankruptcy court made factual findings that BSA did consider and protect Insurers' interests in proposing the Plan, and Insurers did not appeal those findings of fact. Moreover, those findings of fact are well supported by the record.

**a.    BSA Protected Insurers Through Preservation of Their Policy Terms and Coverage Defenses**

Insurers focus on survivor counsel's efforts to obtain terms favorable to their clients, but ignore the uncontested and documented record that BSA steadfastly insisted on provisions to protect the Insurer's contractual rights.  A726–730.  The bankruptcy court found that BSA negotiated hard, and the parties ultimately agreed to Plan terms providing that none of Insurers' rights or obligations were being modified, and preserving any coverage defenses they had.  *Id.*; A6682–89 (Azer Declaration) ¶¶ 27–41.  The district court likewise held that BSA adequately

protected Insurers by "negotiat[ing] against the Coalition, persistently including protections for the Insurers after they had been stricken by the Coalition." A179. Indeed, BSA never stopped negotiating and working to address concerns expressed by the parties. A6686, A6692 (Azer Declaration ¶¶ 36-37, 49).

Insurers argue that there were earlier drafts that repeated the same protection in multiple provisions (C.I. Br. at 48), but those protections were consolidated because repetition added nothing and "the broad general protections in Article V.C would be clearer, less ambiguous, and protected the interests of Non-Settling Insurance Companies." A139. The bankruptcy court made a finding that consolidating the protections into one provision, rather than including them in several provisions, was a matter of drafting convention. A139; A729 (concluding that while "[t]he Non-Settling Insurance Companies may have preferred Mr. Azer's belts and suspenders' language," the bankruptcy court would not "weigh into the apparent disagreement on drafting conventions").

### b.    BSA Protected Insurers by Not Binding Them to Awards

BSA also protected Insurers by providing that they would not be bound by awards issued by the Trust to survivors. A701. As the bankruptcy court found, "[t]he allowed amount of a claim does not necessarily correlate to what an insurer is 'obligated to pay' or what 'a loss' is under its insurance policy and [a finding in the plan] does not equate the two." A701; A737 ("[I]nsurance coverage litigation is

often before the coverage court on whether an insurer must pay a specific settlement entered into by the insured without the insurer's consent.  This would appear to be a fact intensive inquiry."); A743 ("I will not anticipate how an insurance coverage court will interpret the Plan.").  Courts have recognized that this is enough to protect insurers.  *See In re Thorpe Insulation Co.*, 677 F.3d 869, 883 (9th Cir. 2012) (suggesting that amending the trust distribution procedures to clarify that they are not binding is one "viable" remedy that protects insurers' interests).

### c.    BSA Protected Insurers by Designing the TDP and Claim Matrix to Emulate Pre-Bankruptcy Practices

Insurers' argument that the TDP reflects "a clear bias against Insurers and the goal to improperly expand the insurers' obligations in the post-bankruptcy environment" (C.I. Br. at 56) again ignores the unappealed fact findings rejecting that contention, and the record.  A729 ("I cannot find that Debtors abdicated their responsibility to negotiate a plan or proceeded in bad faith.").  Mr. Azer, the lead drafter of the TDP, testified, and the bankruptcy court found, that he and other counsel for BSA drafted the initial TDP based on a model provided by an insurer, then an adversary, not the survivors, as Insurers had alleged notwithstanding the volume of contemporaneous drafts demonstrating that their centerpiece allegation was false.  A2155–57 (Confirmation Hr'g Tr. at 37:20–39:13); A726–27.  BSA also relied on other mass tort bankruptcy trust distribution procedures.  A2157 (Confirmation Hr'g Tr. at 39:14–24).  With those templates as a starting point, BSA

created trust distribution procedures with the goal of emulating, to the greatest extent practical, BSA's prepetition practices for resolving sexual abuse claims.  A6673; A6675–76; A6728–29 (Azer Declaration); A6459–62 (Griggs Declaration).

