**Nos. 23-1664, 23-1665, 23-1666, 23-1667, 23-1668, 23-1669, 23-1670, 23-1671, 23-1672, 23-1673, 23-1674, 23-1675, 23-1676, 23-1677, 23-1678, 23-1780**

────────────────

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 for the Third Circuit

────────────────

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,

*Debtors*.

────────────────

LUJAN CLAIMANTS, ET AL.,

*Appellants*,

-v.-

BOY SCOUTS OF AMERICA, ET AL.,

*Appellees*.

────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE (CASE NO. 22-CV-01237)

────────────────

**ANSWERING BRIEF OF APPELLEES THE FUTURE CLAIMANTS'
REPRESENTATIVE, COALITION OF ABUSED SCOUTS FOR JUSTICE,
AND PFAU/ZALKIN CLAIMANTS**

────────────────

Robert S. Brady
Edwin J. Harron
YOUNG CONAWAY
STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600

Kami E. Quinn
Emily P. Grim
GILBERT LLP
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
(202) 772-2200

*Counsel for the Future Claimants' Representative*

Rachel B. Mersky
MONZACK MERSKY AND BROWDER, PA
1201 North Orange Street
Suite 400
Wilmington, Delaware 19801
(302) 656-8162

*Counsel for the Coalition of Abused Scouts for Justice*

David M. Klauder, Esquire
BIELLI & KLAUDER, LLC
1204 N. King Street
Wilmington, Delaware 19801
(302) 803-4600

Thomas E. Patterson
Daniel J. Bussel
KTBS LAW LLP
1801 Century Park East
Twenty-Sixth Floor
Los Angeles, California 90067
(310) 407-4000

*Counsel for Pfau Cochran Vertetis Amala PLLC*
*and The Zalkin Law Firm, P.C.*

## CORPORATE DISCLOSURE AND STATEMENT OF INTEREST

### Future Claimants' Representative

James L. Patton, Jr. was appointed as Legal Representative for Future Claimants (the "Future Claimants' Representative" or "FCR") on April 24, 2020 . Order Appointing James L. Patton, Jr., as Legal Representative for Future Claimants, *Nunc Pro Tunc* to the Petition Date, *In re Boy Scouts of America*, No. 20-10343 (LSS) (Bankr. D. Del. Apr. 24, 2020), ECF No. 486.

### Coalition of Abused Scouts for Justice

The Coalition of Abused Scouts for Justice (the "Coalition") is an ad hoc group of Survivor claimants consisting of approximately 18,000 holders of Abuse Claims.

### Pfau/Zalkin Claimants

The Pfau/Zalkin Claimants is an ad hoc group of two law firms consisting of Pfau Cochran Vertetis Amala PLLC and The Zalkin Law Firm, P.C.

iii

## <u>CROSS REFERENCE INDEX</u>

Pursuant to Third Circuit Local Appellate Rule 28.2, the Answering Brief of Appellees the Future Claimants' Representative, Coalition of Abused Scouts for Justice, and Pfau/Zalkin Claimants responds to the individual and joint issues raised on appeal by the Appellants as set forth below:

| <u>Issue</u> | <u>Appellant Br.</u><br>**(Page Nos.)** | <u>Ans. Br.</u><br>**(Page Nos.)** |
|---|---|---|
| The Plan Was Proposed in Good Faith | Certain Insurers (52–64) | 11-21 |
| The Bankruptcy Code Permits Assignment of Insurance Rights | Certain Insurers (29–52) | 21-43 |
| The Plan's Judgment Reduction Clause Is Proper | Allianz (27–54) | 44-57 |
| All Claimants Are Treated Fairly and Equitably | Lujan Claimants (58–64) | 57-59 |
| The Plan Does Not Violate the McCarran-Ferguson Act | Lujan Claimants (41–53) | 59-67 |
| The Insurance Settlements Were Properly Approved | Lujan Claimants (41; 57–58) | 67-70 |
| Releases: The Bankruptcy Court Had Subject Matter Jurisdiction to Approve the Scouting-Related Releases and Channeling Injunction | Lujan Claimants (7–26) | 71-75 |
| Releases: The Bankruptcy Court Had Statutory Authority To Approve the Scouting-Related Releases and Channeling Injunction | Lujan Claimants (28–29) | 75-78 |
| Scouting-Related Releases Satisfy the Non-Consensual Third-Party Release Standard | Lujan Claimants (29–41) | 78-87 |

# **TABLE OF CONTENTS**

<strong>Page</strong>

CORPORATE DISCLOSURE AND STATEMENT OF INTEREST ............... iii

CROSS REFERENCE INDEX ........................................................ iv

TABLE OF AUTHORITIES ........................................................ viii

PRELIMINARY STATEMENT ........................................................1

JURISDICTIONAL STATEMENT AND STATEMENT OF ISSUES ...............4

STATEMENT OF RELATED CASES ..................................................4

STATEMENT OF THE CASE.........................................................4

    I.     BSA's Negotiations with the Abuse Survivors ...................5

    II.    Creditor Approval of the Plan ...............................................7

    III.   Plan Confirmation, Affirmance, and the Effective Date.....................8

SUMMARY OF ARGUMENT ..........................................................9

ARGUMENT .........................................................................11

    I.     The Lower Courts Did Not Clearly Err in Determining That the Plan Was Proposed in Good Faith...............................................11

         A.   The Plan Was Proposed in Good Faith. ......................................14

         B.   The Plan Does Not Create a Moral Hazard That Requires a Finding of Bad Faith..................................................17

    II.    The Bankruptcy Code Plainly Permits the Assignment of Insurance Rights to the Trust ..................................................21

         A.   The Plan Adequately Protects the Certain Insurers' Rights and Defenses....................................................23

            1.   The Policies Have Always Been Subject to Applicable Law. ..........................................................25

2. The Policies Have Always Been Subject to the Bankruptcy Code and Principles of *Res Judicata*. ...................................27

3. The Certain Insurers' Asserted Harm Is Speculative. .........31

4. Insurers Are Not Entitled to Control Drafting of a Plan and TDP. ...................................................................................33

B. Plan Confirmation Did Not Require the Assignment of the Debtors' Obligations Under the Abuse Insurance Policies to the Trust. ..........................................................................................34

C. Insurance "Neutrality" Is a Standing Issue, Not a Confirmation Issue. ..........................................................................................38

III. The District Court Did Not Abuse Its Discretion in Upholding the Plan's Judgment Reduction Clause. .....................................................43

A. The Judgment Reduction Provision Adequately Protects Allianz. ..................................................................................................44

B. The District Court Properly Relied on *Plant* and *Duro Dyne*, and Cases on Which Allianz Relies Are Distinguishable. .................49

C. The District Court Properly Found that the "Asymmetrical" Judgment Reduction Clause Would Not Prejudice the Insurers. 52

D. The Judgment Reduction Clause is Consistent with the Principles and Policies Underlying the Bankruptcy Code. ...........................55

IV. The Plan Treats All Abuse Claimants Fairly and Equitably...............57

V. The Plan Does Not Violate the McCarran-Ferguson Act ...................60

VI. The Bankruptcy Court Correctly Approved the Settling Insurer Settlements ........................................................................................67

A. The Abuse Insurance Policies and Their Proceeds Are Property of the Bankruptcy Estate. ...........................................................67

B. The Bankruptcy Court Properly Determined That the Lujan Claimants' Interests Were Adequately Protected and That the Best Interests of Creditors Test Was Satisfied. ...........................70

vi

VII.    The Bankruptcy Court Had Subject Matter Jurisdiction to Approve the Scouting-Related Releases and Channeling Injunction ...............71

VIII.   The Bankruptcy Court Had Statutory Authority to Approve the Scouting-Related Releases and Channeling Injunction .....................76

IX.     The Scouting-Related Releases and Channeling Injunction Satisfy the Standard for Approval of Non-Consensual Third-Party Releases 78

        A.    Master Mortgage Factors............................................................80

              1.    Identity of Interest Between the Debtors and Released Parties...................................................................................80

              2.    Contribution of Substantial Assets to the Reorganization...81

              3.    The Releases and Injunctions Are Essential to the Reorganization. ..................................................................82

              4.    A Substantial Majority of the Impacted Creditors Agree....83

              5.    Payment of All, or Substantially All, of the Claims of Affected Classes. ...................................................................84

        B.    The *Continental* Hallmarks. ......................................................85

CONCLUSION ...................................................................................................87

CERTIFICATION OF COMPLIANCE ................................................................90

CERTIFICATION OF BAR MEMBERSHIP........................................................90

CERTIFICATION OF IDENTICAL COPIES .......................................................90

CERTIFICATION OF VIRUS CHECK.................................................................90

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 710 Long Ridge Rd. Operating Co., II, LLC*,
No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D.N.J. Mar. 5,
2014) ...........................................................................................71, 81, 84

*In re ABB Lummus Glob. Inc.*,
No. 06- 10401-JKF, 2006 WL 2052409 (Bankr. D. Del. June 29,
2006) ........................................................................................................65

*Acands, Inc. v. Travelers Cas. & Sur. Co.*,
435 F.3d 252 (3d Cir. 2006) .......................................................73, 74

*Admiral Ins. Co. v. Grace Indus., Inc.*,
409 B.R. 275 (E.D.N.Y. 2009) ...........................................................31

*In re Akorn, Inc.*,
No. 20-11177 (KBO), 2021 WL 4306222 (D. Del. Sept. 22, 2021) .................12

*Albany Ins. Co. v. Bengal Marine, Inc.*,
857 F.2d 250 (5th Cir. 1988) ...............................................................30

*In re Am. Cap. Equip., LLC*,
688 F.3d 145 (3d Cir. 2012) ...............................................................16

*In re Am. Fam. Enterprises*,
256 B.R. 377 (D.N.J. 2000) ...................................................71, 76, 82

*In re Am. Home Mortg, Holdings, Inc.*,
402 B.R. 87, 92–93 (Bankr. D. Del. 2009) ...........................................35

*In re Arctic Glacier Int'l, Inc.*,
901 F.3d 162 (3d Cir. 2018) ................................................................27

*ARTRA 524(g) Asbestos Trust v. Fairmont Premier Ins. Co.*,
No. 09-cv-458, 2011 WL 4684356 (N.D. Ill. Sept. 30, 2011) ....................29, 30

*Assocs. Com. Corp. v. Rash*,
520 U.S. 953 (1997) ............................................................................56

*In re Caribbean Petroleum Corp.*,
    580 F. App'x 82 (3d Cir. 2014) ..........................................................67

*In re CBI Holding Co.*,
    529 F.3d 432 (2d Cir. 2008) ...............................................................68

*In re Combustion Eng'g, Inc.*,
    391 F.3d 190, 226 (3d Cir. 2004). ..............................................*passim*

*Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*,
    130 S.W.3d 181 (Tex. App. 2003)......................................................25

*In re Coram Healthcare*,
    271 B.R. 228 (Bankr. D. Del. 2001) ..................................................17

*Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel.*
    *Cybergenics Corp. v. Chinery*,
    330 F.3d 548 (3d Cir. 2003) ........................................................33, 76

*Czyzewski v. Jevic Holding Corp.*,
    580 U.S. 451 (2017)..........................................................34, 77, 78

*Decade's Monthly Income & Appreciation Fund v. Whyte &*
    *Hirschboeck, S.C.*,
    495 N.W.2d 335 ...................................................................................66

*In re Duro Dyne Nat'l Corp.*,
    No. 18-27963 (Bankr. D.N.J., Feb. 8, 2019) .....................................51

*In re Duro-Dyne Nat'l Corp.*,
    No. 3:19-CV-15433, 2020 WL 6270691 (D.N.J. Oct. 23, 2020)................49, 65

*Eichenholtz v. Brennan*,
    52 F.3d 478 (3d Cir. 1995) ..........................................................43, 45

*Evans v. TIN, Inc.*,
    No. 11-2067 C/W, 2012 WL 2343162 (E.D. La. June 20, 2012)......................65

*In re Exide Holdings, Inc.*,
    No. 20-11157-CSS, 2021 WL 3145612 (D. Del. July 26, 2021) ......................78

*In re Falch*,
    450 B.R. 88 (Bankr. E.D. Pa. 2011) ..................................................13

*In re Fed.-Mogul Glob. Inc.*,
    684 F.3d 355 (3rd Cir. 2012) ..................................................................*passim*

*In re FINOVA Grp., Inc.*,
    304 B.R. 630 (D. Del. 2004) ..................................................................57

*Folger Adam Security, Inc. v. DeMatteis/MacGregor, J.V.*,
    209 F.3d 252 (3d Cir. 2000) ..................................................................36

*In re Fruehauf Trailer Corp.*,
    444 F.3d 203 (3d Cir. 2006) ..................................................................12

*Gerber v. MTC Elec. Techs. Co.*,
    329 F.3d 297 (2d Cir. 2003) ..............................................................51, 52

*Gillman v. Cont'l Airlines (In re Cont'l Airlines)*,
    203 F.3d 203 (3d Cir. 2000) ........................................................49, 50, 78

*In re Glob. Indus. Techs., Inc.*,
    645 F.3d 201 (3d Cir. 2011) ..............................................................40, 76

*Guillen v. Potomac Ins. Co. of Ill.*,
    785 N.E.2d 1 (Ill. 2003) .........................................................................25

*Highmark, Inc. v. UPMC Health Plan, Inc.*,
    276 F.3d 160 (3d Cir. 2001) ..............................................................60, 67

*Home Ins. Co. of Illinois v. Hooper*,
    294 Ill. App. 3d 626 (Ill. App. 1st Dist. 1998) ....................................30

*Houser v. Allianz Glob. Risks US Ins. Co.*,
    No. 23-cv-01592 (N.D. Tex. Oct. 6, 2023). .....................................32, 33

*Houser v. Allianz Global Risks US Insurance Company*,
    No. 3:23-cv-01592 (N.D. Tex. Jul. 17, 2023). ....................................32

*In re Imerys Talc America, Inc.*,
    No. 19-10289 (LSS) (D. Del. Nov. 4, 2020). ......................................42

*Indiana State Police Pension Trust v. Chrysler LLC (In re Chrysler LLC)*,
    576 F.3d 108 (2d Cir. 2009), *judgment vacated*, 592 F.3d 370 (2d Cir. 2010) ..........................................................................................37

*In re Italian Cook Oil Corp.*,
190 F.2d 994 (3d Cir. 1951) ................................................................36

*In re Kaiser Gypsum Co.*,
No. 16-21602 (JCW), 2021 WL 3215102 (W.D.N.C. July 28,
2021) ....................................................................................................42

*In re Kaiser Gypsum Co.*,
No. 21-1858 (4th Cir. Sept. 20, 2021). ...............................................38

*Lander v. Hartford Life & Annuity Ins. Co.*,
251 F.3d 101 (2d Cir. 2001) ................................................................63

*Law v. Siegel*,
571 U.S. 415 (2014) ..............................................................................77

*In re LightSquared, Inc.*,
534 B.R. 522 (S.D.N.Y. 2015), *aff'd sub nom. Ahuja v.*
*LightSquared Inc.*, 644 F. App'x 24 (2d Cir. 2016) ...........................57

*In re LTL Management, LLC*,
64 F.4th 84, 93 (3d Cir. 2023) ......................................................16, 17

*In re M&G USA Corp.*,
599 B.R. 256 (Bankr. D. Del. 2019) ...................................................34

*MacArthur Co. v. Johns-Manville Corp.*,
837 F.2d 89 (2d Cir. 1988) ..................................................................65

*In re Mallinckrodt PLC*,
639 B.R. 837 (Bankr. D. Del. 2022) .............................................76, 84

*In re Mallinckrodt PLC*,
No. 20-12522 (Bankr. D. Del. Oct. 8, 2021). ...............................18, 64

*In re Marcus Hook Dev. Park, Inc.*,
943 F.2d 261 (3d Cir. 1991) ....................................................71, 72, 73

*In re Maremont Corp.*,
601 B.R. 1 (Bankr. D. Del. 2019) ................................................14, 65

*McDermott, Inc. v. AmClyde*,
511 U.S. 202 (1994) ..............................................................................44

xi

*Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*,
  247 F.3d 44 (3d Cir. 2001) ...................................................................37

*In re Millennium Lab Holdings II, LLC*,
  591 B.R. 559 (D. Del. 2018)...........................................79, 80, 81, 84

*In re Millennium Lab Holdings II, LLC*,
  945 F.3d 126 (3d Cir. 2019) ..........................................................76

*Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp.*,
  518 B.R. 307 (W.D. Pa. 2014).......................................................45

*National Union Fire Insurance Company of Pittsburgh v. Porter*
  *Hayden Company*,
  No. CIV CCB-03-3408, 2012 WL 734176 (D. Md. Mar. 6, 2012).............28, 29

*In re Neidorf*,
  534 B.R. 369 (9th Cir. BAP 2015) .................................................68

*In re Nutraquest, Inc.*,
  434 F.3d 639 (3d Cir. 2006) ..........................................................68

*In re Plant Insulation Co.*,
  469 B.R. 843, 876 (Bankr. N.D. Cal. 2012). ..........................49, 56, 57

*In re Plant*,
  734 F.3d 900 (9th Cir. 2013). ..................................................49, 50

*In re PNC Fin. Servs. Grp., Inc.*,
  440 F. Supp. 2d 421 (W.D. Pa. 2006)...........................................45

*In re Porrett*,
  564 B.R. 57 (Bankr. D. Idaho 2016)..............................................68

*In re Purdue Pharma L.P.*,
  633 B.R. 53 (Bankr S.D.N.Y.), *vacated on other grounds by* 635
  B.R. 26 (S.D.N.Y.), *vacation reversed by* 69 F.4th 45 (2d Cir.
  2023) ..........................................................................................39, 41

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000) ....................................................12, 14, 16

*Reis v OOIDA Risk Retention Grp., Inc.*,
   814 S.E.2d 338 (Ga. 2018) ...................................................................66

*Reserves Dev. LLC v. Crystal Props., LLC*,
   986 A.2d 362 (Del. 2009) ...................................................................37

*In re Residential Cap., LLC*,
   508 B.R. 838 (Bankr. S.D.N.Y. 2014)................................................82

*SEC v. National Securities, Inc.*,
   393 U.S. 453 (1969)............................................................................62

*In re SGL Carbon Corp.*,
   200 F.3d 154 (3d Cir. 1999) ...............................................................17

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*,
   872 F.2d 36 (3d Cir. 1989) .................................................................36

*Spirt v. Teachers Ins. & Annuity Ass'n*,
   691 F.2d 1054 (2d Cir. 1982), *vacated and remanded on other
   grounds*, 463 U.S. 1223 (1983) .........................................................63

