---

# United States Court of Appeals for the Third Circuit

---

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,

*Debtors.*

---

LUJAN CLAIMANTS, ET AL.,

*Appellants,*

-v.-

BOY SCOUTS OF AMERICA, ET AL.,

*Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE (CASE NO. 22-CV-01237)

---

**SUPPLEMENTAL BRIEF OF APPELLEE THE FUTURE CLAIMANTS'
REPRESENTATIVE REGARDING THE EFFECT OF *HARRINGTON V.
PURDUE PHARMA L.P.***

---

Robert S. Brady (DE No. 2847)
Edwin J. Harron (DE No. 3396)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:        rbrady@ycst.com
                   eharron@ycst.com

-and-

Kami E. Quinn
Emily P. Grim
GILBERT LLP
700 Pennsylvania Ave, SE
Suite 400
Washington, DC 20003
Telephone:  (202) 772-2200
Facsimile:  (202) 772-3333
Email:        quinnk@gilbertlegal.com
                   grime@gilbertlegal.com

*Counsel to the Future Claimants' Representative*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................1

ARGUMENT ...........................................................................................2

  I.  *Purdue* Has No Impact on the Boy Scouts' Plan. ...........................2

  II.  *Purdue* Does Not Impact the Plan's Judgment Reduction Provisions. .......10

     A.  *Purdue* Does Not Require Allianz's Preferred Plan Language. .........11

     B.  *Purdue* Did Not Eliminate a Court's Ability to Bar Claims Against Settled Parties. ....................................14

  III.  *Purdue* Does Not Impact the Plan's Treatment of the Lujan Claimants' Direct Action Rights Against Insurers. ..........................17

     A.  The Lujan Claimants Have No Claims Against the Insurers. ............18

     B.  *Purdue* Does Not Impact a Debtor's Ability to Sell Estate Property Pursuant to Section 363 of the Bankruptcy Code. ....................................................20

     C.  The Plan Still Does Not Violate the McCarran-Ferguson Act. ....................................20

CONCLUSION ......................................................................................22

CERTIFICATION OF COMPLIANCE ................................................23

CERTIFICATION OF BAR MEMBERSHIP .......................................23

CERTIFICATION OF VIRUS CHECK ...............................................23

CERTIFICATION OF SERVICE ..........................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Begier v. I.R.S.*,
  496 U.S. 53 (1990)............................................................................4

*In re Boy Scouts of America*,
  No. 20-10343 (LSS) (Bankr. D. Del. Apr. 29, 2024), ECF No.
  12033........................................................................................6

*In re Boy Scouts of America*,
  No. 22-1237-RGA, 2023 WL 6442586 (D. Del. Oct. 3, 2023).......................7, 8

*In re Boy Scouts of America*,
  642 B.R. 504 (Bankr. D. Del. 2022)....................................................18

*In re Continental Airlines*,
  91 F.3d 553 (3d Cir. 1996) ............................................................3, 6

*Eichenholtz v. Brennan*,
  52 F.3d 478 (3d Cir. 1995) ...........................................................15, 16

*In re Envirodyne Industries, Inc.*,
  29 F.3d 301 (7th Cir. 1994) ............................................................9

*In re Fraser's Boiler Service, Inc.*,
  Nos. 3:18-CV-05638 BHS & 3:18-cv-05637-RBL, 2019 WL
  1099713 (W.D. Wash. Mar. 8, 2019) ................................................16, 17

*Gerber v. MTC Electronic Technologies Co.*,
  329 F.3d 297 (2d Cir. 2003) ............................................................16

*Harrington v. Purdue Pharma L.P.,*
  144 S. Ct. 2071 (2024) ...............................................................*passim*

*Harris v. Union Electric Co.*,
  846 F.2d 482 (8th Cir. 1988) ...........................................................19

*In re Munford, Inc.*,
  97 F.3d 449 (11th Cir. 1996) ...........................................................15

iv

*Nordhoff Investments, Inc. v. Zenith Elecs. Corp.*,
   258 F.3d 180 (3d Cir. 2001) ...................................................................6

*In re One2One Communications, LLC*,
   805 F.3d 428 (3d Cir. 2015) ...................................................................7

*In re Philadelphia Newspapers, LLC*,
   690 F.3d 161 (3d Cir. 2012) ...................................................................3

*In re Plant Insulation Co.*,
   469 B.R. 843 (Bankr. N.D. Cal. 2012), *aff'd*, 485 B.R. 203 (N.D.
   Cal. 2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013) ...................13

*In re PNC Financial Services Group, Inc.*,
   440 F. Supp. 2d 421 (W.D. Pa. 2006)..........................................................15, 16

*Taha v. County of Bucks*,
   862 F.3d 292 (3d Cir. 2017) ...................................................................14

*In re Tribune Co.*,
   464 B.R. 126 (Bankr. D. Del. 2011)...........................................................15, 16

*In re Tribune Media Co.*,
   799 F.3d 272 (3d Cir. 2015) ...................................................................3