The Claims Matrix and Scaling Factors, the section of the TDP that provides guidance on valuing claims, was formulated by BSA's expert consultant, Bates White, economists with deep expertise and experience on trust distribution procedures and claim valuation, to identify Base Matrix Values and the aggravating and mitigating scalers to produce results consistent with BSA's prepetition practices. A6676–77; A. 2726 (Confirmation Hr'g Tr. at 95:6–22); *see supra* pp. 20–21, 88–89.  Dr. Bates testified that his assignment was to design the Base Matrix Values and scalers based on and to be consistent with BSA's historical abuse settlements and litigation outcomes.  A2832–61 (Confirmation Hr'g Tr. at 201:10–230:5); A2935–36 (Confirmation Hr'g Tr. at 31:22–32:7).  The Bates White team developed the Claims Matrix based on BSA's data for prepetition claims resolutions and comprehensive statistical modeling and analyses.  A2832–61 (Confirmation Hr'g Tr. at 201:10–230:5).  Dr. Bates further testified that the TDP Base Matrix Values and scalers were designed to be used by the Settlement Trustee to emulate the tort system and replicate the values that Abuse Claims would have received had they been litigated outside of the Chapter 11 Cases.  A2727 (Confirmation Hr'g Tr. at 96:14–20).

The trial court found that "Dr. Bates's analysis was thorough and credible based on data available.  It was also undisputed.  No other expert testified on the aggregate valuation of the Direct Abuse Claims."  A578.  The bankruptcy court credited Dr. Bates's unrebutted opinion that the TDP will result in awards at lower average values, not inflated values, as Insurers argue:

> The result of [Dr. Bates's] thought experiment confirmed his view that the value of a Direct Abuse Claim, on average, will be less than the average value of Historical Abuse Claims although the aggregate of such claims could be significant…Dr. Bates' analysis was thorough and credible based on the data available.  It was also undisputed….Based on the record and my assessment of Dr. Bates's credibility, there is no reason to disregard Dr. Bates's analysis and conclusions, which I accept for purposes of confirmation as his best estimate of the aggregate valuation of the Direct Abuse Claims.

A576–78.

Insurers introduced no evidence contradicting the testimony of these percipient and expert witnesses, or otherwise to support their argument that future claim values will be inflated.  Indeed, Insurers mostly embraced Dr. Bates's analysis: "Mr. Kornfeld is right about one thing, the [Insurers] do like Dr. Bates' opinion, but he's wrong about why we like them, we like them because they're the truth." A11416 (Feb. 11, 2022 Hr'g Tr. at 89:11–13); A12139 (Insurers' Opposition to Valuation of Abuse Claims ¶ 17 ("Dr. Bates's valuation opinions are reliable and relevant, were timely and properly disclosed, and should be fully considered by this Court.")); A12145 ¶ 31  ("Dr. Bates's opinions with respect to selection bias are

supported by published economic literature, his analysis of the historical tort population compared to the abuse claims, and his own experience in other mass tort contexts and should be considered by this Court.").

Importantly, at one point, Insurers retained an economist to try to rebut Dr. Bates, but did not offer that testimony.  A734 ("[T]he Certain Insurers retained an expert to opine on the TDP….The Certain Insurers, however, chose not to use their expert during the confirmation hearing to support their argument that the TDP produce over-inflated values.").  Accordingly, the bankruptcy court found Insurers' position "underwhelm[ing]":

> The Certain Insurers could have chosen to put on their expert to challenge the Base Matrix Value or otherwise clear up any confusion, but they did not. This appears to be all optics. Any misperception, especially when the Certain Insurers chose not to challenge the Base Matrix value through their own expert, is not so egregious as to deny confirmation.

A735; A4943–44 (Confirmation Hr'g Tr. at 44:18–45:1).

Further, the very existence of a Settlement Trust serves to mitigate liability by proposing settlements based on BSA's historical practice of settling claims instead of litigating them to conclusion because childhood sexual abuse claims at issue here otherwise would be subject to jury trials, where awards for these emotionally charged claims have been huge.  *See* A6482–83 (Burnett Declaration ¶ 48) ("In my experience, the detailed, well-founded, defined and extensive criteria of the Matrix and Scaling Factors in Article VIII [of the TDP] would be welcome by both

defendants and their insurers.  They provide a tangible and predictable basis for claim valuation in a way that avoids a volatile and emotionally-charged jury trial in the tort system."); A6492–93; *see also* A6476 (Griggs Declaration ¶ 32) ("Settlement provided a more consistent way to value and settle cases.  Generally, we did not consider a jury trial to be a favorable forum for claims involving allegations of childhood sexual abuse, both with respect to determinations of liability as well as for determinations of damages.").