*Spyglass Media Grp., LLC v. Bruce Cohen Prods. (In re Weinstein
   Co. Holdings, LLC)*,
   997 F.3d 497 (3d Cir. 2021) .........................................................35, 36

*Stephens v. Nat'l Distillers & Chem. Corp.*,
   6 F.3d 1226 (2d Cir. 1995) .................................................................63

*In re TCI 2 Holdings, LLC*,
   428 B.R. 117 (Bankr. D.N.J. 2010) ....................................................16

*In re The Weinstein Co. Holdings, LLC*,
   No. 18-10601 (MFW) (Bankr. D. Del. Jan. 26, 2021) ........................83

*In re TK Holdings*,
   No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018).........................84

*In re Trib. Co.*,
   464 B.R. 126 (Bankr. D. Del. 2011) ...................................................45

*Truck Ins. Exchange v. Kaiser Gypsum Co.*,
   No. 22-1079, 2023 WL 3306520 (May 3, 2023)................................42

*In re U.S. Oil & Gas Litig.*,
  967 F.2d 489 (11th Cir.1992) ...................................................52

*In re Union Fin. Servs. Grp., Inc.*,
  303 B.R. 390 (Bankr. E.D. Mo. 2003).................................82, 83

*Union Labor Life Ins. Co. v. Pireno*,
  458 U.S. 119 (1982)..................................................................61

*UNR Indus. Inc. v. Cont'l Cas. Co.*,
  942 F.2d 1101 (7th Cir. 1991) .................................................29

*In re Vanderveer Estates Holding, LLC*,
  328 B.R. 18 (E.D.N.Y. 2005) .............................................30, 31

*In re W.R. Grace & Co.*,
  315 B.R. 353 (Bankr. D. Del. 2004).........................................74

*In re W.R. Grace & Co.*,
  446 B.R. 96 (Bankr. D. Del. 2011)............................................19

*In re W.R. Grace & Co.*,
  475 B.R. 34, 87–88 (D. Del. 2012)...........................................12

*In re W.R. Grace & Co.*,
  591 F.3d 164 (3d Cir. 2009) .....................................................71

*In re W.R. Grace & Co.*,
  729 F.3d 311 (3d Cir. 2013) ...............................................12, 58

*Wadsworth v. Allied Professionals Ins. Co*,
  748 F.3d 100 (2d Cir. 2014) .....................................................66

## Statutes

11 U.S.C. § 105(a) ...........................................................76, 77

11 U.S.C. § 363...................................................35, 36, 37, 70

11 U.S.C. § 365.................................................................*passim*

11 U.S.C. § 522.........................................................................77

11 U.S.C. § 524(g) ........................................................................49

11 U.S.C. § 541 .......................................................................28, 67

11 U.S.C. § 541(a)(7) ..................................................................68

11 U.S.C. § 1123(a)(4) ...........................................................58, 64

11 U.S.C. § 1123(a)(5) ...........................................................63, 77

11 U.S.C. § 1123(b)(6) .................................................................77

11 U.S.C. § 1126 ............................................................................34

11 U.S.C. § 1129(a) .......................................................................34

11 U.S.C. § 1129(a)(3) ...........................................................*passim*

15 U.S.C. § 1012(b) .......................................................................59

28 U.S.C. § 1334 ............................................................................71

22 G.C.A. § 18305 .........................................................................59

Illinois Insurance Code, Chapter 215, § 5/388 ........................31

## Other Authorities

44 Am. Jur. 2d Insurance § 1391 ...............................................25

## PRELIMINARY STATEMENT

The Boy Scouts of America and Delaware BSA, LLC (collectively, "BSA" or the "Debtors") filed for bankruptcy with the goal of confirming a plan that provides "equitable compensation to victims of abuse in its Scouting programs."  A07023 (Debtors' Info. Brief).[1]  After nearly three years, the Debtors achieved that goal when the Bankruptcy Court confirmed the Debtors' Plan on September 8, 2022.

The Plan was the product of years of hard-fought negotiations among multiple parties, including the Debtors, the Tort Claimants' Committee (the "TCC"), the Coalition of Abused Scouts for Justice (the "Coalition"), the Future Claimants' Representative (the "FCR"), Pfau Cochran Vertetis Amala PLLC and The Zalkin Law Firm, P.C. ("Pfau/Zalkin") (the TCC, Coalition, FCR, and Pfau/Zalkin collectively, the "Claimant Entities"), the Ad Hoc Committee of Local Councils ("AHCLC"), some of BSA's largest Chartered Organizations, and the Settling Insurers.

Following in the footsteps of decades of previous mass-tort bankruptcies, the Plan channels the claims of the 82,000 victims of sexual Abuse, and future claims of sexual Abuse, to a settlement trust (the "Trust").  Settlements achieved by the

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC (A00856-1354) (the "Plan").  References to "A__" refer to the Joint Appendix filed at ECF No. 62.

Debtors and the Claimant Entities provide approximately $2.5 billion, and potential future recoveries, to pay Abuse Claims. The Plan and Trust Distribution Procedures ("TDPs"), as with dozens of other mass-tort plans, provide streamlined claims resolution procedures to ensure funds are primarily used to pay Abuse Claims rather than defense costs, and that Abuse Claims are valued in a manner consistent with the Debtors' historical settlement practices.

The Plan and TDPs preserve the Trust's ability to recover amounts due under BSA's and Local Councils' Abuse Insurance Policies. The Non-Settling Insurance Companies' right to raise defenses regarding their obligations to pay Abuse Claims are preserved. The lower courts agreed this structure met the requirements of the Bankruptcy Code.

Nonetheless, certain insurers (the "Certain Insurers"), Allianz Global Risks US Insurance Company, Interstate Fire & Casualty Company, and National Surety Corporation (together, "Allianz," and collectively with the Certain Insurers, the "Insurers"), the Lujan Claimants, and the Dumas & Vaughn Claimants (the "D&V Claimants") continue to oppose the Plan on a variety of grounds, including that:

- The Plan and TDPs are a product of collusion between the Debtors and the Survivor constituencies, intended to increase the Insurers' liability and strip them of their purported "right" to exercise unfettered control over the defense and settlement of claims.

- The Debtors fail to expressly assign their obligations under the Abuse Insurance Policies to the Trust along with the correlative rights, thus "re-writing" the Insurers' policies.

2

- The Plan and TDPs fail to guarantee the success of the Insurers' coverage defenses post-bankruptcy or exempt the Insurers from the effect of the Confirmation Order and applicable law.

- The Plan must provide a windfall to the Insurers in the form of dollar-for-dollar payment on Insurer contribution claims plus a significant reduction in the Insurers' defenses costs.

- The Plan treats present and future claims inequitably.

- Certain claimants have rights under a Guam statute that requires preferential treatment vis-à-vis other holders of Abuse Claims.

- The Insurance Settlements should not have been approved.

- The Channeling Injunction and Releases are legally impermissible.

These objections each fail as a matter of fact and law. The objected-to features of the Plan and TDPs are common components of mass-tort bankruptcy plans confirmed in this Circuit and elsewhere, have the support of the vast majority of Survivors, and are the best available vehicle to provide resolution and timely, meaningful compensation to the Survivors. The Insurers' repeated objections—which they have employed, in various mass-tort cases, for decades—are nothing more than a transparent attempt to use the Debtors' insolvency to avoid their coverage obligations.

The Bankruptcy Court carefully reviewed the record and concluded that the Plan provides for the fair and equitable resolution of the more than 82,000 Abuse Claims filed by Survivors, delivers value to creditors, and satisfies the Bankruptcy Code. On appeal, the District Court affirmed every aspect of the Plan and Confirmation Order. This Court, too, should affirm.

## JURISDICTIONAL STATEMENT AND STATEMENT OF ISSUES

The FCR, Coalition, and Pfau/Zalkin Claimants adopt the Debtors' jurisdictional statement and statement of the issues.

## STATEMENT OF RELATED CASES

By Clerk's Order, the following appeals have been procedurally consolidated: Nos. 23-1664, 23-1665, 23-1666, 23-1667, 23-1668, 23-1669, 23-1670, 23-1671, 23-1672, 23-1673, 23-1674, 23-1675, 23-1676, 23-1677, 23-1678, and 23-1780. Order, Apr. 12, 2023; Order, May 1, 2023. Other appeals before this Court arising out of the same case include Nos. 21-1792 and 21-2035.

## STATEMENT OF THE CASE

The FCR, Coalition, and Pfau/Zalkin Claimants incorporate the Debtors' statement of the case and write separately to emphasize the following facts. After three years of hard-fought negotiations among the BSA, Claimant Entities, insurers, Local Councils, and Chartered Organizations, the BSA proposed a Plan that was overwhelmingly supported by the creditors, confirmed by the Bankruptcy Court on the basis of a massive factual record, and affirmed by the District Court on all counts. The Plan allows the Trust to maximize and preserve the assets of Debtors' estate, and to resolve equitably and efficiently the more than 82,000 current and future Abuse Claims filed against BSA.

The Plan does so by channeling the liabilities of BSA, Local Councils, and

4

certain Chartered Organizations for Abuse Claims to the Trust.[2]  The Trust will evaluate these claims using the criteria in the TDPs.[3]  To pay these claims, the Plan provides approximately $2.5 billion in initial funding to the Trust through contributions from BSA and Local Councils, as well as settlement payments made by the Settling Insurance Companies and certain Chartered Organizations.[4]  BSA, Local Councils, and certain Chartered Organizations have also transferred to the Trust the right to pursue recoveries under certain insurance policies issued by Non-Settling Insurance Companies, which provide billions of dollars in additional coverage.[5]  The Plan preserves the Non-Settling Insurance Companies' rights to assert coverage defenses under their policies.[6]

## I.    BSA's Negotiations with the Abuse Survivors

The Plan reflects numerous compromises that resulted from input from BSA's creditors, including the Claimant Entities, who represented the abuse survivors and are the majority of BSA's creditors.[7]  The Claimant Entities sought to modify the Plan and TDPs to do a better job of preserving and maximizing the estate's assets,

---

[2] A00980–984 (Plan at Art. X.F).

[3] *See* A06813, A06816–6817, A06820, A06823 (Patton Decl.).

[4] A00046 (District Ct. Op.).

[5]  A00890–891, A00972–973 (Plan at Art. I.A.157, IX.A.3.j).

[6] A00972–973, A00996 (Plan at Art. IX.A.3.j, X.M).

[7] A06681 (Azer Decl.).

including BSA's insurance assets.[8]

First, the Claimant Entities required that the TDPs maintain values and criteria consistent with BSA's historical settlement practices to ensure that the Trust's claims payments were reasonable.[9]

Second, the Claimant Entities requested language clarifying that the full amount of any claim liability, rather than merely the amount the Trust pays claimants, is legally enforceable against the Trust. This modification maximized the insurance asset and reduced the risk that the insurers could reap a windfall from the bankruptcy by arguing that the value of an Abuse Claim is capped by the amount the Trust can pay with its existing assets.[10]

Third, the Claimant Entities suggested removing language from the Plan that would have exempted insurers from the *res judicata* and collateral estoppel effect of the Confirmation Order.[11] The Claimant Entities also proposed several "insurance findings" that would have limited the insurers' ability to force re-litigation of issues the Bankruptcy Court would decide during confirmation.[12]

---

[8] A06811–6813, A06823–6824 (Patton Decl.).

[9] A06813, A06816–6817, A06820–6821, A06823 (Patton Decl.).

[10] *See* A08906–9017 (Restructuring Support Agreement) (the "RSA").

[11] *See* A08911–8912 (RSA).

[12] A06823, A06825, A06827 (Patton Decl.).

Fourth, the Claimant Entities sought to protect the value of the Trust's policies by ensuring that nothing in the Plan would unintentionally breach the policies.[13] Accordingly, the Debtors and Claimant Entities ensured the drafts of the TDPs preserved the insurers' rights to assert coverage defenses.

The Insurers refused to engage constructively in negotiations to seek a mutually agreeable resolution, and instead threatened multi-year litigation if BSA proceeded in developing the TDPs.[14] In the Insurers' view, <u>any</u> TDPs would violate their contractual rights and inflate claims.[15]

## II.    Creditor Approval of the Plan

To gain support for the Plan from the TCC, the official committee representing the current abuse claimants, the Debtors sought to increase the initial funding that had been negotiated for the Trust. Negotiations with insurers and others produced an additional $939 million in settlements for the Trust.[16]

After these additional negotiations, on February 9, 2022, the Debtors, the

---

[13] *See* A06811–6812, A06824, A06827 (Patton Decl.).

[14] A00180–181 (District Ct. Op.); A06691 (Azer Decl.); A02165 (Confirmation Hr'g Tr. Day 4 47:11–15).

[15] A00737-741(Bankr. Confirmation Op.); A033989 (Confirmation Hr'g Day 12 18:2–22).

[16] A10067 (Century and Chubb Companies Term Sheet); A00544 (Bankr. Confirmation Op.).

Coalition, the FCR, the TCC, and Pfau/Zalkin agreed to a settlement resolving Pfau/Zalkin's objections to the Plan (the "TCC Term Sheet"). The TCC Term Sheet included a proposed finding stating that the TDP's base matrix values "are based on and consistent with the Debtors' historical abuse settlements and litigation outcomes."[17] The TCC Term Sheet also added an Independent Review Option (the "IRO") for claimants with allegations of particularly heinous abuse, which permits recovery in excess of the TDP maximum values.[18] These settlements enabled the Debtors to submit a Plan that garnered the support of over 80% of the claimants.[19]

## III.    Plan Confirmation, Affirmance, and the Effective Date

Before deciding whether to confirm the Plan, the Bankruptcy Court held twenty-two days of hearings that included twenty-six witnesses, portions of eight depositions, seven days of oral argument, and over one thousand exhibits.[20] No party adduced evidence that the TDPs are inconsistent with BSA's prepetition claims resolution practices.

On July 29, 2022, having considered this massive record, in a 269-page Opinion, the Bankruptcy Court overruled the Plan objections, with certain minor

---

[17] A10941 (TCC Term Sheet).

[18] A10956–10960 (TCC Term Sheet).

[19] A00565–566 (Bankr. Confirmation Op.).

[20] A00060–61 (District Ct Op.).

exceptions that the Debtors subsequently addressed.[21]  On September 8, 2022, the Bankruptcy Court confirmed the Plan, over the objections of the Certain Insurers, D&V Claimants, and Lujan Claimants.[22]  The objectors appealed.

On March 28, 2023, after more than 900 pages of briefing and a two-day hearing, the District Court affirmed the Plan and Confirmation Order.[23]  The objectors have now appealed the Confirmation Order to this Court.

## SUMMARY OF ARGUMENT

The lower courts correctly found that the Plan satisfied all Bankruptcy Code requirements, and rejected each of the appellants' arguments twice.  Appellants now ask this Court to reach a different conclusion, despite providing no evidence of any error, much less clear error, by either court.  They cannot provide such evidence: the lower courts' conclusions are wholly supported by the Bankruptcy Code, this Court's precedents, and the massive record amassed during three years of bankruptcy proceedings.  This Court should affirm.

1.    The lower courts did not err in determining the Plan was proposed in good faith because the record unequivocally supports the courts' factual findings

---

[21] *See* A00507–785 (Bankr. Confirmation Op.);  A00168–169 (District Ct. Op.).

[22] *See* A12905–13096 (Redline of Plan); A13097–13230 (Redline of TDP); A12818–12881 (Supplemental Findings of Fact and Conclusions of Law re Plan); *See* A13255–13293 (Certain Insurers' Objection to Confirmation Order).

[23] A00046–48, A00063 (District Ct. Op.).

Case: 23-1666    Document: 116    Page: 25    Date Filed: 10/27/2023

that there was no collusion with the Claimant Entities, the TDPs do not inflate claims, and there was no conflict of interest or other indicia of bad faith and, instead, the Plan is consistent with the Debtors' obligations to their creditors. With no clear error in any underlying finding, there can be no error in the overall good faith determination.

2.    The Plan's assignment of the Debtors' rights in the insurance policies to a post-bankruptcy trust, a practice which is a long-standing staple of mass-tort bankruptcies, is permissible because, as the lower courts found, the Plan does not increase the risks the Insurers undertook when they issued the policies. Moreover, under the Bankruptcy Code, the transfer of rights under a non-executory contract like the insurance policies does not require a corresponding transfer of obligations, but in any event, the Plan preserves any obligations that may arise under the policies post-assignment.

3.    The lower courts did not abuse their discretion in upholding the Plan's judgment reduction provision because the judgment reduction mechanism provides adequate protection to the Insurers and the judgment reduction finality requirement does not prejudice insurers.

4.    The lower courts correctly held that the Plan treats all abuse claimants fairly and equitably. All holders of Abuse Claims, both current and future, will be channeled to the Settlement Trust and liquidated pursuant to the TDP. And under

the TDP, all holders of Abuse Claims are subject to the same process and procedures for liquidating their Abuse Claims.

5.    The lower courts properly held that the Plan does not violate the McCarran-Ferguson Act (the "MFA") because Guam's direct-action statute does not regulate the "business of insurance" and is strictly a procedural mechanism. Therefore, reverse pre-emption under the MFA does not apply to prevent enforcement of the Bankruptcy Code.

6.    The lower courts properly approved the Settling Insurance Company settlements because the liability insurance proceeds were property of the bankruptcy estate, other entities with rights in the insurance consented to sale, the Debtor retained rights in the policies that could be sold, and because the Bankruptcy Court properly determined that the best interests of creditors test was satisfied.

7.    The lower courts correctly determined that the Bankruptcy Court had constitutional and statutory authority to approve the Scouting-Related Releases and Channeling Injunction, and that the Scouting-Related Releases and Channeling Injunction are permissible under applicable law.

## **ARGUMENT**

## I.    **The Lower Courts Did Not Clearly Err in Determining That the Plan Was Proposed in Good Faith**

Standard of Review:    The Certain Insurers assert that the Plan was not proposed by the Debtors in good faith as required by Bankruptcy Code Section

1129(a)(3), and that the Bankruptcy Court erred by failing to consider the totality of the circumstances, including Debtors' alleged collusion with Claimant Entities at the insurers' expense and inflation of claims.

Factual findings underlying a good faith determination are reviewed for clear error, and "may only be overturned if they are 'completely devoid of a credible evidentiary basis or bear[ ] no rational relationship to the supporting data.'" *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210 (3d Cir. 2006) (internal quotation omitted).