*U.S. v. Occidental Chem. Corp.*,
   200 F.3d 143 (3d Cir. 1999) ...................................................................19

*In re W.R. Grace & Co.*,
   900 F.3d 126 (3d Cir. 2018) ...................................................................18

**Statutes**

11 U.S.C. § 363 .................................................................................20

11 U.S.C. § 524 .................................................................................13

11 U.S.C. § 1123 ................................................................................15

Guam Code Ann. § 18305 ..........................................................................2

McCarran-Ferguson Act ...........................................................................17, 20, 21

**Other Authorities**

Cir. L.A.R. 31.1(c) .................................................................................23

Cir. L.A.R. 46.1(e) ................................................................................23

Federal Rule of Appellate Procedure 32(f) ............................................23

<u>**PRELIMINARY STATEMENT**</u>

In *Harrington v. Purdue Pharma L.P.*, the Supreme Court answered a very specific question: whether the Bankruptcy Code "authorize[s] a release and injunction that . . . effectively seeks to discharge claims against a nondebtor without the consent of affected claimants." 144 S. Ct. 2071, 2088 (2024). In issuing this ruling, the Supreme Court was careful to explain what its holding did *not* impact: "*consensual* third-party releases offered in connection with a bankruptcy reorganization plan," "what qualifies as a consensual release," or "a plan that provides for the full satisfaction of claims against a third-party nondebtor." *Id.* at 2087-88. Perhaps most significantly, the Court "d[id] not address whether our reading of the bankruptcy code would justify unwinding reorganization plans that have already become effective and been substantially consummated." *Id.* at 2088. Because the Boy Scouts of America's ("BSA") Plan of Reorganization (the "Plan") has gone effective and is substantially consummated, *Purdue* by its express terms has virtually no bearing on it. The Future Claimants' Representative (the "FCR") joins fully in the Debtors' arguments on this point.

The FCR also writes separately to address potential arguments from Allianz Global Risks US Insurance Company, National Surety Corporation, and Interstate Fire & Casualty Company (together, "Allianz") and the Lujan Claimants regarding the Plan's treatment of their theoretical claims against BSA's insurers. Allianz

1

contended, in a June 28, 2024 letter to this Court, that *Purdue* requires modification of the Plan's language (the "Judgment Reduction Clause") enjoining BSA's insurers from bringing contribution and other related claims against those insurers who have entered into settlements with BSA (the "Settling Insurers"). The Lujan Claimants have previously argued that the Plan impermissibly extinguishes their direct action rights against BSA's insurers under Guam's direct action statute, 22 Guam Code Ann. § 18305 ("Guam Direct Action Statute").

Any last-ditch effort by these Appellees to upend the Plan based on *Purdue* is without merit. Nothing in *Purdue* prohibits a bankruptcy court from approving a settlement which bars claims against the settling defendants; indeed, both bankruptcy and non-bankruptcy courts regularly issue such orders. Nor does *Purdue* prevent the bankruptcy court from approving the releases and injunctions applicable to third-party insurers—particularly where, as here, such claims are highly speculative and are more than fully compensated (in the case of Allianz) or do not exist in the first place (in the case of the Lujan Claimants).

Because *Purdue* provides no basis to reverse the District Court's and the Bankruptcy Court's rulings, the Plan should be affirmed.

## ARGUMENT

### I. *Purdue* Has No Impact on the Boy Scouts' Plan.

This Court has long noted the "strong public interest in the finality of

bankruptcy reorganizations." *In re Cont'l Airlines*, 91 F.3d 553, 561 (3d Cir. 1996); *see also In re Phila. Newspapers, LLC*, 690 F.3d 161, 169 (3d Cir. 2012) (explaining that the public policy of affording finality to bankruptcy judgments "encourag[es] investors and others to rely on confirmation orders, thereby facilitating successful reorganizations by fostering confidence in the finality of confirmed plans"), *as corrected* (Oct. 25, 2012). That public interest weighs especially heavy here where thousands of survivors, including Future Abuse Claimants,[1] have come forward to begin the process of healing by seeking compensation, and closure, from the trust created by the confirmed Plan. As the Court explained in *In re Tribune Media Co.*, "the reliable finality of a confirmed and consummated plan allows all interested parties to organize their lives around that fact." *In re Trib. Media Co.*, 799 F.3d 272, 281 (3d Cir. 2015).

Nothing that the Supreme Court said in *Purdue* changes this. The *Purdue* Court in fact went out of its way to make clear that its decision does not affect this case. In response to the BSA's amicus brief urging the Court not to disrupt settled cases, the Court emphasized that its *Purdue* decision "involves only a stayed

---

[1] Future Abuse Claimants are survivors whose abuse occurred before BSA's bankruptcy petition but who, as of the date immediately before the petition, (a) were not 18 years old or (b) were not aware of their abuse claims as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose. *See* A00886 (Plan, Art. I.A.134).

reorganization plan" and does not address plans, like this one, "that have already become effective and been substantially consummated." *Purdue*, 144 S. Ct. at 2088.