### d.    The Bankruptcy Court Further Protected Insurers

The bankruptcy court further considered and protected the interests of Insurers.  The bankruptcy required modifications before it would confirm a plan in response to Insurers' objections that certain terms of a prior plan[61] would prejudice them in future litigation.  A684–702.  The bankruptcy court also required the parties to clarify that Insurers would not be bound to awards.  A13395–96 (Sept. 1, 2022 Hr'g Tr. at 27:11–28:3 (Court: "There are defenses.  We need to make sure those are

---

[61] With respect to Insurers' argument that a prior version of the plan "included the blatantly improper findings that were designed to bind the Certain Insurers," C.I. Br. at 56, the district court ruled that the "Certain Insurers cannot challenge the Plan based on terms that are not in it, much less demonstrate that the Bankruptcy Court committed clear error by not making certain factual findings based on terms that BSA did not propose in the confirmed Plan" that is now on appeal. A189–190.  "A challenge directed to a proposal that was not included in the Plan presented for confirmation, and that is not included in the confirmed Plan, is irrelevant."  A190.  Moreover, "[a]ltering plan provisions before and after confirmation is consistent with bankruptcy precedent and procedure."  *Id.*

preserved and it will have the effect that it has.")).  The bankruptcy court further protected Insurers by requiring additional procedures be included in the Plan to identify fraudulent claims, and required that those procedures be presented to the court for approval.  A724–25.  The bankruptcy court also ruled that the judgment reduction provision had to be mutual, and allowed Insurers to submit a competing draft of the judgment-reduction provision for her consideration.  A14127.  The bankruptcy court even allowed Insurers to invade mediation privileges in search of evidence to support their (baseless) allegations of collusion and bad faith.  A726.[62]

### 4.    Insurers' Novel Argument About Moral Hazard Does Not State a Ground for Appeal, and Is Factually Incorrect

Insurers argue that the lower courts erred in finding that the Plan was proposed in good faith because the Plan allegedly involves "moral hazard," an economic principle where one party bears the economic consequences of another party's behavior.  C.I. Br. at 57–63.  Insurers' argument is legally and factually incorrect.

### a.    The Economic Principle of Moral Hazard Is Not a Confirmation Objection

Insurers' argument that the courts erred in finding that the Plan was proposed in good faith because of an economic principle about a lack of incentive to guard against risk where another party bears the economic consequences is puzzling from

---

[62] Allianz's judgment reduction arguments are addressed in Section III of Future Claimants' Representative's brief, which BSA incorporates herein by reference.

Insurers, as their business is to collect premiums in exchange for covering the risks of another. Any insured can be accused of having less incentive to prevent loss or limit the size of loss where there is insurance, and there is nothing unique to BSA with respect to any alleged moral hazard associated with Insurers' decision to sell insurance.

In any case, Insurers do not cite a single authority for challenging a plan of reorganization based on moral hazard. Indeed, the principle effectively was rejected by this Court. In *Federal-Mogul*, this Court rejected the argument of insurers that a claim trust "might distort ordinary incentives between insurer and insured, encouraging the debtor to collude with claimants and impose costs on the insurer," noting that trust distribution procedures do not create incentives different than those that already exist under the Bankruptcy Code: "[T]he shift in incentives is not unique to [trust distribution procedures in] the asbestos context and occurs in bankruptcy where there is a discharge of liability to the debtor but not that of the insurer." *See In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 380 (3d Cir. 2012).

### b.    There Is No Moral Hazard

In addition to the legal infirmity, Insurers' arguments are factually incorrect and are based upon many of the factual assertions that were rejected by the courts below.

### i.    The Fact That There Is No Requirement to Require the Settlement Trustee "Vigorously

### Contest Claims" in the Tort System Is Irrelevant to BSA's Good Faith

Insurers recognize that the Settlement Trustee can "vigorously contest claims as BSA did in the tort system," but complains that "the Plan does not by its terms require that the Trustee do so." C.I. Br. at 58. The Bankruptcy Code does not require a trustee or anyone else to vigorously contest claims in the tort system. Indeed, there was never a requirement for BSA to vigorously contest claims in the tort system, and BSA did not vigorously contest claims in the tort system. To the contrary, the evidence is undisputed that BSA settled claims "so long as the case appeared credible," especially if the claimant "was willing to accept a settlement offer for an amount less than the cost of pursuing a dismissal of the case." *See* A6455 (Griggs Declaration ¶ 39).