Although the overall good faith determination is given plenary review, that determination should stand unless there is a "definite and firm conviction that a mistake has been committed." *In re Akorn, Inc.*, No. 20-11177 (KBO), 2021 WL 4306222, at *12 (D. Del. Sept. 22, 2021) (quoting *In re J&S Props., LLC*, 872 F.3d 138, 142 (3d Cir. 2017)); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 87–88 (D. Del. 2012), *aff'd,* 729 F.3d 332 (3d Cir. 2013), and *aff'd*, 532 F. App'x 264 (3d Cir. 2013), and *aff'd*, 729 F.3d 311 (3d Cir. 2013) (Bankruptcy courts have "considerable discretion in finding good faith," and "are in the best position to ascertain the good faith of the parties' proposals," and thus, "district and circuit courts should carefully consider any recommendations from the bankruptcy court on appeal").

Argument:  Courts consistently find good faith where the plan will fairly achieve a result consistent with the purposes of the Bankruptcy Code, and deny plan

confirmation for lack of good faith only in the "most extreme of cases." *In re Akorn, Inc.*, 2021 WL 4306222, at *12; *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000); *In re Falch*, 450 B.R. 88, 93 (Bankr. E.D. Pa. 2011). After three weeks of evidentiary hearings, reviewing testimony from twenty-six witnesses, and examining over one thousand exhibits, the Bankruptcy Court determined that the Plan was proposed in good faith in accordance with section 1129(a)(3) of the Bankruptcy Code. A00567–569; A00793 (Bankr. Confirmation Op.). The District Court affirmed, finding "no support in the record for Certain Insurers' argument that the Plan was proposed with ulterior motives, that the Plan's development process suffered from BSA's unclean hands, or that the Plan process otherwise indicates a lack of good faith." A00172 (District Ct. Op.).

The Certain Insurers nonetheless argue that the Plan was not proposed in good faith, based on the Bankruptcy Court's and the Debtors' alleged failures to consider properly, in their "totality," the interests of the Certain Insurers and to protect their rights. Opening Brief of the Certain Insurers at 54 ("C.I. Br."). These arguments merely reframe the Insurers' argument to the Bankruptcy Court below that the Plan fails to preserve their rights, inflates claims, and results in a "moral hazard." The lower courts already found each of these arguments meritless, and these findings are not clearly erroneous. *See* A00724–725 (Bankr. Confirmation Op.); A00168–169 A00194–196 (District Ct. Op.).

13

Consequently, the Certain Insurers' arguments should again be rejected.

## A.    The Plan Was Proposed in Good Faith.

"[T]he important point of inquiry [for good-faith determination under section 1129(a)(3)] is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *PWS Holding*, 228 F.3d at 242 (quoting *In re Abbotts Dairies*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *In re Maremont Corp.*, 601 B.R. 1, 20 (Bankr. D. Del. 2019) (finding good faith where a plan provides a "fair and equitable" resolution of personal-injury claims that results from extensive arms' length negotiations with the major stakeholders). As "bankruptcy courts are in the best position to ascertain the good faith of the parties' proposals," reviewing courts "should carefully consider any recommendations from the bankruptcy courts on appeal." *W.R. Grace*, 475 B.R. at 87.

The Bankruptcy Court made the following factual determinations related to good faith:

- "Based on this record, I cannot find that Debtors colluded with the Coalition or other plaintiff representatives to intentionally deprive insurers of their rights. I cannot find that Debtors abdicated their responsibility to negotiate a plan or proceeded in bad faith. . . . The Certain Insurers' arguments that the Debtors colluded with the Coalition, rather than negotiated with the Coalition, is wholly unsupported by the record." A00729 (Bankr. Confirmation Op.).

- "I reject out-of-hand the notion that this explosion of claims, alone, could be grounds for denial of confirmation. . . . A debtor's ability to

14

obtain a good faith finding necessary for confirmation certainly cannot turn on the number of claims filed, whether plaintiff lawyers advertised for clients or whether plaintiff lawyers filed claims in derogation of applicable rules." A00736 (Bankr. Confirmation Op.).

- "I am also not convinced that the TDP will necessarily result in increased cost or liability to Non-Settling Insurance Companies. While, of course, there is the potential, it is really not possible to know until claims are assessed." A00737 (Bankr. Confirmation Op.).

- "I do not accept [the Insurers' proffered expert Professor Harrington's] opinions regarding the impact of the TDP (or his reading of them), the Findings, or his conclusions about the 'difficulty' an insurance company may face in future coverage litigation." A00743 (Bankr. Confirmation Op.).

- "In any event, on the record presented, I do not conclude that any potential increase in the quantum of liability precludes a finding of good faith under § 1129(a)(3)." A00744 (Bankr. Confirmation Op.).

- "Further, the TDP take into account a potential statute of limitations defense through the mitigating Scaling Factors. . . . In the abstract, I cannot find based on the record before the court, that the payment, or even existence of this claim, increases the quantum of liability for any primary insurer, much less any excess insurer." A00747 (Bankr. Confirmation Op.).

The Certain Insurers do not challenge *any* of the above findings. Instead, in an attempt to avoid a clear error standard of review, the Insurers argue that the "totality of the circumstances" demonstrates that the Plan was not proposed in good faith. C.I. Br. at 60.

The Certain Insurers' argument is nonsensical and defies precedent. If every one of the Debtors' actions was found to be in good faith (as they were), the sum of those actions cannot constitute bad faith. The lower courts did not err, much less

15

clearly err, in any of the factual findings that supported their good faith determination (and the Certain Insurers concede this point), and viewing these facts holistically compels concluding, once again, that the Debtors proposed the Plan in good faith.

The Certain Insurers have not identified a single case that denied the confirmation of a plan for failure to satisfy the Section 1129(a)(3) good faith standard on facts similar to those here. Denial of a plan based on a lack of good faith is confined to the most egregious cases where there is clear evidence of collusion, conflicts of interest, or a breach of fiduciary duty. *See In re Am. Cap. Equip., LLC*, 688 F.3d 145, 158 (3d Cir. 2012); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 142–45 (Bankr. D.N.J. 2010). "[S]cant evidence" and "innuendo" are insufficient to establish a lack of good faith. *PWS Holding*, 228 F.3d at 242.

The cases cited by the Certain Insurers are easily distinguished. In *In re American Capital Equipment, LLC*, 688 F.3d 145, 158 (3d Cir. 2012), the court held that the plan structure created a conflict of interest. Here, by contrast, the lower courts rejected the notion that any such conflict exists. *See* A00194 (District Ct. Op.) ("Unlike the debtor in [*American Capital*], BSA has no conflict of interest, has meaningfully contributed to the Settlement Trust, and has not established a surcharge mechanism at the claimants' expense for the BSA's own gain.").

Nor does *In re LTL Management, LLC* require a finding of bad faith here; *LTL*

16

simply reiterates that good intentions alone do not suffice to establish good faith. 64 F.4th 84, 93 (3d Cir. 2023). But the evidence here proves far more than good intentions. Here, as the lower courts found, the Certain Insurers have not been prejudiced and the Plan preserves their defenses. *See, e.g.*, A00117–118 (District Ct. Op.). These comprehensive findings, not merely good intentions, led the courts to determine that the Plan was proposed and developed in good faith.

This case involves neither a financially healthy debtor nor the type of "egregious" facts (such as inherent conflicts of interest) that justified finding a lack of good faith in other cases. *Compare In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999) (debtor was financially healthy and bankruptcy filing lacked a valid reorganization purpose), *with In re Coram Healthcare*, 271 B.R. 228, 234–35 (Bankr. D. Del. 2001) (conflict of interest and breach of fiduciary duty created by contract with creditor that paid debtor's CEO and required CEO to obey creditor's instructions). On the contrary, the Certain Insurers cannot point to, and the Bankruptcy Court did not find, any such egregious facts here. A00193 (District Ct. Op.). The lower courts had ample justification to find good faith, and the Certain Insurers have not shown otherwise.

### B. The Plan Does Not Create a Moral Hazard That Requires a Finding of Bad Faith.

The Certain Insurers also argue that specific Plan provisions create a "moral hazard" that demonstrates that the Plan was not proposed in good faith. C.I. Br. at

57.  They claim the Plan restructures the "alignment" between insurer and insured, because the Trustee owes fiduciary duties to the claimants, that the TDPs lessen the evidentiary requirements for claimants as compared to the tort system, and that they do not require the Trustee to consider limitations on recovery that would exist in the tort system.  *Id.* at 57–58.  The Certain Insurers assert that these provisions are "particularly troubling" given the increase in post-petition claims filed against BSA, many of which the Insurers claim are fraudulent or will have over-inflated values. C.I. Br. at 58.

None of these Plan provisions operates in the manner that the Insurers claim or provides any basis for this Court to conclude that the good faith requirement was not satisfied.  As an initial matter, the realignment of interests between insurer and insured is hardly unique to this bankruptcy.  The fiduciary duty owed by the Trust to claimants is a requirement of bankruptcy.  Indeed, many dozens of mass tort bankruptcies have been approved over decades despite this "change" in alignment.[24] The Insurers' policies all contain provisions providing that bankruptcy or insolvency

---

[24] *See, e.g.*, *In re Mallinckrodt PLC*, No. 20-12522 (Bankr. D. Del. Oct. 8, 2021), ECF No. 4639-1, § 8.06 (post-bankruptcy trust agreement provides that, "[t]he Trustees shall take into account the interests of, and owe fiduciary duties to, each of the Trust Beneficiaries in making all decisions on behalf of the Trust in accordance with Article IV.U.2 of the Plan").

of the insured will not affect their obligations under the policies.[25]  The Insurers thus knew that this change in "alignment" was possible, and agreed to insure the Debtors regardless.

Nor is it necessary to add any revisions to the TDPs *requiring*, rather than permitting, the Trustee to consider limitations on recovery in the tort system.  The TDPs already include consideration of all of the factors that the Debtors historically used when resolving claims in the tort system pre-petition.  A00172–173 (District Ct. Op.) (finding that TDPs are consistent with the Debtors' pre-petition practices), A00704-05 (Bankr. Confirmation Op.); A00729–730 (Bankr. Confirmation Op.).  Continuing the Debtors' pre-petition practices does not indicate bad faith.

The Certain Insurers' arguments that the increase in the number of (potentially fraudulent) claims against BSA demonstrates bad faith similarly fails.  The Certain Insurers provide no evidence that the Trustee will allow any fraudulent claim, and indeed her obligation to *actual* Survivors requires her to seek to avoid that result.  But should such a claim nevertheless be allowed, as the lower courts found, the Insurers retain their defenses to coverage of any such claim.  *See* A00175–176 (District Ct. Op.) (insurers' coverage defenses are preserved); A00742–746 (Bankr.

---

[25] *E.g.*, A21570 (Lexington Ins. Co. Policy No. 3583189) ("In the event of the Insured's bankruptcy or insolvency or any entity comprising the Insured, we shall not be relieved thereby of the payment of any claim hereunder because of such bankruptcy or insolvency.").

Confirmation Op.); *In re W.R. Grace & Co.*, 446 B.R. 96, 132 (Bankr. D. Del. 2011) ("[T]he mere fact that the Trust pays a claim does not bind the non-settling insurer to reimburse the Trust. The insurer retains its right to object to the claim against it if and when the Trust seeks to recover from the insurer."). The lower courts also correctly rejected the Certain Insurers' assertions that the value of claims was inflated to force the Insurers to settle, and instead found that the Plan and TDPs were designed to compensate claimants fairly and allow the BSA to reorganize. *See* A00732–734 (Bankr. Confirmation Op.); A00172, A00176–177, A00181 (District Ct. Op.) (Plan and TDPs were "intended to replicate the BSA's prepetition claim history—not inflate the value of the claims," and Insurers introduced no evidence of fraudulent claims).

Further, the Confirmation Order required the Trustee to submit, for the Bankruptcy Court's approval, an audit program to identify potentially fraudulent claims submitted to the Trust. *See* A00812 (Supplemental Findings of Fact and Conclusions or Law re Plan). The Bankruptcy has subsequently approved the Trustee's proposed program. *See* Order Granting in Part the Settlement Trust's Motion for Entry of an Order Approving an Audit Program Regarding the Identification of Potential Fraudulent Survivor Claims, In re Boy Scouts of Am., No. 20-10343 (LSS) (Bankr. D. Del Oct. 6, 2023), ECF No. 11526. This program will prevent the allowance of fraudulent claims.

20

The Certain Insurers have not provided any evidence that the lower courts' acceptance of the Plan provisions and structure was in error. These courts' findings of good faith therefore should be upheld.

## II.    The Bankruptcy Code Plainly Permits the Assignment of Insurance Rights to the Trust

Standard of Review:    The Certain Insurers argue that the Plan's insurance assignment abrogates the Certain Insurers' rights and the Debtors' obligations under the policies. Although the permissibility of the assignment is a legal issue, and is therefore reviewed *de novo*, the factual findings underlying the legal conclusion of assignability (*i.e.*, whether the assignment increases the carriers' risk or abrogates their rights) are reviewed for clear error. *See In re Combustion Eng'g, Inc.*, 391 F.3d at 214 n.19.

Argument:    This Court has consistently upheld bankruptcy plans that assign a debtor's insurance rights to a post-bankruptcy trust. *See, e.g.*, *In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 382 (3rd Cir. 2012); *In re W.R. Grace & Co.*, 475 B.R. at 198; *In re Combustion Eng'g, Inc.*, 391 F.3d at 218 n.27. Following this precedent, the lower courts here upheld the assignment of BSA's interests in the Abuse Insurance Policies to the trust (the "Insurance Assignment"). A00115 (District Ct. Op.); A00769–770 (Bankr. Confirmation Op.).[26]

---

[26] Notwithstanding this precedent, the Plan does not decide, but preserves for later

Disregarding the well-established precedents on which the lower courts relied, the Certain Insurers challenge the assignment, arguing that the Plan does not adequately protect their rights under the assigned policies and therefore is unconfirmable.  The Certain Insurers request that the Plan be amended to include (i) language expressly mandating a *cum onere* transfer of policy obligations to the Trust, and (ii) "insurance neutral" language that they think better protects their rights.

None of these proposed amendments is necessary or appropriate.  The Certain Insurers' rights are already adequately preserved under the Plan.  There is no *cum onere* requirement for non-executory contracts like the insurance policies.  Finally, insurance neutrality is a standing issue, not a requirement for confirmation.  What the Certain Insurers really seek is language uniquely exempting them from the Bankruptcy Code and principles of *res judicata*, and enabling them to use the Debtors' bankruptcy to escape their coverage obligations.  Neither the law nor the Certain Insurers' own policies permit this.

---

coverage litigation, the question of whether the post-loss transfer of non-Debtors' rights under policies issued to Local Councils gives rise to a coverage defense under relevant state law, and specifically provides that such transfer will only occur "to the extent permitted under [applicable] state law."  A00972–973 (Plan at Art. IX.A.3.j).

**A.**     **The Plan Adequately Protects the Certain Insurers' Rights and Defenses.**

The Certain Insurers fail to demonstrate that that a plan must transfer policy obligations to be confirmable.  Nonetheless, the Court need not reach this question, because the Certain Insurers have failed to show that the harm they complain of—abrogation of the Debtors' obligations—would occur absent such transfer of obligations.

The Plan and TDPs expressly preserve all rights, obligations, and defenses under the policies to the extent they are otherwise available under the law, including the Insurers' right to assert a claim or defense based on an insured's failure to perform any obligations.

Article X.M of the Plan states:

> Except for the Debtor Policy Assignment (and subject to Article IX.A.3.j.5 herein), or as otherwise provided in the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order, or the findings made by the District Court in the Affirmation Order, nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy issued by a Non-Settling Insurance Company or rights or obligations under such Insurance Policy to the extent such rights and obligations are otherwise available under applicable law, and the rights and obligations, if any, of any Non-Settling Insurance Company relating to or arising out of the Plan Documents, including the Plan, the Confirmation Order, and the Affirmation Order, or any provision thereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law.

A00996 (Plan at Art. X.M.).

Article V.C of the TDPs similarly states:

> Nothing in these TDP shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights and obligations under any Insurance Policy assigned to the Settlement Trust to the extent such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order. The rights and obligations, if any, of any Non-Settling Insurance Company relating to these TDP, or any provision hereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law.

A01017 (TDPs at Art. V.C.).

In addition, the Plan's insurance assignment provision was amended after confirmation specifically to address the Certain Insurers' concern regarding BSA's insurance-related obligations, to state:

> [T]he Settlement Trust's rights under any insurance policies issued by Non-Settling Insurance Companies, including the effect of any failure to satisfy conditions precedent or obligations under such policies (other than, in the case of the BSA Insurance Policies, the terms of any policies or provisions of applicable law that are argued to prohibit the assignment or transfer of such rights), shall be determined under the law applicable to each such policy in subsequent litigation . . . .

A00973 (Plan at Art. IX.A.3.j.).

Nonetheless, the Certain Insurers assert that the Plan and TDPs impermissibly "re-write" their policies because the Certain Insurers' rights and BSA's obligations are preserved "subject to the Plan and Confirmation Order" and only "to the extent such rights and obligations are otherwise available under applicable law." C.I. Br. at 42. The District Court correctly rejected both contentions.

24

### 1.     The Policies Have Always Been Subject to Applicable Law.

As the District Court recognized, the policies, and the specific rights and obligations the insurers seek to preserve, have always been subject to applicable law.  For example, an insurer's right to participate in the settlement of a claim typically (and an insured's obligation to cooperate with the insurer in defense of that claim) exists only where the insurer unequivocally accepts its obligation to pay the resulting settlements, and not where, for instance, an insurer has denied coverage, reserved its right to deny coverage, abandoned its insured, or engaged in other conduct giving rise to a conflict of interest with the policyholder, or even where a settlement is simply reasonable and not prejudicial.[27]  As the District Court noted, "BSA could always settle claims without the Insurers' consent, and it has done so numerous times in the past, subject to the risk of coverage defense."  A00119 (District Ct. Op.).  The same is true now; the Trust can resolve claims, and the Certain Insurers' coverage defenses are preserved under the Plan, subject to applicable law.  If such defenses succeed, the Certain Insurers need not pay the

---

[27] *See, e.g.*, *Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 191–92 (Tex. App. 2003) (settlement without insurer's consent would not discharge insurer's obligations unless insurer was actually prejudiced or deprived of a valid defense); *Guillen v. Potomac Ins. Co. of Ill.*, 785 N.E.2d 1, 6, 11 (Ill. 2003) (requiring tort plaintiff to prove settlement was reasonable before it can have any binding effect upon insurer); 44 Am. Jur. 2d Insurance § 1391 (examples of when the insured is permitted to enter into reasonable and good faith settlements without insurer consent without forfeiting coverage).

claim.