Assuring equality of treatment among similarly situated claimants is one of the main goals of bankruptcy law. *See, e.g.*, *Begier v. I.R.S.*, 496 U.S. 53, 58 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code."); *cf. Purdue*, 144 S. Ct. at 2088 (Kavanaugh, J., dissenting) ("Bankruptcy seeks to . . . prevent a race to the courthouse by individual creditors who, if successful, could obtain all of a company's assets, leaving nothing for all the other creditors."). Doing so is particularly important, and particularly difficult, in the context of mass-tort cases like this one. Claims arise over a period of years, if not decades; the Trust's assets and liabilities are constantly in flux; and the first abuse claims submitted to the Trust will receive payment before the Trust knows with any degree of certainty the number and value of Future Abuse Claims. *See* A06813–14 (Patton Decl.).[2]

The FCR supported the Plan in this case because it assures Future Abuse Claimants the same opportunity for compensation and closure that current abuse claimants have. The Plan is fair and equitable to Future Abuse Claimants and "treats Future Abuse Claimants in a manner that is substantially similar to present Abuse

---

[2] References to "A__" refer to the Joint Appendix filed at ECF No. 62.

Claimants." A06803–04 (Patton Decl.); *see also* A06813–15 (Patton Decl.). As the bankruptcy court observed, "[n]o one has argued that the TDP do not treat holders of current claimants and future claimants in substantially the same manner or that future claimants will receive less as a percentage recovery than holders of current claims." A00696 (Bankr. Confirmation Op.). The Plan here provides mechanisms that will help ensure that the Trust will value, and be in a financial position to pay, similar present and future claims in substantially the same manner. A06813–16 (Patton Decl.). These mechanisms include pro rata distributions and structured, periodic, or supplemental payments. A06814 (Patton Decl.). Indeed, the FCR testified in support of confirmation that "his advisors helped him to fashion TDP that ensure that future claimants are treated the same as current claim holders and that they will receive the same recoveries." A00696 (Bankr. Confirmation Op.).

If the Court were to unwind the Plan now, there is no assurance that Future Abuse Claims would ever obtain an equitable recovery. *Cf.* A00677-A00678 ("Without this Plan, litigation goes one of two ways. Claimants may race to courthouses across the country suing Local Councils and Chartered Organizations. . . . Alternatively, as to some claimants, they will recover only the pennies that a BSA-only bankruptcy plan would bring . . . . Neither path is fair.").

Numerous claimants have already sought resolution from the Trust under the framework established for Future Abuse Claimants in reliance on the finality of Plan

confirmation. The Trust began operations on April 19, 2023, and has been accepting future abuse claim eligibility forms for more than eight months. *See* Notice of Filing of the Annual Report and Claims Report of the BSA Settlement Trust Pursuant to the BSA Settlement Trust Agreement, Ex. B at 1, *In re Boy Scouts of Am.*, No. 20-10343 (LSS) (Bankr. D. Del. Apr. 29, 2024), ECF No. 12033. Based on his conferences with the Trustee, the FCR understands that 61 claimants have already submitted Future Abuse Claim eligibility forms. *See* Decl. of Hon. Barbara J. Houser, ¶ 39, Aug. 7, 2024 ("Houser Decl."). The FCR expects many more to come. Holders of Future Abuse Claims are survivors who, by definition, were not before the bankruptcy court and who have been able to come forward for the first time in the Trust context.

It would be completely inequitable to renege on the promises to these individuals now that they have come forward. Courts must "protect[] the interests of non-adverse third parties who are not before the reviewing court but who have acted in reliance on the plan as implemented." *Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 188 (3d Cir. 2001) (citation omitted); *see also Cont'l Airlines*, 91 F.3d at 562 (instructing that third parties' reliance on the finality of plan confirmation is "[h]igh on the list of prudential considerations taken into account by courts considering whether to allow an appeal following a consummated reorganization"). As this Court has repeatedly explained, courts will not unwind an

6

effective and substantially consummated plan when doing so would "(a) fatally scramble the plan and/or (b) *significantly harm third parties who have justifiably relied on the plan's confirmation.*" *In re One2One Commc'ns, LLC*, 805 F.3d 428, 434–435 (3d Cir. 2015) (emphasis added) (citation omitted).

More than 10 months ago, the District Court made an explicit finding that "abuse claimants . . . and numerous other third parties have relied on the Plan's effectiveness." *In re Boy Scouts of Am.*, No. 22-1237-RGA, 2023 WL 6442586, at *9 (D. Del. Oct. 3, 2023). As the District Court explained, by that time the Trust had already "been engaged in all aspects of the claims process, including opening the claims processing portal, collecting responses to questionnaires, . . . processing expedited distribution claims, [and] publicizing the claims review process and impending distributions." *Id.* at *5. The FCR understands that, all told, the Trust has received more than 62,000 claims to date and paid out more than $20,000,000 to more than 5,000 survivors of abuse. *See* Houser Decl., ¶¶ 33 (the Trust has paid $16,268,773 to 5,009 claimants who made the Expedited Distribution election); 39 (57,660 claimants have submitted questionnaires for determination under the settlement matrix); 40 (Trust has paid $5,362,314 to 688 Matrix claimants), 41 (321 claimants timely elected the IRO process and paid the administrative fee).