BSA was always free to settle abuse claims, rather than litigate, even without the rigor of review by a former bankruptcy court judge and a Claims Matrix developed by experienced economists, as here, and at the values indicated for the Settlement Trust, or at any other value, and Insurers could do nothing to prevent those resolutions. A2205–07 (Confirmation Hr'g Tr. at 87:4–89:13). The insurance policies do not prevent BSA from settling unilaterally or through a trust. A2205–07 (Confirmation Hr'g Tr. at 87:4–89:13). Indeed, Insurers' own insurance expert described the consent rights not as precluding BSA from resolving claims against it outside the tort system, but rather as providing that "no action can be taken against

169

the insurer unless…the claimant, insured, and the insurer agree in writing to settle the claim." A3993 (Confirmation Hr'g Tr. at 22:22–23:1).  And as Insurers' expert conceded, it is not feasible to litigate the 82,209 claims here.  A742 (citing A4074–75 (Confirmation Hr'g Tr. at 103:2–104:6)).

Nonetheless, to the extent that Insurers believe that there is some coverage defense based on the fact that the Trust does not allegedly "vigorously contest claims," their defense is preserved.  As the bankruptcy court held, if the TDP:

> creates a defense in subsequent insurance litigation, the Non-Settling Insurance Companies may reap that benefit.  But, that is not certain. While there is nothing in the TDP that requires the Settlement Trustee to cooperate with the Non-Settling Insurance Companies under the Claims Matrix process, there is nothing that prohibits the Settlement Trustee from taking any and all action that she believes are appropriate or required to ensure that the Settlement Trust Insurance rights are maximized rather than compromised.

A729–30.  This Court has found that insurers do not even have standing to challenge the plan where their rights are protected.  *In re Combustion Engineering*, 391 F.3d at 217, 218 (holding that the insurers did not have standing to challenge the payment process where they had no right to participate in the payment of claims prepetition and they were still permitted to dispute coverage).

### ii.    There Has Been No Shift in Alignment

Insurers argue that before the bankruptcy filing, BSA and its insurers were aligned.  C.I. Br. at 57.  To the contrary, Insurers breached their obligations to BSA, and there was pending litigation with Insurers because they were not aligned.  BSA

settled claims, and Insurers did not always agree to indemnify. *See, e.g.*, A1744–1746 (Confirmation Hr'g Tr. at 122:3–124). Nonetheless, the Plan was designed to replicate prepetition resolutions. *See supra* pp. 162–65.

### iii. The Settlement Trustee Does Not Have a Fiduciary Duty to Pay All Claims

Insurers argue incorrectly that the Trustee is "a fiduciary for all holders of Abuse Claims and is duty-bound to resolve and pay all claims pursuant to the TDPs." C.I. Br. at 57. To the contrary, the Trustee's job includes not paying claims. What the TDP actually provide is that the Trustee must evaluate (not pay) all claims, including all evidence submitted in connection therewith, using the established procedures "to determine…whether or not a Submitted Abuse Claim should be allowed," and then to "either find the Abuse Claim to be legally valid and an Allowed Abuse Claim, or legally invalid and a Disallowed Claim." A1019 (Plan, Art VII.B). Indeed, the Trustee is required to implement and follow procedures to detect fraudulent claims to ensure that invalid claims are not paid. *See infra* pp. 177–78.

### iv. The Volume of Claims Filed Against BSA Is Irrelevant to BSA's Good Faith

Insurers' claim that the number of claims that were filed against BSA somehow demonstrates that the bankruptcy court erred in finding good faith, and the district court erred in affirming the bankruptcy court, is baseless. Bankruptcy law

provides no ground for defeating confirmation based on the volume of claims brought against BSA, nor do Insurers' policies contain any limitation based on the volume of claims filed against BSA, other than aggregate limits, which remain in place. Indeed, as the bankruptcy court correctly held, "the logical extension of [Insurers'] argument is that no entity with mass tort liabilities can file a bankruptcy case because claims might increase exponentially." A737; *see* A4961 (Confirmation Hr'g Tr. at 62:2–6) (finding the argument that the debtors "can't be allowed to file a bankruptcy because it might generate a whole bunch of claims" unpersuasive). In *Federal-Mogul*, this Court rejected an argument that increased exposure for an insurer is a proper objection to a plan of reorganization, though such exposure may provide the insurer with standing to participate in the bankruptcy proceedings, noting that "granting a private party powerful leverage that may amount to a *de facto* veto over the reorganization proceedings does not seem a promising solution to these potential problems." *Fed.-Mogul*, 684 F.3d at 380.