What the Certain Insurers really seek is a "guarantee" in the Plan and TDPs that their rights, and the Debtors' obligations, will always be enforceable, even if they may not otherwise be enforceable under the law. *See, e.g.*, C.I. Br. at 47–48 (asserting that TDPs must "guarantee[ ]" that any Trust award will not bind insurer); *id.* at 41 (asserting that Plan must "recognize" their right to control defense and settlement of claim). For this Court to issue such a ruling, the Court necessarily would have to accept the Insurers' view as to the proper interpretation and application of those provisions in these circumstances and make an advance determination, on a claim-by-claim basis, as to the impact of its findings on the Trust's ability to seek coverage. As the lower courts both held, confirmation does not require resolution of such future coverage disputes or breaches; the consequence of any such dispute or breach is for a future court to determine under the specific facts of that case. A00764–767 (Bankr. Confirmation Op.); A00116, A00119 (District Ct. Op.) ("The effect of any failure to satisfy conditions precedent or obligations under such policies . . . shall be determined under the law applicable to each such policy in subsequent litigation."); *accord* A00764–767 (Bankr. Confirmation Op.) (consequence for not satisfying such an obligation would have to be decided "under applicable law in the context of a specific dispute"); A01017 (TDPs at Art. V.C.); A00795 (Supplemental Findings of Fact

26

and Conclusions of Law re Plan).

### 2. The Policies Have Always Been Subject to the Bankruptcy Code and Principles of *Res Judicata*.

The District Court also correctly rejected the Certain Insurers' contention that they will somehow suffer undue prejudice if they, like all other parties-in-interest, are subject to the Bankruptcy Code, the Confirmation Order, or the Plan:

> Insurers keep the whole gamut of permissible contractual rights under state law except, for example, anti-assignment provisions that are not "otherwise available" under the Bankruptcy Code. Similarly, Insurers' rights and obligations under an Insurance Policy are preserved 'subject to the Plan and Confirmation Order,' which, for example, assign rights under Policies to the Litigation Trust—an assignment not otherwise contemplated or authorized by the Policies.

A00117 (District Ct. Op.). Again, what the Certain Insurers really seek is language uniquely exempting them from the effect of the Debtors' bankruptcy and any rulings made by the Bankruptcy Court in connection with confirmation—despite their vociferous participation in the case. *See* C.I. Br. at 7–8, 40–41 (requesting removal of TDP language subjecting policy rights and obligations to Plan, Confirmation Order, and Bankruptcy Code, and instead inserting language exempting insurers from effect of all three); *id.* at 7–8, 48 (requesting insertion of TDP language that principles of *res judicata* and collateral estoppel will not apply). Neither the law nor the Certain Insurers' policies permit such an outcome.

In the Third Circuit, "[a] plan's preclusive effect is a principle that anchors bankruptcy law: '[A] confirmation order is *res judicata* as to all issues decided or

which could have been decided at the hearing on confirmation.'" *In re Arctic Glacier Int'l, Inc.*, 901 F.3d 162, 166 (3d Cir. 2018) (quoting *In re Szostek*, 886 F.2d 1405, 1408 (3d Cir. 1989)).  Here, the Certain Insurers have had full opportunity to litigate their various objections to the Plan—twice.  To the extent a future court determines that the standards for *res judicata* or collateral estoppel are otherwise met, there is no basis to allow the Certain Insurers to ignore any rulings the Bankruptcy Court and District Court made in connection with those objections simply because they do not like them.

Similarly, nothing in the law provides insurers with a special exemption from the effect of the Bankruptcy Code.  For example, as confirmed by the lower courts, sections 541 and 1123 of the Bankruptcy Code allow the Debtors to transfer rights under their insurance policies to the Settlement Trust notwithstanding any provision in the policies prohibiting such assignment.  *See, e.g.*, *In re Fed.-Mogul Glob. Inc.*, 684 F.3d at 369 (holding that, "[t]he plain language of § 1123(a) evinces Congress's clear intent to preempt state law" with respect to transfer of the debtor's insurance rights in bankruptcy); *In re Combustion Eng'g, Inc.*, 391 F.3d at 218–19 (noting that section 541 prohibits restrictions on the interests of the debtor, including the debtor's insurance policies).  Ignoring the impact of the Plan and Bankruptcy Code on these anti-assignment provisions would allow the insurers to argue in coverage litigation that the transfer was unenforceable or that it otherwise extinguished the most

valuable asset of the Debtors' estate.

Courts have similarly applied bankruptcy law and principles in rejecting other insurer attempts to reap a windfall based on a debtor's bankruptcy.  For example, in *National Union Fire Insurance Company of Pittsburgh v. Porter Hayden Company*, the court rejected the insurers' argument that their payment obligations were limited to the amount the trust could pay claimants, and not the full value of the claim. No. CIV CCB-03-3408, 2012 WL 734176, at *1 (D. Md. Mar. 6, 2012).  In so holding, the court noted:

> The Bankruptcy Code is not intended to enable insurers to evade their indemnity obligations.  The notion that bankruptcy of the insured should not accrue to the benefit of the insurers is well-established.  '[A] party who is derivatively liable for the indebtedness of the debtor, such as its insurer, remains so after confirmation and the debtor's discharge.'

*Id.* at *4 (quoting *In re Jason Pharms., Inc.*, 224 B.R. 315, 321–22 (Bankr. D. Md. 1998) (noting the "fundamental principle . . . codified in section 524(e)" of the Bankruptcy Code that "the discharge in bankruptcy, along with the coextensive permanent injunction and fresh start, are exclusive to the debtor, and *do not otherwise affect the enforcement of any underlying debt, or any nondebtor liability thereon*") (internal citation omitted).[28]

---

[28] *See also UNR Indus. Inc. v. Cont'l Cas. Co.*, 942 F.2d 1101, 1105 (7th Cir. 1991) (rejecting insurer's argument that "the amount of [the policyholder's] loss depends on how much money the Trust actually pays to [mass tort] victims with valid claims for the period in question" on the basis that such a result "threatens to confer a

29

Similarly, many of the policies contain self-insured retentions ("SIR"), which under the terms of the policies may require the insured to pay out thousands or millions of dollars before being able to seek coverage from the insurer. Many courts—relying in part on bankruptcy law and policy—have refused to require insureds to affirmatively pay the SIR when an insured is unable to make those payments due to bankruptcy, but protect the insurer by requiring them only to pay amounts in excess of that SIR. *See, e.g.*, *In re Vanderveer Estates Holding, LLC*, 328 B.R. 18, 25 (E.D.N.Y. 2005) ("[C]ase law interpreting § 365 of the Bankruptcy Code makes it clear that . . . the failure of a bankrupt insured to fund a self-insured retention does not relieve the insurer of the obligation to pay claims under the policy."); *Home Ins. Co. of Illinois v. Hooper*, 294 Ill. App. 3d 626, 632 (Ill. App. 1st Dist. 1998) (rejecting the insurer's argument that a bankrupt policyholder had to satisfy a policy's SIR before a claimant could obtain the proceeds of the policy).[29]

---

windfall on [the insurer] at the . . . victims' expense"); *ARTRA 524(g) Asbestos Trust v. Fairmont Premier Ins. Co.*, No. 09-cv-458, 2011 WL 4684356 (N.D. Ill. Sept. 30, 2011) (finding that policy provisions and public policy concerns required the insurer to indemnify the insured for the full amount of loss rather than the discounted amount of the bankruptcy estate's payment).

[29] *See also Albany Ins. Co. v. Bengal Marine, Inc.*, 857 F.2d 250, 255 (5th Cir. 1988) (applying allowed amount of claims to determine satisfaction of deductible, as the insurer "should not be allowed to escape its obligations under the insurance policy simply because its insured is in bankruptcy"); *ARTRA*, 2011 WL 4684356, at *3 (applying allowed amount of claims to determine trigger of insurer's coverage with respect to claims submitted to post-bankruptcy trust).

While the Plan reserves for coverage litigation the question of whether the Certain Insurers are liable to pay a given claim, the Certain Insurers demand that the Plan *prohibit* a future court from considering the impact of the Bankruptcy Code on that issue. The Certain Insurers are not entitled to tip the scales in this manner. This is inconsistent not only with the Bankruptcy Code and Third Circuit law, but also the promise in the standard form policies issued by the Insurers to pay "notwithstanding the bankruptcy or insolvency of its insured." *See In re Fed.-Mogul*, 684 F.3d at 365–82.[30]

### 3.    The Certain Insurers' Asserted Harm Is Speculative.

The Certain Insurers cannot point to any Plan provision that eliminates rights they would otherwise have under applicable law. Similarly, the Certain Insurers cannot point to any TDP provision that prevents the Trustee from complying with

---

[30] In fact, many states *require* insurers to include such language in their policies. *See, e.g.*, *Admiral Ins. Co. v. Grace Indus., Inc.*, 409 B.R. 275, 282 (E.D.N.Y. 2009) (discussing New York Insurance Law § 3420 and stating that, "under New York law, every policy or contract insuring against liability *must* contain a provision asserting that bankruptcy or insolvency does not release the insurer from its obligations under the policy"); *In re Vanderveer Ests. Holding, LLC*, 328 B.R. 18, 23–24 (Bankr. E.D.N.Y. 2005), *aff'd sub nom. Am. Safety Indem. Co. v. Off. Comm. of Unsecured Creditors*, No. 05 CV 5877 ARR, 2006 WL 2850612 (E.D.N.Y. Oct. 3, 2006) ("The Illinois Insurance Code, Chapter 215, § 5/388, requires that no liability or indemnity insurance policy may be issued, 'unless it contains in substance a provision that the insolvency or bankruptcy of the insured shall not release the company from the payment of damages for injuries sustained or death resulting therefrom or loss occasioned during the term of such policy . . . .'").

any obligations under the policies.  Instead, they rely on speculative future harms at best.  The Certain Insurers do not cite a single case that has refused confirmation of a plan based on such speculation.

The filing of a coverage action by the Trustee does not make the Insurers' alleged harms any less speculative—in fact, it confirms that the Plan does not resolve coverage issues.  As an initial matter, what the Trustee asserts in a post-Effective Date coverage action has no bearing on whether the Plan is confirmable.  But if this Court does examine the complaint filed in *Houser v. Allianz Global Risks US Insurance Company*, No. 3:23-cv-01592 (N.D. Tex. Jul. 17, 2023), ECF No. 1 (the "Coverage Complaint"), it will see that the Certain Insurers have misrepresented or misinterpreted its allegations.[31]  Nowhere does the Coverage Complaint allege that

---

[31] Notably, in a recent filing in another coverage action, National Surety Corporation criticized the Coverage Complaint as "[u]sing boilerplate language and without stating any alleged facts, policy provisions, or other allegations that might demonstrate entitlement to relief, the complaint generically seeks a declaration against all 90 insurers 'of the rights and obligations of the parties . . . regarding the nature and extent of the Defendants' obligations' under hundreds of policies 'to pay insurance proceeds in connection with Abuse Claims,' as well as rulings that all 90 insurers either breached or will breach their policies and are or will be in bad faith." Exhibit 18 to National Surety Insurers' and Allianz's Mot. to Dismiss at A433, *Houser v. Allianz Glob. Risks US Ins. Co.*, No. 23-cv-01592 (N.D. Tex. Oct. 6, 2023), ECF No. 200-3 (citation omitted) (alteration in original).  The insurers thus characterize the Coverage Complaint as either containing generic, boilerplate allegations or specific accusations designed to undermine the insurers' defenses, depending on the situation.

the Certain Insurers' rights or defenses were abrogated by the Plan, nor does it state that, "the Certain Insurers' coverage defenses were considered and rejected by the courts below," as the Insurers claim. C.I. Br. at 44. The Plan does not collaterally estop the Certain Insurers from arguing that the facts of a particular claim tendered by the Trust trigger an exclusion or other policy defense (and nowhere does the Coverage Complaint make any such assertion). [32]

### 4. Insurers Are Not Entitled to Control Drafting of a Plan and TDP.

The Plan provides all of these protections for the Certain Insurers despite the fact that the Debtors are not, as the Certain Insurers erroneously claim, required to take the interests of the Certain Insurers into account when developing and proposing the Plan. C.I. Br. at 56. Such a position—that the Debtors are required to defer to the interests of their insurers (obligors to the Debtors' estates) to the detriment of their creditors—would completely upend the legal requirements for confirming a

---

[32] Indeed, the Insurers' own filings in the coverage action demonstrate concrete harm the Trust would suffer if the Plan exempted the Insurers from any rulings made by the Bankruptcy Court during confirmation. National Surety (i.e., Allianz) is already seeking to raise coverage defenses based on underlying factual issues that it spent years litigating unsuccessfully in the bankruptcy proceedings—for example, arguing that it has no obligation to pay any Abuse Claim because BSA agreed to TDPs "that deprive the National Surety Insurers of its right to associate with the defense of claims." Exhibit 18 to National Surety Insurers' and Allianz's Mot. to Dismiss at A143-144, *Houser v. Allianz Glob. Risks US Ins. Co.*, No. 23-cv-01592 (N.D. Tex. Oct. 6, 2023), ECF 200-3.

plan and the basic principles of the Bankruptcy Code, including that the Debtors owe a fiduciary obligation to their creditors to preserve and maximize the value of their assets. *See Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (noting that Chapter 11 debtor has a "fiduciary duty to maximize the value of the bankruptcy estate").

That the Debtors removed language from the TDPs that the Insurers believed provided them *additional* protection does not indicate bad faith or improper collusion between the Debtors and claimant entities. As noted above, this language is not necessary to protect the Certain Insurers. Further, the Bankruptcy Code requires the very behavior to which the Certain Insurers object—negotiations, exchange of competing views, and resolution of issues so as to facilitate plan approval. *See* 11 U.S.C. §§ 1129(a), 1126 (requiring creditor approval of plan); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 454 (2017) ("Chapter 11 allows debtors and their creditors to negotiate a plan for dividing an estate's value."); *In re M&G USA Corp.*, 599 B.R. 256, 260 (Bankr. D. Del. 2019) (affirming plan where creditors "vigorously engaged with the Debtors to protect their interests in hopes of obtaining a recovery that seemed far from assured"). The lower courts did not clearly err in rejecting the Certain Insurers' contentions.

### B. Plan Confirmation Did Not Require the Assignment of the Debtors' Obligations Under the Abuse Insurance Policies to the Trust.

The Bankruptcy Code's requirement that debtors transfer obligations along

with rights applies only to executory contracts. *See* 11 U.S.C. § 365. But the Abuse Insurance Policies are not executory contracts. *See* A00115 (District Ct. Op.) ("The Insurance Policies are not executory contracts, and no insurer argues otherwise." (citing *In re Boy Scouts of Am.,* 642 B.R. 504, 668 n.729 (Bankr. D. Del. 2022)); A008600 (Allianz Insurers' Objection to Second Modified Fifth Amended Chapter 11 Plan of Reorganization, Feb. 10, 2022); A008398 (Joinder and Objection of Liberty Mutual to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization, Feb. 9, 2022). "A non-executory contract . . . can be sold under § 363 to a buyer, who must satisfy post-closing obligations but need not worry about pre-closing breaches or defaults, which typically remain unsecured claims against the debtor's estate." *Spyglass Media Grp., LLC v. Bruce Cohen Prods. (In re Weinstein Co. Holdings, LLC)*, 997 F.3d 497, 501 (3d Cir. 2021).

The Certain Insurers do not dispute that the Bankruptcy Code Section 365 requirement to transfer obligations along with rights applies only to executory contracts. Instead, the Certain Insurers assert that cases generally holding that contracts cannot be rewritten or modified in bankruptcy to benefit the debtor require extending the application of this requirement to non-executory contracts. C.I. Br. at 29. This position is entirely unsupported.

The Certain Insurers have not identified a single case in which a court refused to confirm a plan because a debtor failed to assign contractual obligations with

35

corresponding rights to a trust. The Certain Insurers' continued reliance on *American Home Mortgage Holdings*, 402 B.R. 87, 92–93 (Bankr. D. Del. 2009), is misguided. There, the bankruptcy court severed loan sale provisions from servicing provisions of the debtors' non-executory mortgage agreement, allowing for rights and obligations to be treated separately. *In re Am. Home Mortg*, 402 B.R. at 92–93. As the lower courts here made clear, "[u]nder the Bankruptcy Code, if a contract is not executory, a debtor may assign, delegate, or transfer rights *and/or* obligations under section 363 of the Bankruptcy Code, provided that the criteria of that section are satisfied." A00115 (District Ct. Op.) (quoting *In re Boy Scouts of Am.*, 642 B.R. at 668). *See also In re Fed.-Mogul*, 684 F.3d at 378–79 (stating that plan transferred insurance "rights," not policies or obligations.)[33] Thus, the lower courts both correctly interpreted *American Home Mortgage* as supporting Debtors' transfer of rights in the Abuse Insurance Policies to the Trust and severing contract obligations from rights, in general. *See* A00764 (Bankr. Confirmation Op.); A00115 (District Ct. Op.).

The other cases cited by the Certain Insurers are similarly inapplicable here, either because they involve executory contracts, *Sharon Steel Corp. v. Nat'l Fuel*

---

[33] The Certain Insurers' reliance on *In re Italian Cook Oil Corp.*, 190 F.2d 994, 997 (3d Cir. 1951) is also misplaced, as that case involves an executory contract unlike the Abuse Insurance Policies, which are non-executory.

*Gas Distrib. Corp.*, 872 F.2d 36, 39–40 (3d Cir. 1989) (analyzing executory contract under § 365), or because they merely support that *future* obligations are not abrogated in a section 363 sale, *Spyglass Media*, 997 F.3d at 505;[34] *Folger Adam Security, Inc. v. DeMatteis/MacGregor, J.V.*, 209 F.3d 252 (3d Cir. 2000).    The Certain Insurers rely on other cases to assert that contractual obligations that arise post-assignment are not abrogated in assignment, but that is not in dispute—there is simply no such abrogation here.    *See Reserves Dev. LLC v. Crystal Props., LLC*, 986 A.2d 362, 370 (Del. 2009) ("Unless the obligee agrees otherwise, neither delegation of performance, nor a contract to assume the duty discharges any duty or liability of the delegator-obligor."); *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 60 (3d Cir. 2001) (assignee to a contract "simply moves into the shoes of the assignor" (citation omitted)).[35]    As the Bankruptcy Court noted, the Certain Insurers' real concern is the consequence of a failure to comply with such obligation, which is to be decided subject to applicable law under the facts and

---

[34] Certain Insurers rely on an oral transcript of the Bankruptcy Court's decision that ultimately was reviewed by the Third Circuit in *Spyglass Media*, C.I. Br. at 33 n.3, but this statement is hardly persuasive.  The Third Circuit itself did not state that the *cum onere* principle applies to non-executory contracts.