The process of obtaining resolution from the Trust is thus well underway for both current and Future Abuse Claimants. As noted above, numerous Future Abuse

Claimants are relying on the Plan and the Trust to provide fair compensation for their injuries. But more than that, Future Abuse Claimants are relying on the Plan and the Trust for closure. In its opinion, the bankruptcy court described the "moving, and sometimes painful, testimony in support of the Plan" from abuse survivors who emphasized "the importance of resolution." A00678 (Bankr. Confirmation Op.); *cf. Boy Scouts of Am.*, 2023 WL 6442586, at *9 (denying request to stay Plan consummation because survivors "should not continue to wait for compensation or closure").

At the confirmation hearing, Dr. Kennedy, Co-Chair of the TCC, testified that "as a survivor, I can tell you, having some degree of resolution, it is an important component in your life"[3] and that the Plan "start[ed] the process of closure for survivors[,]" A00679-A00680 (Bankr. Confirmation Op.) ("Q Does the plan['s] potential approval by the Court start the process of closure for survivors? A It does."). Mr. Meidl, a member of the Survivor Working Group who represented himself in the bankruptcy proceeding, testified to "the pain of ripping off our scabs to file those proofs of claim" in the bankruptcy:

> [I] don't know everything about the economics [of the Plan]. Frankly, I don't—I'm not going to say I don't care because I do. It was a very important part of me getting involved. But I—I know how torturous this experience was, not just for me, but for many other survivors. And

---

[3] A00679 (Bankr. Confirmation. Op.); *see also id.* (quoting Dr. Kennedy's testimony that "[f]or survivors, a big portion of this bankruptcy is some degree of resolution").

to be two plus years into this, with all the machinations, all the money spent, all the pain of ripping off our scabs to file those proofs of claim and watch this slog on, I—I would say it's just time. It's time for survivors to know that we have something on the books.

A00680 (Bankr. Confirmation Op.).

This is not a situation in which a court may order a trade creditor to simply disgorge an erroneous distribution. Unwinding the Plan here would open survivors' wounds afresh. This is particularly true for Future Abuse Claimants, who have just begun to submit their claims to the Trust with the implicit promise of an expeditious, confidential, and relatively trauma-free resolution. They did not sign up to have their abuse claims thrown back into an agonizing, seemingly interminable, bankruptcy proceeding.

Future Abuse Claimants have relied on the claim process put in place by the Plan, and they deserve protection. These survivors are true third parties to the proceedings before the bankruptcy court—people who, by definition, could not and did not participate in those proceedings. *Cf. In re Envirodyne Indus., Inc.*, 29 F.3d 301, 304 (7th Cir. 1994) (discussing "the age-old principle that in formulating equitable relief a court must consider the effects of the relief on innocent third parties" and noting that "courts will frequently refuse to modify the plan if it has already been implemented, because of the effects of modification on nonparties to the dispute"). They have come forward now believing that, finally, they can obtain fair compensation, start the healing process, and move forward with their lives. They

9

should not be forced to open their mailbox one day to find that their Trust submissions have been nullified, that it is unclear when, if ever, they may expect to receive a resolution, and, most importantly, that they have ripped off their scabs for nothing. This further betrayal of abuse survivors would be supremely unjust.

Bankruptcy is meant to provide closure, and Future Abuse Claimants, who have submitted claims to the Trust in reliance on the Plan's finality, deserve it.

## II. *Purdue* Does Not Impact the Plan's Judgment Reduction Provisions.

In its June 28, 2024 letter to this Court, Allianz argues that *Purdue*'s prohibition on the nonconsensual discharge of claims against a nondebtor "compels modification of the Judgement Reduction Clause or reversal and remand of the Affirmation Order with respect to [the] Judgment Reduction Clause." Ltr. from H. Winsberg, Att'y, to P. Dodszuweit, Clerk of Court at 2, ECF No. 166. Notably, Allianz did not contend in its letter—and has never contended in its prior briefs— that *Purdue*, or any other case, prohibits the use of a judgment reduction clause to address any lost equitable contribution claims Allianz may have against the Settling Insurers. (Indeed, this is hardly surprising, given that settling insurers are the ones that typically demand such protection.) Rather, Allianz appears to suggest that *Purdue* mandates that the Plan compensate it dollar-for-dollar for any such claims.