> A debtor's ability to obtain a good faith finding necessary for confirmation certainly cannot turn on the number of claims filed, whether plaintiff lawyers advertised for clients or whether plaintiff lawyers filed claims in derogation of applicable rules. The remedy for inappropriate behavior, if any, rests with state supreme courts and/or disciplinary counsel around the country, any appropriate remedy in this court for personal who failed to perform appropriate diligence before signing proofs of claim and appropriate procedures in the TDP to ferret out any fraudulent claims. Denying confirmation, however, is not an appropriate or proportional remedy.

A737. And as bankruptcy court further found, "having presided over these cases, I

have no doubt that insurers would have made the same objections had there been "only" 50,000 proofs of claims filed or 25,000 proofs of claim or 10,000 proofs of claim." A736–37.

Insurers respond that "the courts below both found that the claims *alone* does not demonstrate an absence of good faith in the Plan." C.I. Br. at 60. Insurers have dropped their argument that the court did not consider the "totality of circumstances," an argument based on the above quotation. As the district court found, the courts used the word "alone" only in response to Insurers' argument that "this 'explosion' of claims *alone* is grounds to deny confirmation of the Plan." A171 (emphasis added).

Insurers' argument that the volume of claims can result in pressure to settle is likewise irrelevant to BSA's good faith. C.I. Br. at 59. Insurers certainly did not feel pressure to settle, as they are the only parties on the defense side that have steadfastly refused to settle. In any case, as the courts found, BSA proposed the Plan in good faith, regardless of whether or not Insurers may feel pressure to settle. A135–136. And Insurers can point to no confirmation objection based on whether insurers feel pressure to settle (yet do not settle) because their insured is exposed to the very liability they agreed to cover in exchange for premiums.

None of the cases Insurers cite are bankruptcy cases, but they only support the Plan, as they discuss that in tort litigation entities "abandon substantial defenses and

[] pay settlements in order to avoid the expense and risk of going to trial," to avoid "the threat of discovery expense" and to "avoid[] the risk, however small, of potentially ruinous liability," which BSA has done here.  C.I. Br. at 59–60 (citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 189 (1994); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 164 (3d. Cir. 2001).

### v.     Insurers' Speculation That Some Claims Are Invalid Is Irrelevant to BSA's Good Faith

Insurers argue that many of the abuse claims filed against BSA are fraudulent, but Insurers had access to all 82,209 proofs of claims and did not challenge a single one.  As the district court found that: "The Certain Insurers introduced no evidence that any of the claims were invalid."  A182.

Insurers cite evidence about certain group filings at the deadline, but an attorney's effort to preserve claims before they expire does not prove fraud.  A3959-3962 (Confirmation Hr'g Tr. At 221:15–224:12) (explaining that proof of claim forms were submitted, and sometimes signed on behalf of claimants, at or near the bar date "to protect them from a Draconian bar date in a pandemic" and "avoid the Draconian consequences of missing the bar date").  As the bankruptcy court found, the "explosion" of claims "could be a consequence of a bankruptcy filing and a bar date and an open statutes of limitations and the advertising that went on."  A5353 (Confirmation Hr'g Tr. at 191:10–17).

Additionally, Dr. Bates comprehensively analyzed the difference between pre-petition and post-petition claim numbers, and concluded that the increase of claims post-petition was a result of survivors' privacy concerns and economic considerations of survivors and their attorneys. A2773–77 (Confirmation Hr'g Tr. at 142:9–146:8). That is, survivors who were unwilling to engage in costly and public litigation in the tort system came forward in the bankruptcy proceeding to file claims when presented the opportunity to do so through the confidential proof of claim process. A2773–77 (Confirmation Hr'g Tr. at 142:9–146:8).