[35] Certain Insurers also argue that section 363 is commonly used for asset sales, and thus a determination that it does not require the transfer of obligations will have far-reaching implications.  C.I. Br. at 32.  The case they rely upon for support, *Indiana State Police Pension Trust v. Chrysler LLC (In re Chrysler LLC)*, 576 F.3d 108, 115 (2d Cir. 2009), *judgment vacated*, 592 F.3d 370 (2d Cir. 2010), does not involve the transfer of obligations.

circumstances of the case.  None of these cases requires transfer of obligations under a non-executory contract.

Moreover, to treat executory and non-executory contracts as identical would defy well-established principles of statutory interpretation that militate against construing two sections of a statute in the same manner where Congress employed different words in the two sections.  Here, Congress's decision not to require transfer of obligations for estate property other than executory contracts, as it did in Section 365, means that it did not intend for this requirement to apply here.  *See, e.g.*, *In re Fed.-Mogul*, 684 F.3d at 373 ("Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)).

There is thus no authority for requiring transfer of policy obligations to the Trust, much less requiring a transfer of obligations as a prerequisite for Plan confirmation.  The Insurance Assignment is permissible, and the Plan and Bankruptcy Court and District Court orders should be affirmed.

### C.    Insurance "Neutrality" Is a Standing Issue, Not a Confirmation Issue.

Finally, the Certain Insurers assert that a plan that is not "insurance neutral" cannot be confirmed.  The Certain Insurers again ignore that the Plan preserves the rights that they are entitled to, and fundamentally misunderstand the concept of insurance neutrality.

As the Bankruptcy Court explained, "'insurance neutrality' is a standing

38

concept that appears to have arisen in the context of mass-tort cases in order to prevent insurance companies from objecting to confirmation." A00762 (Bankr. Confirmation Op.); *see also In re Kaiser Gypsum Co.*, No. 21-1858 (4th Cir. Sept. 20, 2021), ECF No. 38 ("'Insurance neutrality' is merely "a judge-made doctrine that purports to bar an insurer from challenging a plan if it doesn't alter the insurer's rights or obligations'"). "[T]here is no requirement that a Chapter 11 plan be 'insurance neutral' in any respect." *In re Purdue Pharma L.P.*, 633 B.R. 53, 63 (Bankr S.D.N.Y.), *vacated on other grounds by* 635 B.R. 26 (S.D.N.Y.), *vacation reversed by* 69 F.4th 45 (2d Cir. 2023). Rather, "if a plan is not 'insurance neutral,' insurance companies have standing (at either the bankruptcy or the appellate level, as applicable) to be heard." A00736 (Bankr. Confirmation Op.).

The Certain Insurers claim that insurance "neutrality" is rooted in the principle that bankruptcy does not expand or contract contractual rights and duties. C.I. Br. at 35. The Certain Insurers are wrong. In each of the cases they cite, the plan proponents *chose* to include neutrality language, based on the specific circumstances of each case, to eliminate insurer standing to object to the plan. The relevant question was whether the neutrality provisions included in the plan were sufficiently unambiguous to achieve that purpose—not whether the law required "neutrality."

The Certain Insurers principally rely on *Combustion Engineering*, 391 F.3d at 218. Yet as the Certain Insurers themselves admit, C.I. Br. at 36–37, this case

concerned the insurers' standing. The court determined that the insurers had limited appellate standing to challenge a specific plan provision, after finding that the District Court's modifications to this provision may have impaired their rights. *Combustion Eng'g*, 391 F.3d at 217–19. The Certain Insurers note that the court vacated the District Court's modification and reinstated the original provision, but fail to add that this resolution was achieved because "at oral argument [the Debtor] stated it would be amenable to reinstating the . . . provision as drafted by the Bankruptcy Court." *Id.* at 218. Nowhere did the court state that the plan could not be confirmed without this change, nor did it state that neutrality is required for confirmation. Indeed, if neutrality *were* required, insurer standing would never be debated, because they would never have standing to challenge a confirmable plan. As both the Bankruptcy Court and District Court below held, *Combustion Engineering* does not aid Insurers here.

Nor does *Global Industrial*, 645 F.3d at 211, support the Certain Insurers' view of insurance "neutrality." Like *Combustion Engineering*, this case also concerned whether the insurers had standing to challenge the substance of a plan where they argued that an increase in claims potentially impaired their contractual rights. 645 F.3d at 209 (addressing "Hartford and Century's standing to object to the confirmation of the GIT Plan in the Bankruptcy Court"). Whether that court endorsed a plan that included broad insurance protections is irrelevant to the question

of whether a plan *must* be "insurance neutral" to be confirmed, and what precise language must be used if so. Nothing in *Global Industrial* requires finding that the language in this Plan renders it unconfirmable.

Contrary to the Certain Insurers' argument, no court has ever held that insurers have a *right* to an "insurance neutral" plan. Instead, courts—including the lower courts here—have stated that there is *no* requirement that a Plan contain "insurance neutral" language. *See Purdue Pharma*, 633 B.R. at 63 ("[T]here is no requirement that a Chapter 11 plan be 'insurance neutral' in any respect."); A00191 (District Ct. Op.) ("There is no confirmation requirement that a chapter 11 plan be 'insurance neutral.'").

For the reasons explained above, the Certain Insurers' view of "insurance neutrality" would mean that insurers, unlike any other entity that has contracted with a debtor, cannot be affected by the debtor's bankruptcy. Instead, their contracts remain unaffected, both legally and practically, and they are not bound by generally accepted principles of law like *res judicata* or collateral estoppel. Nowhere does the Bankruptcy Code provide such a special carveout for insurance companies. Like any other entity, they should be bound by the Bankruptcy Court's orders, the Bankruptcy Code, and other applicable law.

Further, the inclusion of broad "neutrality" language here is neither desirable nor appropriate, for three reasons.

41

First, inclusion of broad insurance "neutrality" language now, after the parties have already litigated the Plan for several years, would do nothing to streamline these proceedings. The Certain Insurers have filed hundreds of pages of objections to the Plan and took every opportunity to challenge various aspects of the bankruptcy proceedings from the outset of these Chapter 11 cases.

Second, even if the Plan were not already confirmed over the objections of the Certain Insurers, the inclusion of such language would pose no benefit to the Debtors or the Survivor constituencies. In case after case since the concept of "neutrality" was introduced, insurers (represented by the same counsel participating in this case) have sought to delay and derail bankruptcy proceedings even where plans include the "robust protective language" they demand here.[36] Insurers' weaponization of "neutrality" language over the last several decades has undermined its purpose.

---

[36] *See* Ltr. from S. Stamoulis to Hon. Silverstein, *In re Imerys Talc America, Inc.*, No. 19-10289 (LSS) (D. Del. Nov. 4, 2020), ECF No. 2466 (letter from counsel to insurers stating that, "the so-called insurance neutrality language in the Plan means nothing without a clear understanding of which coverage defenses are purportedly disallowed or may otherwise be limited or impaired . . . ."); *In re Kaiser Gypsum Co.*, No. 16-21602 (JCW), 2021 WL 3215102, at *27 (W.D.N.C. July 28, 2021) (insurer raised objections to plan that court determined was "insurance neutral"); Petition for Writ of Cert., *Truck Ins. Exchange v. Kaiser Gypsum Co.*, No. 22-1079, 2023 WL 3306520 (May 3, 2023) (insurer filed petition for Supreme Court review of Fourth Circuit ruling saying that it lacked standing to object); Op., No. 22-1079, 2023 WL 6780372 (order from Supreme Court granting certiorari).

Third, as noted above, the objections raised by the Certain Insurers make clear that their intent in seeking "neutrality" is to enable them to re-litigate core findings as to the validity and appropriateness of fundamental components of the Plan—specifically, the Debtors' conduct in negotiating the Plan settlements and the process through which the Trust will value and resolve claims. Permitting such litigation would undermine the Plan's settlement framework, waste Trust funds that otherwise would go to Survivors, and constitute a breach of the Debtors' duty to preserve and protect the value of their insurance assets. For these reasons as well, the courts below properly rejected the "insurance neutrality" language the Certain Insurers seek.

## III.   The District Court Did Not Abuse Its Discretion in Upholding the Plan's Judgment Reduction Clause.

<u>Standard of Review</u>:  The Plan enjoins Non-Settling Insurers from asserting "Recovery Claims." These are claims for contribution against Settling Insurers that might arise if a court entered a judgment requiring a Non-Settling Insurer to pay more than its fair share of liability for an Abuse Claim. To prevent unfairness resulting from such a judgment, the Plan requires the Trust to reduce its own judgment against the Non-Settling Insurer by the amount of the judgment that the Settling Insurer would be obligated to pay absent its settlement. Of the 91 Non-Settling Insurers that may provide coverage for Abuse Claims, a single insurer, Allianz, argues that the Plan's judgment reduction provision is unfair and prejudicial. The lower courts rejected this argument, and their decision is reviewed

43

for abuse of discretion. *Eichenholtz v. Brennan*, 52 F.3d 478, 487 (3d Cir. 1995) (reviewing a district court's finding that a proportionate judgment reduction is the fairest method and determining that the non-settling defendants will not be prejudiced by a proportionate fault reduction).

<u>Argument</u>:

**A.    The Judgment Reduction Provision Adequately Protects Allianz.**

A judgment reduction clause is a device for preventing potential unfairness to an insurer that has not settled with its policyholder.  If a Non-Settling Insurer refuses to pay insurance coverage sought by the Trust, the Trust may obtain a judgment against the Non-Settling Insurer in a coverage action that it is obligated to pay. Ordinarily, if the claim at issue also implicates a Settling Insurer, and the Non-Settling Insurer has paid "more than its fair share" of liability for the claim, the Non-Settling Insurer could seek contribution from the Settling Insurer. *See McDermott, Inc. v. AmClyde*, 511 U.S. 202, 209, 215 (1994) (holding that contribution claims (and related claims) arise only where one insurer has paid "more than its fair share" for claims against its insured).  However, because the Plan enjoins claims against Settling Insurers, the Non-Settling Insurers instead must assert their contribution claims against the Trust.  For example, if the Trust obtains a judgment from a Non-Settling Insurer for $1 million, and the Non-Settling Insurer obtains a ruling that a

44

Settling Insurer was responsible $250,000 of that liability, to prevent any potential prejudice to the Non-Settling Insurer, the Plan requires the Trust to reduce its judgment against the Non-Settling Insurer by the amount of the Settling Insurer's share of the liability. The result is that the Non-Settling Insurer only has to pay $750,000.

Numerous courts have approved the use of judgment reduction provisions similar to this one in mass-tort bankruptcies and other contexts. *See, e.g.*, *Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp.*, 518 B.R. 307, 316 (W.D. Pa. 2014); *Eichenholtz*, 52 F.3d at 487 (Third Circuit upholds bar on contribution claims in securities action because proportionate judgment reduction adequately protects non-settling parties); *In re PNC Fin. Servs. Grp., Inc.*, 440 F. Supp. 2d 421, 438, 452–53 (W.D. Pa. 2006) (approving partial settlement of claims where non-settling defendant would "enjoy the benefit of a corresponding judgment reduction for the elimination of its contribution claims against any released party"); *In re Trib. Co.*, 464 B.R. 126, 179 (Bankr. D. Del. 2011) (proposed bankruptcy plan's bar order was substantively fair to the non-settling defendants because they were protected by the proportionate judgment reduction provision)).

As those courts did, the District Court here correctly found that the Plan's judgment reduction provision was an adequate remedy for insurers' Recovery Claims, because, among other reasons, "it is unlikely that Insurers will ever be

required by judgment to pay 'more than their fair share' in the first instance." A00160 (District Ct. Op.).  Indeed, as the District Court observed, Allianz *conceded* that "usually . . . an insurer's rights are protected by the existing judgment reduction clause."  A00161 (District Ct. Op.)

Allianz hypothesizes one scenario in which its claim against a Settling Insurer may exceed the Trust's judgment against Allianz (giving rise to what Allianz deems an "Excess Claim").  That scenario arises ***only if*** (1) a Survivor elects not to accept the amount offered to him by the Trust and instead elects to file their Abuse Claim in the tort system under the TDPs' "Tort System Alternative," TDPs Article XII, (2) a Settling Insurer would have responsibility to defend that claim, (3) Allianz elects to defend that claim instead, and (4) Allianz proves in a subsequent coverage action that it was not responsible for the claim (i.e., if the Trust has no coverage award against Allianz to offset).  Under these facts, Allianz would not be reimbursed dollar-for-dollar for the defense costs it had expended.  *See* Allianz Br. at 2, 31–32.

The District Court considered and correctly rejected this hypothetical as a basis for upending the Plan.  As the District Court found, the TDPs substantially *reduce* the Non-Settling Insurers' potential costs of defending Abuse Claims overall compared to what they might have experienced without the TDPs.  A00161 (District Ct. Op.) ("The TDPs streamline and reduce defense costs by resolving claims consensually through an out-of-court process.  Thus, the likelihood that an Insurer

46

is saddled with significant costs of defending Abuse Claims in the tort system is small."). This finding, like the finding that it was unlikely that a Non-Settling Insurer would ever pay more than its fair share, was amply supported by evidence in the record:

> The TDPs establish an orderly, alternative mechanism to verify, evaluate, and resolve Abuse Claims, which predominantly involve state law issues, without overwhelming the Bankruptcy Court. To litigate tens of thousands of claims before the Bankruptcy Court would take decades and would result in uncertainty and delay. Moreover, considerable resources would be expended litigating claims, diminishing the assets available for distribution to Survivors. The TDPs avoid this outcome by permitting Abuse Claims to be resolved in an effective, fair, and cost-efficient manner, maximizing overall distributions to Survivors. Providing procedures to facilitate this process and to encourage settlement and compromise promote important policies of the Bankruptcy Code and should be encouraged.

A00157 (District. Ct. Op.).[37]  In addition to a reduction of the insurers' defense costs, the TDPs place caps on tort recoveries and subordinate punitive damages, further benefiting insurers.  *See* A01025, A01042-1043 (TDP at Art. VIII.B., XIII.N.).  For the foregoing reasons, at the very least, the District Court did not abuse its discretion

---

[37] Allianz's assertion that it would have to defend a significant number of claims in the tort system is further undercut by the fact that the TDPs contain an "Independent Review Option," or "IRO."  The IRO permits Survivors with high-value claims to have a neutral third party make a settlement recommendation to the Trustee, which is intended to replicate, to the extent possible, the amount a reasonably jury might award for the Abuse Claim.  *See* A01037-1043 (TDP at Art. XIII).  Allianz fails to explain why *any* claimant would take on the time, risk, and cost of the Tort System Alternative when there is already a streamlined, out-of-court mechanism through which they may potentially recover the tort system value of their claim.

in finding that the TDPs will reduce Non-Settling Insurers' overall defense costs, even if, in an individual Abuse Claim, an "Excess Claim" could exist.

Allianz argues that the District Court improperly disregarded deposition testimony by a TCC expert that 90% of the liability for Abuse Claims rests with Settling Insurers. *See* Allianz Br. at 33. Such testimony holds little weight, however, as the allocation of liability is properly determined by a coverage court. As the Debtors' insurance expert, Nancy Gutzler testified, a wide range of allocation assumptions may be applied to value BSA's coverage program. A00582–583 (Bankr. Confirmation Op.) (citing Day 9 Hr'g Tr. 62:4–15).

Regardless, such testimony is irrelevant. Even if the Settling Insurers are responsible for the defense of 90% of post-bankruptcy tort claims, the Non-Settling Insurers' liability for defense costs is still significantly reduced overall because, as noted previously, there will be fewer tort claims to defend. *See* A00162 (District Ct. Op.) ("Even where a substantial number of injury claims continue to be asserted against non-settling insurers in the tort system, courts have found that insurers are appropriately protected from defense overpayment recovery claims by judgment reduction because the number of claims an insurer must defend is reduced, reducing their defense costs overall"). Allianz provides no evidence to the contrary.

What Allianz really seeks by way of its proposed modification to the judgment reduction provision is a windfall—significantly reduced defense costs *and* full

payment on its contribution claims.  The District Court did not abuse its discretion

in rejecting Allianz's argument regarding defense costs, and its decision was correct.

**B.    The District Court Properly Relied on *Plant* and *Duro Dyne*, and Cases on Which Allianz Relies Are Distinguishable.**

The District Court cited multiple cases in rejecting Allianz's argument that

neither the Bankruptcy Code nor the Constitution requires non-settling insurers to

be compensated in full for every contribution claim.  A00161–162 (District Ct. Op.)

(citing *In re Plant Insulation Co.*, 469 B.R. 843, 876 (Bankr. N.D. Cal. 2012), *aff'd*,

485 B.R. 203 (N.D. Cal. 2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013),

and *aff'd*, 544 F. App'x 669 (9th Cir. 2013) (concluding that the plan's judgment

reduction provision adequately protected the insurers by "mitigat[ing] the greatest

hardships of the injunction"); *In re Duro-Dyne Nat'l Corp.*, No. 3:19-CV-15433,

2020 WL 6270691, at *65 (D.N.J. Oct. 23, 2020) (confirming Plan over insurer

objection to similar judgment reduction provision).

Allianz argues that *Plant* conflicts with Third Circuit precedent and that it is

inapposite because it was decided under 11 U.S.C. 524(g), which applies only to

asbestos bankruptcies.[38]  Allianz Br. at 39 (citing *Gillman v. Cont'l Airlines (In re*

---

[38] Allianz incorrectly suggests, in a footnote, that using the judgment reduction mechanism to address its Recovery Claims constitutes an unconstitutional taking without just compensation.  As the *Plant* court ruled, an insurer's entitlement to contribution is not sufficiently specific and well protected to rise to the level of a property right.  *See In re Plant*, 469 B.R. at 881.  Allianz's alleged rights here are

*Cont'l Airlines)*, 203 F.3d 203 (3d Cir. 2000).  Allianz is wrong on both points.

First, Allianz cites no case in the Third Circuit, inside or outside of the 524(g) context, requiring perfect, direct compensation for such claims.  In *In re Continental*, the Third Circuit determined that the creditors at issue were entitled to "reasonable consideration" (not "full payment," as Allianz suggests) for the release of their claims against non-debtors.  203 F.3d at 216.  The *Continental* court concluded that this "reasonableness" standard was not met because the creditors had received no consideration whatsoever for their lost claims.  *Id.*  In contrast, the *Plant* court determined that the objecting insurers had received substantial consideration in the form of reduced overall defense costs (as Allianz would here).  Allianz fails to demonstrate how *Plant*'s analysis "conflicts directly" with *In re Continental*.  Allianz Br. at 39.