*Purdue* has no bearing on the factual issue of whether the Plan sufficiently compensates Allianz for the loss of any equitable contribution claims against the

10

Settling Insurers, or on the appropriateness of the Judgment Reduction Clause writ large. The lower courts properly found that the Judgment Reduction Clause adequately compensates Allianz for its barred claims, which analysis did not depend on the availability of nonconsensual third-party releases under the Bankruptcy Code. Thus, even if this Court determines that Plan has not been substantially consummated, Allianz is still not entitled to its requested relief.

### A. *Purdue* Does Not Require Allianz's Preferred Plan Language.

*Purdue* does not require modification of the Judgment Reduction Clause. To be clear, Allianz has never before challenged the Bankruptcy Court's general authority to enjoin its contribution claims. Instead, Allianz takes issue with the manner in which it is compensated for the loss of any such claims. *See, e.g.*, Opening Br. on Appeal of Appellants the Allianz Insurers at 3, ECF No. 55 (arguing for "[m]odest revisions to the Judgment Reduction Clause" in the form of a trust backstop reimbursing Allianz for any lost Excess Claims); *see also* Reply in Supp. of Appellants the Allianz Insurers' Opening Br. on Appeal at 2, ECF No. 145 ("Allianz Reply Br.") (discussing "the Allianz Insurers' requested modifications to the Judgment Reduction Clause"). *Purdue* has no bearing on the factual dispute of whether the Plan sufficiently compensates Allianz for the loss of any contingent,

theoretical "Excess Claims," which was fully briefed for the Court earlier this year.[4]

Further, even if *Purdue* could be interpreted to have some bearing on the scope of the judgment reduction language, it would not compel Allianz's desired result here. *Purdue* is clear that its holding regarding third-party releases does not apply to "a plan that provides for the full satisfaction of claims against a third-party nondebtor." 144 S. Ct. at 2088. Allianz's claims against the Settling Insurers—the third-party nondebtors—are fully satisfied. In fact, the District Court concluded that Allianz received *more* than the value of its lost claims:

> [T]he TDPs streamline and reduce defense costs by resolving claims consensually through an out-of-court process. Thus, the likelihood that an Insurer is saddled with significant costs of defending Abuse Claims in the tort system is small.
>
>  . . .
>
> [C]ourts have found that insurers are appropriately protected from defense overpayment recovery claims by judgment reduction because the number of claims an insurer must defend is reduced, reducing their defense costs overall. Here, where the TDPs were designed to resolve virtually all claims through out-of-court processes, protection for the Insurers is greatly increased. *Their net expenditures for the defense of Abuse Claims are likely to be substantially reduced by the Plan,*

---

[4] Allianz defines these "Excess Claims" as claims against another insurer for that insurer's portion of liability for indemnity or defense of an underlying abuse claim that exceed the amount of the Settlement Trust's offsetting judgment. *See* Opening Br. of Allianz at 1-2. Allianz has identified only one hypothetical scenario in which it would have any "Excess Claim." *See* Answering Br. of Appellees FCR, Coalition of Abused Scouts for Justice, and Pfau/Zalkin Claimants at 46, ECF 119 ("FCR Resp. Br.") (detailing every contingency that must occur before an Excess Claim would arise).

rendering the protection provided at least "adequate." A00161-A00162 (D. Ct. Op.) (emphasis added) (internal citation omitted). The District Court's conclusions are well-supported by the record. *See, e.g.*, A01011 (TDP, Art. I.D.) (providing that the TDP procedures are the "sole and exclusive methods" for claimants to recover); A01017-A01023, A01037-A01043 (TDP, Arts. VI, VII, XIII) (describing out-of-court processes for resolving claims).

Accordingly, Allianz has been fully compensated for its lost claims. *See In re Plant Insulation Co.*, 469 B.R. 843, 878 (Bankr. N.D. Cal. 2012), *aff'd*, 485 B.R. 203 (N.D. Cal. 2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013), and *aff'd*, 544 F. App'x 669 (9th Cir. 2013) (holding that where "Judgment-Reduction and Trust-Payment Credits will substantially reduce the number of claims brought in the tort system that the Non-Settling Insurers are called upon to defend," these plan provisions "will be substantially effective in *indirectly* restoring to the Non-Settling Insurers the value of their lost contribution rights, including those . . . dismissed without payment to the claimant").[5] Allianz's *overall* defense costs will be reduced as a result of the Plan structure and the Judgment Reduction Clause,

---

[5] Allianz will undoubtedly argue that because *Plant* involved third-party releases under Bankruptcy Code section 524(g), its reasoning is inapposite in light of *Purdue*. But *Plant*'s reasoning is not solely informed by the permissibility of third-party releases. Rather, as discussed *infra*, *Plant* applies the same fairness principles as all courts evaluating settlement bar orders, even those outside of bankruptcy.

rendering the expenditures of any so-called "Excess Claims" irrelevant. Allianz points to no case holding that it is entitled to compensation on a dollar-for-dollar basis, and nothing in *Purdue* mandates such a conclusion. Because the District Court found that Allianz will receive (more than) full satisfaction of its claims against the Settling Insurers, *Purdue* does not require this Court to change the language of the Judgment Reduction Clause.