Insurers' assertion that "experts on both sides testified that a significant portion of the claims are likely fraudulent" is incorrect. C.I. Br. at 58. Insurers cite to an incompetent statement made by a witness that was not retained or qualified as an expert to evaluate the prevalence of fraud in the claim pool, and did not evaluate the claim pool. *See* A3935 (Confirmation Hr'g Tr. at 197:17–24) (proffering Dr. Conte as an expert witness to opine on the characteristics of the allegations, survivor profiles, and legal issues presented by the proofs of claim, but not to evaluate the claim pool for instances of fraud). And the witness simply said during a deposition outside of his retention that his reaction was that, given the number of claims, "a significant portion of that 80,000...are probably not real claims," without defining what would constitute a significant portion or providing any data or analysis to support his personal belief, much less a report. A3940 (Confirmation Hr'g Tr. at

202:20–22).   Consequently, the testimony is incompetent.   *Ace Pallet Corp. v. Conrail*, 764 F. App'x 197, 198 (3d Cir. 2019); *Mfg. Res. Int'l, Inc. v. Civiq Smartscapes, LLC*, No. 17-269 (RGA), 2019 WL 4198194, at *7 (D. Del. Sept. 4, 2019) (excluding opinion that contains "no actual analysis").   In fact, an expert analysis would have been that the number of claims does not indicate fraud because BSA has served more than 130 million Americans since its inception (A7031 (First Day Declaration ¶ 6))—and the witness did not indicate that he was aware that BSA had served 130 million children—so that 82,209 claims was 0.06% of the population, which is actually lower than the national average (and how that fact might impact his reaction).   Again, Insurers' position is not prejudiced or changed because BSA could settle fraudulent claims without a trust, subject only to coverage defense.

Insurers also note that 90% of claimants never reported abuse to Scouting or law enforcement (C.I. Br. at 58–59), but as the district court correctly held, "[t]he fact that children that were abused decades ago did not report, or frequently even understand, abuse does not remotely support Insurers' argument that 'tens of thousands' of claims are fraudulent."   A184.   Insurers introduced no evidence whatsoever that abused children frequently reported abuse decades ago, or that claims involving a survivor that did not report abuse are fraudulent.   Insurers never even argued at confirmation that the fact that most claimants never reported abuse

to Scouting or law enforcement proved that their claims were fraudulent.  *See*

A11945–12125 (Insurers' Supplemental Plan Objection).  Insurers also introduced

no evidence that BSA did not pay claims that were not reported.  To the contrary,

the evidence is that BSA did pay claims that had not been reported, and insurers

funded those settlements.  *See* A6455, A6458–59 (Griggs Declaration ¶¶ 39, 48).

### vi.    The Trust Accounts for Fraudulent Claims

In any case, Insurers' purported concern about fraudulent claims is addressed

in the Plan.  The Plan includes numerous provisions for assessing the validity of

claims and one of the founding principles of the TDP is the "prevention and detection

of any fraud."   A1010 (Plan, Art. I.B.5).   For example, as the district court

acknowledged:

> the signature page on the proof of claim form requires a signature under
> penalty of perjury, and contains a warning of substantial consequences
> for submitting false claims:
>
> "Penalty for presenting fraudulent claim has a fine of up to $500,000 or
> imprisonment of up to five years or both. 18 U.S.C. §§ 152, 157, 2571."
>
> "I have examined the information in the sexual abuse survivor proof of
> claim and have a reasonable belief that the information is true and
> correct."
>
> "I declare under penalty of perjury that the foregoing statements are true and
> correct."

A184 (citing A23116).

Furthermore, as discussed above, the bankruptcy court directed that the

Confirmation Order provide that the Settlement Trustee propose certain procedures

"to suss out fraudulent claims."  A724–25.

> As the district court held:

> No settlement trust (or litigation) is immune from efforts by unscrupulous people to commit fraud.  The Plan includes procedures for denying such claims. That an unscrupulous person might pursue a fraudulent claim does not support an argument that BSA lacked good faith in proposing the plan.  Mass tort settlements administered by trusts like the one at issue here are commonplace. *See In re Maremont Corp.*, 601 B.R. 1, 20-21 (Bankr. D. Del. 2019); *In re W.R. Grace & Co.*, 446 B.R. 96, 132 (Bankr. D. Del. 2011) ("The Trustees have a fiduciary duty to ensure that only valid claims are paid. No evidence was proffered to suggest, let alone prove, that Trustee will violate that duty."), *aff'd*, 729 F.3d 311 (3d Cir. 2013).