Second, *Plant* is not inapposite simply because it involved a 524(g) injunction. The Ninth Circuit specifically recognized that the district court below had confirmed that "the Plan generally conformed to the rigorous standard for enjoining creditors' claims enunciated in [non-524(g) case] *Dow Corning*."  As the Ninth Circuit observed:

---

even more speculative and less specific than those in *In re Plant* (and *Duro Dyne*), where the plans (unlike the Plan here) provided for a "pass-through" structure under which claims would continue to be asserted directly against non-settling insurers in the tort system.

Appellants claim that this standard requires 'a mechanism to pay for all, or substantially all' the rights of third parties that the injunction extinguishes. But the Plan confirmed by the bankruptcy court provides not unsubstantial protection for the Non–Settling Insurers, in the form of the Trust–Payment Credit and Judgment–Reduction Credit, as outlined above.

*In re Plant*, 734 F.3d at 912. For these reasons, Allianz's 524(g) argument is a red herring.[39]

Allianz's reliance on *Gerber v. MTC Elec. Techs. Co.*, 329 F.3d 297 (2d Cir. 2003) is likewise misplaced. Allianz cites *Gerber* for the proposition that its contribution claims for defense costs are "independent claims" that courts are "almost universally unwilling to bar." *See* Allianz Br. at 30, 43–44 (citing *Gerber*, 329 F.3rd at 306).

---

[39] Allianz's attempt to distinguish *Duro Dyne* on the basis that it was an asbestos case is unavailing for the same reasons. Nowhere did the *Duro Dyne* court suggest that its approval of the judgment reduction mechanism was based on an affirmative grant of authority under 524(g). Allianz's attempt to dismiss the relevance of *Duro Dyne* because the objecting insurer settled before the district court affirmed the confirmation order similarly fails. Allianz does not dispute that the bankruptcy court recommended confirmation of the plan over the very same objections Allianz is raising now. *See* Joint Obj. of Certain Insurers to Debtors' Second Am. Plan of Reorganization for Duro Dyne Nat'l Corp., et al., Under Chapter 11 of the Bankr. Code at 18, *In re Duro Dyne Nat'l Corp.*, No. 18-27963 (Bankr. D.N.J., Feb. 8, 2019), ECF No. 445 (arguing that the plan's judgment reduction provision did not adequately protect insurers' contribution rights). The fact that the insurer then settled, thus enabling it to enjoy the protection of the judgment reduction mechanism it previously challenged, does not render the case any less relevant.

Allianz misreads *Gerber*. The court defined "independent claims" as those that are unrelated to the defendants' liability to the plaintiff. Here, any contribution claims among insurer defendants would be based on their respective obligations to the Trust (the plaintiff) for the defense and indemnity of the Abuse Claims. Whether the liability arising from those obligations comes in the form of indemnity payments or incurred defense costs is irrelevant, and the *Gerber* court makes no such distinction. *Id.* at 306–07 (citing *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 495–96 (11th Cir.1992) (holding that the district court properly enjoined claims against the settling defendants that "were sufficiently related to the subject matter of plaintiffs' case against defendants").[40]

### C.     The District Court Properly Found that the "Asymmetrical" Judgment Reduction Clause Would Not Prejudice the Insurers.

Allianz continues to object to the "finality requirement" in the judgment reduction provision, which requires that a Non-Settling Insurers' Recovery Claim become a final judgment before the Trust must reduce its judgment against that Non-

---

[40] *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 496, n.5 (11th Cir. 1992) ("Thus, the case before us is not one of those rare instances where a crossclaim unrelated to defendants' liability to the plaintiffs has somehow remained in the case. We question whether truly independent claims that a settlement bar order cannot extinguish will ever remain in a class action lawsuit. We do not decide that hypothetical question, however, on the facts before us. Suffice it to say that in this case, as in most others involving crossclaims between defendants in a class action lawsuit, the cross-claims were sufficiently related to the subject matter of plaintiffs' case against defendants that the district court properly barred all such claims").

Settling Insurer.  Allianz's attempt to continue to blue-pencil this provision at the appellate level is inappropriate and unsupported by the record.

First, Allianz speculates that it will suffer financial harm—entry against it of a full (unreduced) adverse judgment—if the Trust seeks to enforce a coverage judgment against Allianz before the court renders a final judgment on Allianz's Recovery Claim. *See* Allianz Br. at 46.

The Plan already was modified before confirmation—at Allianz's insistence—to prevent precisely such financial harm.  The judgment reduction provision specifically provides that the Trust "shall not seek to enforce" its own judgment until a Non-Settling Insurer's claim for a reduction in judgment becomes final.  A00163 (District Ct. Op.) (citation omitted).  Allianz cites no evidence that the Trustee, a retired federal bankruptcy judge, is likely to violate the governing Plan Documents.  Indeed, Allianz concedes that its concern is not that the Trustee *will* execute on an unreduced judgment, but merely that she *can*.  *See* Allianz Br. at 49.

As the District Court directly noted, even if the Trustee did ignore the finality requirement, Allianz could seek injunctive relief or damage from a court of competent jurisdiction, just as any party would enforce restrictions or limitations on the Trustee's powers.[41]  A00163–164 (District Ct. Op.).  Allianz has no basis to

---

[41] *See* A19894–896 (Hr'g Tr. Feb. 9, 2023).

object to a Plan provision simply because another party could violate it.

Second, Allianz complains that "the asymmetry of the Judgment Reduction Clause permits—or at least, does not prohibit—an erroneous assessment of prejudgment interest on the Settlement Trust's unreduced judgment, notwithstanding the future offset from an awarded but unapplied Recovery Claim." *See* Allianz Br. at 46. Again, Allianz provides no support for the proposition that a coverage court will misapply prejudgment interest on an unreduced judgment. Allianz has no reasonable basis to object to a Plan provision because a court might make a mistake. The District Court thus did not abuse its discretion in rejecting Allianz's arguments.

Finally, Allianz argues "[T]he lopsided structure of the Judgment Reduction Clause—and the resulting harm—is entirely unnecessary. Allianz Br. at 47. The Plan's only other judgment reduction provision, which is unavailable to Recovering Insurers, lacks any such asymmetry. And the record reflects no legitimate reason, rooted in evidence or factual findings, for this imbalance." *See* Allianz Br. at 47–48.

The record belies this argument. *See* Tr. of Status Conf. Hr'g before the Hon. Laurie Selber Silverstein Chief U.S. Bank. J .63:25–64:8, *In re Boy Scouts of Am.*, No. 20-10343 (Bankr. D. Del. Sept. 7, 2022), ECF No. 10317 ("Without [a final and non-appealable requirement], the Trust could be in a position where it essentially

54

reduces its judgment, then has to un-reduce that judgment or further reduce that judgment based on the outcome of any appeal. This creates a whole host of procedural complexities, it creates all sorts of difficulties for the Trust in terms of reserves, accounting, reporting, potentially taxes, and requiring that an insurer's judgment is final and non-appealable will reduce, if not eliminate, all of those issues"). Regardless, as the District Court recognized, Allianz's arguments involve a "minor dispute over the drafting of language," and it is not the role of an appellate court to draw lines on such language.[42] Allianz's arguments rest on the fact it did not receive its preferred judgment reduction language. But that fact neither renders the Plan unconfirmable nor makes the judgment reduction provision unfair to Allianz. Given that the judgment reduction clause provides adequate protection for the Non-Settling Insurers and that its "final and non-appealable" requirement does not prejudice the Insurers, the District Court neither abused its discretion in its affirming of the Bankruptcy Court's confirmation of the Plan nor its decision to uphold the judgment reduction provision of the Plan.

### D.     The Judgment Reduction Clause is Consistent with the Principles and Policies Underlying the Bankruptcy Code.

Allianz argues that the judgment reduction clause is incompatible with the principles and policies underlying the Bankruptcy Code. *See* Allianz Br. at 50–54.

---

[42] A19898–899 (Hr'g Tr. Feb. 9, 2023).

Allianz asserts that, (1) the existing judgment reduction provision imposes no limits on the Debtors' "unfettered power" to extinguish excess claims; (2) rights of insurers are funneled, involuntarily, to forums they did not choose; and (3) the rights of insurers are prejudiced. Allianz is wrong on all points.

The Bankruptcy Code only requires adequate protection—i.e., protection that suffices under the circumstances. A00161 (District Ct. Op.) (citing *In re Plant*, 469 B.R. at 876 ("The Non-Settling Insurers need not be compensated in full," but conditions should "'mitigate the greatest hardships of the injunction'"); *In re O'Connor*, 808 F.2d 1393, 1396–97 (10th Cir. 1987) ("courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis," and is a fact finding subject to clearly erroneous review)). Even the "adequate protection" standard is generally only applicable to secured claims, which Allianz's theoretical excess recovery claims are not. In any case, adequate protection does not require "perfect protection" or "identical protection." *In re Plant*, 469 B.R. at 875.

Moreover, the power of Congress to establish uniform laws of bankruptcy includes the power to impair the obligation of contracts, rights under final judgments, and other legal rights. While the Bankruptcy Code is not a license to trample on all non-debtors' rights, instances are many in which rights of non-debtors are lost or redefined in a bankruptcy case (as with the Survivors' rights here). As

the Supreme Court has noted in a different context, Congress, through the Bankruptcy Code, has "reshaped debtor and creditor rights in marked departure from state law." *Assocs. Com. Corp. v. Rash,* 520 U.S. 953, 964 (1997). Permitting a bankruptcy court to enjoin contribution claims is well "within Congress's power to provide for the discharge of unsecured claims in bankruptcy with or without compensation." *In re Plant*, 469 B.R. at 875 (citing *Hanover Nat'l Bank v. Moyses,* 186 U.S. 181 (1902); *accord United States v. Sec. Indus. Bank,* 459 U.S. 70, 80(1982)).

Allianz has not demonstrated that it will ever bear the burden of paying any defense costs and thus be entitled to recovery of excess or contribution claims. If any of Allianz' speculated events do occur, as lower courts determined, Allianz will be adequately compensated by the Plan and its judgment reduction provision. Allianz is not entitled to a windfall in the form of significant defense cost savings *and* full reimbursement of any "Excess" defense claims with money that otherwise would go to Survivors. Accordingly, the District Court did not abuse its discretion in concluding that the judgment reduction clause is an adequate remedy for insurers' recovery claims.

## IV.    The Plan Treats All Abuse Claimants Fairly and Equitably

<u>Standard of Review</u>:    The D&V Claimants allege that current Abuse Claimants are being treated unfairly because, unlike future Abuse Claimants, current

57

claimants were required to file proofs of claim by a Bankruptcy Court-approved deadline (the "Bar Date"). Equality of treatment is a mixed question of law and fact reviewed *de novo* on appeal. *See In re FINOVA Grp., Inc.*, 304 B.R. 630, 635, 637 (D. Del. 2004); *In re LightSquared, Inc.*, 534 B.R. 522, 537 (S.D.N.Y. 2015), *aff'd sub nom. Ahuja v. LightSquared Inc.*, 644 F. App'x 24 (2d Cir. 2016).

Argument: As a threshold matter, and as noted by the District Court, the D&V Claimants did not raise this issue in their objection to confirmation. Thus, the issue was not properly preserved for appeal.

Assuming, arguendo, that the issue is properly before the Court, the D&V Claimants' misunderstand the nature of Future Abuse Claims, and they also misunderstand the concept of treatment under the Plan. The "treatment" that the D&V Claimants complain of—being required to file a proof of claim—is a function of the Bankruptcy Court's bar date order (the "Bar Date Order") (A07507–7569); it is not "treatment" under the Plan. The D&V Claimants never objected to the Bar Date Order, and the deadline to appeal the Bar Date Order is long past.

As the District Court recognized, holders of future Abuse Claims, "by definition, as 'futures' . . . were unable to assert their claims by the Bar Date." A00149 (District Ct. Op.). Given that future Abuse Claims have yet to manifest, it would not comport "with principles of fairness, due process, and common sense" to impose an arbitrary cutoff on future Abuse Claimants. *Id.*

58

As the Bankruptcy Court and the District Court properly concluded, all holders of Abuse Claims are receiving the same treatment under the Plan, as required by § 1123(a)(4) of the Bankruptcy Code. Cases construing § 1123(a)(4) have interpreted equal treatment to mean that all claimants in the same class must be subject to the same process for recovery. *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013). Here, all holders of Abuse Claims, both current and future, will be channeled to the Settlement Trust and liquidated pursuant to the TDP. And under the TDP, all holders of Abuse Claims are subject to the same process and procedures for liquidating their Abuse Claims.

The D&V Claimants also baselessly allege that current claimants may have to "wait decades for their compensation." D&V Br. at 69. The District Court properly rejected this claim as unsupported hyperbole, recognizing that,

> the Settlement Trust will be governed by comprehensive process-oriented guidelines for paying current claims, while also ensuring that sufficient funds remain to continue to compensate remaining current, as well as future, claims going forward. Distributions from the Settlement Trust to current Direct Abuse Claims will not be delayed because of Future Abuse Claims; rather, the Settlement Trustee may make distributions to holders of current or future Direct Abuse Claims when those claims are allowed under the procedures set forth in the TDP.

A00149 (District Ct. Op.) (citing TDPs Art. IX & Trust Agreement Art. 4).

Accordingly, for the reasons set forth herein, the D&V Claimants' argument that the Plan is not fair and equitable to current Abuse Claimants is unfounded.

## V.    The Plan Does Not Violate the McCarran-Ferguson Act

Standard of Review:    The McCarran-Ferguson Act ("MFA") prohibits constructions of federal statutes that "impair" state regulation of the "business of insurance."  15 U.S.C. § 1012(b).  The Lujan Claimants contend that the Plan's insurance settlements impair their rights under 22 G.C.A. § 18305, a Guam statute that grants an "injured person" the right to bring a "direct action against the insurer" under its policy, "provided that the cause of action arose in Guam."  *See* Lujan Br. at 41–53.  The contention raises issues of statutory interpretation; the standard of review is therefore *de novo*.  *Highmark, Inc. v. UPMC Health Plan, Inc*., 276 F.3d 160, 166 (3d Cir. 2001).

Argument:    Both the Bankruptcy Court and the District Court properly rejected this contention.  As both courts observed, the threshold issue under the MFA is whether the conduct regulated by the state statute constitutes the "business of insurance."  A00127–128 (District Ct. Op.); A00144 (Bankr. Confirmation Op.).

As shown below, Guam's direct-action statute does not regulate the "business of insurance," nor does it provide the Lujan Claimants with rights of any kind under the policies; it is merely "a procedural statute" that enables a plaintiff to name an insurer as a defendant on a substantive claim against the insured.  A00622 (District Ct. Op.) (citation omitted).  Accordingly, the Lujan Claimants are incorrect that the Guam direct-action statute preempts the Bankruptcy Code under the McCarran

Ferguson Act, or that Guam claimants should receive preferential treatment compared to claimants from other states.

As the Lujan Claimants acknowledge, Lujan Br. at 47, the Supreme Court has established a three-factor inquiry for determining whether a state law regulates the "business of insurance":  (1) "whether the practice has the effect of transferring or spreading a policyholder's risk," (2) "whether the practice is an integral part of the policy relationship between the insurer and the insured," and (3) "whether the practice is limited to entities within the insurance industry." *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129 (1982).  Applying these three factors here demonstrates that the Guam direct-action statute does not regulate the "business of insurance."  Even assuming the direct-action statute is "limited to entities within the insurance industry," the first two factors are not present here.

First, permitting an injured third party to sue the policyholder's insurer does not affect the transfer of risk between the insurer and the policyholder.  As the Supreme Court has observed, "[t]he transfer of risk from an insured to insurer is effected by means of the contract between the parties—the insurance policy—and that transfer is complete at the time that the contract is entered."  *Pireno*, 458 U.S. at 130.  And even taking the direct-action statute into account, the risk transferred by the policy (*i.e.*, the risk that the policyholder's activities will result in personal injury) remains the same.  All the direct-action statute does is to increase the number

61

of parties that can sue the insurer on its obligation to cover that risk.

Second, the injured third party's statutory right to sue an insurer directly is not "an integral part of the policy relationship between the insurer and insured." *Pireno*, 458 U.S. at 129. That relationship is governed by the terms of the policy and the applicable law. The contractual duties that the insurer and the policyholder owe each other are not affected by the direct-action statute.

As the Supreme Court has explained, the MFA's "focus . . . [i]s on the relationship between the insurance company and the policyholder" with an aim toward "protecting or regulating this relationship." *SEC v. National Securities, Inc.*, 393 U.S. 453, 460 (1969). By its terms, Guam's direct-action statute does not affect or regulate the relationship between the insurer and the policyholder, whose rights "are unaffected by the statute." A00132 (District Ct. Op.). And the statute "is aimed not at protecting policyholders but instead at benefiting third parties [*i.e.*, those allegedly injured by the policyholder]." A00132 (District Ct. Op.). As the lower courts observed:

The goal of this statute, therefore, is not policyholder protection nor does it change the payment provisions of the policy or the spread of risk between the insurer and insured. Instead, it is a procedural law granting standing to sue or, at best, some collection remedy for a creditor of the policyholder in the event the creditor can prove the policyholder's liability and the policy covers the loss. A00622 (Bankr.

62

Confirmation Op.) (quoting *Cruz Reyes v. United States*, No. 08-00005, 2010 WL 5207583, at *7 (D. Guam Dec. 15, 2010)).  Thus, the statute "does not regulate the 'business of insurance.'"  A00616–617 (Bankr. Confirmation Op.).  For that reason alone, the MFA does not apply.[43]

But even if the direct-action statute did regulate the business of insurance, the MFA still would not apply here.  The MFA cannot be used to prevent the enforcement of a federal statute (in this case, the Bankruptcy Code) that expressly preempts state law.  *See Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 116–20 (2d Cir. 2001) ("[W]here the preemptive force of [the Securities Litigation Uniform Standards Act] is explicit, and where we have strong indications that Congress intended just such an effect . . . . [w]e hold that McCarran-Ferguson does not preclude the application of SLUSA to variable annuity contracts.").[44]

---

[43] For the same reasons that the Lujan Claimants' arguments fail as to the threshold question of whether the statute regulates the business of insurance, they also fails under the second prong of the MFA, which similarly asks whether "the state law regulating the activity was enacted for the purpose of regulating the business of insurance." A00129 (District Ct. Op.); A00616–623 (Bankr. Confirmation Op.) ("If the threshold question is answered in the affirmative, then reverse preemption will apply if three requirements are met:  (i) the federal law at issue does not specifically relate to the business of insurance; (ii) the state law regulating the activity was enacted for the purpose of regulating the business of insurance; and (iii) applying federal law would invalidate, impair or supersede the state law").