### B. *Purdue* Did Not Eliminate a Court's Ability to Bar Claims Against Settled Parties.

Nonetheless, to the extent that Allianz now attempts to rely on *Purdue* to challenge the Bankruptcy Court's authority to enjoin contribution claims for the first time on appeal,[6] such an argument still fails. In *Purdue*, the Supreme Court held "only that the *bankruptcy code* does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants." 144 S. Ct. at 2088 (emphasis added). Neither the Bankruptcy Court nor the District Court relied upon the availability of third-party releases under the Bankruptcy Code to approve the injunction of Allianz's contribution and related claims and the corresponding

---

[6] Allianz has waived such argument by failing to raise it previously. *Taha v. Cnty. of Bucks*, 862 F.3d 292, 299 (3d Cir. 2017) ("[A]bsent exceptional circumstances, issues not raised before the district court are waived on appeal.") (alteration in original) (citation omitted).

Judgment Reduction Clause.

Courts both inside and outside of bankruptcy regularly enjoin claims against settling defendants in complex litigations involving many parties. "[M]odern settlements increasingly incorporate settlement bar orders"—that is, "a final discharge of all obligations of the settling defendants and bar[ of] any further litigation of claims made by non-settling defendants"—"into partial settlements." *Eichenholtz v. Brennan*, 52 F.3d 478, 486 (3d Cir. 1995) (approving a partial settlement of a federal securities lawsuit which barred non-settling defendants from asserting contribution claims against their settling co-defendants) (citation omitted); *In re PNC Fin. Servs. Grp., Inc.*, 440 F. Supp. 2d 421, 449 (W.D. Pa. 2006) (holding that "indemnification claims integrally related to the securities claim being compromised properly may be extinguished through a comprehensive bar order"); *In re Trib. Co.*, 464 B.R. 126, 176 (Bankr. D. Del. 2011) ("Bankruptcy courts have authority to enter settlement bar orders.") (citing *In re Munford, Inc.*, 97 F.3d 449, 455 (11th Cir. 1996) (concluding that "section 105(a) and [Federal Rule of Civil Procedure] 16 taken together provide ample authority" for the bankruptcy court to bar nonsettling defendants from asserting contribution and indemnity claims against a settling defendant, not the Bankruptcy Code provision, section 1123(b)(6), analyzed by the Supreme Court in *Purdue*)).

Both inside and outside of bankruptcy, courts must simply ensure that the bar

order is "fair to the non-settling defendants . . . by providing an appropriate right of set-off from any judgment imposed against them." *In re Trib.*, 464 B.R. at 177; *Eichenholtz*, 52 F.3d at 487 & n.16 (agreeing with the district court's conclusion that "the proportionate judgment reduction is the fairest method" and noting that the Supreme Court "stated that . . . the proportionate judgment reduction method[] adequately protects non-settling defendants' contribution rights"); *In re PNC*, 440 F. Supp. 2d at 453 (approving settlement where non-settling defendant "will be adequately protected through the settlement's judgement reduction provisions").[7]

Here, as discussed *supra*, the Judgment Reduction Clause provides this fairness to Allianz, ensuring that it is adequately compensated for its barred claims.[8]

---

[7] Allianz repeatedly argues that the Bankruptcy Court erroneously barred it from asserting "independent claims" against the Settling Insurers because it cannot bring contribution claims for defense costs. *See, e.g.*, Allianz Reply Br. at 8. Because under the Plan "the only claims that are extinguished are claims where the injury is the non-settling defendants' liability to the plaintiffs," *Gerber v. MTC Elec. Techs. Co.*, 329 F.3d 297, 307 (2d Cir. 2003), the Plan does not extinguish any "independent claims." *See generally* FCR Resp. Br. at 51-52.

[8] Allianz has previously relied on *In re Fraser's Boiler Service, Inc.*, Nos. 3:18-CV-05638 BHS & 3:18-cv-05637-RBL, 2019 WL 1099713 (W.D. Wash. Mar. 8, 2019), to argue that the Judgment Reduction Clause is insufficient. But as the District Court explained, the structure of the plan at issue in *Fraser's* (which contemplated that non-settling insurers would continue regularly defending claims in the tort system), as well as the existence of a separate agreement among the insurers setting out "specific percentages of defense costs and establish[ing] that each insurer must pay indemnity costs on a 'pro rata by time basis,'" distinguish the proposed *Fraser's* settlement from the settlement at issue here. 2019 WL 1099713, at *9. While "the judgment reduction clause provides almost no protection" to the non-settling

The lower courts' approval of this mechanism is consistent with the holdings of courts across the country, which in no way relied upon third-party releases under the Bankruptcy Code to bar claims by non-settling defendants. Their orders are unaffected by the Supreme Court's decision in *Purdue*.