A185.

Additionally, speculation that potential fraudulent claims will get past Judge

Houser, but would not also have fooled BSA, is unsupported by any evidence, and

does not demonstrate bad faith.  And contrary to Insurers' suggestion that litigation

would identify invalid claims through discovery, evidence shows that sexual abuse

claims are established primarily through the testimony of the survivor, not through

recordings or documentary evidence, and the TDP allows Judge Houser to take

testimony.  *See* A1018–19 (Plan, Art VII.A).  Moreover, the evidence is that BSA

paid claims prepetition as long as the case appeared credible, especially if the abuse

claimant "was willing to accept a settlement offer for an amount less than the cost

of defending the case through trial."  A6455–56 (Griggs Declaration ¶ 39).

Nonetheless, if Judge Houser somehow does not identify fraudulent claims as such, then Insurers will have their coverage defenses.

> ### vii. The Ability of the Trustee to Consider "Any Further Limitations" on Claims Is Irrelevant to BSA's Good Faith

Insurers argue for bad faith because the Plan language provides that the Trustee "may" consider "any further limitations on the abuse claimant's recovery in the tort system," rather than "must" consider such limitations.  C.I. Br. at 22, 58.  Such allegations misquote the TDP.  Insurers focus on the statute of limitations "that claimants would otherwise have to overcome in the tort system," is similarly misplaced as the Trustee is required to take into account statute of limitations defenses. A1029 (TDP Art. VIII.D(iii)) ("If the evidence…results in the Settlement Trustee concluding that the subject Direct Abuse Claim could be dismissed or denied in the tort system…due to the passage of a statute of limitations or a statute of repose, the Settlement Trustee *shall* apply an appropriate Scaling Factor…giving due consideration to any changes in the applicable law.") (emphasis added).[63]

And the uncontested record is that prepetition BSA settled claims subject to statute of limitations defenses.  Indeed, Mr. Griggs testified that BSA settled claims with a statute of limitations defense, even if it was likely to prevail on the defense,

---

[63] To the extent Insurers refer to other "further limitations," they have not identified any such limitations, so BSA is unable to respond in this brief.

179

and insurers often approved and funded those settlements. A6451–53 (Griggs Declaration ¶¶ 22–26). BSA even paid claims after prevailing on the defense. A6452–53. Many of the largest settlements paid by BSA and its insurers arose out of claims where BSA believed it had a viable statute of limitations defense. A6451–52. In fact, BSA's largest settlement was subject to a time-bar defense. A6451–52 (describing settlement of Hacker claims).

As the district court held, the "testimony at trial established that States consistently revive abuse claims, and that "courts are reluctant to grant dispositive motions on a statute of limitations basis, particularly for something like childhood sexual abuse. Indeed, many of the states that had potentially applicable statutes of limitations also included exceptions (such as discovery exceptions) that would effectively negate a dispositive motion on a statute of limitations defense." A187 (quoting witness testimony); A6451–52 (Griggs Declaration ¶ 24). As the district court noted, the "Bankruptcy Court credited Mr. Griggs' unrefuted evidence: 'During the trial there was much discussion about the statute of limitations defense. As Mr. Griggs testified, his experience is that even states with closed statutes of limitations, courts are hesitant to dismiss on statute of limitations grounds.'" A187–88 (citing A704 n. 566).

> There is no 'law' that prevents a defendant (or putative defendant) from settling with or paying a claim made by a personal injury claimant whose claim may be time-barred. Indeed, the uncontroverted testimony of Mr. Griggs is that prepetition BSA was not often successful in

asserting statute of limitations defenses even in states where the defense was viable, and that even when BSA prevailed on a statute of limitations defense it still might subsequently settle the claim.

A746.