[44] *See also Stephens v. Nat'l Distillers & Chem. Corp.*, 6 F.3d 1226, 1232–33 (2d Cir. 1995) (because Foreign Sovereign Immunities Act "preempt[s] all other laws purporting to set forth rules for suits against foreign sovereigns," MFA is

Here, Section 1123(a)(5) of the Bankruptcy Code expressly preempts state law by granting bankruptcy courts authority to provide adequate means for implementation of a plan "[n]otwithstanding any otherwise applicable nonbankruptcy law." Given this express preemptive language, the MFA does not apply. Similarly, Section 1123(a)(4), which includes the same express preemptory language, requires that a plan "provide the same treatment for each claim or interest of a particular class." The Channeling Injunction, therefore, necessarily must apply to the claims of the Lujan Claimants, including their purported direct-action rights, so that they are afforded the same treatment as other Survivors. As the Bankruptcy Court observed, given the direct-action statute's procedural nature, the Lujan Claimants' claims are "identical to the claims of others in Class 8" and rightly receive the same classification and treatment as the holder of all other Abuse Claims, and thus, any direct-action interest that *may* exist can be sold free and clear under Section 363(f). A00624–626, A00703–704, A00711 (Bankr. Confirmation Op.).

In rejecting the Lujan Claimants' argument under the MFA, the lower courts acted consistently with numerous decisions enjoining all persons other than a post-

---

inapplicable); *Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1065 (2d Cir. 1982), *vacated and remanded on other grounds*, 463 U.S. 1223 (1983) ("Title VII [of the Civil Rights Act] is not being *construed* to *implicitly* pre-empt state laws. Title VII contains a broad and explicit pre-emptive provision.").

confirmation trust from asserting any purported rights against insurance policies transferred to the trust.[45]    Moreover, as the Confirmation Hearing made clear, Insurers would be unwilling to make substantial contributions to the Trust without complete peace under their policies.  A03221–3222, A03268–3270 (Confirmation Hr'g Tr. Day 8); A03771–3788 (Confirmation Hr'g Tr. Day 21); A06177 (Confirmation Hr'g Tr. Day 18); A06807–6808 (Patton Decl.); A06589, A06600–6601, A06612, A06616 (Whittman Decl.).  The Lujan Claimants' proposed reading of the Guam direct-action statute and the MFA therefore would render insurance settlements in mass-tort bankruptcy cases with nationwide claims impossible. *See In re W.R. Grace & Co.*, 475 B.R. at 85 ("If each unknown claimant [in a mass-tort bankruptcy] could later sue the insurer and not be estopped by a fully litigated judgment against its insured or by a fair and equitable settlement, there would be no finality to litigation and no realistic likelihood of settlement." (quoting *In re Dow Corning Corp.*, 198 B.R. 214, 242 (Bankr. E.D. Mich. 1996))).

---

[45] *See, e.g.*, Fourth Amended Joint Plan of Reorganization of Mallinckrodt PLC and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, *In re Mallinckrodt PLC*, No. 20-12522 (JTD) (Bankr. D. Del. Jan. 6, 2022), ECF No. 6066 (confirmed plan enjoining claims against insurers as to policies transferred to settlement trust); *In re Maremont Corp.*, 601 B.R. 1, 77, 102-03 (Bankr. D. Del. 2019) (same); *In re Duro Dyne Nat'l Corp.*, 2020 WL 6270691, at *12 (same); *In re ABB Lummus Glob. Inc.*, No. 06- 10401-JKF, 2006 WL 2052409, at *17–20 (Bankr. D. Del. June 29, 2006) (order confirming plan with same); *see also MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93–94 (2d Cir. 1988) (affirming district court decision affirming insurance injunctions issued by the Manville bankruptcy court).

It is thus not surprising that the Lujan Claimants cite no case where direct-action claims were carved out of injunctions for claims against insurance companies, despite such injunctions being common in mass-tort cases for decades.  Instead, the Lujan Claimants cite *Evans v. TIN, Inc.*, No. 11-2067 C/W, 2012 WL 2343162 (E.D. La. June 20, 2012), *Wadsworth v. Allied Professionals Ins. Co*, 748 F.3d 100 (2d Cir. 2014), and *Reis v OOIDA Risk Retention Grp., Inc.*, 814 S.E.2d 338 (Ga. 2018). Lujan Br. at 48–51.  But as the District Court observed, *Evans* improperly fails to give due weight to relevant precedent; *Wadsworth* and *Reis* were not decided under an MFA analysis; and all three cases construed non-Guam statutes and thus have "no binding, and little persuasive, effect" here.  A00132–137 (District Ct. Op.) (quoting *Heikkila v. Sphere Drake Ins. Underwriting Mgmt., Ltd.*, No. CIV. 96-00047, 1997 WL 995625, at *4 n.4 (D. Guam Aug. 29, 1997) for statement that case law pertaining to Louisiana direct-action statute "has no binding, and little persuasive, effect" on the Guam direct-action statute).[46]

---

[46] Alternatively, the Lujan Claimants assert, for the first time, that the Guam direct-action statute is "deemed to be part of every liability policy governed by Guam law." On this basis, they argue the sale of the polices under section 363(f) is equivalent to modifying or rescinding the policies after a known loss.  Lujan Br. at 59–60.  The Lujan Claimants provide no support for this point (and, in any event, make no showing that Guam law would apply to any of the relevant policies).  The sole case the Lujan Claimants cite is a Wisconsin state court case interpreting the scope of Wisconsin's direct-action statute, *Decade's Monthly Income & Appreciation Fund v. Whyte & Hirschboeck, S.C.*, 495 N.W.2d 335, 339–40 (Wisc.1993).  Even if a Wisconsin court's analysis of a Wisconsin statute were relevant to this issue,

In sum, the Lujan Claimants' arguments regarding the MFA are unpersuasive, and the cases on which they rely are readily distinguishable.  Consequently, this Court should affirm the lower courts' holdings that the MFA does not apply here.

## VI.    The Bankruptcy Court Correctly Approved the Settling Insurer Settlements

### A.    The Abuse Insurance Policies and Their Proceeds Are Property of the Bankruptcy Estate.

Standard of Review:  The Lujan Claimants acknowledge that BSA's Abuse Insurance Policies are property of the bankruptcy estate, but assert that (i) the *proceeds* of those Policies, (ii) Local Council Abuse Insurance Policies, and (iii) BSA Abuse Insurance Policies that were partially released pre-petition are not property of the bankruptcy estate under Section 541 of the Bankruptcy Code and, therefore, may not be disposed of free and clear under Sections 363, 1123, or 1129 of the Code.  Lujan Br. at 53–56, 64–68.  This assertion raises issues of statutory interpretation; the standard of review is therefore *de novo*.  *Highmark, Inc.*, 276 F.3d at 166.

Argument:  The Bankruptcy Code and Third Circuit law make clear that the Lujan Claimants' argument has no merit.

First, the Third Circuit has repeatedly rejected the Lujan Claimants' attempt

---

*Decade's Monthly* confirms that the direct action statute is merely procedural, *id.* at 702, and nowhere states that it somehow confers substantive policy rights on injured claimants.

to distinguish between insurance policies and their proceeds. It is well established that, "the proceeds of a debtor's liability insurance policies are considered property of its bankruptcy estate." *In re W.R. Grace*, 475 B.R. at 81 (citing *In re Nutraquest, Inc.*, 434 F.3d 639, 647 n.4 (3d Cir. 2006)); *see also In re Caribbean Petroleum Corp.*, 580 F. App'x 82, 88 n.5 (3d Cir. 2014). The *only* potential exception to that rule is when a policy only insures and pays out to non-debtors. *In re Nutraquest, Inc.*, 434 F.3d at 647 n.4. The Bankruptcy Court and District Court correctly found that exception inapplicable here, where the Debtor is a named insured and has a right to policy proceeds. *See* A00604–605 (Bankr. Confirmation Op.); A00048 (District Ct. Op.).

Second, the Lujan Claimants' argument that the Local Councils' Abuse Insurance Policies are not property of the estate fails, because Local Councils assigned those policies to the estate pursuant to the Plan. *See* A00949–950 (Plan at Art. V.S.4). Property assigned to a debtor post-petition unquestionably becomes property of the estate. *See, e.g.*, *In re CBI Holding Co.*, 529 F.3d 432, 459 (2d Cir. 2008) (holding that a creditor's claims that were assigned to debtor properly became property of the estate under section 541(a)(7) and explaining that, "[a]llowing a debtor's creditors to assign their claims for the benefit of the debtor's estate permits debtors, creditors, and bankruptcy courts the flexibility in reorganizing or liquidating a debtor's assets necessary to achieve efficient administration of the

reorganization").

The Lujan Claimants cite *In re Porrett*, 564 B.R. 57 (Bankr. D. Idaho 2016), and *In re Neidorf*, 534 B.R. 369 (9th Cir. BAP 2015), but overlook that both cases neither involved Chapter 11 bankruptcy reorganizations, insurance policy proceeds, nor assignment of the rights to such policies for the administration of a reorganization. Rather, both cases involved post-discharge consent decrees entitling debtors to settlement payments, and the courts there examined whether the payments were sufficiently traceable to any prepetition conduct or interests. These cases are irrelevant to whether the assignment of insurance policies and their proceeds are property of the estate. As the lower courts previously recognized, "[a]ny Local Council Insurance Policies, once assigned to BSA in connection with the Plan, will be property of the estate."  A00600 (Bankr. Confirmation Op.) (citing 11 U.S.C. § 541(a)(7)) (property of the estate includes "[a]ny interest in property that the estate acquires after the commencement of the case"); A00098 (District Ct. Op.) ("BSA's residual interest is indisputably "property of the estate").

Moreover, under Section 363(f)(2), a debtor may sell property free and clear where such entity has consented to the sale.  Here, all entities with rights under the Abuse Insurance Policies—Local Councils, Contributing Chartered Organizations, Participating Chartered Organizations, and Settled Insurers—have all affirmatively consented to the sale of the Abuse Insurance Policies. *See* A00944–945 (Plan at Art.

69

V.S.1.a–c).  The rights of Opt-Out Chartered Organizations provided under their independent policies are ***not*** being assigned, sold, or released under the Plan.  *See* A00947 (Plan at V.S.1.g).

Third, the Lujan Claimants' assertion that Debtors released their coverage rights under 1976 and 1977 Abuse Insurance Policies issued by Hartford, and thus that those policies are not property of the estate, is baseless.  BSA has ongoing rights in these policies, specifically including rights for non-Abuse Claims.  *See* A09459, A09509-A09512 (Am. Disclosure Statement to Fifth Am. Plan).

**B.      The Bankruptcy Court Properly Determined That the Lujan Claimants' Interests Were Adequately Protected and That the Best Interests of Creditors Test Was Satisfied.**

Because their argument relies upon a misconstruction of Section 1129(a)(7), the Lujan Claimants' best-interests test argument should be summarily rejected.  *See* Lujan Br. at 70–74.  The FCR, Coalition, and Pfau/Zalkin Claimants adopt in full and incorporate herein the arguments of the Debtor with respect to the best interests test [Debtors' Brief at Argument VII].

Similarly, the Lujan Claimants' argument that their interests are not adequately protected by the Section 363(f) sale of insurance policies, relies on the incorrect assertion that they have prejudgment and priority direct action rights under Guam law.  The Bankruptcy Court and the District Court both approved the sale of the BSA Insurance Policies free and clear of the Lujan Claimants' direct-action

rights pursuant to Section 363 of the Bankruptcy Code. *See* A00624 (Bankr. Confirmation Op.); A00132 (District Ct. Op.). As such, the FCR, Coalition, and Pfau/Zalkin Claimants adopt in full and incorporate herein the arguments of the Debtor with respect to adequate protection of creditors [Debtors' Br. at Argument VI.C].

## VII.    The Bankruptcy Court Had Subject Matter Jurisdiction to Approve the Scouting-Related Releases and Channeling Injunction

Standard of Review: The Lujan Claimants and D&V Claimants argue that the Bankruptcy Court lacked subject matter jurisdiction to approve the Scouting-Related Releases and Channeling Injunction. "Whether subject matter jurisdiction exists is a question of law, and thus [the] standard of review is *de novo*." *In re W.R. Grace & Co.*, 591 F.3d 164, 170 n.7 (3d Cir. 2009).

Argument: It is well established that bankruptcy court jurisdiction extends to: (i) cases under title 11; (ii) proceedings "arising under" title 11; (iii) proceedings "arising in" a case under title 11; and (iv) proceedings "related to" a case under title 11. 28 U.S.C. § 1334; *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 264 (3d Cir. 1991). The Bankruptcy Court and District Court correctly determined that the Bankruptcy Court had "arising under" and "arising in," and "related to" jurisdiction to approve the Scouting-Related Releases and Channeling Injunction.

With respect to "arising under" and "arising in" jurisdiction to confirm the Plan as well as the Scouting-Related Releases, as the precedent makes clear,

Bankruptcy Courts "unquestionably [have] jurisdiction to consider and confirm [a] Plan." *In re Am. Fam. Enterprises*, 256 B.R. 377, 405 (D.N.J. 2000); *see also In re 710 Long Ridge Rd. Operating Co., II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *12–13 (Bankr. D.N.J. Mar. 5, 2014) ("Clearly, bankruptcy courts may enter orders and judgments to confirm a plan."). Confirmation of a plan is a proceeding that, by its very nature, can only arise in the context of a chapter 11 proceeding. Whether a chapter 11 plan containing third-party releases and a channeling injunction can be confirmed implicates various provisions of the Bankruptcy Code, including sections 105, 1123, and 1129.

Moreover, the Bankruptcy Court also had "related to" jurisdiction to grant the Scouting-Related Releases and Channeling Injunction. Proceedings "related to" a chapter 11 case include "suits between third parties that conceivably may have an effect on the bankruptcy estate." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 226 (3d Cir. 2004). "Bankruptcy jurisdiction will exist so long as it is possible that a proceeding may impact on 'the debtor's rights, liabilities, options, or freedom of action' or the 'handling and administration of the bankrupt estate.'" *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 264 (3d Cir. 1991) (citing *In re Smith*, 866 F.2d 576, 580 (3d Cir.1989)). As noted by the District Court, the Third Circuit has "instructed that third-party claims against non-debtors are 'related to' a bankruptcy case where the action against the non-debtor 'affect[s] the bankruptcy [] without the

intervention of yet another lawsuit.'" A00083 (District Ct. Op.).

"Related to" jurisdiction exists to grant the Scouting-Related Releases and Channeling Injunction for a number of reasons. First, there is an identity of interest between the Debtors and the released parties. As the Bankruptcy Court found, "it takes all three constituencies—BSA, Local Councils and Chartered Organizations—to deliver the Scouting program." A00633 (Bankr. Confirmation Op.). The Debtors cannot deliver the mission of Scouting without the support of the Local Councils, which organize, operate, and promote Scouting, and Chartered Organizations, which sponsor local Scouting units. Indeed, prior to the Petition Date, "plaintiffs often treated BSA, Local Councils and Chartered Organizations as jointly responsible for Direct Abuse Claims, pleading that each was responsible for the conduct not only of themselves, but of others." *Id*. Given this interconnectedness, a suit against a Local Council or Chartered Organization could have an immediate impact on BSA.

In addition, the Debtors have shared insurance policies with Local Councils and Chartered Organizations. Abuse Claims asserted against the Local Councils and Chartered Organizations may deplete the Debtors' insurance policies, which are assets of the Debtors' estates. *See, e.g.*, *Acands, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260 (3d Cir. 2006). As the District Court recognized, a reduction of the Debtors' available insurance coverage without the need for an intervening action "is precisely the type of effect on the estate that can adversely affect the Debtor's

reorganization and provide the basis for 'related to' jurisdiction." A00092 (District Ct. Op.).

"Related to" subject matter jurisdiction also exists by virtue of BSA's residual interest in Local Council property. Under BSA's bylaws and rules and regulations, as well as the form bylaws for Local Councils, BSA has a contingent, reversionary interest in Local Council property, which would become a possessory interest if the Local Council is dissolved or its charter lapses. This residual interest constitutes property of the estate. Thus, any Abuse Claim that diminishes the assets of a Local Council will also diminish the assets of the Debtors' estates.

Finally, the Chartered Organizations have asserted contractual claims for indemnification arising out of their relationship with BSA and the Local Councils. BSA resolved to defend and indemnify Chartered Organizations and their employees, directors, officers, members, and volunteers in certain circumstances pursuant to BSA's October 30, 2013 resolution. A00635 (Bankr. Confirmation Op.). Local Councils agreed to indemnify Chartered Organizations in the Annual Unit Charter Agreement. *Id.* Such indemnification claims are sufficient to establish "related to" jurisdiction over Abuse Claims against the Chartered Organizations. *See In re W.R. Grace & Co.*, 315 B.R. 353, 359–360 (Bankr. D. Del. 2004) (finding "related to" jurisdiction where an action triggered the debtors' contractual obligation to indemnify a third party).

The Lujan Claimants and D&V Claimants rely on *Combustion Engineering* for the proposition that the Bankruptcy Court lacks "related to" jurisdiction. *See* Lujan Br. at 13; D&V Br. at 28. In *Combustion Engineering*, the Third Circuit held that the bankruptcy court lacked "related to" jurisdiction over asbestos-related personal injury claims against non-debtor affiliates where the claims against the debtor and non-debtor affiliates "arose from different products, involved different asbestos-containing materials, and were sold to different markets." *In re Combustion Eng'g, Inc.*, 391 F.3d at 231. Unlike *Combustion Engineering*, the Abuse Claims subject to the Scouting-Related Releases and Channeling Injunction all involve abuse related to Scouting. Accordingly, as the Bankruptcy Court correctly found, claims against the Local Councils and Chartered Organizations "are not wholly separate from claims against BSA and therefore are 'derivative' for the purposes of the channeling injunction." A00653 (Bankr. Confirmation Op.).

In sum, the key inquiry in determining whether "related to" jurisdiction exists is whether a lawsuit involving third parties *conceivably* may affect the bankruptcy estate. For the foregoing reasons, it is conceivable that Abuse Claims against the Settling Insurers, Local Councils, and Chartered Organizations will impact the Debtors' estates. Accordingly, the Bankruptcy Court and District Court did not err in concluding that the Bankruptcy Court had subject matter jurisdiction to approve the Scouting-Related Releases and Channeling Injunction.