## III. *Purdue* Does Not Impact the Plan's Treatment of the Lujan Claimants' Direct Action Rights Against Insurers.

The Lujan Claimants have asserted on appeal that the Plan improperly releases and enjoins their procedural rights to sue BSA's insurers under Guam's Direct Action Statute; that the Settling Insurers' policies cannot be sold free and clear of such rights under section 363 of the Bankruptcy Code; and that the Plan's alleged impairment of these rights violates the McCarran-Ferguson Act. *See, e.g.*, Appellants Lujan Claimants' Opening Br. at 41, 55, ECF No. 66 ("Lujan Br."). The lower courts correctly rejected all of these arguments. To the extent the Lujan

_____

insurers in *Fraser's*, *id.*, the lower courts properly found that the Plan structure and the Judgment Reduction Clause does protect Allianz here. Here, Allianz has identified only one hypothetical scenario in which it would have *any* "Excess Claim." *See* FCR Resp. Br. at 46 (detailing every contingency that must occur before an Excess Claim would arise). Further, while Allianz has argued that it will face defense costs pursuant to the IRO mechanism in the TDP, *see* Allianz Reply Br. at 17-18, the reality is that the number of IRO claims asserted against the Trust is dwarfed by the number of claims resolved by the Trust without any defense involvement from insurers. Houser Decl., ¶ 41 (321 claimants have elected IRO), ¶ 39 (57,660 claimants have submitted materials for evaluation under the settlement matrix). At any rate, the IRO process itself is designed to be quick and streamlined compared to the tort system. There is simply no scenario in which Allianz's overall costs are not reduced by the Plan's structure.

Claimants assert that *Purdue* impacts the Plan's treatment of their direct action rights, they are wrong.

## A.    The Lujan Claimants Have No Claims Against the Insurers.

The lower courts correctly found that the Lujan Claimants have no claims against BSA's insurers—let alone claims that the Plan impermissibly releases or enjoins. The Lujan Claimants' direct action "rights" arise solely from Guam's direct action statute, which is "procedural in nature, not substantive." A00621-A00622 (Bankr. Confirmation Op.). As the lower courts noted, "[t]he statute 'is not a cause of action, but merely a citation of a procedural statute that enables a plaintiff to name a defendant's insurers in any substantive claim (s)he may have against defendant.'" A00131-A00132 (D. Ct. Op.) (quoting *In re Boy Scouts of Am.*, 642 B.R. 504, 583 (Bankr. D. Del. 2022) (alterations omitted)). Accordingly, the relevant claims being released are the Lujan Claimants' underlying Abuse Claims against the defendant-insureds (i.e., BSA, Local Councils, and Chartered Organizations)—not any cause of action against BSA's insurers.[9] As discussed above, *Purdue* has no impact on the

---

[9] Any direct-action claim that the Lujan Claimants would assert against the insurers is entirely derivative of their claims against BSA, the Local Councils, or the Chartered Organizations. *See In re W.R. Grace & Co.*, 900 F.3d 126, 136 (3d Cir. 2018) ("In an insurance context, a direct action against an insurer—whereby a beneficiary may sue the insurer directly rather than sue the insured—is no doubt an attempt to hold the insurer 'directly liable' for claims against its insured."). And because the Bankruptcy Court correctly concluded that the Local Councils' and Chartered Organizations' liability is ultimately derivative of BSA's liability, *see*

Plan's ability to release claims against third-party Local Councils and protected Chartered Organizations, because the Plan provides a mechanism to satisfy those claims in full. Because those claims are channeled and released, the Lujan Claimants no longer have any substantive claims against any defendant-insured for which they could seek to hold an insurer liable. As the lower courts noted, the Lujan Claimants' procedural rights under the Guam Direct Action Statute do not entitle them to more than a 100% recovery.[10]

Separately, even if the Plan did not release the Lujan Claimants' underlying Abuse Claims against third-party Local Councils and protected Chartered Organizations, the Lujan Claimants *still* would have no procedural right against BSA's insurers for the Plan to release or enjoin. The Lujan Claimants have no rights under the Abuse Insurance Policies. A00624-A00625 (Bank. Confirmation Op.). Local Councils and protected Chartered Organizations have assigned any rights they may have to the Abuse Insurance Policies to the BSA Settlement Trust. *See* A00894,

---

A00653 (Bankr. Confirmation Op.), any direct action claims against those entities' insurers is ultimately derivative of the Lujan Claimants' claims against BSA itself.

[10] As set forth more fully in the Supplemental Brief filed by BSA, the Ad Hoc Committee of Local Councils and the Coalition of Abused Scouts for Justice (the "Supplemental Brief"), "an injured party is entitled to only one satisfaction for each injury." *Harris v. Union Elec. Co.*, 846 F.2d 482, 485 (8th Cir. 1988); *see also U.S. v. Occidental Chem. Corp.*, 200 F.3d 143, 148 (3d Cir. 1999) (acknowledging that a plaintiff is entitled to only one satisfaction for her loss). The FCR incorporates by reference section II.B of the Supplemental Brief.