Dr. Bates and his team analyzed BSA's prepetition claim pool to evaluate the impact of the statute of limitations defense on claim value, and he testified that BSA's average value in the claim pool was not in fact reduced where there were statute of limitations defenses. A2891–92 (Confirmation Hr'g Tr. at 260:5–261:1). "[I]n fact, if you…go through the claims, evaluate the historical claims based on the statute of limitations discount and do it properly, you wind up finding no difference in the average values in the claim pool." A2894–95 (Confirmation Hr'g Tr. at 263:15–264:4). Nonetheless, Dr. Bates and his team formulated a Claims Matrix that includes different discounts for statute of limitations defenses based on the strength of the relevant State's statute.[64]

---

[64] As the district court held: "Certain Insurers complain that the statute of limitations defense is a mitigating factor, rather than part of the General Criteria for allowance, but Mr. Griggs testified that the availability of a potential statute of limitations defense was considered a mitigating factor prepetition also, and not a requirement for payment." A187; A6451–52 (Griggs Declaration ¶ 24) Mr. Burnett, an expert on sexual abuse claim evaluation, also testified that it was reasonable to treat the statute of limitations and the statute of repose as a mitigating factor, rather than a claim validity criteria, given (a) his experience that trial courts are reluctant to grant statute of limitations defenses in sexual abuse claims, (b) that dismissal on the basis of statute of limitations are usually without prejudice, with the bankruptcy court providing a roadmap on how to remedy pleasing errors in an amended complaint, (c) complexities concerning

[BSA sometimes] would use the possibility of a statute of limitation defense as an argument to reduce the value of a settlement in negotiations with counsel for underlying plaintiffs, but not as a complete bar to recovery. This is because if we presented the statute of limitations defense and lost, the underlying plaintiffs' settlement demand would likely increase to be more similar to a claim that was not subject to any such defense. For instance, BSA had a statute of limitations defense to Hacker claims, but lost the motion for summary judgment on the defense. BSA took an appeal, and lost again. Consequently, we did not ultimately achieve any discount for the statute of limitations in settling with the plaintiffs.

A6451–52 (Griggs Declaration ¶ 24). Nonetheless, if there is some coverage defense based on the statute limitations, it is preserved.

The bankruptcy court found, based on the record before it, that it could not find "that this result means the Plan was not proposed in good faith." A747. The district court likewise held there is no support for Insurers' contention that "claims subject to statute of limitations defenses would receive nothing outside the Settlement Trust or that the potential availability of the defense should be part of the General Criteria, not a mitigating factor." A188.

### viii.    That the Claims at Issue Have Less Value Than Historical Claims Is Accounted For in the TDP

Insurers argument that the Base Matrix Values ultimately would be scaled down by 90% in aggregate does not support bad faith. C.I. Br. at 59. Dr. Bates

---

reviver windows, and (4) that prevailing on a statute of limitations defense can be a pyrrhic victory where defense costs exceed the value of a claim. A6460–61 (Griggs Declaration ¶¶ 54–56).

testified that the Base Matrix Value was not the amount of any claim. Indeed, he did not expect that a single claim would be awarded in such amount. A734–735. Rather, the Base Matrix Value was just the first step before applying aggravating and mitigating scalers to reach an award consistent with prepetition resolutions. The TDP accommodates awards between $0 and $2.7 million. Dr. Bates testified that he could have used any combination of Base Matrix Values and scalers replicate prepetition resolutions, and he selected the ones in the TDP as the most appropriate to accommodate the range of potential values. A2841–2847(Confirmation Hr'g Tr. at 210:18–216:10) (concluding the Base Matrix Values are not "magic number[s]"); A734. Dr. Bates used a demonstrative to demonstrate that setting the Base Matrix Value at a lower number would work, but it would also require much higher scalers to accommodate the serious cases. A2847–2849 (Confirmation Hr'g Tr. at 216:11–218:10). The reason that post-petition claims are overall lower in value is based on differences in the abuser profile, the age of the survivor, applicable statute of limitations, and other matters. A2766–2795 (Confirmation Hr'g Tr. at 135:13–164:14). As addressed above, the Court accepted as credible Dr. Bates' uncontested expert evidence. *See supra* pp. 84–86.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this response complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(b) because, excluding the portions of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 44,806 words.

I further certify that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Pursuant to 3d Cir. L.A.R. 28.3(c), I further certify that I am a member of the bar of this Court.

Pursuant to 3d Cir. L.A.R. 31.1(c), I further certify that the text of this electronic brief is identical to the text in the paper copies, and that this document was run through a CrowdStrike Falcon malware scan and no virus was detected.

Dated: October 27, 2023

/s/ *Derek C. Abbott*
Derek C. Abbott