**VIII.    The Bankruptcy Court Had Statutory Authority to Approve the Scouting-Related Releases and Channeling Injunction**

Standard of Review:  The Lujan Claimants and D&V Claimants argue that the Bankruptcy Court lacked statutory authority to grant the Scouting-Related Releases and Channeling Injunction.  The Bankruptcy Court's conclusion that it had such statutory authority is a legal determination, which is reviewed by this Court *de novo*. *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 133 n. 5 (3d Cir. 2019).

Argument:   The Bankruptcy Court and District Court correctly held that sections 105(a), 1123(a)(5), and 1123(b)(6) provided the Bankruptcy Court statutory authority to grant the Scouting-Related Releases and Channeling Injunction.

Section 105(a) of the Bankruptcy Code grants the bankruptcy court with broad authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the [Bankruptcy Code]."  11 U.S.C. § 105(a).  This provision gives bankruptcy courts the power to "craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain." *Chinery*, 330 F.3d at 568.  The Third Circuit has interpreted section 105(a) of the Bankruptcy Code to permit non-consensual releases and channeling injunctions where such releases and injunctions are necessary to the reorganization and fair.  *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011); *see also In re Mallinckrodt PLC*, 639 B.R. 837, 874 (Bankr. D. Del. 2022) (finding that the use of non-consensual non-debtor releases under the circumstances of the case was

76

"precisely the situation envisioned by Section 105(a)"); *In re Am. Fam. Enterprises*, 256 B.R. at 408 (approving a channeling injunction pursuant to section 105(a) of the Bankruptcy Code).

In addition to section 105(a), the Bankruptcy Court had statutory authority to approve third-party releases and channeling injunctions pursuant to sections 1123(a)(5) and 1123(b)(6) of the Bankruptcy Code. Section 1123(a)(5) provides that a plan shall "provide adequate means for the plan's implementation," and section 1123(b)(6) states that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of the [Bankruptcy Code]." 11 U.S.C. § 1123(a)(5), 1123(b)(6). The Scouting-Related Releases and Channeling Injunction are the cornerstone of the Plan and integral to its implementation. No provision of the Bankruptcy Code prohibits such releases and injunction. Therefore, the Scouting-Related Releases and Channeling Injunction are appropriate under sections 1123(a)(5) and 1123(b)(6).

The D&V Claimants cite *Law* and *Czyzewski* in support of the proposition that the bankruptcy court has no residual or inherent authority to grant non-debtor releases. D&V Br. at 42–44. These cases are distinguishable. In *Law*, the bankruptcy court surcharged a homestead exemption as a result of the debtor's misconduct. *Law v. Siegel*, 571 U.S. 415, 420 (2014). The Supreme Court found that, in doing so, the bankruptcy court violated the express terms of section 522 of

the Bankruptcy Code, exceeding the limits of its authority under section 105(a). *Id.* at 422. In *Czyzewksi*, the bankruptcy court approved a dismissal order that provided for distributions that did not follow the Bankruptcy Code's priority scheme. *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 454–55 (2017). The Supreme Court held that the bankruptcy court did not have the power to deviate from the priority rules set forth in the Bankruptcy Code. *Id.* at 455. In each of these cases, the bankruptcy court used its equitable powers to grant relief that conflicted with the Bankruptcy Code. However, in this case, unlike *Law* and *Czyzewksi*, the Scouting-Related Releases and Channeling Injunction do not contravene any provision of the Bankruptcy Code.

For the reasons set forth above, the Bankruptcy Court had statutory authority to approve the Scouting-Related Releases and Channeling Injunction.

## IX. The Scouting-Related Releases and Channeling Injunction Satisfy the Standard for Approval of Non-Consensual Third-Party Releases

Standard of Review: The Lujan Claimants and D&V Claimants argue that the Scouting-Related Releases and Channeling Injunction do not satisfy the standard for approval of non-consensual third-party releases. "Courts review the approval of releases and injunctions for clear error." *In re Exide Holdings, Inc.*, No. 20-11157-CSS, 2021 WL 3145612, at *12 (D. Del. July 26, 2021).

Argument: The Bankruptcy Court and District Court did not err in concluding that the Scouting-Related Releases and Channeling Injunction satisfy the standards

78

for approval of non-consensual third-party releases. Under Third Circuit law, such releases are appropriate where the hallmarks of fairness and necessity to the reorganization are present and the bankruptcy court makes specific factual findings to support these conclusions. *In re Cont'l Airlines*, 203 F.3d 203, 214 (3d Cir. 2000). In determining whether the hallmarks of permissible non-consensual releases are present, courts in this district examine the factors set forth in *Master Mortgage* (the "Master Mortgage Factors"). *See In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 584 (D. Del. 2018). These factors, which are set forth below, are "helpful guideposts" but are not "an exclusive list of considerations, nor are they a list of conjunctive requirements." *Id.* (citing *In re Master Mortg. Inv. Fund, Inc.,* 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)).

The Bankruptcy Court concluded that the Scouting-Related Releases and Channeling Injunction satisfied the *Continental* and *Master Mortgage* factors. The Bankruptcy Court's conclusions were supported by detailed factual findings based on an extensive evidentiary record. The D&V Claimants and Lujan Claimants cannot establish that these findings are clearly erroneous. Accordingly, for the reasons set forth below, the Bankruptcy Court's approval of the Scouting-Related Releases and Channeling Injunction should be upheld.

A.    **Master Mortgage Factors.**

1.    **Identity of Interest Between the Debtors and Released Parties.**

The Bankruptcy Court correctly concluded that there is an identity of interest between the Debtors and the parties receiving the benefit of the Scouting-Related Releases.  The evidence presented during the Confirmation Hearing established that: (i) BSA, Local Councils, and Chartered Organizations are interrelated and that it takes all three levels of organization to deliver Scouting; (ii) prepetition, plaintiffs, including the D&V Claimants and Lujan Claimants, often sued BSA, Local Councils, and Chartered Organizations together; (iii) BSA took on the defense of claims brought prepetition and settled those claims on behalf of BSA, Local Councils, and Chartered Organizations; and (iv) from 1976 forward, BSA included Local Councils and Chartered Organizations as additional insureds under BSA's insurance policies.  A00646–A649 (Bankr. Confirmation Op.).  With respect to Settling Insurers, the Bankruptcy Court found that they shared an identity of interest with the Debtors given that they are the Debtors' insurers.  A00648 (Bankr. Confirmation Op.).  The Bankruptcy Court further held that the Non-Debtor Related Entities each served a specific function for BSA and/or Local Councils and there is no record that any of the Non-Debtor Related Entities was involved in anything other than Scouting.  *Id.*  Finally, BSA's Representatives also share an identity of interest with the Debtors as they have both indemnification and advancement rights against

80

the Debtors.  *Id.*

## 2.    Contribution of Substantial Assets to the Reorganization.

The Bankruptcy Court found that the monetary and non-monetary contributions made by the Settling Insurers, the Local Councils, and the Chartered Organizations were substantial.  A00653 (Bankr. Confirmation Op.).  Specifically, these contributions include $1.656 billion from the Settling Insurers, $655 million from the Local Councils, $30 million from the United Methodist Entities, and BSA's, Local Councils' and the Contributing and Participating Chartered Organizations' rights in BSA's insurance policies and their own policies.  *Id.* Without the contributions from these parties, the Plan would not be confirmable.  *In re 710 Long Ridge Rd. Operating Co., II, LLC*, 2014 WL 886433, at *15 (finding a substantial contribution where the non-debtor parties provided critical financial contributions necessary to make the plan feasible).  The Bankruptcy Court did not err in concluding that the foregoing contributions were substantial.

The D&V Claimants' and Lujan Claimants' argument that the parties receiving the benefit of the Scouting-Related Releases are not contributing substantial assets is belied by the record.  The Bankruptcy Court made detailed factual findings supporting the conclusion that the Settling Insurers, Local Councils, the Chartered Organizations, and the Related Non-Debtor Entities and their Representatives made substantial contributions.  A00653–661 (Bankr. Confirmation

81

Op.).  The D&V Claimants and Lujan Claimants have not established that these findings are clearly erroneous.

### 3.    The Releases and Injunctions Are Essential to the Reorganization.

The Bankruptcy Court also correctly concluded that the third *Master Mortgage* Factor—the essential nature of the releases and injunctions to the reorganization—was satisfied.  Numerous courts have approved third-party releases where, as here, the absence of such releases would result in the loss of critical funds for a proposed reorganization.  *See, e.g.*, *In re Am. Fam. Enters.*, 256 B.R. at 392; *In re Residential Cap., LLC,* 508 B.R. 838, 850 (Bankr. S.D.N.Y. 2014); *In re Union Fin. Servs. Grp., Inc*., 303 B.R. 390, 428 (Bankr. E.D. Mo. 2003).

The Scouting-Related Releases and Channeling Injunction are "the cornerstone of the Plan."  A00667–668 (Bankr. Confirmation Op.).  Absent these provisions, the Settling Insurers, Local Councils, and Chartered Organizations would not have made their significant contributions to the Plan, and the Settlement Trust would not have sufficient assets to make meaningful distributions to survivors of abuse.  *See* A00664, A00667 (Bankr. Confirmation Op.).  In addition, without the Scouting-Related Releases and Channeling Injunction, the viability of BSA would be jeopardized.  BSA's business plan and financial projections are premised upon the Plan.  A00666 (Bankr. Confirmation Op.).  The Bankruptcy Court found that, "[m]embership drives BSA's finances, which in turn depends on Local Councils and

Chartered Organizations to both maintain and recruit Scouts." *Id.*  The Local Councils' collective contribution to the Settlement Trust ensures that Local Councils themselves do not file for bankruptcy and that the Chartered Organizations remain with the Scouting program.  A00668 (Bankr. Confirmation Op.).  In light of the "interconnected nature of the delivery of Scouting," the existence of the Local Councils and continued Chartered Organization affiliation is "critical to the BSA's existence as a national organization." *Id.*  The recruiting that occurs at the local level "ensures membership and, relatedly BSA's fiscal viability." *Id.*  Finally, absent the settlement of insurance coverage issues and corresponding releases and injunctions reflected in the Plan, the chapter 11 cases "would devolve into a morass of coverage litigation, and recoveries to holders of Abuse Claims would be delayed for countless years." *Id*.

### 4.    A Substantial Majority of the Impacted Creditors Agree.

The Bankruptcy Court found that, in light of the "highly charged nature" of these cases, the overall acceptance rates reflected that a substantial majority of impacted creditors supported the Plan.  A00662 (Bankr. Confirmation Op.).  The Bankruptcy Court did not err in coming to this conclusion.  85.72% of Direct Abuse Claims and 82.41% of Indirect Abuse Claims who voted accepted the Plan.  *Id.*  In addition to obtaining the overwhelming support of abuse survivors, the Future Claimants' Representative supports the Plan, which support should be afforded

significant deference.

The Lujan Claimants and D&V Claimants argue that votes of at least 90% are required to satisfy this *Master Mortgage* Factor.  *See* Lujan Br. at 38; D&V Br. at 59.  However, bankruptcy courts have approved non-consensual releases where less than 90% of the impacted class accepts the plan.  *See, e.g.*, *In re The Weinstein Co. Holdings, LLC*, No. 18-10601 (MFW) (Bankr. D. Del. Jan. 26, 2021), ECF No. 3203 (finding overwhelming support where 82% of impacted creditors voted to accept the plan); *In re TK Holdings*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018), ECF No. 2120 (approving non-consensual releases with 74–78.18% of affected creditors voting in favor of the plan).

### 5.    Payment of All, or Substantially All, of the Claims of Affected Classes.

Courts have found the final *Master Mortgage* Factor satisfied where the plan provides for significant distributions to affected claimants that would otherwise be unavailable or substantially reduced, even if the claimants do not receive payment in full.  *See, e.g.*, *In re Mallinckrodt PLC*, 639 B.R at 871 (approving a third-party release where creditors would likely receive more than they would in an alternative scenario); *In re 710 Long Ridge Rd. Operating Co.*, II, LLC, 2014 WL 886433, at *16 (approving a third-party release where all classes of claims were receiving payments in excess of the liquidation value of their claims); *In re Millennium Lab Holdings II, LLC*, 591 B.R. at 586 (approving a third-party release where the

payments and distributions under the plan "dwarfed any recoveries for [the impacted class] in a wipeout liquidation").

The Settlement Trust will be funded with over $2.5 billion in cash, plus the assignment of insurance rights. The Settlement Trust and TDPs establish a process that will allow holders of Abuse Claims to access these funds while avoiding the significant litigation costs that would otherwise dilute their recoveries. Collectively, the Plan, TDP, and Settlement Trust Agreement provide a mechanism that will ultimately result in the payment of all, or substantially all, of the Abuse Claims. Accordingly, the Bankruptcy Court did not err in determining that the final *Master Mortgage* Factor was satisfied.

### B.    The *Continental* Hallmarks.

The Bankruptcy Court made specific factual findings that the Scouting-Related Releases and Channeling Injunction were necessary to the reorganization and fair. The Bankruptcy Court's conclusion that such provisions are necessary to the reorganization was not erroneous. The Local Councils, Chartered Organizations, and Settling Insurers are contributing more than $2.5 billion in cash, plus the assignment of insurance rights. These contributions would not have been made without the Scouting-Related Releases and Channeling Injunction. A00664–667 (Bankr. Confirmation Op.). Moreover, absent the Scouting-Related Releases and Channeling Injunction, the Settling Insurers would not settle their liability, and the

cases would be mired in coverage litigation, delaying recoveries to survivors for "countless years." A00668, A00676 (Bankr. Confirmation Op.). In addition, the evidence was uncontroverted that, "without releases for Local Councils and Chartered Organizations, BSA is likely to suffer a drop in membership, significantly affecting revenue and putting into serious question BSA's ability to continue as a national organization." A00676–677 (Bankr. Confirmation Op.). Thus, the Scouting-Related Releases and Channeling Injunction are necessary to the reorganization.

The D&V Claimants and Lujan Claimants argue that the Scouting-Related Releases and Channeling Injunction are not essential to the reorganization because the Debtors previously proposed the toggle plan, which did not contain such provisions. *See* Lujan Br. at 32–33; D&V Br. at 56–57. Even if the toggle plan were feasible, this does not mean such a plan would be confirmable. A00669 (Bankr. Confirmation Op.). The Bankruptcy Court correctly determined that the toggle plan was "not a true resolution and would leave claimants racing to the courthouse, filing suits across the country, and BSA in shambles." *Id.*

In addition, the Bankruptcy Court did not err in finding that the Scouting-Related Releases and Channeling Injunction are fair. The Plan allows BSA to emerge with a renewed focus on achieving its mission. At the same time, the Plan adequately compensates survivors by providing a mechanism for payment of all or

86

substantially all of Direct Abuse Claims.  *See* A00677 (Bankr. Confirmation Op.).

Abuse survivors overwhelmingly voiced their support for the Plan, with 85% voting

to accept the Plan, further establishing the fairness of the Scouting-Related Releases

and Channeling Injunction.  In addition, the Plan provides "for a more equal

treatment across claimants[,] who will be assessed consistently under the TDP." *Id.*

Ultimately, the Bankruptcy Court's findings that the Scouting-Related

Releases and Channeling Injunction are fair and necessary to the reorganization are

supported by the extensive evidentiary record of the Confirmation Hearing.  The

Lujan Claimants and D&V Claimants have failed to establish that the Bankruptcy

Court's findings are clearly erroneous.  Accordingly, the Scouting-Related Releases

and Channeling Injunction satisfy the *Continental* hallmarks and should be upheld.

## CONCLUSION

For the foregoing reasons, the FCR, the Coalition, and the Pfau/Zalkin

Claimants respectfully ask the Court to affirm the Plan.

Dated:  October 27, 2023

Respectfully Submitted,

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
*/s/Robert S. Brady*
Robert S. Brady (DE No. 2847)
Edwin J. Harron (DE No. 3396)

87

Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
eharron@ycst.com

-and-

Kami E. Quinn
Emily P. Grim
GILBERT LLP
700 Pennsylvania Ave, SE
Suite 400
Washington, DC 20003
Telephone: (202) 772-2200
Facsimile: (202) 772-3333
Email: quinnk@gilbertlegal.com
grime@gilbertlegal.com

*Counsel to the Future Claimants'
Representative*

/s/Rachel B. Mersky
Rachel B. Mersky (DE No. 2049)
MONZACK MERSKY AND BROWDER,
PA
1201 North Orange Street
Suite 400
Wilmington, Delaware 19801
Telephone: (302) 656-8162
Facsimile: (302) 656-2769
Email: Rmersky@Monlaw.com

*Counsel for the Coalition of Abused Scouts
for Justice*

/s/David M. Klauder
David M. Klauder (DE No. 5769)
88

BIELLI & KLAUDER, LLC
1204 N. King Street
Wilmington, Delaware 19801
Tephone: (302) 803-4600
Email: dklauder@bk-legal.com

-and-

Thomas E. Patterson
Daniel J. Bussel
KTBS LAW LLP
1801 Century Park East
Twenty-Sixth Floor
Los Angeles, California 90067
Telephone: (310) 407-4000
Facsimile: (310) 407-9090
Email: tpatterson@ktbslaw.com
dbussel@ktbslaw.com

*Counsel for The Zalkin Law Firm, P.C. and
Pfau Cochran Vertetis Amala PLLC*

## CERTIFICATION OF COMPLIANCE

The foregoing brief was prepared on a computer using Microsoft Word. A proportionally spaced typeface was used, as follows:

Name of typeface:   Times New Roman
Point size:   14
Line spacing:   Double

The total number of words in the brief, excluding the items set forth in Federal Rule of Appellate Procedure 32(f), is 21,316.

## CERTIFICATION OF BAR MEMBERSHIP

I certify, pursuant to 3d Cir. L.A.R. 46.1(e), that at least one of the attorneys whose names appear on the brief for each party is a member of the bar of this court or has filed an application for admission pursuant to that rule.

## CERTIFICATION OF IDENTICAL COPIES

I hereby certify, pursuant to 3d Cir. L.A.R. 31.1(c), that the text of the PDF filed and hard copies of this brief are identical.

## CERTIFICATION OF VIRUS CHECK

I hereby certify, pursuant to 3d Cir. L.A.R. 31.1(c), that a virus check was performed on the electronic copy of this brief, using Metadact, and that no virus was indicated.

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 27, 2023, the foregoing brief was caused to

be served on all counsel of record via the Court's CM/ECF system.


YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert S. Brady*
Robert S. Brady (DE No. 2847)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:  rbrady@ycst.com

*Counsel to the Future Claimants' Representative*

Dated:  October 27, 2023