A00944 (Plan, Art. I.A.181.b, Art. V.S.1.a (Local Councils)); A00879, A00944-45 (Plan, Art. I.A.85.b, Art. V.S.1.b (protected Chartered Organizations)). Therefore, those parties hold no insurance rights under the Abuse Insurance Policies against which the Lujan Claimants could seek to enforce their Abuse Claim.

## B. *Purdue* Does Not Impact a Debtor's Ability to Sell Estate Property Pursuant to Section 363 of the Bankruptcy Code.

*Purdue* similarly does not move the needle on the Lujan Claimants' argument that the sale of the Settling Insurers' policies pursuant to § 363 of the Bankruptcy Code impermissibly extinguishes their procedural rights against the Settling Insurers. The lower courts correctly found that the proceeds of the Settling Insurers' policies are property of the estate. Accordingly, the Bankruptcy Court had the power to dispose of the policies just as it would any other asset of the Debtors' estate, including via a sale under § 363. A00606 (Bankr. Confirmation Op.) (concluding that settled policies "and the proceeds of those policies are property of the estate. Accordingly, they can be sold consistent with § 363"); *see also* 11 U.S.C. § 363(b)(1). *Purdue* addresses the release of claims against third parties—it does not address the disposition of Debtor property. *Purdue* therefore is not relevant to the Court's analysis of this issue.

## C. The Plan Still Does Not Violate the McCarran-Ferguson Act.

Finally, *Purdue* does not disturb the lower courts' rejection of the Lujan Claimants' argument that the Plan "impairs Lujan Claimants' statutory right to sue

insurers, in contravention of the McCarran-Ferguson Act." Lujan Br. at 42; *see also id.* at 43-44 ("To the extent the Plan prohibits or impedes Lujan Claimants from directly suing insurers, the Plan violates the MFA and the Bankruptcy Court lacked jurisdiction to confirm it.").

The McCarran-Ferguson Act provides that a state law that regulates "the business of insurance" may in some circumstances preempt federal law. The lower courts correctly concluded that the Plan does not violate the McCarran-Ferguson Act because the Guam direct action statute does not "regulate the business of insurance." *See* A00137 (D. Ct. Op.) (finding "no error" in Bankruptcy Court's "conclusion that the Guam direct action statute does not regulate the 'business of insurance' as that term is used in the McCarran-Ferguson Act," and therefore the McCarran-Ferguson Act did not deprive the bankruptcy court of authority to channel abuse claims to the Trust, effectively extinguishing any procedural rights against BSA's insurers).

*Purdue* concerned "whether the bankruptcy code authorizes a court to issue an order" extinguishing "existing and potential claims against [non-debtors]." 144 S. Ct. at 2078. This has no relation to the question of whether the Guam direct action statute regulates the business of insurance.

## **CONCLUSION**

For the foregoing reasons, the Supreme Court's decision in *Harrington v. Purdue Pharma L.P.* does not impact the BSA Plan.

Dated:  August 7, 2024

Respectfully Submitted,

YOUNG CONAWAY
STARGATT & TAYLOR, LLP

*/s/ Robert S. Brady*
Robert S. Brady (DE No. 2847)
Edwin J. Harron (DE No. 3396)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:        rbrady@ycst.com
                    eharron@ycst.com

-and-

Kami E. Quinn
Emily P. Grim
GILBERT LLP
700 Pennsylvania Ave, SE
Suite 400
Washington, DC 20003
Telephone:  (202) 772-2200
Facsimile:  (202) 772-3333
Email:        quinnk@gilbertlegal.com
                    grime@gilbertlegal.com

*Counsel    to    the    Future    Claimants'
Representative*

22

## CERTIFICATION OF COMPLIANCE

The foregoing brief was prepared on a computer using Microsoft Word. A proportionally spaced typeface was used, as follows:

Name of typeface:   Times New Roman
Point size:   14
Line spacing:   Double

The total number of words in the brief, excluding the items set forth in Federal Rule of Appellate Procedure 32(f), is 5,396.

## CERTIFICATION OF BAR MEMBERSHIP

I certify, pursuant to 3d Cir. L.A.R. 46.1(e), that at least one of the attorneys whose names appear on the brief for each party is a member of the bar of this court or has filed an application for admission pursuant to that rule.

## CERTIFICATION OF VIRUS CHECK

I hereby certify, pursuant to 3d Cir. L.A.R. 31.1(c), that a virus check was performed on the electronic copy of this brief, using Microsoft Defender, and that no virus was indicated.

## CERTIFICATION OF SERVICE

I hereby certify that on August 7, 2024, the foregoing brief was caused to be served on all counsel of record via the Court's CM/ECF system.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert S. Brady*
Robert S. Brady (DE No. 2847)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com

*Counsel to the Future Claimants' Representative*

Dated: August 7, 2024